# EXHIBIT 2

**EFiled: Aug 27 2019 02:35PM EDT**
**Transaction ID 64135551**
**Case No. 2019-0417-PRW**

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| SAVANT NEGLECTED DISEASES, LLC, | §<br>§<br>§<br>§ C.A. No. 2019-0417-PRW<br>§<br>§ |
| Plaintiff, | §<br>§ |
| v. | §<br>§ |
| HUMANIGEN, INC.,<br>NOMIS BAY LTD. and MADISON<br>JOINT VENTURE LLC, | §<br>§<br>§<br>§ |
| Defendants. | §<br>§<br>§ |

## FIRST AMENDED VERIFIED COMPLAINT

Plaintiff Savant Neglected Diseases LLC ("Savant") files this First Amended Verified Complaint seeking equitable, declaratory, and ancillary relief to remedy the harm from the scheme of Defendants Humanigen, Inc. ("Humanigen"), Nomis Bay Ltd. ("Nomis Bay"), and Madison Joint Venture LLC ("Madison") to cut Plaintiff out of tens of millions of dollars that it is entitled to under a contract between Plaintiff and Humanigen—a contract whose express terms Defendants have abrogated in bad faith.

## NATURE OF THE ACTION

1.     Plaintiff Savant is a start-up drug manufacturer, formed by five longtime industry participants and largely self-funded, that has been pursuing FDA approval for benznidazole since 2011 to combat a severe shortage of drugs

available to treat a tropical parasitic infection, Chagas disease. Defendant Humanigen is Savant's drug development partner, and Defendant Madison is a shell entity controlled by a notorious investor, Marc Bistricer, through his Bermuda corporate entity, Nomis Bay.

2.     Plaintiff and Humanigen entered into a drug development agreement to pursue FDA approval of benznidazole and to commercialize it for worldwide use in the fight against Chagas disease.  Defendants recently unveiled their scheme to cut Savant out of the benefits of that contract. After several machinations— including Humanigen's abandonment of its commercialization obligations under the contract, an improper and ineffective assignment of Humanigen's interests to Madison, and Humanigen's  commencement of a meritless suit that is controlled by Bistricer—Madison is now pursuing a lawsuit against third-parties for hundreds of millions of dollars that is predicated on the contention that these third-parties stole *Savant's* intellectual property. Madison claims in this lawsuit that Savant is not entitled to anything. However, even a cursory review of the factual background illuminates why Savant is entitled to a remedy.

3.     This joint venture between Humanigen and Savant required Savant to provide the exclusive scientific data that it owned to Humanigen, and for Humanigen to fund and otherwise take all necessary and reasonable steps to obtain FDA approval and market acceptance for the related drug. The agreement

2

contemplated $21 million in milestone payments to be paid by Humanigen to Savant for the right to commercialize the drug. The agreement further provided that Savant was due 20% of the proceeds from a valuable FDA priority review voucher (worth in excess of $100 million), and 15% of sales of benznidazole.

4.      From the beginning, Humanigen also knew it was in a race to get FDA approval for benznidazole. Before the parties executed the development contract, Humanigen had information suggesting that a competitor, Chemo, might have wrongfully obtained access to Savant's exclusive scientific data from the aforementioned efficacy study. This was a risk that Humanigen knowingly accepted. Under the terms of the contract, Humanigen was obligated to commercialize benznidazole irrespective of whether a FDA priority review voucher was still available, as the voucher represented only one source of potential revenue from the drug and the drug was also being developed to assist the humanitarian needs of Latin American countries with Chagas disease. However, in order to *maximize* the value of the contract and Savant's exclusive data, Humanigen had to move quickly, because only the company that received FDA approval for benznidazole first would receive the valuable priority review voucher.

5.      In order to address the risk associated with obtaining the voucher, Humanigen was provided with a generous exit option. Upon ninety days written notice, Humanigen could terminate the agreement for convenience and Savant

3

would be obligated to pay Humanigen 90% of its development costs if Savant wanted to reacquire the intellectual property it had sold to Humanigen.

6.      Humanigen was unable to beat Chemo to the finish line. In August 2017, the FDA announced that Chemo had received FDA approval for its version of benznidazole, which was based largely on Savant's data. The FDA proceeded to award the priority review voucher to Chemo.

7.      At that juncture, Humanigen could have continued the development program or terminated the program and received 90% of its development costs. Humanigen's response was to do neither. It abandoned all efforts to commercialize benznidazole, yet retained Savant's assets in clear breach of the Development Agreement.

8.      Shortly thereafter, Humanigen sold its rights under the Development Agreement and its claims against Chemo to Bistricer's entity, but retained the liabilities owed to Savant. This transaction was contrary to the terms of the Development Agreement, which expressly required that any assignee of Savant's scientific data agree in writing to assume Humanigen's liabilities to Savant, and that any assignment that did not comport with this requirement would be "null and void."

9.      In March 2019, Madison commenced a lawsuit in the United States District Court for the District of New Jersey against Chemo Research, Exeltis

4

USA, Inc. and Dr. Sergio Sosa-Estani (collectively, the "Chemo Defendants"). In that matter (the "New Jersey Action"), Madison claims that but for Chemo Defendants' misappropriation of Savant's proprietary data, Humanigen would have received FDA approval for benznidazole to treat Chagas. Madison also alleges that it, and no one else, is entitled to hundreds of millions in damages due to the alleged misappropriation of this data. In other words, Madison seeks to recover all of the benefits that would have flowed to both Humanigen and Savant in the but-for-world in which Humanigen was successful in receiving FDA approval, and that Savant is thus due nothing.

10.     This attempted recovery of a massive windfall (at Savant's expense) is wholly inappropriate. But it is fully consistent with how Bistricer does business. As set forth in a *Wall Street Journal* article on Bistricer's investment in Humanigen, he was previously "the architect of a plan that flooded the market with shares of an obscure Greek shipping company . . . driving the stock price down by 99.9%." In connection with trading in shares of this company and two other shipping companies, Bistricer is presently accused of securities fraud and stock market manipulation in three class actions presently pending in the Eastern District of New York.

11.     Savant brings this action to halt Defendants' attempt to cut Savant out of the benefits of its contract with Humanigen, to recover as damages the amounts

5

owed to it under the Development Agreement, and to reclaim Savant's intellectual property so that it can continue to develop benznidazole as a treatment for Chagas disease in countries where it remains unavailable.

## **PARTIES**

12.     Plaintiff Savant Neglected Diseases LLC is a Delaware limited liability company with its principal place of business in Nevada.

13.     Defendant Humanigen, Inc. f/k/a KaloBios Pharmaceuticals, Inc. is a Delaware corporation with its principal place of business in California.

14.     Defendant Nomis Bay Ltd. is a Bermuda exempted company with limited liability, with its principal place of business, on information and belief, in Toronto, Canada.

15.     Defendant Madison Joint Venture LLC is a Delaware limited liability company that was formed for the purpose of litigating against the Chemo Defendants and, on information and belief, has no other assets than those claims. It is controlled by Nomis Bay, which is, in turn, controlled by Bistricer. Humanigen owns a 30% minority interest in Madison.

ME1 31295245v.1

## JURISDICTION

16.     Delaware has personal jurisdiction because all parties to this suit are business entities incorporated in Delaware, with the exception of Nomis Bay. Specific jurisdiction exists as to Nomis Bay because it entered into a fraudulent transfer with Humanigen in which it acquired the rights to litigation ongoing in Delaware and it has, since that time, controlled the conduct of that litigation in Delaware. The agreement effectuating that transaction contains a Delaware choice of law clause and a District of Delaware choice of forum clause. Nomis Bay subsequently created a Delaware LLC, Madison, and it transferred the assets it fraudulently acquired from Humanigen to that LLC.

17.     Humanigen also consented to the jurisdiction of this Court under its Agreement for the Manufacture, Development and Commercialization of Benznidazole with Savant (the "Development Agreement") and, as Humanigen's assignees, Nomis Bay and Madison likewise consented to this Court's jurisdiction and/or are estopped from challenging it.

18.     Plaintiff invokes this Court's equitable jurisdiction by seeking declaratory judgments and a constructive trust, as detailed below. The remaining claims should be adjudicated by this Court pursuant to the clean-up doctrine and this Court's ancillary jurisdiction over legal claims.

7

## FACTUAL BACKGROUND

### Savant Begins Work on its Benznidazole Project

19.     Savant was co-founded in 2009 by Stephen Hurst, its President and CEO, and by Scott Freeman, its Chief Medical Officer. Hurst and Freeman each had worked in the biopharmaceutical industry for more than ten years, and they joined forces to start a company with three other industry veterans. The idea behind Savant was that the company would focus on researching, developing and bringing to market pharmaceuticals in areas with significant unmet medical needs that were being ignored by major pharmaceutical companies.

20.     At the end of 2011, Savant began to evaluate the potential for benznidazole as a treatment for Chagas disease, a tropical parasitic infection that primarily affects individuals in rural parts of Latin America. While the initial effects of Chagas are in most cases mild, the chronic stage of the disease can result in severe damage to the sufferer's digestive system, heart and nervous system. If left untreated, approximately 30% of sufferers eventually die of heart failure. The number of sufferers of Chagas are estimated to be in the range of 8-10 million, with approximately 300,000 located in the United States at the time that figure was last measured.

21.     Benznidazole had already been approved for the treatment of Chagas disease in Argentina and Brazil. However, because benznidazole was not

8

commercially available in the United States, it could only be acquired from the Centers for Disease Control on a difficult and time-consuming patient-by-patient basis. It was also unavailable in a number of countries where Chagas disease affects rural populations, such as Ecuador, Bolivia, and Peru. This situation is what initially led Savant to investigate if benznidazole could be developed for regulatory approval.

22.     Another factor supporting Savant's interest in benznidazole was that in 2007 the FDA had established a priority review voucher program for neglected tropical diseases. The program was created to encourage drug companies to develop treatments for drugs that might otherwise not be profitable to develop.

23.     Under the program, if a pharmaceutical drug manufacturer successfully develops and obtains the first FDA approval for a drug to treat an eligible disease or condition, it is granted a "priority review voucher" that can be used to expedite the FDA's approval of any other drug.

24.     Not only can a priority review voucher be used to expedite approval of any drug, but priority review vouchers are also transferable. This means that such a voucher, once obtained, can be bid upon by all pharmaceutical companies that are developing drugs for use in the United States.

25.     While the monetary value of a priority review voucher was uncertain in 2011, when Savant started work on its benznidazole project, the value has since

9

proven to be considerable. In July 2014, BioMarin sold its 50% interest in the first priority review voucher to Sanofi and Regeneron for $67.5 million. The next year, Retrophin sold a voucher to Sanofi for $245 million, and United Therapeutics sold a voucher to AbbVie for $350 million. Most recently, priority review vouchers have sold for in excess of $100 million.

26.    In early 2012, Freeman began developing a regulatory and manufacturing strategy for seeking FDA approval for benznidazole in the treatment of Chagas disease. As part of this strategy, Freeman reviewed the relevant literature and determined that Dr. Sergio Sosa-Estani had completed a double-blind randomized trial on benznidazole's efficacy[1] (the "Sosa-Estani Study" or "Study").

27.    Acquiring exclusive access to this data was essential for a future FDA application. The alternative to a randomized trial in demonstrating efficacy for benznidazole would have been a prospective clinical trial. However, conducting that type of trial would take at least three years to complete, and it is considered less reliable than a randomized trial when seeking FDA approval.

---

[1] The term "double-blind" refers to the fact that both the physician performing the study, and the patients, are unaware of which patients receive a placebo.

10

## **The FDA Grants Savant Approval for a 505(b)(2) Application**

28.    On or about May 29, 2012, Freeman started the process for getting FDA approval for benznidazole by submitting to the FDA background materials for a Pre-Investigational New Drug Meeting. The primary purpose of the Meeting was to confirm that the FDA would accept a 505(b)(2) application for benznidazole, which would allow the drug to be approved for treatment of Chagas in children based on the existing randomized studies.

29.    A 505(b)(2) application is a particular type of new drug application, the name of which refers to a section of the Federal Food, Drug, and Cosmetic Act. The provisions of 505(b)(2) were created, in part, to help avoid unnecessary duplication of studies already performed on a drug previously approved by a regulatory authority; the section permits the FDA to rely on data not developed by the applicant. A 505(b)(2) application contains complete safety and effectiveness reports but certain of the information required for approval, such as safety and efficacy information on the active ingredient, comes from studies not conducted by or for the applicant. In other words, it relies on clinical trials that have already been performed, thus saving the developer tens of millions of dollars in expenses and years of delay.

30.    On or about June 29, 2012, the Investigational New Drug Meeting took place between Freeman and representatives of the FDA. In the course of the

11

Meeting, the FDA confirmed that it would be willing to accept a 505(b)(2) NDA for benznidazole and that it was amenable to the Sosa-Estani Study serving as the foundation for the application.

## Savant Licenses the Sosa-Estani Study

31.     Encouraged by the FDA's receptiveness to a 505(b)(2) NDA, Freeman reached out to Sosa-Estani. Following the initial correspondence, Freeman went to Argentina to meet with Sosa-Estani and to confirm the data was of a high quality, which included review of specific patient charts, and to negotiate an exclusive Data License Agreement. The trial was double-blind and was well-conducted, involving 106 children, aged six to thirteen years, who were followed for 48 months following treatment with benznidazole and a placebo.

32.     On May 24, 2013, Freeman sent Sosa-Estani an email in which he offered to purchase the data from his Study. He explained that Savant would like to use every patient from the study, if possible, and it would pay for access on a per-patient basis. Sosa-Estani would retain the right to use the data for his academic or scientific endeavors, since the Study would only be exclusively licensed for the purpose of obtaining FDA approval for benznidazole to fight Chagas. However, it was essential that this contract grant Savant *exclusive* access to the Study within those parameters. Given the costs and effort that would be required to get FDA approval for benznidazole even with access to the Study, this was a material,

12

critical term of the agreement. Freeman asked Sosa-Estani to inform him if these conditions were acceptable, and if so, stated he would send a formal agreement for Sosa-Estani to sign.

33.     Approximately three weeks later, Sosa-Estani accepted Freeman's offer to purchase the rights to use the database: "Yes Scott, I agree with your proposal." There was further email correspondence in which Sosa-Estani confirmed that the parties had an agreement, and that the contract memorializing the agreement should be between Savant and an entity called Instituto de Efectividad Clínica y Sanitaria ("IECS"), which owned the data in the Study, over which Sosa-Estani represented he had decision-making authority.

34.     The parties entered into an exclusive license agreement (the "License Agreement"). The License Agreement grants Savant an exclusive, perpetual, and irrevocable license to view and use the "Data Products" in connection with FDA approval; with "Data Products" defined broadly to include the Sosa-Estani Study and related present and future intellectual property. In addition, the License Agreement mandates that IECS (emphasis added):

> (a) *may not grant any license to any other person of the Data Products for the Exclusive Use, in whole or in part*, (b) reserves no rights in the Data Products for the Exclusive Use to itself or its affiliates, and (c) *may not assign transfer or otherwise dispose of the Data Products*, except as part of an assignment of this Agreement in its entirety in accordance with Section 2.6.

13

35.     Pursuant to the License Agreement, IECS also represented and warranted that it would not "take any actions that would result in or omit to act resulting in the termination of the rights granted to Savant under this Agreement," as well as that "Savant has the exclusive right to use the data for regulatory filings in the United States and Europe."

**Savant and Humanigen Team Up to Seek FDA Approval**

36.     Following execution of the License Agreement, Savant continued to work on its benznidazole project and the development of a manufacturing process for producing a purer version of the drug.

37.     In August 2015, as Savant had hoped for and anticipated, the FDA added Chagas to the list of neglected tropical diseases that were eligible for a priority review voucher. While this was the development that Savant had been waiting for since 2011, it was not in a position to take advantage of the opportunity on its own. Savant needed a partner with the required additional monetary resources to assist with the commercialization of benznidazole.

38.     In March 2016, Savant and Humanigen began conducting due diligence on the parameters of a partnership to develop benznidazole. In connection with this process, which took approximately three months to complete, Humanigen was fully informed of, and had the opportunity to conduct due diligence on, all of the risks associated with the project, including the possibility

14

that another drug manufacturer could attempt to steal Savant's intellectual property, including exclusive access to data from the Sosa-Estani Study, as part of a competing FDA application for benznidazole.

39.     Around this same time, Savant received correspondence from IECS in which it contended that the License Agreement was invalid. While this claim was preposterous on its face, it was not totally unexpected. When the FDA approved Chagas disease as eligible for a priority review voucher, the value of the Sosa-Estani data dramatically increased. IECS's suspicious timing and concocted arguments suggested that the Institute was intending to sell access to the Sosa-Estani Study in breach of the exclusive License Agreement.

40.     Despite the dubious nature of IECS's claim, Savant included the letter and the relevant correspondence between IECS and Savant in the data room related to the transaction with Humanigen, and expressly disclosed the fact that IECS disputed the enforceability of the License Agreement in the MDC Agreement with Humanigen.

41.     Not only was Humanigen aware of the risk that IECS would breach the License Agreement, it also knew that Chemo was the party most likely to pay for access to the Sosa-Estani Study. It was widely known that Chemo's Argentina subsidiary, ELEA, was selling benznidazole in that country, and that Sosa-Estani

had a working relationship with ELEA. If anyone was to interfere with Savant's contract, Chemo would be the most likely culprit.

42.     On April 18, 2016, Ted Shih, Humanigen's Vice President of Clinical Development, sent an email informing his "Savant colleagues. . . [i]t appears that we likely have competition from [Chemo] as there are some sources from WHO and other publications, including receipt of FDA orphan designation, and the Chemo/ELEA website declaring that they have FDA approved manufacturing facilities in Spain and Italy." Shih explained that the parties should discuss the matter because it "may shift our regulatory approach."

43.     Following this email, Freeman met with Shih and other persons from Humanigen. During these meetings, Freeman discussed IECS's fabricated arguments concerning the enforceability of the License Agreement. Freeman also noted the possibility that  Sosa-Estani, who was based in Argentina, might be reluctant to work with Humanigen and Savant despite the existence of the License Agreement.

44.     On June 13, 2016, Hurst introduced Humanigen's CEO, Cameron Durrant, to Sosa-Estani by email and explained that Humanigen and Savant would be working together to procure FDA approval for benznidazole. Sosa-Estani responded three days later, copying Durrant, thanking Hurst for the introduction and inviting Durrant to contact him.

16

45.     On June 19, 2016, Durrant emailed Hurst about the IECS letter. Hurst noted that the parties had discussed this issue and the letter several times, and he restated what had taken place in the negotiations between Savant and IECS related to the License Agreement. Hurst further conveyed that Savant's lawyers were preparing a disclosure to be included in the final contract related to the issue. He shared a draft version of this disclosure, which substantially parallels what was memorialized in Section 8.5(b) and Schedule 8.5(g) of the final contract.

46.     In this email, Hurst also explained why Savant had not yet taken legal action against IECS or Sosa-Estani:

> As you know, we've chosen to pursue the data through a collaborative approach with Dr. Estani rather than turn immediately to a more formal and legal response to the IECS letter. So far, the strategy appears to be working, since you are now in direct contact with Dr. Estani and he appears cooperative. *If, however, this approach breaks down, [Humanigen] will have all legal options preserved going forward.*

(emphasis added).

47.     On June 22, 2016, Durrant emailed Sosa-Estani in response to his June 16 email. He noted "[t]he work you have conducted will be important for us to be able to work with [the] FDA and to ultimately benefit patients." Durrant offered to speak with Sosa-Estani or to meet with him in Buenos Aires.

48.     Following this email exchange, if Humanigen had any concerns about the enforceability of the License Agreement, it could have brought those up

17

directly with Sosa-Estani or IECS. Or it could have raised those concerns to Savant. Likewise, it could have brought those concerns to the attention of the Delaware Bankruptcy Court that was overseeing its reorganization, since the transaction with Savant was a component of its plan of reorganization. Humanigen did none of those things prior to executing the Development Agreement. Plainly, Humanigen was comfortable that it had done the necessary due diligence and the License Agreement was valid.

**Savant and Humanigen Team Up To Seek FDA Approval**

49.     On or around June 30, 2016, Humanigen and Savant entered into the Development Agreement. A copy of this contract is attached as Exhibit A. Under this Agreement, Savant sold and licensed its intellectual property related to benznidazole (the "Benznidazole IP") to Humanigen to be used for the drug's development, manufacture, and commercialization.

50.     In consideration for the sale and license of the Benznidazole IP, Humanigen agreed to make certain payments to Savant and to take primary responsibility for the continued development of the drug and the FDA application. The Development Agreement provides that upon closing, Humanigen will make an initial payment to Savant and provide it with a warrant to purchase 200,000 shares in Humanigen.

18

51.     Humanigen also committed to paying Savant: (1) $21 million in aggregate payments for reaching particular milestones on the path to FDA approval (the "Milestone Payments"); (2) 20% of the proceeds from the sale of a priority review voucher, if received; and (3) a 15% royalty on annual net worldwide sales of benznidazole.

52.     As set forth in Sections 5.2 to 5.4 of the Development Agreement, Humanigen was supposed to develop the drug for FDA approval and commercial sale in the United States "as soon as reasonably practicable." It also agreed to conduct a feasibility study for developing the drug for commercial sale for countries in the European Union and Japan.

53.     These obligations bound Humanigen irrespective of whether a competitor received approval before it, and acquired the priority review voucher. Neither the requirement to develop the drug for FDA approval and commercialize the drug in the United States (which would trigger the Milestone Payments) nor the obligation to conduct a feasibility analysis was conditioned on the availability of a priority review voucher. According to Section 13.5, the only way that Humanigen could be absolved of these obligations and retain ownership of the assets was upon mutual consent of the parties. This was an important consideration for Savant because the company had spent years developing benznidazole to address the insidious effects of Chagas disease.

54.     The Development Agreement can be terminated for "convenience" by either party upon ninety days' written notice. If Humanigen exercised this option, Section 13.6(a) indicates that "all rights and licenses granted to [Humanigen] under this Agreement shall terminate," and it would be required to transfer to Savant "all right, title and interest in and to the Acquired Assets any and all intellectual property rights, regulatory approvals and any other assets developed . . . from the Acquired Assets pursuant to the Joint Development Program" in exchange for a payment of 90% of the development costs actually incurred by Humanigen. Accordingly, if Humanigen lost interest in the project, it would receive most of its development costs back and Savant could continue to develop benznidazole for, among other reasons, humanitarian purposes.

55.     The Development Agreement can also be terminated "for cause" by either party. Section 13.3(a) provides that the non-breaching party may terminate the contract for cause "in the event the other party . . . shall have materially breached or defaulted in the performance of its obligations . . . ." If Savant terminates the Development Agreement for cause, Section 13.6(d) provides that "all rights and licenses granted to [Humanigen] under this Agreement shall terminate," and Humanigen "shall transfer to [Savant] all right, title and interest in and to" the benznidazole-related assets.

20

56.    If Humanigen became insolvent, Savant had the option to immediately cancel the Development Agreement. If Savant had terminated the Agreement, which it would have done if Humanigen had notified Savant of a triggering event, Section 13.6(d) indicates that this shall be treated like a termination for cause.

57.    In short, Humanigen entered into the Development Agreement with Savant because the Benznidazole IP was valuable, the FDA's priority review voucher (if awarded) was potentially even more valuable,  and because it received the right to develop and sell benznidazole. Under no circumstances could Humanigen discontinue its drug development program but retain access to the Benznidazole IP. If Humanigen either failed to meet its obligations or became insolvent, all rights to the intellectual property and the drug itself would revert to Savant.

### Chemo Beats Humanigen in the Race for FDA Approval

58.    In August 2016, the parties agreed that, effective as of September 28, 2016, Humanigen, at its request, assumed full responsibility for development of the drug and preparation of the FDA application. It was up to Humanigen to win the race for FDA approval.

59.    On December 7, 2016, Hurst had a call with Durrant in which the latter provided an update on the status of Humanigen's FDA application. Durrant was positive about the progress that Humanigen had made and its meetings with

21

the FDA. According to Durrant, Chemo was also lagging behind. Hurst reported to Freeman that, "[Humanigen] has soft intelligence that the [Chemo] program is too broad and they may have over reached at FDA."

60.     While Humanigen was in the lead at that time, Chemo's improper access to the Sosa-Estani Study allowed it to catch and then, ultimately, pass Humanigen. Documents produced in discovery demonstrate that Humanigen's "soft intelligence" informed it that in the summer of 2017 Chemo was in the final stages of seeking FDA approval.

61.     Humanigen kept this critical information from Savant, who was supposed to be its partner in the development of benznidazole. This was likely due to the fact that Humanigen was already planning how it could sell its interest in a lawsuit against Chemo to its creditors—in the process attempting to cut Savant out of the transaction entirely, thereby purportedly increasing the value of what it was offering its creditors. On information and belief, it also proceeded to cease working on its FDA application as soon as it became aware that Chemo was just weeks away from obtaining FDA approval.

62.     By that point, it would have been too late for Humanigen to beat Chemo to the finish line without, at least, seeking to block or head off Chemo's FDA filing. However, Humanigen's priorities lay elsewhere, as it proceeded to initiate an unwarranted dispute with Savant. Humanigen's progress on

22

development of benznidazole had triggered an obligation to pay the initial two Milestone Payments to Savant. Rather than paying those Milestone Payments, as it was obligated to do, Humanigen apparently decided to file a meritless, preemptive lawsuit against Savant as part of its campaign to get Savant to give up its interest in benznidazole (and related claims) entirely.

63.     On July 10, 2017, Humanigen commenced litigation against Savant in Delaware Superior Court related to purported cost overages in its benznidazole development program, and claiming that these overages should be offset against the $2 million it owed Savant (the "Delaware Action"). In order to succeed on its claims Humanigen would need to demonstrate, among other things, that the product was ready for a NDA application and that its cost overruns were in excess of $8,500,000. Nevertheless, no invoices were enclosed with its complaint, and, to date, it has still not produced any supporting invoices. This action was simply a smokescreen to obscure the fact that Humanigen owed Savant Milestone Payments, that it had abandoned drug development, and that it was in material breach of the Development Agreement.

64.     On or about July 11, 2017, Savant informed Humanigen that it was in breach of the Development Agreement based on non-payment of the first Milestone Payment. As required by the Development Agreement, Savant gave Humanigen an opportunity to cure its non-performance, which it failed to do.

23

Subsequently, Savant counterclaimed against Humanigen, seeking the $2 million in Milestone Payments and other relief.

65.    It is unclear at this juncture if Humanigen started this litigation as part of a ploy to negotiate with Savant or as a first step in a scheme to transfer Savant's intellectual property to Bistricer. But irrespective of why it brought the case, Humanigen cannot show that Savant materially breached the Development Agreement. Accordingly, its dubious allegations do not excuse Humanigen's failure to commercialize benznidazole and to pay the remaining Milestone Payments.

## Defendants Cut Savant Out of a Lawsuit Against Chemo

66.    The other shoe dropped on August 29, 2017. The FDA announced its approval of benznidazole in the pediatric treatment of Chagas disease and awarded a priority review voucher to Chemo. That same day, Humanigen made a public filing in which it stated that it was "assessing its options" with respect to its benznidazole development program. This was a guarded way for Humanigen to disclose that it had ceased all efforts to develop benznidazole (which it had surreptitiously ended in July, when it learned Chemo would get FDA approval).

67.    According to documents filed in a bankruptcy proceeding, almost immediately after this disclosure, Humanigen's lawyers began investigating potential claims against IECS and Chemo.

68.     In September 2017, these lawyers sent IECS and Chemo letters claiming that their actions had caused "millions in damages to Humanigen, and continue[] to cause it irreparable harm." These letters include various demands, and threaten, if these demands are not satisfied, that Humanigen "will be compelled to take steps to protect its rights." Notably, there is no mention of the harms suffered by Savant or its role in a potential lawsuit.

69.     In November 2017, IECS and Chemo rejected Humanigen's settlement demands. While the Development Agreement required Humanigen to inform Savant of any instances of suspected misappropriation, Humanigen failed to disclose the existence of this settlement correspondence to Savant.

70.     On information and belief, Humanigen and Nomis Bay had already decided to cut Savant out, which is why the existence of this correspondence was hidden from Savant.

71.     In December 2017, Humanigen announced it was selling its interests in benznidazole under the Development Agreement and all related legal claims to Madison, for the purpose of satisfying Humanigen's outstanding debt obligations to Madison's majority owner, Nomis Bay. Humanigen also received a 30% interest in Madison, which means it stood to profit from any legal claims pursued by Madison. Attached hereto as Exhibit B is a copy of the Securities Purchase and Loan Satisfaction Agreement by and among Humanigen, Inc., Black Horse Capital

25

Master Fund Ltd., Black Horse Capital L.P., Cheval Holdings, Ltd. and Nomis Bay Ltd., dated December 21, 2007 (the "SPL  Agreement"), which sets forth the terms of this transaction.

72.     Humanigen entered into this lucrative arrangement even though it contravenes the terms of the Development Agreement. The SPL Agreement indicates that Nomis Bay is acquiring only the assets of Humanigen's benznidazole program, leaving the liabilities with Humanigen. This violates Section 15.2 of the Development Agreement, which states in relevant part: "Any permitted assignee [of Humanigen's rights under the Agreement] will expressly assume all obligations imposed on the assigning Party by this Agreement in writing. . . .  Any purported assignment in violation of this Section 15.2 shall be *null and void*." (emphasis added).

73.     According to the SPL Agreement, Madison was established as an "affiliate" of Humanigen. As its purported affiliate, Humanigen is a guarantor of Madison's performance under the Development Agreement. Pursuant to Section 15.8, each party "guarantees the performance by its Affiliates of such Party's obligations under this Agreement, and shall cause its Affiliates to comply with the provisions of this Agreement in connection with such performance." Because Humanigen failed to obtain Madison's agreement that it would comply with all of

the terms of the Development Agreement, including the performance obligations set forth therein, Humanigen breached Section 15.8.

74.     Defendants' misconduct did not stop there. The SPL Agreement provides that Nomis Bay or Madison is responsible for payment of "Claim Advances" related to Humanigen's Delaware litigation against Savant. Payment of these so-called "Advances" is not contingent on any actions by Nomis Bay, Madison, or Humanigen, or even the outcome of the litigation. The Agreement also states that, following a due diligence period, if Nomis Bay decides to retain the benznidazole assets it was acquiring on Madison's behalf, Nomis Bay will have full control over the Delaware Action, including whether to settle it and who will represent Humanigen in the litigation.

75.     That due diligence period has long since passed. While Nomis Bay controls the Delaware Action, it did not attempt to substitute itself as the real party in interest until August 2019. Instead, Nomis Bay and Madison have been using the Delaware Action for the improper purpose of getting discovery to use against Chemo.

76.     Defendants have admitted as much in their Amended Complaint, in which they claim that Savant should have provided Humanigen with discovery so it could have funneled these documents to Madison for the New Jersey Action.

27

77.    Neither Nomis Bay nor Madison has an interest in the Delaware Action or the New Jersey Action prior to the SPL Agreement; they are strangers who are controlling those lawsuits at the behest of Bistricer. This arrangement violates Delaware's prohibition against champerty because it constitutes an agreement between the owner of a claim and volunteer, wherein the volunteer is controlling the claim and dividing any proceeds with the owner.  Defendants' failure to abide by established Delaware law is further evidence of their misguided scheme.

78.    Finally, based on documents produced in discovery, it is evident that Humanigen has violated other provisions of the Development Agreement in furtherance of Defendants' scheme to cut Savant out. These documents show that Humanigen has long been collecting evidence to use in the case against the Chemo Defendants, including by sending letters to the FDA and other parties, and making FOIA submissions.  None of this information was shared with Savant, in violation of Sections 6.3 and 10.2(b) of the Development Agreement.

### Defendants Concede that the Humanigen-Nomis Bay
### Transaction was Fraudulent

79.    It has recently become apparent that Humanigen's sale of its legal claims and the Benznidazole IP to Nomis Bay, and the transfer of those assets to Madison, was specifically made to benefit Nomis Bay as a creditor.  Humanigen and Madison have also claimed that Madison is a reconstituted version of one branch of Humanigen.  In other words, the transfer of the aforementioned assets to Madison was a fraudulent transaction that was entered into to subvert Savant's rights as a creditor, to benefit another creditor (Nomis Bay).

80.    According to Humanigen's November 17, 2017 10-Q filing, its liabilities exceeded its assets. As a result, "[t]he ability of the Company to meet its total liabilities of $24.1 million at September 30, 2017 and to continue as a going concern [was] dependent upon the availability of future funding." Moreover, if it was "unable to restructure to reach a satisfactory agreement with its Term Loan Lenders on any alternative transactions," Humanigen would have likely been "forced to file for a second bankruptcy."

81.    In a June 10, 2019 letter to this Court, Humanigen provided color on how it was able to avoid a formal bankruptcy proceeding. Humanigen explained that it entered into the transaction with Nomis Bay and its other lenders because they were "about to foreclose on Humanigen's assets," and this deal was "in lieu of foreclosure." This represents an acknowledgement that the purpose of the

29

transaction was to benefit a select group of creditors at the expense of Savant, another creditor.

82.     Humanigen further claimed that a "restructuring" created two branches of the company, one of which (Madison) would hold the benznidazole assets, while the other (Humanigen) would pursue development of other drugs. According to Humanigen's letter, the transaction:

> [E]ssentially divided the company in two, with one of the lenders, Nomis Bay Ltd., agreeing to continue supporting the benznidazole program . . . and the second lender agreeing to support the other drugs held by Humanigen. Both before and after this restructuring transaction, each of the lenders owned equity in Humanigen, and both continue to have an interest in Madison, which is the joint venture set up by Nomis Bay to hold the benznidazole assets.

83.     These statements were repeated virtually verbatim in paragraphs 100 to 104 of the Amended Complaint, dated August 9, 2019.

84.     This purported "restructuring" is the basis upon which Madison is now claiming that it is entitled to all of the proceeds of the Development Agreement. The transaction thus had the intended effect of benefitting one creditor, Nomis Bay, by depriving another creditor, Savant, from money owed to it under the Agreement and that Savant would have received if Humanigen had performed under the Agreement, commenced the New Jersey Action, or done both.

## Humanigen Undergoes a Change of Control

85.     Pursuant to the SPL Agreement, another lender, Black Horse Capital, received significant additional equity in Humanigen in exchange for debt relief. On February 27, 2018, Humanigen publicly stated that this equity grant constituted a change of control: "The new shares issued to affiliates of Black Horse Capital, when combined with their previous ownership stakes, resulted in a change in control of the company, with Black Horse Capital and its affiliates owning more than 50 percent of the company's outstanding shares of common stock."

86.     This change of control triggered an obligation for Humanigen to immediately pay Savant $1.9 million, constituting ten percent of the unpaid Milestone Payments beyond the $2 million at issue in the Delaware Action. As set forth in Section 3.3(b) of the Development Agreement, "if a Change of Control of [Humanigen] occurs, [Humanigen] shall pay to [Savant] ten percent (10%) of all unpaid Milestone Payments, if any, concurrently with such Change of Control, irrespective of whether the corresponding milestone events have been achieved . . ." As with its other contractual obligations, Humanigen has not made this payment to Savant.

## Madison Initiates Litigation in New Jersey

87.     On March 6, 2019, Madison initiated the New Jersey Action. Madison claims that it has suffered irreparable harm and it seeks equitable relief, in addition

31

to hundreds of millions in damages and lost profits. The reality is that Madison is a shell litigation vehicle controlled by an opportunist who, unlike Savant, never had an interest in helping those suffering from Chagas disease.  Any monetary relief that Madison receives will be promptly disbursed to Bistricer and Humanigen. Absent a declaration of Savant's rights, it will receive nothing from a project that it conceived of and has pursued since 2011.

### Count 1: Declaratory Judgment That All Rights to the Benznidazole IP And Related Claims Have Reverted to Savant

88.    Savant incorporates all of the above factual allegations as though set forth fully herein.

89.    Humanigen has materially breached the Development Agreement by (1) abandoning its performance obligations under the Agreement; (2) attempting to assign its rights to Nomis Bay and Madison without also assigning obligations vis-à-vis Savant to Nomis Bay and Madison; (3) failing to obtain Madison's agreement in writing that it would comply with the terms of the Development Agreement as Humanigen's purported affiliate; (4) turning over control of the Delaware Action and the New Jersey Action to Nomis Bay and Madison, in contravention of both Delaware's prohibition against champerty and the terms of the Development Agreement, and attempting to cut Savant out of any proceeds from the New Jersey action; (5) withholding information from regulatory authorities and other parties to

32

which Savant was entitled; (6) failing to make Milestone Payments; and (7) failing to make the required payment resulting from a Change of Control.

90.     On July 11, 2017, Savant informed Humanigen it was in breach of the Development Agreement and gave it an opportunity to cure. Humanigen ignored this correspondence and it has abandoned its obligations under the Development Agreement. Savant has no further obligation to notify Humanigen of its breaches of the Development Agreement because it would be futile.

91.     Savant seeks a declaratory judgment that, under Section 13.3(a) and (d) of the Development Agreement, it has the right to terminate the Development Agreement under Section 13.3, it has properly terminated the Agreement, and that all intellectual property and claims assigned by Savant to Humanigen under the Agreement have reverted to Savant.

92.     Savant also seeks a declaratory judgment stating that, pursuant to Section 15.2, the purported assignment of Humanigen's rights and claims under the Development Agreement to Nomis Bay and Madison is null and void because the rights reverted to Savant prior to any transfer to them and because Nomis Bay and Madison did not execute an agreement in writing acknowledging their obligations to Savant under the terms of the Agreement.

93.     Moreover, Humanigen's assignment of claims to Nomis Bay and Madison should be declared null and void for the additional reason that it is

33

champertous. Champerty is defined as an agreement between the owner of a claim and a volunteer that the latter may take the claim and collect it, dividing the proceeds with the owner, if they prevail; the champertor to carry on the suit at his own expense.

94.     Savant seeks a declaratory judgment stating that the agreement between Humanigen and Nomis Bay, in which Humanigen purportedly assigned its claims to Nomis Bay and then on to Madison so that it may take the claims and collect them, dividing the proceeds with Humanigen, if they prevail, with Madison to carry on the suit at its own expense, amounts to champerty, and that the assignment is null and void for this additional reason.

95.     The dispute between Savant, Humanigen, Nomis Bay, and Madison is real and adverse because Madison has brought claims in the New Jersey Action even though Savant is the rightful owner of those claims, and Humanigen, Nomis Bay, and Madison have repeatedly made it clear to Savant, in the parties' communications, that they intend to cut Savant out of that lawsuit and not grant it its proper share of damages pursuant to the terms of the Development Agreement.

96.     This Court's resolution of this dispute through a declaratory judgment will necessarily determine the rights and obligations of the parties.

97.     The issue is ripe because there are sufficient facts before the Court to enable an analysis of the contractual language in issue as well as the facts

surrounding Humanigen's material breaches and repudiation of the Development Agreement and its arrangement with its creditors (Nomis Bay and the Black Horse entities) which are in clear derogation of its obligations to Savant.

### Count 2: Declaratory Judgment that Savant is Entitled to Its Portion of Any Recovery from the New Jersey Action <u>(In the Alternative)</u>

98.     Savant incorporates all of the foregoing factual allegations as though set forth fully herein.

99.     If the Court does not declare the Development Agreement terminated and the assignments from Savant to Humanigen, and from Humanigen to Nomis Bay and then to Madison, null and void, Savant requests, in the alternative, a declaratory judgment that it is entitled to its rightful share of the proceeds from Madison's New Jersey Action.

100.    Madison's New Jersey Action is expressly premised on the theory that, but-for the Chemo Defendants' wrongful acts, Humanigen would have been the first to obtain FDA approval for benznidazole, would have obtained a valuable priority review voucher, and would have successfully commercialized benznidazole.

101.    If the jury in New Jersey accepts this "but for" scenario, then Humanigen's obligations to Savant under the Development Agreement (and Madison's obligations, as Humanigen's assignee), are clear:

35

    a. Humanigen/Madison would have had to pay Savant $21 million in Milestone Payments on the way to obtaining FDA approval;

    b. Humanigen/Madison would have had to pay Savant 20% of the value of the priority review voucher; and

    c. Humanigen/Madison would have had to pay Savant 15% of all profits from benznidazole sales.

102. Accordingly, the Court should enter a declaratory judgment stating that, if Madison prevails in the New Jersey Action, Savant is entitled to all three of the above enumerated amounts as its share of the damages awarded in the New Jersey Action. These amounts represent moneys that would have gone to Savant, not to Humanigen (or its assignees, Nomis Bay and Madison), under the terms of the Development Agreement, in the "but for" scenario upon which Madison's damages model in New Jersey is based.

103. Stated differently, Madison cannot have its cake and eat it, too: by asking the jury to award damages based upon its preferred scenario, while keeping those damages all for itself (instead of paying Savant the share of those proceeds that it would have been owed, under the Development Agreement).

104. The dispute between Savant, Humanigen, Nomis Bay, and Madison is real and adverse because Madison has brought claims in the New Jersey Action even though Savant is the rightful owner of those claims, and Humanigen, Nomis Bay, and Madison have repeatedly made it clear to Savant, in the parties'

communications, that they intend to cut Savant out of that lawsuit and not grant it its proper share of damages pursuant to the terms of the Development Agreement.

105.   This Court's resolution of this dispute through a declaratory judgment will necessarily determine the rights and obligations of the parties.

106.   The issue is ripe because there are sufficient facts before the Court to enable an analysis of the contractual language in issue as well as the facts surrounding Humanigen's material breaches and repudiation of the Development Agreement and its arrangement with its creditors (Nomis Bay and the Black Horse entities) which are in clear derogation of its obligations to Savant.

### Count 3: Breach of Contract (against Humanigen)

107.   Savant incorporates all of the foregoing factual allegations as though set forth fully herein, and makes them the basis of claim for breach of contract against Humanigen.

108.   Savant and Humanigen entered into the Development Agreement, which is a valid and binding contract.

109.   Plaintiff has substantially performed under the Development Agreement, by, among other things, providing Humanigen with exclusive access to the Sosa-Estani Study and its other valuable intellectual property.

110.   As explained above, Humanigen had an obligation to continue to seek FDA approval for benznidazole even after Chemo had obtained the first approval

37

and associated priority review voucher. The Development Agreement has provisions obligating Humanigen to pursue FDA approval, and make $21 million in Milestone Payments to Savant in the process, which are wholly separate from the obligation to attempt to obtain a priority review voucher and pay Savant 20% of the proceeds obtained from a sale of that voucher.

111.   Nowhere in the contract is Humanigen's obligation to continue to seek FDA approval made contingent on the continued availability of a priority review voucher. For example, Section 5.3 requires Humanigen to use "diligent efforts" to commercialize the drug and to launch it in the United States "as soon as reasonably practicable." That requirement is not limited in any way. Humanigen was under an obligation to continue to work to obtain FDA approval and to commercialize the drug even after the priority review voucher was no longer available.

112. Moreover, the Development Agreement explicitly envisions Humanigen conducting a feasibility study regarding the commercialization of benznidazole in Japan and the European Union. The geographic area for the envisioned benznidazole sales under the Agreement was defined to be worldwide. Thus, Humanigen's commercialization obligations went beyond FDA approval.

113.   Humanigen materially breached these obligations by abandoning the development of benznidazole in, on information and belief, July 2007, causing

38

Savant $21 million in damages related to the Milestone Payments, and the loss of 15% of the proceeds from the sale of the drug.

114.   Further, Humanigen breached the Development Agreement, including Section 5.3 and the implied covenant of good faith and fair dealing, by concealing from Savant in July 2017 that Chemo was on the cusp of receiving FDA approval, and by failing to take any steps to bar that application. Humanigen had acquired the exclusive rights to the Sosa-Estani Study in the transaction with Savant. Humanigen's apparently calculated decision not to take preemptive action against Chemo, even though it had received information suggesting Chemo had misappropriated the Sosa-Estani Study, negatively impacted the entire drug development and commercialization program.

115.   Madison was established as Humanigen's purported affiliate. Pursuant to Section 15.8 of the Development Agreement, Humanigen was required to cause Madison, to the extent it is an affiliate, to comply with the terms of the Development Agreement. Because Humanigen failed to obtain Madison's agreement that it would abide by the terms of the Development Agreement and Madison has repudiated its obligations under the Development Agreement, Humanigen is responsible. Under Section 15.8, "[a]ny breach by a Party's Affiliate of any of such Party's obligations under this Agreement shall be deemed a breach

39

by such Party, and the other Party may proceed directly against such Party without any obligation to first proceed against such Party's Affiliate."

116.   In addition, as noted above, the change of control within Humanigen granting the Black Horse entities control over the company also triggered an unequivocal obligation to pay Savant 10% of outstanding Milestone Payments. This establishes additional grounds for liability for Humanigen's failure to pay that portion of the payments, or roughly $1.9 million.

117.   Accordingly, Savant requests an award of damages in an amount to be determined at trial.

### Count 4:  Fraudulent Transfer (against All Defendants)

118.   Savant incorporates all of the foregoing factual allegations as though set forth fully herein, and makes them the basis of its claim for fraudulent transfer in violation of 6 Del.C. § 1304(a)(1).

119.   At the time Humanigen entered into the transaction with Nomis Bay and Madison, it was in default of its loan obligations in excess of $16 million and its creditors were about to foreclose on its remaining assets. Humanigen was technically insolvent because its liabilities exceeded its assets.

120.   Savant was one of Humanigen's creditors at the time of its insolvency because Humanigen owed outstanding Milestone payments to Savant and it had continuing obligations under the Development Agreement to compensate Savant.

40

121.   The transaction between Humanigen and Nomis Bay/Madison was made for the purpose of hindering Savant's ability to recover money owed to it, which is evident because Madison has used the transaction as the basis for arguing it alone is entitled to a recovery in the New Jersey Action. Indeed, the only reason for transferring Humanigen's benznidazole-related assets to Madison was to cut Savant out. If Defendants were not attempting to hinder Savant's ability to collect, Nomis Bay would have funded Humanigen directly and the latter would have served as the plaintiff in the New Jersey Action.

122.   Defendants' fraudulent intent also can be inferred because Humanigen was insolvent at the time it negotiated, the transaction was contrary to the assignment provision in the Development Agreement, and Humanigen has continued to violate the Agreement following the transaction.

123.   Accordingly, Savant requests a declaration that the assignment to Nomis Bay/Madison is null and void because it violates 6 Del.C. § 1304(a)(1), that an attachment on the fraudulently transferred assets be issued in accordance with applicable law, and that Savant receive damages equal to the value of the transferred assets.

## Count 5: Constructive Trust (against Madison)

124.   Savant incorporates all of the forgoing factual allegations as though set forth fully herein, and makes them the basis of this request for a constructive

ME1 31295245v.1

trust over its proper share of the proceeds from the New Jersey Action, pursuant to the terms of the Development Agreement.

125.   Based upon the allegations set forth herein, if Madison is permitted to collect proceeds from the New Jersey Action, it will be unjustly enriched at Savant's expense. Savant is rightfully entitled to a share in the proceeds, and Madison cannot equitably be permitted to retain Savant's share.

126.   Accordingly, Savant requests a constructive trust over its share of the proceeds from the New Jersey Action, which, pursuant to the terms of the Development Agreement, is equal to $21 million in Milestone Payments Savant would have received if FDA approval were obtained, 20% of the value of any priority review voucher that would have been received, and 15% of all sales of benznidazole that would have taken place after Humanigen successfully commercialized benznidazole.

<u>**PRAYER FOR RELIEF**</u>

**WHEREFORE**, all premises considered, Plaintiff respectfully asks this Court for an Order of judgment on the merits, and the following relief:

1.  Decree that all rights to the Benznidazole IP have reverted to Savant and that it owns the claims brought by Madison in the New Jersey Action;

2.  Decree, in the alternative, that Savant is entitled to recover in the New Jersey Action the benefits of the Development Agreement it would have

42

received had Humanigen been granted FDA approval for benznidazole;

3. Award Savant damages in an amount to be determined at trial for Humanigen's breaches of the Development Agreement;

4. Award Savant damages equal to the value of the fraudulently transferred assets;

5. Decree that the transfer of assets to Madison is null and void because it is a fraudulent transfer and/or conveyance;

6. Grant Savant a constructive trust that would entitle it to receive from Madison the benefits of the Development Agreement it would have received had Humanigen been granted FDA approval for benznidazole;

7. Award Savant pre- and post-judgment interest;

8. Award Savant its attorneys' fees, costs, and disbursements; and

9. Award Savant such other and further relief the Court may deem just and proper.

ME1 31295245v.1

Dated:  August 27, 2019

**McCARTER & ENGLISH, LLP**

**OF COUNSEL:**

L. Reid Skibell
**HARRIS, ST. LAURENT &
CHAUDRY LLP**
40 Wall Street, 53rd Floor
New York, New York 10005

and

Mazin Sbaiti
Jan Michal Zapendowski
**SBAITI & COMPANY PLLC**
Renaissance Tower
1201 Elm Street, Suite 4010
Dallas, Texas 75270

_/s/ Steven P. Wood_____
Steven P. Wood (No. 2309)
Dawn Kurtz Crompton (No. 5579)
Travis J. Ferguson (No. 6029)
Renaissance Centre
405 N. King Street, 8th Floor
Wilmington, Delaware 19801
(302) 984-6300

_Attorneys for Plaintiff Savant Neglected
Diseases, LLC_

44

## <u>CERTIFICATE OF SERVICE</u>

I, Steven P. Wood, hereby certify that on August 27, 2019,  I caused a copy

of the foregoing First Amended Verified Complaint to be served via File &

ServeXpress on the following:

> Travis S. Hunter, Esquire
> RICHARDS, LAYTON & FINGER, P.A.
> One Rodney  Square
> 920 North King St.
> Wilmington, DE  19801

> /s/ Steven P. Wood
> Steven P. Wood (No. 2309)

ME1 31295245v.1

EFiled:  Aug 27 2019 02:35PM EDT
Transaction ID 64135551
Case No. 2019-0417-PRW

## VERIFICATION

STATE OF ___Nevada___           )
                                ) ss:
COUNTY OF ___CLARK___           )

I, _Scott Freeman_, being duly sworn according to law, depose and

say as follows:

  1.    I am the _President_ of Plaintiff Savant Neglected

Diseases, LLC (the "Company"). I am authorized to make this verification on

behalf of the Company, the Plaintiff in this matter.

  2.    I have reviewed the Company's First Amended Verified Complaint in

this action  (the "Amended Complaint").

  3.    To the extent the allegations of the Amended Complaint concern the

actions of the Company, I know the allegations to be true and correct.

  4.    To the extent the allegations of the Amended Complaint concern the

actions of those other than the Company, I believe the allegations to be true and

correct.

_____
[INSERT NAME; TITLE]   Scott Freeman
                       President

SUBSCRIBED TO AND SWORN
Before me this 27th day of August, 2019

_____
Notary Public

My Commission Expires: August 19, 2022

THOMAS R. BACH
NOTARY PUBLIC
STATE OF NEVADA
APPT. No. 05-96611-1
MY APPT. EXPIRES AUG. 19, 2022

ME1 31294606v.1

EFiled:  Aug 27 2019 02:35PM EDT
Transaction ID 64135551
Case No. 2019-0417-PRW

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| SAVANT NEGLECTED DISEASES, LLC, ~~a Delaware limited liability company,~~ | )§<br>)§<br>)§<br>)§<br>)§ C.A. No.<br>)§<br>)§ ——————— 2019-0417-P<br>)§ RW<br>)§ |
| Plaintiff, | |
| v. | )§<br>)§<br>)§ |
| HUMANIGEN, INC. ~~f/k/a~~, ~~KALOBIOS PHARMACEUTICALS, INC., a Delaware corporation,~~ NOMIS BAY LTD. and MADISON JOINT VENTURE LLC, ~~a Delaware limited liability company,~~ | )§<br>)§<br>§)<br>)<br>)<br>) |
| Defendants. | |

### FIRST AMENDED VERIFIED COMPLAINT

Plaintiff Savant Neglected Diseases~~,~~ LLC ("Savant") ~~and~~ files this First Amended Verified Complaint seeking equitable, declaratory, and ancillary relief to remedy the harm from the scheme of Defendants Humanigen, Inc. ~~f/k/a KaloBios Pharmaceuticals, Inc.~~ ("Humanigen"), Nomis Bay Ltd. ("Nomis Bay"), and Madison Joint Venture LLC ("Madison") ~~bring this action seeking equitable, declaratory, and ancillary relief to remedy Defendants' scheme~~ to cut Plaintiff out of ~~hundreds~~tens of millions of dollars that it is entitled to under a contract between Plaintiff and Humanigen—a contract whose express terms Defendants have

abrogated in bad faith.

## NATURE OF THE ACTION

1.      Plaintiff Savant is a start-up drug manufacturer, formed by five longtime industry participants and largely self-funded, that has been pursuing FDA approval for benznidazole since 2011 to combat a severe shortage of drugs available to treat a tropical parasitic infection, Chagas disease. Defendant Humanigen is Savant's drug development partner, and Defendant Madison is a shell entity controlled by a notorious investor, Marc Bistricer, through his Bermuda corporate entity, Nomis Bay.

2.      Plaintiff and Humanigen entered into a drug development agreement to pursue FDA approval of benznidazole and to commercialize it for worldwide use in the fight against Chagas disease (the "Development Agreement"). Defendants now intend recently unveiled their scheme to cut Savant out of the benefits of that contract. After several machinations—including Humanigen's abandonment of its commercialization obligations under the contract, an improper and ineffective assignment of Humanigen's interests to Madison, and Humanigen's commencement of a meritless suit that is controlled by Bistricer—Madison is now pursuing a lawsuit against third-parties for hundreds of millions of dollars that is predicated on the contention that these third-parties stole *Savant's* intellectual property. Madison claims in this lawsuit that Savant is not entitled to anything. However, even a

2

cursory review of the factual background illuminates why Savant is entitled to a remedy.

3.      This joint venture between Humanigen and Savant required Savant to provide the exclusive scientific data that it owned to Humanigen, and for Humanigen to fund and otherwise take all necessary and reasonable steps to obtain FDA approval and market acceptance for the related drug. The agreement contemplated $21 million in milestone payments to be paid by Humanigen to Savant for the right to commercialize the drug. The ~~Agreement~~agreement further provided that Savant was due 20% of the proceeds from ~~the anticipated transfer of~~ a valuable FDA priority review voucher (worth in excess of $100 million), and 15% of sales of benznidazole.

4.      From the beginning, Humanigen also knew it was in a race to get FDA approval for benznidazole. Before the parties executed the development contract, Humanigen had information suggesting that a competitor, Chemo, might have wrongfully obtained access to Savant's exclusive scientific data from the aforementioned efficacy study. This was a risk that Humanigen knowingly accepted. Under the terms of the contract, Humanigen was obligated to commercialize benznidazole irrespective of whether a FDA priority review voucher was still available, as the voucher represented only one source of potential revenue from the drug~~. In~~ and the drug was also being developed to assist the humanitarian needs of

3

Latin American countries with Chagas disease. However, in order to *maximize* the value of the contract and Savant's exclusive data, Humanigen had to move quickly, because only the ~~first~~ company that received FDA approval for benznidazole first would receive the valuable priority review voucher.

5.     In order to address the risk associated with obtaining the voucher, Humanigen was provided with a generous exit option. Upon ninety days written notice, Humanigen could terminate the agreement for convenience and Savant would be obligated to pay Humanigen 90% of its development costs if Savant wanted to reacquire the intellectual property it had sold to Humanigen.

6.     ~~5.~~Humanigen was unable to beat Chemo to the finish line. In August 2017, the FDA announced that Chemo had received FDA approval for its version of benznidazole, which was based largely on Savant's data. The FDA proceeded to award the priority review voucher to Chemo.~~In response~~

7.     At that juncture, Humanigen could have continued the development program or terminated the program and received 90% of its development costs. Humanigen's response was to do neither. It abandoned all efforts to commercialize benznidazole, yet retained Savant's assets in clear breach of the Development Agreement.

8.     ~~6.~~Shortly thereafter, Humanigen sold its rights under the Development Agreement and its claims against Chemo to ~~Bistricer~~Bistricer's entity, but retained

4

the liabilities owed to Savant. This transaction was contrary to the terms of the Development Agreement, which expressly required that any assignee of Savant's scientific data agree in writing to assume Humanigen's liabilities to Savant, and that any assignment that did not comport with this requirement would be "null and void."

9.   7. In March 2019, Madison commenced a lawsuit in the United States District Court for the District of New Jersey against Chemo Research, Exeltis USA, Inc. and Dr. Sergio Sosa-Estani (collectively, the "Chemo Defendants"). In that matter (the "New Jersey Action"), Madison claims that but for Chemo Defendants' misappropriation of Savant's proprietary data, Humanigen would have received FDA approval for benznidazole to treat Chagas. Madison also alleges that it, and no one else, is entitled to hundreds of millions in damages due to the alleged misappropriation of this data. In other words, Madison seeks to recover all of the benefits that would have flowed to both Humanigen and Savant in the but-for-world in which Humanigen was successful in receiving FDA approval, and that Savant is thus due nothing.

10.   8. This attempted recovery of a massive windfall (at Savant's expense) is wholly inappropriate. But, nonetheless, it is fully consistent with how Bistricer does business. As set forth in a *Wall Street Journal* article on Bistricer's investment in Humanigen, he was previously "the architect of a plan that flooded the market with shares of an obscure Greek shipping company . . . driving the stock price down

5

by 99.9%." In connection with trading in shares of this company and two other shipping companies, Bistricer is presently accused of securities fraud and stock market manipulation in three class actions presently pending in the Eastern District of New York.

11. ~~9.~~ Savant brings this action to halt Defendants' attempt to cut Savant out of the benefits of its contract with Humanigen, to recover as damages the amounts owed to it under the Development Agreement, and to reclaim Savant's intellectual property so that it can continue to develop benznidazole as a treatment for Chagas disease in countries where it remains unavailable.

## **PARTIES**

12. ~~10.~~ Plaintiff Savant Neglected Diseases LLC is a Delaware limited liability company with its principal place of business in Nevada.

13. ~~11.~~ Defendant Humanigen, Inc. f/k/a KaloBios Pharmaceuticals, Inc. is a Delaware corporation with its principal place of business in California. ~~Humanigen may be served via its registered agent Incorporating Services, Ltd., 3500 S. Dupont Highway, Dover, Delaware 19901.~~

14. Defendant Nomis Bay Ltd. is a Bermuda exempted company with limited liability, with its principal place of business, on information and belief, in Toronto, Canada.

6

15. ~~12.~~ Defendant Madison Joint Venture LLC is a Delaware limited liability company that was formed for the purpose of litigating against the Chemo Defendants and, on information and belief, has no other assets than those claims. It is controlled by Nomis Bay ~~Ltd.~~, which is, in turn, controlled by Bistricer. Humanigen owns a 30% minority interest in Madison. ~~Madison may be served via its registered agent The Corporation Trust Company, 1209 Orange Street, Wilmington, Delaware 19801.~~

7

## JURISDICTION

16.   ~~13.~~ Delaware ~~holds~~has personal jurisdiction ~~over Humanigen and Madison~~ because ~~they~~all parties to this suit are business entities ~~formed under the laws of Delaware.~~incorporated in Delaware, with the exception of Nomis Bay. Specific jurisdiction exists as to Nomis Bay because it entered into a fraudulent transfer with Humanigen in which it acquired the rights to litigation ongoing in Delaware and it has, since that time, controlled the conduct of that litigation in Delaware. The agreement effectuating that transaction contains a Delaware choice of law clause and a District of Delaware choice of forum clause. Nomis Bay subsequently created a Delaware LLC, Madison, and it transferred the assets it fraudulently acquired from Humanigen to that LLC.

17.   ~~14. The Court has subject matter jurisdiction pursuant to 10 *Del. C.* § 341, which provides this Court with jurisdiction "to hear and determine all matters and causes in equity[,]" because Plaintiff seeks a constructive trust, as detailed below. The Court has subject matter jurisdiction over Plaintiff's claims for declaratory judgment under 10 *Del. C.* §§ 6501, *et seq*. Further,~~ Humanigen also consented to the jurisdiction of this Court under its Agreement for the Manufacture, Development and Commercialization of Benznidazole with Savant (the "Development Agreement") and, as Humanigen's ~~purported assignee.~~assignees,

8

Nomis Bay and Madison likewise consented to this Court's jurisdiction and/or ~~is~~are estopped from challenging it. ~~Development Agreement, § 14.2.~~

18.    Plaintiff invokes this Court's equitable jurisdiction by seeking declaratory judgments and a constructive trust, as detailed below. The remaining claims should be adjudicated by this Court pursuant to the clean-up doctrine and this Court's ancillary jurisdiction over legal claims.

ME1 30587255v.1
ME1 31295245v.1

## FACTUAL BACKGROUND

### Savant Begins Work on its Benznidazole Project

19.   ~~15.~~ Savant was co-founded in 2009 by Stephen Hurst, its President and CEO, and by Scott Freeman, its Chief Medical Officer. Hurst and Freeman each had worked in the biopharmaceutical industry for more than ten years, and they joined forces to start a company with three other industry veterans. The idea behind Savant was that the company would focus on researching, developing and bringing to market pharmaceuticals in areas with significant unmet medical needs that were being ignored by major pharmaceutical companies.

20.   ~~16.~~ At the end of 2011, Savant began to evaluate the potential for a benznidazole as a treatment for Chagas disease, a tropical parasitic infection that primarily affects individuals in rural parts of Latin America. While the initial effects of Chagas are in most cases mild, the chronic stage of the disease can result in severe damage to the sufferer's digestive system, heart and nervous system. If left untreated, approximately 30% of sufferers eventually die of heart failure. The number of sufferers of Chagas are estimated to be in the range of 8-10 million, with approximately 300,000 located in the United States at the time that figure was last measured.

21.   ~~17.~~ Benznidazole had already been approved for the treatment of Chagas disease in Argentina and Brazil. However, because benznidazole was not

10

commercially available in the United States, it could only be acquired from the Centers for Disease Control on a difficult and time-consuming patient-by-patient basis. It was also unavailable in a number of countries where Chagas disease affects rural populations, such as Ecuador, Bolivia, and Peru. This situation is what initially led Savant to investigate if benznidazole could be developed for regulatory approval.

22.   18. Another factor supporting Savant's interest in benznidazole was that in 2007 the FDA had established a priority review voucher program for neglected tropical diseases. The program was created to encourage drug companies to develop treatments for drugs that might otherwise not be profitable to develop.

23.   19. Under the program, if a pharmaceutical drug manufacturer successfully develops and obtains the first FDA approval for a drug to treat an eligible disease or condition, it is granted a "priority review voucher" that can be used to expedite the FDA's approval of any other drug.

24.   20. Not only can a priority review voucher be used to expedite approval of any drug, but priority review vouchers are also transferable. This means that such a voucher, once obtained, can be bid upon by all pharmaceutical companies that are developing drugs for use in the United States.

25.   21. While the monetary value of a priority review voucher was uncertain in 2011, when Savant started work on its benznidazole project, the value

11

has since proven to be considerable. In July 2014, BioMarin sold its 50% interest in the first priority review voucher to Sanofi and Regeneron for $67.5 million. The next year, Retrophin sold a voucher to Sanofi for $245 million, and United Therapeutics sold a voucher to AbbVie for $350 million. Most recently, priority review vouchers have sold for in excess of $100 million.

26.    22.  In early 2012, Freeman began developing a regulatory and manufacturing strategy for seeking FDA approval for benznidazole in the treatment of Chagas disease. As part of this strategy, Freeman reviewed the relevant literature and determined that Dr. Sergio Sosa-Estani had completed a double-blind randomized trial on benznidazole's efficacy.[1] (the "Sosa-Estani Study" or "Study").

27.    23.  Acquiring exclusive access to this data was essential for a future FDA application. The alternative to a randomized trial in demonstrating efficacy for benznidazole would have been a prospective clinical trial. However, conducting that type of trial would take at least three years to complete, and it is considered less reliable than a randomized trial when seeking FDA approval.

---

[1] The term "double-blind" refers to the fact that both the physician performing the study, and the patients, are unaware of which patients receive a placebo.

ME1 30587255v.1
ME1 31295245v.1

## **The FDA Grants Savant Approval for a 505(b)(2) Application**

28.   ~~24.~~ On or about May 29, 2012, Freeman started the process for getting FDA approval for benznidazole by submitting to the FDA background materials for a Pre-Investigational New Drug Meeting. The primary purpose of the Meeting was to confirm that the FDA would accept a 505(b)(2) application for benznidazole, which would allow the drug to be approved for treatment of Chagas in children based on the existing randomized studies.

29.   ~~25.~~ A 505(b)(2) application is a particular type of new drug application, the name of which refers to a section of the Federal Food, Drug, and Cosmetic Act. The provisions of 505(b)(2) were created, in part, to help avoid unnecessary duplication of studies already performed on a drug previously approved by a regulatory authority; the section permits the FDA to rely on data not developed by the applicant. A 505(b)(2) application contains complete safety and effectiveness reports but certain of the information required for approval, such as safety and efficacy information on the active ingredient, comes from studies not conducted by or for the applicant. In other words, it relies on clinical trials that have already been performed, thus saving the developer tens of millions of dollars in expenses and years of delay.

30.   ~~26.~~ On or about June 29, 2012, the Investigational New Drug Meeting took place between Freeman and representatives of the FDA. In the course of the

13

Meeting, the FDA confirmed that it would be willing to accept a 505(b)(2) NDA for benznidazole and that it was amenable to the Sosa-Estani Study serving as the foundation for the application.

**Savant Licenses the Sosa-Estani Study**

31. ~~27.~~ Encouraged by the FDA's receptiveness to a 505(b)(2) NDA, Freeman reached out to Sosa-Estani. Following the initial correspondence, Freeman went to Argentina to meet with Sosa-Estani and to confirm the data was of a high quality, which included review of specific patient charts, and to negotiate an exclusive Data License Agreement. The trial was double-blind and was well-conducted, involving 106 children, aged six to thirteen years, who were followed for 48 months following treatment with benznidazole and a placebo.

32. ~~28.~~ On May 24, 2013, Freeman sent Sosa-Estani an email in which he offered to purchase the data from his Study. He explained that Savant would like to use every patient from the study, if possible, and it would pay for access on a per-patient basis. Sosa-Estani would retain the right to use the data for his academic or scientific endeavors, since the Study would only be exclusively licensed ~~in~~for the ~~context~~purpose of obtaining FDA approval for benznidazole to fight Chagas. However, it was essential that this contract grant Savant *exclusive* access to the Study ~~for use in any pharmaceutical endeavor or purpose~~within those parameters. Given the costs and effort that would be required to get FDA approval for

14

benznidazole even with access to the Study, this was a material, critical term of the agreement. Freeman asked Sosa-Estani to inform him if these conditions were acceptable, and if so, stated he would send a formal agreement for Sosa-Estani to sign.

33. 29. Approximately three weeks later, Sosa-Estani accepted Freeman's offer to purchase the rights to use the database: "Yes Scott, I agree with your proposal." There was further email correspondence in which Sosa-Estani confirmed that the parties had an agreement, and that the contract memorializing the agreement should be between Savant and an entity called Instituto de Efectividad Clínica y Sanitaria ("IECS"), which owned the data in the Study, over which Sosa-Estani represented he had decision-making authority.

34. 30. The parties entered into an exclusive license agreement (the "License Agreement"). The License Agreement grants Savant an exclusive, perpetual, and irrevocable license to view and use the "Data Products" in connection with FDA approval, which is; with "Data Products" defined broadly to include the Sosa-Estani Study and related present and future intellectual property. In addition, the License Agreement mandates that IECS (emphasis added):

> (a) *may not grant any license to any other person of the Data Products for the Exclusive Use, in whole or in part*, (b) reserves no rights in the Data Products for the Exclusive Use to itself or its affiliates,                                     and
> (c) *may not assign transfer or otherwise dispose of the Data Products*,

15

except as part of an assignment of this Agreement in its entirety in accordance with Section 2.6.

35.   ~~31.~~ Pursuant to the License Agreement, IECS also represented and warranted that it would not "take any actions that would result in or omit to act resulting in the termination of the rights granted to Savant under this Agreement," as well as that "Savant has the exclusive right to use the data for regulatory filings in the United States and Europe."

### Savant and Humanigen Team Up to Seek FDA Approval

36.   ~~32.~~ Following execution of the License Agreement, Savant continued to work on its benznidazole project and the development of a manufacturing process for producing a purer version of the drug.

37.   ~~33.~~ In August 2015, as Savant had hoped for and anticipated, the FDA added Chagas to the list of neglected tropical diseases that were eligible for a priority review voucher. While this was the development that Savant had been waiting for since 2011, it was not in a position to take advantage of the opportunity on its own. Savant needed a partner with the required additional monetary resources ~~and experience~~ to assist with the commercialization of benznidazole.

38.   ~~34.~~ In March 2016, Savant and Humanigen began conducting due diligence on the parameters of a partnership to develop benznidazole. In connection with this process, which took approximately three months to complete, Humanigen

16

was fully informed of, and had the opportunity to conduct due diligence on, all of the risks associated with the project, including the possibility that another drug manufacturer could attempt to steal Savant's intellectual property, including exclusive access to data from the Sosa-Estani Study, as part of a competing FDA application for benznidazole.

39. 35. Around this same time, Savant received correspondence from IECS in which it contended that the License Agreement was invalid. While this claim was preposterous on its face, it was not totally unexpected. When the FDA approved Chagas disease as eligible for a priority review voucher, the value of the Sosa-Estani data dramatically increased. IECS's suspicious timing and concocted arguments suggested that the Institute was intending to sell access to the Sosa-Estani Study in breach of the exclusive License Agreement.

40. 36. Despite the dubious nature of IECS's claim, Savant included the letter and the relevant correspondence between IECS and Savant in the data room related to the transaction with Humanigen, and expressly disclosed the fact that IECS disputed the enforceability of the License Agreement in the MDC Agreement with Humanigen.

41. 37. Not only was Humanigen aware of the risk that IECS would breach the License Agreement, but it also knew that Chemo was the party most likely to pay for access to the Sosa-Estani Study. It was widely known that Chemo's

17

Argentina subsidiary, ELEA, was selling benznidazole in that country, and that Sosa-Estani had a working relationship with ELEA. If anyone was to interfere with Savant's contract, Chemo would be the most likely culprit.

42. 38. On April 18, 2016, Ted Shih, Humanigen's Vice President of Clinical Development, sent an email informing his "Savant colleagues. . . [i]t appears that we likely have competition from [Chemo] as there are some sources from WHO and other publications, including receipt of FDA orphan designation, and the Chemo/ELEA website declaring that they have FDA approved manufacturing facilities in Spain and Italy." Shih explained that the parties should discuss the matter because it "may shift our regulatory approach."

43. 39. Following this email, Freeman met with Shih and other persons from Humanigen. During these meetings, Freeman discussed IECS's fabricated arguments concerning the enforceability of the License Agreement. Freeman also noted the possibility that Sosa-Estani, who was based in Argentina, might be reluctant to work with Humanigen and Savant despite the existence of the License Agreement.

44. 40. On June 13, 2016, Hurst introduced Humanigen's CEO, Cameron Durrant, to Sosa-Estani by email and explained that Humanigen and Savant would be working together to procure FDA approval for benznidazole. Sosa-Estani

18

responded three days later, copying Durrant, thanking Hurst for the introduction and inviting Durrant to contact him.

45.   41. On June 19, 2016, Durrant emailed Hurst about the IECS letter. Hurst noted that the parties had discussed this issue and the letter several times, and he restated what had taken place in the negotiations between Savant and IECS related to the License Agreement. Hurst further conveyed that Savant's lawyers were preparing a disclosure to be included in the final contract related to the issue. He shared a draft version of this disclosure, which substantially parallels what was memorialized in Section 8.5(b) and Schedule 8.5(g) of the final contract.

46.   42. In this email, Hurst also explained why Savant had not yet taken legal action against IECS or Sosa-Estani:

> As you know, we've chosen to pursue the data through a collaborative approach with Dr. Estani rather than turn immediately to a more formal and legal response to the IECS letter. So far, the strategy appears to be working, since you are now in direct contact with Dr. Estani and he appears cooperative. *If, however, this approach breaks down, [Humanigen] will have all legal options preserved going forward*.

(emphasis added).

47.   43. On June 22, 2016, Durrant emailed Sosa-Estani in response to his June 16 email. He noted "[t]he work you have conducted will be important for us to be able to work with [the] FDA and to ultimately benefit patients." Durrant offered to speak with Sosa-Estani or to meet with him in Buenos Aires.

19

48.   44. Following this email exchange, if Humanigen had any concerns about the enforceability of the License Agreement, it could have brought those up directly with Sosa-Estani or IECS. Or it could have raised those concerns to Savant. Likewise, it could have brought those concerns to the attention of the Delaware Bankruptcy Court that was overseeing its reorganization, since the transaction with Savant was a component of its plan of reorganization. Humanigen did none of those things prior to executing the Development Agreement. Plainly, Humanigen was comfortable that it had done the necessary due diligence and the License Agreement was valid.

### Savant and Humanigen Team Up To Seek FDA Approval

49.   45. On or around June 30, 2016, Humanigen and Savant entered into the Development Agreement. A copy of this contract is attached as Exhibit A. Under this Agreement, Savant sold and licensed its intellectual property related to benznidazole (the "Benznidazole IP") to Humanigen to be used for the drug's development, manufacture, and commercialization.

50.   46. In consideration for the sale and license of the Benznidazole IP, Humanigen agreed to make certain payments to Savant and to take primary responsibility for the continued development of the drug and the FDA application. The Development Agreement provides that upon closing, Humanigen will make an

20

initial payment to Savant and provide it with a warrant to purchase 200,000 shares in Humanigen.

51. 47. Humanigen also committed to paying Savant: (1) $21 million in aggregate payments for reaching particular milestones on the path to FDA approval (the "Milestone Payments"); (2) 20% of the proceeds from the sale of a priority review voucher, if received; and (3) a 15% royalty on annual net worldwide sales of benznidazole.

52. 48. As set forth in Sections 5.2 to 5.4 of the Development Agreement, Humanigen was supposed to develop the drug for FDA approval and commercial sale in the United States "as soon as reasonably practicable." It also agreed to conduct a feasibility study for developing the drug for commercial sale for countries in the European Union and Japan.

53. 49. These obligations bound Humanigen irrespective of whether a competitor received approval before it, and acquired the priority review voucher. Neither the requirement to develop the drug for FDA approval and commercialize the drug in the United States (which would trigger the Milestone Payments) nor the obligation to conduct a feasibility analysis was conditioned on the availability of a priority review voucher for benznidazole. According to Section 13.5, the only way that Humanigen could be absolved of these obligations and retain ownership of the assets was upon mutual consent of the parties. This was an important consideration

21

for Savant because the company had spent years developing benznidazole to address the insidious effects of Chagas disease.

54.   50. The Development Agreement can be terminated for "convenience" by either party upon ninety days' written notice. If Humanigen exercised this option, Section 13.6(a) indicates that "all rights and licenses granted to [Humanigen] under this Agreement shall terminate," and it would be required to transfer to Savant "all right, title and interest in and to the Acquired Assets any and all intellectual property rights, regulatory approvals and any other assets developed . . . from the Acquired Assets pursuant to the Joint Development Program" in exchange for a payment of 90% of the development costs actually incurred by Humanigen. Accordingly, if Humanigen lost interest in the project, it would receive most of its development costs back and Savant could continue to develop benznidazole for, among other reasons, humanitarian purposes.

55.   51. The Development Agreement can also be terminated "for cause" by either party. Section 13.3(a) provides that the non-breaching party may terminate the contract for cause "in the event the other party . . . shall have materially breached or defaulted in the performance of its obligations . . . ." If Savant terminates the Development Agreement for cause, Section 13.6(d) provides that "all rights and licenses granted to [Humanigen] under this Agreement shall terminate," and

22

ME1 30587255v.1
ME1 31295245v.1

Humanigen "shall transfer to [Savant] all right, title and interest in and to" the benznidazole-related assets.

56.     If Humanigen became insolvent, Savant had the option to immediately cancel the Development Agreement. If Savant had terminated the Agreement, which it would have done if Humanigen had notified Savant of a triggering event, Section 13.6(d) indicates that this shall be treated like a termination for cause.

57.     52. In short, Humanigen ~~agreed to pay considerable sums of money to Savant in exchange for access to the valuable Benznidazole IP and~~entered into the Development Agreement with Savant because the Benznidazole IP was valuable, the FDA's priority review voucher (if awarded) was potentially even more valuable, and because it received the right to develop and sell benznidazole. Under no circumstances could Humanigen discontinue its drug development program but retain access to the Benznidazole IP. If Humanigen either failed to meet its obligations or became insolvent, all rights to the intellectual property and the drug itself would revert to Savant.

**Chemo Beats Humanigen in the Race for FDA Approval**

58.     53. In August 2016, the parties agreed that, effective as of September 28, 2016, Humanigen, at its request, assumed full responsibility for development of the drug and preparation of the FDA application. It was up to Humanigen to win the race for FDA approval.

23

59.   54. On December 7, 2016, Hurst had a call with Durrant in which the latter provided an update on the status of Humanigen's FDA application. Durrant was positive about the progress that Humanigen had made and its meetings with the FDA. According to Durrant, Chemo was also lagging behind. Hurst reported to Freeman that, "[Humanigen] has soft intelligence that the [Chemo] program is too broad and they may have over reached at FDA."

60.   55. While Humanigen was in the lead at that time, Chemo's improper access to the Sosa-Estani Study allowed it to catch and then, ultimately, pass Humanigen. On information and belief,Documents produced in discovery demonstrate that Humanigen's "soft intelligence" informed it that in the summer thatof 2017 Chemo was in the final stages of seeking FDA approval.

61.   Humanigen kept this critical information from Savant, who was supposed to be its partner in the development of benznidazole. This was likely due to the fact that Humanigen was already planning how it could sell its interest in a lawsuit against Chemo to its creditors—in the process attempting to cut Savant out of the transaction entirely, thereby purportedly increasing the value of what it was offering its creditors. On information and belief, it also proceeded to cease working on its FDA application as soon as it became aware that Chemo was just weeks away from obtaining FDA approval.

62.   ~~56. However, instead of focusing on beating~~By that point, it would have been too late for Humanigen to beat Chemo to the finish line ~~by developing the drug and submitting an application, Humanigen initiated~~without, at least, seeking to block or head off Chemo's FDA filing. However, Humanigen's priorities lay elsewhere, as it proceeded to initiate an unwarranted dispute with Savant. Humanigen's progress on development of benznidazole had triggered an obligation to pay the initial two Milestone Payments to Savant. Rather than paying those Milestone Payments, as it was obligated to do, Humanigen apparently decided to file a meritless, preemptive lawsuit against Savant as part of its campaign to get Savant to give up its interest in benznidazole (and related claims) entirely.

63.   ~~57.~~On July 10, 2017, Humanigen commenced litigation against Savant in Delaware Superior Court related to purported cost overages in its benznidazole development program, and claiming that these overages should be offset against the $2 million it owed Savant (the "Delaware Action"). In order to succeed on its claims Humanigen would need to demonstrate, among other things, that the product was ready for a NDA application and that its cost overruns were in excess of $8,500,000. Nevertheless, no invoices were enclosed with its complaint, and, to date, it has still not produced any supporting invoices. This action was simply a smokescreen to obscure the fact that Humanigen owed Savant Milestone Payments,

ME1 30587255v.1
ME1 31295245v.1

that it had abandoned drug development, and that it was in material breach of the Development Agreement.

64.   58. On or about July 11, 2017, Savant informed Humanigen that it was in breach of the Development Agreement based on non-payment of the first Milestone Payment. As required by the Development Agreement, Savant gave Humanigen an opportunity to cure its non-performance, which it failed to do. Subsequently, Savant counterclaimed against Humanigen, seeking the $2 million in Milestone Payments and other relief.

65.   59. Humanigen's claims in this lawsuit are baseless. It is unclear at this juncture if Humanigen started this litigation as part of a ploy to negotiate with Savant or as a first step in a scheme to transfer Savant's intellectual property to Bistricer. But irrespective of why it brought the case, the simple fact is that Humanigen does not allege cannot show that Savant materially breached the Development Agreement. Accordingly, its dubious allegations do not excuse Humanigen's failure to commercialize benznidazole and to pay the remaining Milestone Payments.

## Defendants Cut Savant Out of a Lawsuit Against Chemo

66.   60. The other shoe dropped on August 29, 2017. The FDA announced its approval of  benznidazole in the pediatric treatment of Chagas disease and awarded a priority review voucher to Chemo. That same day, Humanigen made a

26

public filing in which it stated that it was "assessing its options" with respect to its benznidazole development program. This was a guarded way for Humanigen to disclose that it had ceased all efforts to develop benznidazole (which it had surreptitiously ended in July, when it learned Chemo would get FDA approval).

67.   61. According to documents filed in a bankruptcy proceeding, almost immediately after this disclosure, Humanigen's lawyers began investigating potential claims against IECS and Chemo.

68.   62. In September 2017, these lawyers sent IECS and Chemo letters claiming that their actions had caused "millions in damages to Humanigen, and continue[] to cause it irreparable harm." These letters include various demands, and threaten, if these demands are not satisfied, that Humanigen "will be compelled to take steps to protect its rights." Notably, there is no mention of the harms suffered by Savant or its role in a potential lawsuit.

69.   63. In November 2017, IECS and Chemo rejected Humanigen's settlement demands. While the Development Agreement required Humanigen to inform Savant of any instances of suspected misappropriation, Humanigen failed to disclose the existence of this settlement correspondence to Savant.

70.   64. On information and belief, Humanigen and BistricerNomis Bay had already decided to cut Savant out, which is why the existence of this correspondence was hidden from Savant.

ME1 30587255v.1
ME1 31295245v.1

71. 65. In December 2017, Humanigen announced it was selling its interests in benznidazole under the Development Agreement and all related legal claims to Madison, for the purpose of satisfying Humanigen's outstanding debt obligations to Madison's majority owner, Nomis Bay. Humanigen also received a 30% interest in Madison, which means it stood to profit from any legal claims pursued by Madison. Attached hereto as Exhibit B is a copy of the Securities Purchase and Loan Satisfaction Agreement By by and Among among Humanigen, Inc., Black Horse Capital Master Fund Ltd., Black Horse Capital L.P., Cheval Holdings, Ltd. and Nomis Bay Ltd., dated December 21, 2007 (the "SPL Agreement"), which sets forth the terms of this transaction.

72. 66. Humanigen entered into this lucrative arrangement even though it contravenes the terms of the Development Agreement. The SPL Agreement indicates that Madison Nomis Bay is acquiring only the assets of Humanigen's benznidazole program, leaving the liabilities with Humanigen. This violates Section 15.2 of the Development Agreement, which states in relevant part: "Any permitted assignee [of Humanigen's rights under the Agreement] will expressly assume all obligations imposed on the assigning Party by this Agreement in writing. . . .  Any purported assignment in violation of this Section 15.2 shall be *null and void*." (emphasis added).

28

73.    According to the SPL Agreement, Madison was established as an "affiliate" of Humanigen. As its purported affiliate, Humanigen is a guarantor of Madison's performance under the Development Agreement. Pursuant to Section 15.8, each party "guarantees the performance by its Affiliates of such Party's obligations under this Agreement, and shall cause its Affiliates to comply with the provisions of this Agreement in connection with such performance." Because Humanigen failed to obtain Madison's agreement that it would comply with all of the terms of the Development Agreement, including the performance obligations set forth therein, Humanigen breached Section 15.8.

74.    67. Defendants' misconduct did not stop there. The SPL Agreement provides that Nomis Bay or Madison is responsible for payment of "Claim Advances" related to Humanigen's Delaware litigation against Savant. Payment of these so-called "Advances" is not contingent on any actions by Nomis Bay, Madison, or Humanigen, or even the outcome of the litigation. The Agreement also states that, following a due diligence period, if Nomis Bay decides to retain the benznidazole assets it was acquiring on Madison's behalf, Nomis Bay will have full control over the Delaware Action, including whether to settle it and who will represent Humanigen in the litigation.

75.    68. That due diligence period has long since passed. While Nomis Bay controls the Delaware Action, it has never substituteddid not attempt to substitute

29

itself as the real party in interest until August 2019. Instead, Nomis Bay has~~and~~ Madison have been using the Delaware Action ~~to get~~for the improper purpose of getting discovery to use against Chemo.

76.    Defendants have admitted as much in their Amended Complaint, in which they claim that Savant should have provided Humanigen with discovery so it could have funneled these documents to Madison for the New Jersey Action.

77.    ~~69.~~ Neither Nomis Bay nor Madison has an interest in the Delaware Action or the New Jersey Action ~~separate from~~prior to the SPL Agreement; they are strangers who are controlling those lawsuits at the behest of Bistricer. This arrangement violates Delaware's prohibition against champerty because it constitutes an agreement between the owner of a claim and volunteer, ~~where~~wherein the volunteer is controlling the claim and dividing ~~the~~any proceeds with the owner. Defendants' failure to abide by established Delaware law is further evidence of their misguided scheme.

78.    Finally, based on documents produced in discovery, it is evident that Humanigen has violated other provisions of the Development Agreement in furtherance of Defendants' scheme to cut Savant out. These documents show that Humanigen has long been collecting evidence to use in the case against the Chemo Defendants, including by sending letters to the FDA and other parties, and making

30

FOIA submissions.  None of this information was shared with Savant, in violation of Sections 6.3 and 10.2(b) of the Development Agreement.

ME1 30587255v.1
ME1 31295245v.1

**Defendants Concede that the Humanigen-Nomis Bay
Transaction was Fraudulent**

79.   It has recently become apparent that Humanigen's sale of its legal claims and the Benznidazole IP to Nomis Bay, and the transfer of those assets to Madison, was specifically made to benefit Nomis Bay as a creditor.  Humanigen and Madison have also claimed that Madison is a reconstituted version of one branch of Humanigen.  In other words, the transfer of the aforementioned assets to Madison was a fraudulent transaction that was entered into to subvert Savant's rights as a creditor, to benefit another creditor (Nomis Bay).

80.   According to Humanigen's November 17, 2017 10-Q filing, its liabilities exceeded its assets. As a result, "[t]he ability of the Company to meet its total liabilities of $24.1 million at September 30, 2017 and to continue as a going concern [was] dependent upon the availability of future funding." Moreover, if it was "unable to restructure to reach a satisfactory agreement with its Term Loan Lenders on any alternative transactions," Humanigen would have likely been "forced to file for a second bankruptcy."

81.   In a June 10, 2019 letter to this Court, Humanigen provided color on how it was able to avoid a formal bankruptcy proceeding. Humanigen explained that it entered into the transaction with Nomis Bay and its other lenders because they were "about to foreclose on Humanigen's assets," and this deal was "in lieu of

32

foreclosure." This represents an acknowledgement that the purpose of the transaction was to benefit a select group of creditors at the expense of Savant, another creditor.

82.   Humanigen further claimed that a "restructuring" created two branches of the company, one of which (Madison) would hold the benznidazole assets, while the other (Humanigen) would pursue development of other drugs. According to Humanigen's letter, the transaction:

> [E]ssentially divided the company in two, with one of the lenders, Nomis Bay Ltd., agreeing to continue supporting the benznidazole program . . . and the second lender agreeing to support the other drugs held by Humanigen. Both before and after this restructuring transaction, each of the lenders owned equity in Humanigen, and both continue to have an interest in Madison, which is the joint venture set up by Nomis Bay to hold the benznidazole assets.

83.   These statements were repeated virtually verbatim in paragraphs 100 to 104 of the Amended Complaint, dated August 9, 2019.

84.   This purported "restructuring" is the basis upon which Madison is now claiming that it is entitled to all of the proceeds of the Development Agreement. The transaction thus had the intended effect of benefitting one creditor, Nomis Bay, by depriving another creditor, Savant, from money owed to it under the Agreement and that Savant would have received if Humanigen had performed under the Agreement, commenced the New Jersey Action, or done both.

33

## Humanigen Undergoes a Change of Control

85. ~~70.~~ Pursuant to the SPL Agreement, another lender, Black Horse Capital, received significant additional equity in Humanigen in exchange for debt relief. On February 27, 2018, Humanigen publicly stated that this equity grant constituted a change of control: "The new shares issued to affiliates of Black Horse Capital, when combined with their previous ownership stakes, resulted in a change in control of the company, with Black Horse Capital and its affiliates owning more than 50 percent of the company's outstanding shares of common stock."

86. ~~71.~~ This change of control triggered an obligation for Humanigen to immediately pay Savant $1.9 million, constituting ten percent of the unpaid Milestone Payments beyond the $2 million at issue in the Delaware Action. As set forth in Section 3.3(b) of the Development Agreement, "if a Change of Control of [Humanigen] occurs, [Humanigen] shall pay to [Savant] ten percent (10%) of all unpaid Milestone Payments, if any, concurrently with such Change of Control, irrespective of whether the corresponding milestone events have been achieved . . . ~~.~~" As with its other contractual obligations, Humanigen has not made this payment to Savant.

## Madison Initiates Litigation in New Jersey

34

ME1 30587255v.1
ME1 31295245v.1

72. On March 6, 2019, Madison initiated the New Jersey Action. In its pleading, Madison conceded that Humanigen knew it was in a race to get FDA approval for benznidazole from the beginning. Madison also alleges that but for the misconduct of Chemo and its collaborators, Humanigen would have won the race for FDA approval.

73. While the substance of Madison's claims against Chemo are compelling, the complaint contains a number of false or misleading allegations. As an initial matter, the complaint alleges that "Humanigen transferred to Madison all its assets and claims related to benznidazole." But no such transfer has taken place because Section 15.2 of the Development Agreement prohibits asset-only assignments.

74. The complaint further alleges that Humanigen, a sophisticated actor pursuing a priority review voucher worth in excess of $100 million, first learned that Sosa-Estani had disclosed the data from his study to Chemo on August 29, 2017, when the FDA announced that it had granted Chemo's NDA for benznidazole. That is incorrect. Even before Humanigen entered into the Development Agreement, it knew that this misappropriation had likely either taken place or was about take place, and its "soft intelligence" sources kept it apprised of developments in Chemo's FDA application along the way. Humanigen simply delayed suing Chemo until it could transfer the rights to do so to a third party, thus giving Defendants cover to cut Savant out and obviate the need to spend money further developing

35

~~benznidazole for treatment of Chagas disease in foreign countries. In other words, the entire proceeds from the voucher would go into the pockets of investors.~~

~~75. Madison also alleges that when Chemo received FDA approval, "[Humanigen] was forced to entirely reconfigure its plan to commercialize benznidazole." That is similarly false. Humanigen has no intention of commercializing the drug or expanding its availability, and this carefully worded allegation was apparently made to obscure that Humanigen has abandoned the Development Agreement.~~

87. ~~76. In~~ On March 6, 2019, Madison initiated the New Jersey Action~~,~~. Madison claims that it has suffered irreparable harm and it seeks equitable relief, in addition to hundreds of millions in damages and lost profits. The reality is that Madison is a shell litigation vehicle controlled by an opportunist who, unlike Savant, never had an interest in helping those suffering from Chagas disease.  Any monetary relief that Madison receives will be promptly disbursed to Bistricer and Humanigen. Absent a declaration of Savant's rights, it will receive nothing from a project that it conceived of and has pursued since 2011.

### Count 1: Declaratory Judgment That All Rights to the Benznidazole IP And Related Claims Have Reverted to Savant

88. ~~77.~~ Savant incorporates all of the above factual allegations as though set forth fully herein.

~~ME1 30587255v.1~~
ME1 31295245v.1

89. 78. Humanigen has materially breached the Development Agreement by (1) abandoning its performance obligations under the Agreement; (2) attempting to assign its rights to Nomis Bay and Madison without also assigning obligations vis-à-vis Savant to Nomis Bay and Madison; (3) andfailing to obtain Madison's agreement in writing that it would comply with the terms of the Development Agreement as Humanigen's purported affiliate; (4) turning over control of the Delaware Action and the New Jersey Action to Nomis Bay and Madison, in contravention of both Delaware's prohibition against champerty and the terms of the Development Agreement, and attempting to cut Savant out of any proceeds from the New Jersey action; (5) withholding information from regulatory authorities and other parties to which Savant was entitled; (6) failing to make Milestone Payments; and (7) failing to make the required payment resulting from a Change of Control.

90. 79. On July 11, 2017, Savant informed Humanigen it was in breach of the Development Agreement and gave it an opportunity to cure. Humanigen ignored this correspondence and it has abandoned its obligationobligations under the Development Agreement. Savant has no further obligation to notify Humanigen of its breaches of the Development Agreement because it would be futile.

91. 80. Savant seeks a declaratory judgment that, under Section 13.3(a) and (d) of the Development Agreement, it has the right to terminate the Development Agreement under Section 13.3, it has properly terminated the

37

Agreement, and that all intellectual property and claims assigned by Savant to Humanigen under the Agreement have reverted to Savant.

92.   81. Savant also seeks a declaratory judgment stating that, pursuant to Section 15.2, the purported assignment of Humanigen's rights and claims under the Development Agreement to Nomis Bay and Madison is null and void because the rights reverted to Savant prior to any transfer to Madisonthem and because Nomis Bay and Madison did not execute an agreement in writing acknowledging itstheir obligations to Savant under the terms of the Agreement.

93.   82. Moreover, Humanigen's assignment of claims to Nomis Bay and Madison should be declared null and void for the additional reason that it is champertous. Champerty is defined as an agreement between the owner of a claim and a volunteer that the latter may take the claim and collect it, dividing the proceeds with the owner, if they prevail; the champertor to carry on the suit at his own expense.

94.   83. Savant seeks a declaratory judgment stating that the agreement between Humanigen and MadisonNomis Bay, in which Humanigen purportedly assigned its claims to Nomis Bay and then on to Madison so that Madisonit may take the claims and collect them, dividing the proceeds with Humanigen, if they prevail, with Madison to carry on the suit at its own expense, amounts to champerty, and that the assignment is null and void for this additional reason.

38

95.   84. An actual and justiciable controversy exists The dispute between Savant, Humanigen, Nomis Bay, and Madison is real and adverse because Madison has brought claims in the New Jersey lawsuit Action even though Savant is the rightful owner of those claims, and Humanigen, Nomis Bay, and Madison have repeatedly made it clear to Savant, in the parties' communications, that they intend to cut Savant out of that lawsuit and not grant it its proper share of damages pursuant to the terms of the Development Agreement.

96.   85. This Court's resolution of this dispute through a declaratory judgment will necessarily determine the rights and obligations of the parties.

97.   86. The issue is ripe because there are sufficient facts before the Court to enable an analysis of the contractual language in issue as well as the facts surrounding Humanigen's material breaches and repudiation of the Development Agreement and its arrangement with its creditors (Nomis Bay and the Black Horse entities) which are in clear derogation of its obligations to Savant.

**Count 2: Declaratory Judgment that Savant is Entitled to Its Portion of Any Recovery from the New Jersey Action**
**(In the Alternative)**

98.   87. Savant incorporates all of the foregoing factual allegations as though set forth fully herein.

99.   88. In the alternative, if If the Court does not declare the Development Agreement terminated and the assignments from Savant to Humanigen, and from

39

Humanigen to Nomis Bay and then to Madison, null and void, Savant requests, in the alternative, a declaratory judgment that it is entitled to its rightful share of the proceeds from Madison's New Jersey lawsuitAction.

100.   89. Madison's New Jersey lawsuitAction is expressly premised on the theory that, but-for the Chemo Defendants' wrongful acts, Humanigen would have been the first to obtain FDA approval for benznidazole, would have obtained a valuable priority review voucher, and would have successfully commercialized benznidazole.

101.   90. If the jury in New Jersey accepts this "but for" scenario, then Humanigen's obligations to Savant under the Development Agreement (and Madison's obligations, as Humanigen's assignee), are clear:

   a. Humanigen/Madison would have had to pay Savant $21 million in Milestone Payments on the way to obtaining FDA approval;

   b. Humanigen/Madison would have had to pay Savant 20% of the value of the priority review voucher; and

   c. Humanigen/Madison would have had to pay Savant 15% of all profits from benznidazole sales.

102.   91. Accordingly, the Court should enter a declaratory judgment stating that, if Madison prevails in the New Jersey lawsuitAction, Savant is entitled to all three of the above enumerated amounts as its share of the damages awarded in the New Jersey litigationAction.  These amounts represent moneys that would have gone to Savant, not to Humanigen (or its assigneeassignees, Nomis Bay and

40

Madison), under the terms of the Development Agreement, in the "but for" scenario upon which Madison's damages model in New Jersey is based.

103. 92. Stated differently, Madison cannot have its cake and eat it, too: by asking the jury to award damages based upon its preferred scenario, while keeping those damages all for itself (instead of paying Savant the share of those proceeds that it would have been owed, under the Development Agreement).

104. 93. An actual and justiciable controversy exists The dispute between Savant, Humanigen, Nomis Bay, and Madison is real and adverse because Madison has brought claims in the New Jersey lawsuit Action even though Savant is the rightful owner of those claims, and Humanigen, Nomis Bay, and Madison have repeatedly made it clear to Savant, in the parties' communications, that they intend to cut Savant out of that lawsuit and not grant it its proper share of damages pursuant to the terms of the Development Agreement.

105. 94. This Court's resolution of this dispute through a declaratory judgment will necessarily determine the rights and obligations of the parties.

106. 95. The issue is ripe because there are sufficient facts before the Court to enable an analysis of the contractual language in issue as well as the facts surrounding Humanigen's material breaches and repudiation of the Development Agreement and its arrangement with its creditors (Nomis Bay and the Black Horse entities) which are in clear derogation of its obligations to Savant.

## Count 3: Breach of Contract (against Humanigen)

107. 96. Savant incorporates all of the foregoing factual allegations as though set forth fully herein, and makes them the basis of claim for breach of contract against Humanigen and Madison, which is brought in the alternative to the above attempt to terminate the Development Agreement.

108. 97. Savant and Humanigen entered into the Development Agreement, which is a valid and binding contract.

109. 98. Plaintiff has substantially performed under the Development Agreement., by, among other things, providing Humanigen with exclusive access to the Sosa-Estani Study and its other valuable intellectual property.

110.   As explained above, Humanigen had an obligation to continue to seek FDA approval for benznidazole even after Chemo had obtained the first approval and associated priority review voucher. The Development Agreement has provisions obligating Humanigen to pursue FDA approval, and make $21 million in Milestone Payments to Savant in the process, which are wholly separate from the obligation to attempt to obtain a priority review voucher and pay Savant 20% of the proceeds obtained from a sale of that voucher.

111. 99. Nowhere in the contract is Humanigen's obligation to continue to seek FDA approval made contingent on the continued availability of a priority review voucher. For example, Section 5.3 requires Humanigen to use "diligent

42

efforts" to commercialize the drug and to launch it in the United States "as soon as reasonably practicable." That requirement is not limited in any way. Humanigen was under an obligation to continue to work to obtain FDA approval and to commercialize the drug even after the priority review voucher was no longer available.

112.   100.   Moreover, the Development Agreement explicitly envisions Humanigen conducting a feasibility study regarding the commercialization of benznidazole in Japan and the European Union. The geographic area for the envisioned benznidazole sales under the Agreement was defined to be worldwide. Thus, Humanigen Humanigen's commercialization obligations went beyond FDA approval.

113.   101.   Humanigen materially breached these obligations by abandoning the development of benznidazole in, on information and belief, July 2007, causing Savant $21 million in damages related to the Milestone Payments, and the loss of 15% of the proceeds from the sale of the drug.

114.   Further, Humanigen breached the Development Agreement, including Section 5.3 and the implied covenant of good faith and fair dealing, by concealing from Savant in July 2017 that Chemo was on the cusp of receiving FDA approval, and by failing to take any steps to bar that application. Humanigen had acquired the exclusive rights to the Sosa-Estani Study in the transaction with Savant.

Humanigen's apparently calculated decision not to take preemptive action against Chemo, even though it had received information suggesting Chemo had misappropriated the Sosa-Estani Study, negatively impacted the entire drug development and commercialization program.

115.   Madison was established as Humanigen's purported affiliate. Pursuant to Section 15.8 of the Development Agreement, Humanigen was required to cause Madison, to the extent it is an affiliate, to comply with the terms of the Development Agreement. Because Humanigen failed to obtain Madison's agreement that it would abide by the terms of the Development Agreement and Madison has repudiated its obligations under the Development Agreement, Humanigen is responsible. Under Section 15.8, "[a]ny breach by a Party's Affiliate of any of such Party's obligations under this Agreement shall be deemed a breach by such Party, and the other Party may proceed directly against such Party without any obligation to first proceed against such Party's Affiliate."

116.   ~~102.~~ In addition, as noted above, the change of control within Humanigen granting the Black Horse entities control over the company also triggered an unequivocal obligation to pay Savant 10% of outstanding Milestone Payments.  This establishes additional grounds for liability for Humanigen's failure to pay that portion of the payments, or roughly $1.9 million.

44

117.   Accordingly, Savant requests an award of damages in an amount to be determined at trial.

**Count 4:  Fraudulent Transfer (against All Defendants)**

118.   Savant incorporates all of the foregoing factual allegations as though set forth fully herein, and makes them the basis of its claim for fraudulent transfer in violation of 6 Del.C. § 1304(a)(1).

119.   At the time Humanigen entered into the transaction with Nomis Bay and Madison, it was in default of its loan obligations in excess of $16 million and its creditors were about to foreclose on its remaining assets. Humanigen was technically insolvent because its liabilities exceeded its assets.

120.   Savant was one of Humanigen's creditors at the time of its insolvency because Humanigen owed outstanding Milestone payments to Savant and it had continuing obligations under the Development Agreement to compensate Savant.

121.   The transaction between Humanigen and Nomis Bay/Madison was made for the purpose of hindering Savant's ability to recover money owed to it, which is evident because Madison has used the transaction as the basis for arguing it alone is entitled to a recovery in the New Jersey Action. Indeed, the only reason for transferring Humanigen's benznidazole-related assets to Madison was to cut Savant out. If Defendants were not attempting to hinder Savant's ability to collect, Nomis

ME1 30587255v.1
ME1 31295245v.1

Bay would have funded Humanigen directly and the latter would have served as the plaintiff in the New Jersey Action.

122.   Defendants' fraudulent intent also can be inferred because Humanigen was insolvent at the time it negotiated, the transaction was contrary to the assignment provision in the Development Agreement, and Humanigen has continued to violate the Agreement following the transaction.

123.   Accordingly, Savant requests a declaration that the assignment to Nomis Bay/Madison is null and void because it violates 6 Del.C. § 1304(a)(1), that an attachment on the fraudulently transferred assets be issued in accordance with applicable law, and that Savant receive damages equal to the value of the transferred assets.

## Count 4~~5~~: Constructive Trust (against Madison)

124.   ~~103.~~ Savant incorporates all of the forgoing factual allegations as though set forth fully herein, and makes them the basis of this request for a constructive trust over its proper share of the proceeds from the New Jersey ~~lawsuit~~Action, pursuant to the terms of the Development Agreement.

125.   ~~104.~~ Based upon the allegations set forth herein, if Madison is permitted to collect proceeds from the New Jersey ~~lawsuit~~Action, it will be unjustly enriched                                                                at

46

Savant's expense. Savant is rightfully entitled to a share in the proceeds, and Madison cannot equitably be permitted to retain Savant's share.

126.   105. Accordingly, Savant requests a constructive trust over its share of the proceeds from the New Jersey Lawsuit Action, which, pursuant to the terms of the Development Agreement, is equal to $21 million in Milestone Payments Savant would have received if FDA approval were obtained, 20% of the value of any priority review voucher that would have been received, and 15% of all sales of benznidazole that would have taken place after Humanigen successfully commercialized benznidazole.

## PRAYER FOR RELIEF

**WHEREFORE**, all premises considered, Plaintiff respectfully requests that asks this Court to grant for an Order of judgment on the merits, and the following relief:

1. a) Judgment in favor of Plaintiff on Count 1, including a declaration stating Decree that all rights to the Benznidazole IP have reverted to Savant and that it owns the claims brought by Madison in the New Jersey Action;

2. b) In Decree, in the alternative, judgment in favor of Plaintiff on Count 2, including a declaration stating that Savant is entitled to recover in the New Jersey Action the benefits of the Development Agreement it would

47

have received had Humanigen been granted FDA approval for benznidazole;

3. ~~c) Judgment in favor of Plaintiff on Count 3, including an Order, awarding~~Award Savant damages in an amount to be determined at trial for Humanigen's breaches of the Development Agreement~~.~~;

4. Award Savant damages equal to the value of the fraudulently transferred assets;

5. Decree that the transfer of assets to Madison is null and void because it is a fraudulent transfer and/or conveyance;

6. ~~d)  Judgment in favor of Plaintiff on Count 3, including an Order establishing~~Grant Savant a constructive trust that would entitle ~~Savant~~it to receive from Madison the benefits of the Development Agreement it would have received had Humanigen been granted FDA approval for benznidazole;

7. Award Savant pre- and post-judgment interest;

8. ~~e) An Order awarding~~Award Savant its attorneys' fees, costs, and disbursements ~~incurred in bringing this action~~; and

9. ~~f) An Order awarding~~Award Savant such other and further relief the Court may deem ~~equitable,~~just~~.~~ and proper.

Dated: ~~June 4~~August 27, 2019

48

**McCARTER & ENGLISH, LLP**

**OF COUNSEL:**

L. Reid Skibell
**HARRIS, ST. LAURENT &
CHAUDRY LLP**
40 Wall Street, 53rd Floor
New York, New York 10005

and

Mazin Sbaiti
Jan Michal Zapendowski
**SBAITI & COMPANY PLLC**
Renaissance Tower
1201 Elm Street, Suite 4010
Dallas, Texas 75270

*/s/ Steven P. Wood*
Steven P. Wood (No. 2309)
Dawn Kurtz Crompton (No. 5579)
Travis J. Ferguson (No. 6029)
Renaissance Centre
405 N. King Street, 8th Floor
Wilmington, Delaware 19801
(302) 984-6300

*Attorneys for Plaintiff Savant Neglected
Diseases, LLC*

ME1 30587255v.1
ME1 31295245v.1

## CERTIFICATE OF SERVICE

I, Steven P. Wood, hereby certify that on August 27, 2019,  I caused a copy

of the foregoing First Amended Verified Complaint to be served via File &

ServeXpress on the following:

> Travis S. Hunter, Esquire
> RICHARDS, LAYTON & FINGER, P.A.
> One Rodney  Square
> 920 North King St.
> Wilmington, DE  19801

> /s/ Steven P. Wood
> Steven P. Wood (No. 2309)

| Summary report: Litéra® Change-Pro TDC 7.5.0.235 Document comparison done on 8/27/2019 2:20:07 PM | |
|---|---|
| **Style name:** McCarter | |
| **Intelligent Table Comparison:** Active | |
| **Original DMS:** iw://WORK/ME1/30587255/1 | |
| **Modified DMS:** iw://WORK/ME1/31295245/1 | |
| **Changes:** | |
| Add | 323 |
| Delete | 236 |
| Move From | 2 |
| Move To | 2 |
| Table Insert | 1 |
| Table Delete | 0 |
| Table moves to | 0 |
| Table moves from | 0 |
| Embedded Graphics (Visio, ChemDraw, Images etc.) | 0 |
| Embedded Excel | 0 |
| Format changes | 0 |
| **Total Changes:** | 564 |

EFiled:  Aug 27 2019 02:35PM EDT
Transaction ID 64135551
Case No. 2019-0417-PRW

# EXHIBIT A

*Execution Version*

**AGREEMENT FOR THE MANUFACTURE, DEVELOPMENT AND COMMERCIALIZATION OF BENZNIDAZOLE FOR HUMAN USE**

**by and between**

**SAVANT NEGLECTED DISEASES, LLC**

**and**

**KALOBIOS PHARMACEUTICALS, INC**.

**Dated as of June 30, 2016**

**CONFIDENTIAL**
\\BA - 045347/000003 - 594503 v33

## Table of Contents

**Page**

**Article 1 DEFINITIONS** ........................................................................- 2 -

**Article 2 PURCHASE AND SALE OF ASSETS** ................................- 15 -

Section 2.1    Acquired Assets ..................................................- 15 -
Section 2.2    Excluded Assets ..................................................- 16 -
Section 2.3    Assumed Liabilities ............................................- 17 -
Section 2.4    Excluded Liabilities ...........................................- 17 -
Section 2.5    Closing................................................................- 18 -
Section 2.6    Delivery of Acquired Assets; Assigned Books and Records. ..................- 18 -
Section 2.7    Conditions to Closing. ........................................- 18 -
Section 2.8    Deliveries at Closing. .........................................- 20 -

**Article 3 CONSIDERATION**....................................................................- 21 -

Section 3.1    Initial Payment...................................................- 21 -
Section 3.2    Warrant ..............................................................- 21 -
Section 3.3    Milestones..........................................................- 21 -
Section 3.4    Voucher Payment ..............................................- 23 -
Section 3.5    Security Agreement ...........................................- 26 -
Section 3.6    Purchase Price Allocation..................................- 26 -
Section 3.7    Payments............................................................- 26 -
Section 3.8    Audits ................................................................- 27 -
Section 3.9    Taxes..................................................................- 28 -

**Article 4 DEVELOPMENT PROGRAM** ................................................- 29 -

Section 4.1    Overview; Joint Development Program Term .......................- 29 -
Section 4.2    Joint Development Plan .....................................- 29 -
Section 4.3    Joint Development Program Costs .....................- 30 -
Section 4.4    Diligent Efforts .................................................- 31 -
Section 4.5    Subcontracting ...................................................- 31 -
Section 4.6    Compliance ........................................................- 31 -
Section 4.7    Regulatory Filings .............................................- 31 -
Section 4.8    Compensation for Development Delays................- 32 -
Section 4.9    Monthly Activity Log ........................................- 33 -

**Article 5 COMMERCIALIZATION** ........................................................- 33 -

Section 5.1    Overview ............................................................- 33 -
Section 5.2    Commercialization Plan .....................................- 33 -
Section 5.3    Diligent Efforts..................................................- 34 -

Section 5.4    Development, Commercialization outside the United States ................... - 34 -
Section 5.5    Reporting Requirements ........................................................................ - 34 -
Section 5.6    Drug Pricing Matters ............................................................................ - 34 -

**Article 6 GOVERNANCE ......................................................................................... - 34 -**

Section 6.1    Joint Steering Committee ...................................................................... - 34 -
Section 6.2    Joint Development Committee ............................................................... - 36 -
Section 6.3    Commercialization Report..................................................................... - 37 -
Section 6.4    No Authority to Amend .......................................................................... - 37 -

**Article 7 INTELLECTUAL PROPERTY RIGHTS ................................................. - 37 -**

Section 7.1    Development Program IP ....................................................................... - 37 -
Section 7.2    Licenses by the Company...................................................................... - 38 -
Section 7.3    Licenses by KaloBios ............................................................................ - 39 -
Section 7.4    Prosecution and Maintenance of Development Program IP................... - 39 -
Section 7.5    Third Party Infringement ...................................................................... - 39 -
Section 7.6    Defense of Claims Brought by Third Parties ......................................... - 40 -
Section 7.7    Grant of Rights to Company IP ............................................................. - 40 -
Section 7.8    Royalty on Company IP. ........................................................................ - 41 -
Section 7.9    Currency; Exchange Rate ...................................................................... - 42 -
Section 7.10   Taxes..................................................................................................... - 42 -
Section 7.11   Prosecution and Maintenance of Company IP ...................................... - 43 -
Section 7.12   Third Party Infringement of Company IP. ............................................ - 43 -
Section 7.13   Defense of Claims Brought by Third Parties ......................................... - 44 -

**Article 8 REPRESENTATIONS AND WARRANTIES OF THE COMPANY ............... - 44 -**

Section 8.1    Corporate Existence............................................................................... - 44 -
Section 8.2    Authorization and Enforceability .......................................................... - 44 -
Section 8.3    No Conflict ............................................................................................ - 45 -
Section 8.4    Legal Proceedings ................................................................................. - 45 -
Section 8.5    Contracts and Commitments. ................................................................ - 45 -
Section 8.6    No "Bad Actor"; No Debarment ............................................................ - 46 -
Section 8.7    Title; Encumbrances; Sufficiency. ........................................................ - 47 -
Section 8.8    No Consents. .......................................................................................... - 47 -
Section 8.9    Compliance with Laws .......................................................................... - 47 -
Section 8.10   Safety and Efficacy; Exclusive Rights to Certain Existing Foreign Data - 48 -
Section 8.11   Good Practices....................................................................................... - 48 -
Section 8.12   Regulatory Matters. .............................................................................. - 49 -
Section 8.13   Taxes..................................................................................................... - 50 -
Section 8.14   No Undisclosed Liabilities .................................................................... - 50 -
Section 8.15   Inventory ............................................................................................... - 51 -
Section 8.16   Brokers .................................................................................................. - 51 -
Section 8.17   Compliance with the Foreign Corrupt Practices Act and Export Control and
                Anti-boycott Laws ................................................................................ - 51 -

Section 8.18      Intellectual Property ............................................................- 52 -

**Article 9 REPRESENTATIONS AND WARRANTIES OF KALOBIOS** ........................- 52 -

Section 9.1       Corporate Existence ............................................................- 52 -
Section 9.2       Authorization and Enforceability ........................................- 52 -
Section 9.3       Capitalization ....................................................................- 53 -
Section 9.4       No Conflict ........................................................................- 53 -
Section 9.5       Legal Proceedings .............................................................- 54 -
Section 9.6       No "Bad Actor"; No Debarment ..........................................- 54 -
Section 9.7       Solvency ...........................................................................- 54 -
Section 9.8       Unencumbered Cash Balance .............................................- 55 -
Section 9.9       Data...................................................................................- 55 -
Section 9.10      Private Offering .................................................................- 55 -
Section 9.11      Brokers .............................................................................- 55 -

**Article 10 COVENANTS** ..................................................................................- 55 -

Section 10.1      Availability of Records ......................................................- 55 -
Section 10.2      Regulatory ........................................................................- 56 -
Section 10.3      Disqualification Events or Debarment ................................- 56 -
Section 10.4      Further Assurances ............................................................- 56 -
Section 10.5      Consents ...........................................................................- 57 -
Section 10.6      Omitted Assets ..................................................................- 57 -
Section 10.7      Reserved ...........................................................................- 58 -
Section 10.8      Listing of Common Stock on National Securities Exchange ..................- 58 -
Section 10.9      Securities Registration Matters ..........................................- 58 -
Section 10.10     Insurance ..........................................................................- 59 -

**Article 11 CONFIDENTIALITY** .......................................................................- 59 -

Section 11.1      Confidential Information ....................................................- 59 -
Section 11.2      Authorized Disclosure .......................................................- 60 -
Section 11.3      Press Release; Disclosure of Agreement .............................- 60 -
Section 11.4      Survival.............................................................................- 60 -

**Article 12 INDEMNIFICATION** .......................................................................- 61 -

Section 12.1      Indemnification by the Company ........................................- 61 -
Section 12.2      Indemnification by KaloBios .............................................- 61 -
Section 12.3      Indemnification Procedures ...............................................- 62 -
Section 12.4      Right of Set Off .................................................................- 62 -
Section 12.5      Survival.............................................................................- 63 -
Section 12.6      Limitation on Indemnity ....................................................- 63 -
Section 12.7      Limitation of Liability .......................................................- 64 -
Section 12.8      Exclusive Remedy .............................................................- 64 -

**Article 13 TERM AND TERMINATION** ...........................................................- 64 -

Section 13.1    Term ........................................................................................- 64 -
Section 13.2    Termination for Convenience...............................................- 64 -
Section 13.3    Termination for Cause ..........................................................- 64 -
Section 13.4    Termination for Bankruptcy .................................................- 65 -
Section 13.5    Termination of Joint Development Program upon Mutual Consent ........- 65 -
Section 13.6    Effects of Termination after Closing.....................................- 65 -
Section 13.7    Termination Prior to Closing .................................................- 66 -
Section 13.8    Other Termination Consequences .........................................- 67 -

**Article 14 DISPUTE RESOLUTION ...........................................................- 68 -**

Section 14.1    Governing Law ......................................................................- 68 -
Section 14.2    Dispute Resolution ................................................................- 68 -

**Article 15 GENERAL PROVISIONS ..........................................................- 68 -**

Section 15.1    Force Majeure.........................................................................- 68 -
Section 15.2    Assignment..............................................................................- 69 -
Section 15.3    Severability.............................................................................- 69 -
Section 15.4    Notices....................................................................................- 69 -
Section 15.5    Construction of Agreement ....................................................- 70 -
Section 15.6    Headings; Interpretation ........................................................- 70 -
Section 15.7    Independent Contractors ........................................................- 71 -
Section 15.8    Performance by Affiliates.......................................................- 71 -
Section 15.9    Waiver ....................................................................................- 71 -
Section 15.10   Counterparts ...........................................................................- 71 -
Section 15.11   Expenses .................................................................................- 71 -
Section 15.12   Time of the Essence................................................................- 71 -
Section 15.13   Entire Agreement; Amendments ............................................- 71 -

## EXHIBITS

Exhibit A        Compound
Exhibit B-1      Issued Company Patents
Exhibit B-2      Pending Company Patents
Exhibit C        Form of Bill of Sale
Exhibit D        Form of Assignment and Assumption Agreement
Exhibit E        Form of Opinion
Exhibit F        Form of Warrant
Exhibit G        Form of Security Agreement
Exhibit H        Form of Escrow Agreement
Exhibit I        Current Development Plan
Exhibit J        Databases

## SCHEDULES

Schedule 2.1     Schedule of Acquired Assets

Schedule 2.6(a)   Additional Acquired Assets
Schedule 3.6       Allocation Schedule
Schedule 8         Company Disclosure Schedules
Schedule 9         KaloBios Disclosure Schedules

**CONFIDENTIAL**
\\BA - 045347/000003 - 594503 v33

## AGREEMENT

This AGREEMENT FOR THE MANUFACTURE, DEVELOPMENT AND COMMERCIALIZATION OF BENZNIDAZOLE FOR HUMAN USE (this "**Agreement**") is entered into as of June 30, 2016 (the "**Effective Date**"), by and between Savant Neglected Diseases, LLC, a Delaware limited liability company, having a place of business at 655 Skyway Road, Suite 218, San Carlos, CA 94070 (U.S. Mail: P.O. Box 620732, Woodside, CA 94062-0732) (the "**Company**"), and KaloBios Pharmaceuticals, Inc., a Delaware corporation, having offices at 1000 Marina Blvd, Suite 250, Brisbane, CA 94005 ("**KaloBios**").  The Company and KaloBios are sometimes referred to in this Agreement individually as a "**Party**" and collectively as the "**Parties**."

## RECITALS

WHEREAS, the Company is a biopharmaceutical company with expertise in the manufacture and development of medications that prevent or treat disease and maintain wellness;

WHEREAS, KaloBios is a biopharmaceutical company with expertise in the development of pharmaceutical products and is working to create and develop novel pharmaceutical products;

WHEREAS, the Company owns or controls certain rights to benznidazole, an antiparasitic medication currently used in the treatment of Chagas disease outside the United States;

WHEREAS, the Company and KaloBios entered into a Confidential Disclosure Agreement dated December 1, 2015;

WHEREAS, the Company and KaloBios entered into the Prior Letter of Intent (as defined below);

WHEREAS, the then chief executive officer of KaloBios, Martin Shkreli, was arrested on securities fraud charges by United States federal agents on December 17, 2015, and subsequently dismissed as chief executive officer;

WHEREAS, KaloBios filed for protection under Chapter 11 of the Bankruptcy Code on December 29, 2015;

WHEREAS, the United States Bankruptcy Court on February 26, 2016, approved the Letter of Intent (as defined below);

WHEREAS, the Company and KaloBios entered into the Letter of Intent as approved by the United States Bankruptcy Court effective February 29, 2016, thereby superseding the Prior Letter of Intent;

WHEREAS, the Company and KaloBios desire to supersede the Letter of Intent effective February 29, 2016, by entering into one or more definitive agreements as contemplated by the Letter of Intent;

- 1 -

**WHEREAS**, the Company further desires to sell to KaloBios, and KaloBios further desires to purchase from the Company, all right, title and interest in and to certain assets relating to the Compound and the Product (as such terms are defined below), for the consideration and on the terms set forth in this Agreement;

**WHEREAS**, the Company further desires to grant to KaloBios an exclusive license to certain intellectual property rights relating to the Compound and the Product;

**WHEREAS**, the Company and KaloBios have agreed to jointly perform certain development activities for the Product; and

**WHEREAS**, KaloBios has agreed that it will commercialize the Product, subject to the terms and conditions of this Agreement; and

**WHEREAS**, the Company and KaloBios intend to perform their respective obligations under this Agreement in a manner that maximizes the value of the Product to patients.

**NOW, THEREFORE**, in consideration of the foregoing premises and the mutual promises, covenants, and conditions contained in this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, hereby agree as follows:

**ARTICLE 1**
**DEFINITIONS**

In addition to the terms defined above and other terms defined in other sections of this Agreement, the following capitalized terms have the meanings set forth in this <u>Article 1</u> for purposes of this Agreement:

"**Acquired Assets**" has the meaning set forth in <u>Section 2.1</u>.

"**Action**" means any action, claim, lawsuit, legal proceeding, litigation, arbitration or mediation, or any hearing, investigation, probe or inquiry by any Governmental Authority or other Person.

"**Active Ingredient**" means any clinically active material that provides pharmacological activity in a pharmaceutical product.

"**Affiliate**" means, with respect to either Party, any Person that directly or indirectly controls, is controlled by, or is under common control with such Party.  For the purpose of this definition, "**control**" (including, with correlative meaning, the terms "**controlled by**" and "**under the common control**") means (i) direct or indirect ownership of fifty percent (50%) or more, including ownership by trusts with substantially the same beneficial interests, of the voting securities of such Person, or (ii) the power to direct or cause the direction of the management of such Person.

"**Agreement**" has the meaning set forth in the Preamble.

- 2 -

**CONFIDENTIAL**
\\BA - 045347/000003 - 594503 v33

"**Allocation Schedule**" has the meaning set forth in Section 3.6.

"**Annual Net Sales**" means, with respect to a Product, aggregate Net Sales in the Territory in a particular Calendar Year for such Product.

"**Assigned Books and Records**" has the meaning set forth in Section 2.1(e).

"**Assignment and Assumption Agreement**" means the assignment and assumption agreement, dated as of the Closing Date, substantially in the form attached hereto as Exhibit D.

"**Assumed Contracts**" has the meaning set forth in Section 2.1(b).

"**Assumed Liabilities**" has the meaning set forth in Section 2.3.

"**Bankruptcy Code**" has the meaning set forth in Section 13.4.

"**Bankruptcy Exit**" has the meaning set forth in Section 2.7(c)(iv).

"**Beneficial Owner**" has the meaning set forth in Rule 13d-3 under the Securities Exchange Act of 1934, as amended from time to time.

"**Bill of Sale**" means the bill of sale, dated as of the Closing Date, substantially in the form attached hereto as Exhibit C.

"**Breaching Party**" has the meaning set forth in Section 13.3(a).

"**Business**" means the Company's and its Affiliates' business to the extent related to the Compound, the Product and the Acquired Assets.

"**Business Day**" means any day other than (a) Saturday or Sunday, or (b) any other day on which banks in San Francisco, California are closed for business.

"**Calendar Quarter**" means a period of three (3) consecutive months ending on the last day of March, June, September or December, respectively.

"**Calendar Year**" means a period of twelve (12) consecutive months beginning on January 1 and ending on December 31.

"**Cap**" has the meaning set forth in Section 12.6(a).

"**C.F.R.**" means the Code of Federal Regulation.

"**cGMP**" or "**GMP**" means, with respect to any pharmaceutical product, current Good Manufacturing Practices as defined by the FDA (21 C.F.R. Parts 210 and 211), as may be amended from time to time, and other similar provisions under applicable Law outside the United States.

"**Change of Control**" means with respect to any Party (a) any sale, exchange, transfer or issuance to or acquisition in one transaction or a series of related transactions by one or more

- 3 -

Third Parties of shares representing more than fifty percent (50%) of the aggregate ordinary voting power entitled to vote for the election of directors represented by the issued and outstanding stock of such Party or any Affiliate that directly or indirectly controls such Party, whether such sale, transfer, exchange, issuance or acquisition is made directly or indirectly, by merger or otherwise, or beneficially or of record, but excluding the issuance of shares in a bona fide financing transaction; (b) a merger or consolidation under Law of the Party with a Third Party in which the stockholders of the Party immediately prior to such consolidation or merger do not continue to hold immediately following the closing of such merger or consolidation at least fifty percent (50%) of the aggregate ordinary voting power entitled to vote for the election of directors represented by the issued and outstanding stock of the entity surviving or resulting from such consolidation; or (c) a sale, transfer, exclusive license or other disposition of all or substantially all of the assets of the Party to one or more Third Parties in one transaction or a series of related transactions.  Notwithstanding the foregoing, neither (i) the transactions related to the emergence of KaloBios from protection under Chapter 11 of the Bankruptcy Code, including the issuance of New Common Stock to the Primary Plan Sponsor (as such terms are defined in KaloBios' Second Amended Plan of Reorganization, dated May 9, 2016 [D.I. 434] (the "**Plan**")), nor (ii) any sale or other disposition of KaloBios securities by or on behalf of Martin Shkreli, shall constitute a Change of Control.

"**Claim**" has the meaning set forth in <u>Section 12.3</u>.

"**Closing**" has the meaning set forth in <u>Section 2.5</u>.

"**Closing Date**" has the meaning set forth in <u>Section 2.5</u>.

"**Commercialization Plan**" has the meaning set forth in <u>Section 5.2(a)</u>.

"**Commercialization Program**" has the meaning set forth in <u>Section 5.1</u>.

"**Common Stock**" means the common stock, $0.001 par value, of KaloBios.

"**Company**" has the meaning set forth in the Preamble.

"**Company Covered Person**" has the meaning set forth in <u>Section 8.6</u>.

"**Company Commercialization Notice**" has the meaning set forth in <u>Section 3.3(c)(ii)</u>.

"**Company Development Program IP**" has the meaning set forth in <u>Section 7.1(a)</u>.

"**Company Field**" means any and all veterinary uses.

"**Company IP**" means the Company Patents and Company Know-How.

"**Company Know-How**" means any Know-How Controlled by the Company or its Affiliates as of the Effective Date to the extent relating to the Compound or the Product except as solely related to the Company Field.

"**Company Offer**" has the meaning set forth in <u>Section 3.4(b)(ii)</u>.

- 4 -

**CONFIDENTIAL**
\\BA - 045347/000003 - 594503 v33

"**Company Patents**" means those Patents that are Controlled by the Company or its Affiliates as of the Effective Date that claim or cover the Exploitation of the Compound or the Product.  The issued patents constituting Company Patents as of the Effective Date are set forth on Exhibit B-1 of this Agreement and the pending patent applications constituting Company Patents as of the Effective Date are set forth on Exhibit B-2 of this Agreement.

"**Compound**" means the compound known as benznidazole, having the chemical name and structure set forth in Exhibit A.

"**Confidential Disclosure Agreement**" means that Confidential Disclosure Agreement, dated as of December 1, 2015, by and between KaloBios and the Company.

"**Confidential Information**" has the meaning set forth in Section 11.1.

"**Confirmation Order**" means that certain Order Confirming the Plan issued by the United States Bankruptcy Court for the District of Delaware on June 16, 2016 with respect to the matter entitled In re KaloBios Pharmaceuticals, Inc. (Case No. 15-12628).

"**Contemplated Transactions**" means all of the transactions contemplated by the Transaction Documents.

"**Contingent Payments**" means the collective amount of all Milestone Payments, Royalties and the Voucher Payment, if any.

"**Contract**" means any written or oral contract, agreement, instrument, commitment, obligation, understanding, or undertaking of any nature (including, without limitation, leases, licenses, mortgages, notes, guarantees, sublicenses, subcontracts, covenants not to compete, covenants not to sue, confidentiality agreements, options and warranties), whether or not legally binding, and any amendments thereto.

"**Control**," "**Controls**," "**Controlled**" or "**Controlling**" means, with respect to any material, Know-How or other intellectual property rights, that a Party has the legal authority or right (whether by ownership, license or otherwise) to grant a license, sublicense, access or other right (as applicable) under such material, Know-How or other intellectual property rights to the other Party on the terms and conditions set forth herein, in each case without breaching the terms of any agreement or other arrangement with a Third Party.

"**Deposit**" means (a) Five Hundred Thousand Dollars ($500,000), which amount was paid by KaloBios to the Company under the terms of the Letter of Intent on February 26, 2016.

"**Development Program IP**" has the meaning set forth in Section 7.1(a).

"**Diligent Efforts**" means, with respect to a Party, the performance of obligations or tasks in a manner consistent with the efforts a Party devotes (and which in no event shall be less than the level of effort and resources reasonably standard in the biopharmaceutical industry for a company having similar financial resources) for the Exploitation of a product resulting from its own research efforts and having similar technical and regulatory factors, clinical development plan complexity and requirements, and similar market potential, sales and profit potential and

- 5 -

strategic value, and that is at a similar stage in its development or product life cycle as the Product, in each case based on conditions then prevailing.

"**Disclosing Party**" has the meaning set forth in <u>Section 11.1</u>.

"**Disclosure Schedule**" means any schedule delivered by the Company pursuant to <u>Article 8</u> or KaloBios pursuant to <u>Article 9</u>.

"**Dispute**" has the meaning set forth in <u>Section 14.2</u>.

"**Disqualification Event**" has the meaning set forth in <u>Section 8.6(a)</u>.

"**Dollars**" means U.S. dollars, and "**$**" shall be interpreted accordingly.

"**Effective Date**" has the meaning set forth in the Preamble.

"**EMA**" means the European Medicines Agency or any successor agency thereto.

"**Encumbrance**" means any charge, claim, condition, equitable interest, lien, mortgage, security interest, pledge, defect or irregularity in title, easement, rights-of-way, encroachment, servitude, right of first option, right of first refusal or similar restriction, covenant, restriction and any other matters typically raised as exceptions in a commitment to issue a title insurance policy, or any other restriction on use, voting, transfer or exercise of any other attribute of ownership other than a Permitted Encumbrance.

"**Escrow Agent**" means Wilmington Savings Fund Society, FSB.

"**Excluded Assets**" has the meaning set forth in <u>Section 2.2</u>.

"**Excluded Liabilities**" means all Liabilities of the Company and its Affiliates other than the Assumed Liabilities.

"**Executive Officers**" means, (a) with respect to the Company, Stephen L. Hurst, and (b) with respect to KaloBios, Cameron Durrant.

"**Exploit**" means to make, have made, import, use, sell or offer for sale, including to research, develop, commercialize, manufacture, register, hold or keep (whether for disposal or otherwise), have used, export, transport, distribute, have distributed, promote, market or have sold or otherwise dispose of a product or a process, and "**Exploitation**" means the act of Exploiting a product or process.

"**FD&C Act**" means the U.S. Federal Food, Drug, and Cosmetic Act, as amended.

"**FDA**" means the U.S. Food and Drug Administration or any successor entity.

"**First Commercial Sale**" means, with respect to a particular Product, the first sale for which revenue has been recognized by KaloBios for use or consumption by the general public of such Product in any country in the Territory after all required Regulatory Approvals have been granted in such country.

**CONFIDENTIAL**
\\BA - 045347/000003 - 594503 v33

"**FTE**" means 1880 labor hours for one (1) year directly related to the Joint Development Program.  Overtime and work on weekends, holidays and the like shall not be counted with any multiplier (*i.e.*, time-and-a-half or double time) toward the number of hours that are used to calculate the number of FTEs under this Agreement.

"**FTE Rate**" means a rate per FTE equal to Three Hundred and Fifty Dollars ($350) per hour (which may be prorated on a daily or hourly basis as necessary) with respect to Joint Development Program activities conducted pursuant to this Agreement.  "FTE Rate" includes direct and indirect costs of internal scientific, medical, technical or commercial personnel (including personnel and travel expenses, and includes the costs of any allocated managerial, financial, legal or business development personnel).

"**Fundamental Representations**" means, (a) with respect to the Company, the representations and warranties of the Company set forth in Sections 8.1, 8.2 and 8.3, and (b) with respect to KaloBios, the representations and warranties of KaloBios set forth in Sections 9.1, 9.2, 9.3and 9.9.

"**Future Assets**" has the meaning set forth in Section 13.6(a).

"**GAAP**" means United States generally accepted accounting principles and practices, consistently applied.

"**Galenyx**" shall mean Galenyx, LLC.

"**GCP**" means current Good Clinical Practices as defined in Article 1.24 of the April 1996 International Conference on Harmonization ("**ICH**") E6 Good Clinical Practice Guideline, as may be amended from time to time, and other similar provisions outside the United States.

"**GLP**" has the meaning set forth in Section 8.11.

"**Governmental Approval**" means any consent, license, registration or permit issued, granted, given or otherwise made available by or under the authority of any Governmental Authority or pursuant to any Law.

"**Governmental Authority**" means any federal, national, state, provincial or local government, or political subdivision thereof (including any agency, branch, office, commission, or council), or any multinational organization or any authority, agency, or commission entitled to exercise any administrative, executive, judicial, legislative, police, regulatory or taxing authority or power, any court or tribunal (or any department, bureau or division thereof, or any governmental arbitrator or arbitral body).

"**IECS**" means Instituto de Efectividad Clinica y Sanitaria.

"**IECS Agreement**" means that certain Data License and Services Agreement by and between the Company (formerly known as Savant Chagas, LLC) and IECS dated as of August 23, 2013.

- 7 -

"**IND**" means any investigational new drug application as defined in Part 312 of Title 21 of the U.S. Code of Federal Regulations or any comparable application filed with any Regulatory Authority outside of the United States.

"**Indemnification Basket**" has the meaning set forth in Section 12.6(a).

"**Indemnified Party**" has the meaning set forth in Section 12.3.

"**Indemnifying Party**" has the meaning set forth in Section 12.3.

"**Infringement of Development Program IP**" has the meaning set forth in Section 7.5(a).

"**Infringement of Company IP**" has the meaning set forth in Section 7.12(a).

"**Initial Payment**" has the meaning set forth in Section 3.1.

"**Intellectual Property**" means Patents, Know-How and copyrights.

"**Inventory**" means all inventories of the Company or its Affiliates, wherever located, including all work in process, raw materials, starting materials, intermediates from the synthesis of the Compound, the Compound (including Compound bulk stock), the Product, spare parts, assay materials (including cell lines and other reagents) and all other materials and supplies to be used or consumed by the Company in the Exploitation of the Compound or the Product.

"**Joint Development Committee**" or "**JDC**" has the meaning set forth in Section 6.2.

"**Joint Development Plan**" has the meaning set forth in Section 4.2(a).

"**Joint Development Program**" means the conduct of the activities conducted by the Parties during the Joint Development Program Term, according to Section 4.1 hereto and the other terms and conditions set forth in this Agreement, and as set forth in the Joint Development Plan.

"**Joint Development Program Costs**" has the meaning set forth in Section 4.3(a).

"**Joint Development Program IP**" has the meaning set forth in Section 7.1(a).

"**Joint Development Program Term**" has the meaning set forth in Section 4.1.

"**Joint Steering Committee**" or "**JSC**" has the meaning set forth in Section 6.1.

"**KaloBios Development Program IP**" has the meaning set forth in Section 7.1(a).

"**KaloBios**" has the meaning set forth in the Preamble.

"**KaloBios Covered Person**" has the meaning set forth in Section 9.6.

- 8 -

**CONFIDENTIAL**

\\BA - 045347/000003 - 594503 v33

"**KaloBios Non-Commercialization Notice**" has the meaning set forth in Section 3.3(c)(i).

"**Know-How**" means any proprietary data, results, material(s), technology, and nonpublic information of any type whatsoever, in any tangible or intangible form, including: (a) information, techniques, technology, practices, trade secrets, discoveries, developments, methods, knowledge, know-how, skill, experience, data, inventions (whether patentable or not) results (including assay development, compound screening, chemical, pharmacological, toxicological and clinical test data and results), analytical and quality control data, results or descriptions, software and algorithms, reports and study reports; and (b) compositions of matter, cells, cell lines, assays, animal models and physical, biological or chemical material.

"**Knowledge**" means (a) with respect to the Company, the actual knowledge of Stephen L. Hurst, Scott Freeman and Chad Boulanger, after due investigation or inquiry, and (b) with respect to KaloBios, the actual knowledge of Cameron Durrant, David Moradi, Morgan Lam and Ronald Barliant, after due investigation or inquiry.

"**Law**" means any federal, state, local, foreign or multinational law, statute, standard, ordinance, code, rule, regulation, resolution or promulgation, or any order by any Governmental Authority, or any license, franchise, permit or similar right granted by any Governmental Authority, or any similar provision having the force or effect of law, including the rules or regulations of the SEC or of any stock exchange or trading market on which a Party's (or its Affiliate's) securities are traded.

"**Letter of Intent**" means that certain letter agreement between KaloBios and the Company, dated February 29, 2016, setting forth the intent of the Parties to consummate the Contemplated Transactions.

"**Liabilities**" means any and all debts, costs and expenses, liabilities and obligations (including with respect to Taxes), whether accrued or fixed, absolute or contingent, matured or unmatured, determined or determinable, asserted or unasserted, known or unknown, including those arising under any Law, action or governmental order and those arising under any Contract.

"**Licensed Field**" means any and all uses in humans.

"**Losses**" has the meaning set forth in Section 12.1.

"**MAA**" means an application to the appropriate Regulatory Authority for approval to market a Product (but excluding Pricing Approval) in any particular jurisdiction (including an NDA in the United States) and all amendments and supplements thereto.

"**Material Adverse Effect**" means any change, circumstance or effect that, individually or in the aggregate, would or would reasonably be expected to (a) have a materially adverse effect on the Acquired Assets taken as a whole, including the value thereof or KaloBios' ability to receive, operate and develop the Acquired Assets taken as a whole free of Encumbrances pursuant hereto; *provided*, that none of the following changes, effects, events, circumstances or occurrences shall be deemed, either alone or in combination, to constitute a Material Adverse Effect, or be taken into account in determining whether a Material Adverse Effect has occurred

- 9 -

or would reasonably be expected to occur: (i) changes or effects in general economic or financial conditions; (ii) changes in applicable Laws or accounting rules (including GAAP) or the enforcement, implementation or interpretation thereof; (iii) changes or effects that generally affect the pharmaceutical or medical device industry; (iv) changes or effects that arise out of or are attributable to the commencement, occurrence, continuation or intensification of any war, sabotage, armed hostilities or acts of terrorism; (v) changes or effects arising out of or attributable to the public announcement of the transactions contemplated by this Agreement or the compliance with the provisions of this Agreement including losses or threatened losses of employees, customers, suppliers, distributors or others having relationships with the Company and the Business; or (vi) any matter which KaloBios is aware of on the date hereof; or (b) prevent or materially delay consummation of the Contemplated Transactions.

"**Milestone Payments**" has the meaning set forth in Section 3.3(a).

"**NDA**" means a New Drug Application filed with the FDA, under Sections 505(b)(1) or 505(b)(2) of the FD&C Act, to obtain approval to market a Product (but excluding Pricing Approval) in the United States and all amendments and supplements thereto.

"**Net Sales**" means, with respect to any Product, the total amount invoiced by KaloBios or its respective Affiliates or Sublicensees (the "**Selling Party**") to each Third Party purchasing the Product in arm's length transactions, less the following deductions from such total amounts which are actually incurred, allowed, accrued or specifically allocated:

(a)      transportation and insurance charges related to the delivery of the Products to customers;

(b)      normal trade, volume and cash discounts, including retroactive price reductions, pertaining to the sale of the Products;

(c)      any service fees actually paid to customers as a requirement for the stocking and subsequent re-distribution of the Product;

(d)      credits, allowances or refunds given or made to customers for rejection, damage, defect, recall or return of the Product to the Selling Party by customers;

(e)      sales and excise taxes, value added taxes, other taxes (excluding income taxes) or other governmental charges otherwise imposed upon the amounts billed for the Product, as adjusted for rebates and refunds or duties that fall due or are absorbed or otherwise imposed on or paid by the Selling Party on sales of Products and other governmental charges imposed upon the importation or sale of the Products;

(f)      chargebacks and rebates to third parties, including, without limitation, to managed care health organizations, federal and state government agencies and/or other purchasers of the Product, and group purchasing organization administration fees;

(g)      the amount of the rebate that is provided or credited with respect to couponing, a patient assistance program, a patient insurance co-pay program or any program designed to provide a discount to the patient for the cost of a prescription for the Product;

- 10 -

(h)      delayed shipping credits, discounts or payments related to the impact of Product price increases between purchase dates and shipping dates, and fees for service payments to customers for non-separable services (including compensation for maintaining agreed Product inventory levels and providing Product-related information);

(i)      that portion of the annual fee on prescription drug manufacturers imposed by the Patient Protection and Affordable Care Act, Pub. L. No. 111-148 (as amended), that the Selling Party allocates to sales of the Product in accordance with their respective standard policies and procedures consistently applied across its products; and

(j)      all such deductions set forth in (a) through (i) above being supported by reasonable written documentation.

Net Sales shall be calculated and accounted for in accordance with GAAP.

Notwithstanding anything to the contrary contained herein, for the purposes of this definition, (i) the transfer of the Product by KaloBios or one of its Affiliates or Sublicensees to another Affiliate, other than for value, shall not be considered a sale, and (ii) any disposal of the Product for, or use of the Product in or for research, test marketing, clinical trial purposes, free samples, or for warehousing or staging in advance of release of the Product for commercial sale, shall not be considered a sale.

"**New Common Stock**" has the meaning set forth in the definition of Change of Control.

"**Net Voucher Proceeds**" means the consideration received or deemed received by KaloBios or its Affiliate(s) for the sale or transfer of a Voucher in a Voucher Sale or as determined under Section 3.4 (as reduced for all costs and expenses incurred by KaloBios or its Affiliate(s), exclusively related to a Voucher Sale and excluding any and all government filing fees and costs incurred prior to such Voucher Sale, to a maximum of six percent (6%) of gross proceeds). For the avoidance of doubt, in the event that the Voucher Sale occurs in connection with other transactions between KaloBios and the purchaser of the Voucher, the Net Voucher Proceeds shall mean only the consideration received by KaloBios or its Affiliate(s) that is attributable solely to the purchase of the Voucher.

"**No-Action Letter**" has the meaning set forth in Section 10.9(a).

"**Non-breaching Party**" has the meaning set forth in Section 13.3(a).

"**Non-Voucher Accompanying Approval**" has the meaning set forth in Section 3.3(c).

"**Omitted Asset**" has the meaning set forth in Section 10.6.

"**Orphan Drug Designation**" means a grant by the FDA of a request for designation under Section 526 of the FD&C Act as amended (21 U.S.C. 360bb) in the United States or any analogous grant by a Regulatory Authority in any other country in the Territory.

"**Party**" and "**Parties**" have the meaning set forth in the Preamble.

- 11 -

"**Patent**" means (a) all patents and patent applications in any country or supranational jurisdiction in the Territory, and (b) any substitutions, divisions, continuations, continuations-in-part, provisional applications, reissues, renewals, registrations, confirmations, re-examinations, extensions, supplementary protection certificates and the like of any such patents or patent applications.

"**Permitted Encumbrance**" means (a) liens for Taxes not yet due and payable or being contested in good faith by appropriate procedures; (b) mechanics', carriers', workmen's, repairmen's or other like liens arising or incurred in the ordinary course of business; (c) liens arising under original purchase price conditional sales contracts and equipment leases with Third Parties entered into in the ordinary course of business; (d) easements, rights of way, zoning ordinances and other similar Encumbrances affecting real property; and (e) other imperfections of title or Encumbrances, and with respect to (a) through (e), which are neither, individually or in the aggregate, material to the business of the Company, nor have not had, and would not reasonably be expected to have, a Material Adverse Effect.

"**Person**" means any individual, corporation, partnership, joint venture, limited liability company, trust, business association, organization, Governmental Authority, a division or operating group of any of the foregoing or other entity or organization, including any successors or assigns (by merger or otherwise) of any such entity, or government or political subdivision or any agency, department or instrumentality thereof.

"**Plan**" has the meaning set forth in the definition of Change of Control.

"**Pricing Approval**" means such Governmental Approval, agreement, determination or decision establishing prices for a Product that can be charged and/or reimbursed in regulatory jurisdictions where the applicable Governmental Authorities approve or determine the price and/or reimbursement of pharmaceutical products and where such Governmental Approval or determination is necessary for the commercial sale of such Product in such jurisdictions.

"**Prior Letter of Intent**" means that Letter of Intent entered into by the Company and KaloBios on December 1, 2015 and effective as of December 2, 2015.

"**Priority Review**" means a priority review of, and action, upon a human drug application by the FDA not later than six (6) months after the filing of such application to the FDA, as defined in the FD&C Act.

"**Product**" means any pharmaceutical product that contains the Compound, either alone or in combination with other Active Ingredients

"**Program**" means the research and development program, including the Joint Development Program, to obtain Regulatory Approval for the Product in the United States for the treatment of Chagas disease.

"**Receiving Party**" has the meaning set forth in Section 11.1.

"**Registrable Securities**" means (i) the Warrant Shares and any shares of Common Stock issued in respect thereof as a result of any stock split, dividend or other distribution,  merger,

- 12 -

consolidation, recapitalization or similar event and (ii) any Common Stock issued as (or issuable upon the exercise of any warrant, right or other security that is issued as) a dividend or other distribution with respect to, or in exchange or in replacement of, the Warrant Shares described in clause (i) of this definition; *provided, however,* that any such Registrable Securities shall cease to be Registrable Securities (and KaloBios shall not be required to maintain the effectiveness of any, or file another, Registration Statement hereunder with respect thereto) when (a) a Registration Statement with respect to the sale of such Registrable Securities is declared effective by the SEC under the Securities Act and such Registrable Securities have been disposed of in accordance with such effective Registration Statement, (b) such Registrable Securities have been previously sold in accordance with Rule 144, (c) such securities become eligible for resale without volume or manner-of-sale restrictions and without current public information pursuant to Rule 144 as reasonably determined by KaloBios, upon the advice of counsel to KaloBios, or (d) such time as the SEC issues the No-Action Letter.

"**Registration Statement**" means any registration statement filed under the Securities Act for an offering to be made on a continuous basis pursuant to Rule 415 thereunder, including (in each case) all exhibits thereto, any amendments thereto (including pre- and post-effective amendments), the related prospectus and any prospectus supplement, and all material incorporated by reference or deemed to be incorporated by reference in any such registration statement.

"**Regulatory Approval**" means those approvals (*e.g.*, drug approval, medical device approval, Pricing Approval and reimbursement approval) necessary for the Exploitation of a Compound or a Product in a given country or regulatory jurisdiction.

"**Regulatory Authority**" means in a particular country or jurisdiction, any applicable Governmental Authority or non-Governmental Authority involved in granting Regulatory Approval in such country or jurisdiction.

"**Regulatory Exclusivity**" means, with respect to a Product in a particular country, any exclusive marketing rights or data exclusivity rights conferred by any Regulatory Authority with respect to such Product in such country other than a Patent right (including Patent rights extended by the grant of a Regulatory Authority, such as patent term restoration in the United States under Section 156 of Title 35 of the U.S. Code, as amended from time to time).

"**Regulatory Materials**" means, with respect to any pharmaceutical product in any jurisdiction, any and all regulatory applications, submissions, notifications, communications, correspondence, registrations, Regulatory Approvals, and/or other filings made to, received from or otherwise conducted with, a Regulatory Authority in order to Exploit a Compound or Product in a particular country or jurisdiction, including, without limitation, all INDs, NDAs and MAAs.

"**Royalties**" has the meaning set forth in Section 7.8(a).

"**Royalty Term**" has the meaning set forth in Section 7.8(b).

"**Rule 144**" means Rule 144 promulgated under the Securities Act.

"**Sale Proceeds Voucher Payment**" has the meaning set forth in Section 3.4(c).

- 13 -



"**SEC**" means the U.S. Securities and Exchange Commission.

"**Securities Act**" means the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

"**Security Agreement**" has the meaning set forth in <u>Section 3.5</u>.

"**Selling Party**" has the meaning set forth in the definition of Net Sales.

"**Sponsored Research Agreement**" means that certain Sponsored Research Agreement dated January 1, 2013 with IECS for a course of chronic *Trypanosoma cruzi* infection after treatment based on parasitological and serological tests: a systematic review of follow-up studies (PROSPERO Register Number CRD42012002162).

"**Sublicensee**" means, with respect to a particular Product, a Third Party to whom KaloBios has granted a sublicense under any Company Patents or Company Know-How, but excluding distributors.

"**Tax**" means all taxes, charges, fees, duties, levies or other assessments, including, income, gross receipts, net proceeds, turnover, real and personal property (tangible and intangible), sales, use, franchise, excise, value added, license, payroll, unemployment, escheat, environmental, customs duties, capital stock, disability, stamp, leasing, lease, user, transfer, fuel, excess profits, occupational and interest equalization, windfall profits, severance and employees' income withholding and social security or similar taxes imposed by the United States or by any state, municipality, subdivision or Governmental Authority or by any foreign country or by any other tax authority, whether disputed or not, in each case to the extent relevant in the given context, and such term includes any interest, penalties or additions to tax attributable to such taxes, and shall include any liability for such amount as a result either of being a member of a combined, consolidated, unitary or affiliated group, or of a continuing obligation to indemnify any Person or as a result of being a transferee or a successor of another Person.

"**Tax Returns**" means all returns, declarations, reports, statements and other documents of, relating to, or required to be filed in respect of, any and all Taxes (including any schedule or attachment thereto, and including any amendment thereof).

"**Term**" has the meaning set forth in <u>Section 13.1</u>.

"**Territory**" means all countries of the world.

"**Third Party**" means any Person other than a Party or an Affiliate of a Party.

"**Third Party License**" means any license or other agreement between a Third Party and KaloBios or its Affiliate pursuant to which KaloBios or its Affiliate is granted a license or other rights to Patents, assets or Know-How owned or controlled by a Third Party, where such license or other rights are related to the Exploitation of the Compound or Products.

"**Transaction Documents**" means, collectively, this Agreement, the Bill of Sale, the Assignment and Assumption Agreement, the Security Agreement and the Warrant.

- 14 -

"**United States**" or "**U.S.**" means the United States of America including its territories and possessions.

"**Voucher**" means a priority review voucher issued by the FDA or otherwise under the authority of the United States Department of Health and Human Services to KaloBios or its Affiliate(s) as the sponsor of a rare pediatric disease or neglected tropical disease product application related to the Compound or the Product, that entitles the holder of such voucher to Priority Review of a single human drug application submitted under Section 505(b)(1) or 505(b)(2) of the FD&C Act or Section 351(a) of the United States Public Health Service Act, as further defined in the FD&C Act.

"**Voucher Issuance Expiration Date**" has the meaning set forth in Section 3.3(c).

"**Voucher Payment**" has the meaning set forth in Section 3.4(a).

"**Voucher Payment Floor**" has the meaning set forth in Section 3.4(b)(iii).

"**Voucher Sale**" means the good faith sale, transfer or other direct or indirect disposition of a Voucher for value by KaloBios or its Affiliate that results, in a single transaction or a series of related transactions, in its ownership by, or the benefits of ownership flowing to, a Third Party.

"**Warrant**" has the meaning set forth in Section 3.2.

"**Warrant Shares**" has the meaning set forth in Section 9.3(b).

## ARTICLE 2
## PURCHASE AND SALE OF ASSETS

Section 2.1    Acquired Assets.   On the terms and subject to the conditions contained herein and in consideration for the payment of the Initial Payment, the Milestone Payments and the Voucher Payment (to the extent that such amounts become payable) and the issuance of the Warrant by KaloBios, the Company hereby  sells, transfers, conveys, assigns and delivers to KaloBios, at the Closing, free and clear of all Encumbrances, and KaloBios accepts, at the Closing, all of the Company's  right, title and interest in and to the following assets (collectively, the "**Acquired Assets**"):

(a)    all Regulatory Materials in the Territory relating to the Compound or the Product, including the Regulatory Materials set forth on Schedule 2.1;

(b)    all contracts relating to the Compound or the Product, including the contracts set forth on Schedule 2.1 (the "**Assumed Contracts**");

(c)    all Inventory, including the Inventory set forth on Schedule 2.1;

(d)    all Governmental Approvals and all pending applications therefor or renewals thereof, in each case to the extent relating to the Compound or the Product and transferable to KaloBios, including the Government Approvals, pending applications and

- 15 -

**CONFIDENTIAL**

\\BA - 045347/000003 - 594503 v33

renewals set forth on <u>Schedule 2.1</u>, and for the avoidance of doubt, the right to be the sponsor of, and to own all rights to, all applications or other submissions to FDA in the future relating to the Compound or the Product, including all INDs, NDAs and NDA supplements, orphan drug designations, drug master files, and requests for issuance of vouchers, including pursuant to the change of ownership regulations set forth in 21 C.F.R. § 314.72 and 21 C.F.R. § 316.27;

(e)     any and all material books, records, files, manuals, data and other documentation (including clinical study reports and data, investigator brochures and laboratory notebooks) that relate primarily to the Compound or the Product, including (i) all data in all databases for all clinical and pre-clinical studies, (ii) research and development reports, creative materials, studies, reports, correspondence and other similar documents and records, and (iii) all other material business information, whether tangible or intangible, including, in each case, the books and records set forth on <u>Schedule 2.1</u> (the "**Assigned Books and Records**") and contact information for all Third Parties in contact with the Company in connection with any of the Acquired Assets, or who may have access to assets necessary to support the Program;

(f)     all claims, causes of action, judgments and demands of whatever kind or description (regardless of whether or not such claims and causes of action have been asserted by the Company) of the Company against Third Parties that arise out of or relate to the Acquired Assets, whether choate or inchoate, known or unknown, contingent or non-contingent, to the extent such claims, causes of action, judgments or demands are not Excluded Assets;

(g)     all rights of indemnification, warranty, contribution, credits, refunds, reimbursement and other rights of recovery (regardless of whether such rights are currently exercisable) against Third Parties (excluding insurance carriers) that arise out of or relate to any of the Acquired Assets to the extent such rights first arise after the Closing and are not Excluded Assets or do not relate to (or represent a counterclaim of the Company in connection with) any Excluded Liability;

(h)     all other claims, rights and causes of action relating to the items described in clauses (a) through (g) above or the Assumed Liabilities against Third Parties that arise after the Closing, whether liquidated or unliquidated; and

(i)     any and all intangibles and goodwill of the Company  arising from the items described in clauses (a) through (h) above.

Section 2.2     <u>Excluded Assets</u>.  All assets, properties, rights and interests of the Company and its Affiliates not expressly included in the Acquired Assets under <u>Section 2.1</u>, including the Excluded Assets, are expressly excluded from the transfer, conveyance, assignment and delivery contemplated hereby and as such are not included in the Acquired Assets and shall remain the assets, properties, rights and interests of the Company and its Affiliates.  Excluded Assets shall include all of the Company's right, title and interest in and to the following assets (collectively, the "**Excluded Assets**"):

(a)     all Company IP;

(b)     all cash and cash equivalents, bank accounts and securities of the Company;

- 16 -

(c)     all contracts that are not Assumed Contracts;

(d)     the corporate seals, organizational documents, minute books, stock books, Tax Returns, books of account or other records having to do with the corporate organization of the Company, all employee-related or employee benefit-related files or records, other than personnel files of any employees transferred to KaloBios, and any other books and records which the Company is prohibited from disclosing or transferring to KaloBios under applicable Law and is required by applicable Law to retain;

(e)     all Company employee benefit plans and trusts or other assets attributable thereto;

(f)     all Tax assets (including duty and Tax refunds and prepayments) of the Company or any of its Affiliates;

(g)     all rights to any action, suit or claim of any nature available to pursue or being pursued by the Company, whether arising by way of counterclaim or otherwise;

(h)     any attorney work product, attorney-client communications and other items protected by attorney-client privilege generated in connection with the Transaction Documents or related to the Excluded Assets;

(i)     all other assets of the Company and its Affiliates other than the Acquired Assets;

(j)     all rights of indemnification, warranty, contribution, credits, refunds, reimbursement and other rights of recovery (regardless of whether such rights are currently exercisable) against Third Parties (excluding insurance carriers) that arise out of or relate to any of the Excluded Assets; and

(k)     all rights which accrue or will accrue to the Company under this Agreement and the Transaction Documents.

Section 2.3     Assumed Liabilities.  Upon the terms and subject to the conditions of this Agreement, at the Closing, KaloBios shall assume, and shall pay, perform, satisfy and discharge (or cause to be paid, performed, satisfied and discharged on behalf of KaloBios) when due, the following Liabilities of the Company related to the Acquired Assets (collectively, the "**Assumed Liabilities**"):

(a)     Liabilities for all Taxes relating to the Compound, the Product or the Acquired Assets for any taxable period (or portion thereof) beginning on or after the Closing Date, including those payable by KaloBios pursuant to Section 3.9; and

(b)     any Liability exclusively related to the Acquired Assets, to the extent arising after the Closing.

Section 2.4     Excluded Liabilities.  Notwithstanding anything to the contrary contained in this Agreement, the Assumed Liabilities will exclude any other Liabilities whatsoever not

- 17 -

expressly assumed by KaloBios under <u>Section 2.3</u>, including the Excluded Liabilities.  For the avoidance of doubt, it is understood and agreed that KaloBios is not assuming any Liabilities or claims arising out of the use or operation of the Acquired Assets prior to the Closing.

Section 2.5     <u>Closing</u>.  The Closing (the "**Closing**") will take place on the date of the Bankruptcy Exit; provided, that if all conditions to the Closing set forth in <u>Section 2.6</u> have not been satisfied or waived on or prior to such date, the Closing shall take place on the first Business Day following the satisfaction or waiver (by the Party entitled to waive the condition) of all conditions to the Closing set forth in <u>Section 2.6</u>, or at such other time and place as the Parties to this Agreement may agree (the "**Closing Date**").  Each Party shall deliver its closing deliverables pursuant to <u>Section 2.8</u> to the other Party, and KaloBios shall deliver, or cause to be delivered, the funds payable pursuant to <u>Section 3.1</u>, to the Escrow Agent, and the Escrow Agent shall release such funds in accordance with the Escrow Agreement in substantially the form attached hereto as <u>Exhibit H</u>.  The Closing will be deemed effective for tax, accounting and other computational purposes as of 11:59 p.m. Eastern time on the Closing Date.

Section 2.6     <u>Delivery of Acquired Assets; Assigned Books and Records</u>.

(a)     The Company shall use commercially reasonable efforts to deliver all Acquired Assets in the Company's possession necessary to support the Program promptly after the Closing Date (and in any case within thirty (30) days after the Closing Date) to KaloBios at its principal place of business or at such other location mutually agreed by the Parties, at the sole cost and expense of KaloBios.  To the extent any Acquired Assets are not in the Company's possession or have not been delivered by the Company to KaloBios within thirty (30) days after the Closing Date, the Company shall, within ninety (90) days after the Effective Date, obtain possession and control of and deliver to KaloBios such remaining Acquired Assets, including those Acquired Assets set forth in <u>Schedule 2.6(a)</u>.  For the avoidance of doubt, the Company shall be solely responsible for such delivery and any reasonable costs and expenses incurred by the Company in the delivery of the Acquired Assets, and KaloBios shall be solely responsible for any damages that may occur to the Acquired Assets once delivered.

(b)     The Company may retain copies of any Assigned Books and Records (i) to the extent necessary for tax, accounting, regulatory, compliance or litigation purposes, (ii) in order to perform and discharge the Excluded Liabilities and the Company's obligations under the Transaction Documents, or (iii) to the extent that such Assigned Books and Records contain information with respect to any Excluded Asset or Excluded Liability. For the avoidance of doubt, such retained Assigned Books and Records shall be treated as Confidential Information of KaloBios pursuant to <u>Article 11</u>.

Section 2.7     <u>Conditions to Closing</u>.

(a)     *Conditions to Obligations of Each Party*.  The obligations of the Company and KaloBios to consummate the Closing are subject to the satisfaction (or the waiver by each of the Company and KaloBios in their respective sole and absolute discretion) of the following condition: there shall not be in effect a final, non-appealable order or decree entered by a Governmental Authority that permanently enjoins, restrains or otherwise prohibits the consummation of the Contemplated Transactions.

- 18 -

(b)     *Conditions to Obligations of KaloBios*.  The obligation of KaloBios to consummate the Closing is subject to the satisfaction (or the waiver by KaloBios in its sole and absolute discretion) of the following further conditions:

(i)     The Company shall have performed in all material respects all of its covenants and obligations under this Agreement that are required to be performed by it at or prior to the Closing;

(ii)     The representations and warranties of the Company set forth in Article 8 that are qualified by materiality or Material Adverse Effect shall be true and correct and so qualified in all respects as of the Effective Date and as of the Closing Date, except to the extent expressly made as of a specified date, in which case such representations and warranties shall be true and correct as of such date, and the representations and warranties of the Company set forth in Article 8 that are not qualified by materiality or Material Adverse Effect shall be true and correct in all material respects as of the Effective Date and as of the Closing Date, except to the extent expressly made as of a specified date, in which case such representations and warranties shall be true and correct as of such date;

(iii)     KaloBios shall have received the documents listed in Section 2.8(a) to be delivered at Closing.

(c)     *Conditions to Obligations of the Company*.  The obligation of the Company to consummate the Closing is subject to the satisfaction (or the waiver by the Company in its sole and absolute discretion) of the following further conditions:

(i)     KaloBios shall have performed in all material respects all of its covenants and obligations under this Agreement that are required to be performed by it at or prior to the Closing;

(ii)     the representations and warranties of KaloBios set forth in Article 9 that are qualified by materiality shall be true and correct and so qualified in all respects as of the Effective Date and as of the Closing Date, except the extent expressly made as of a specified date, in which case such representations and warranties shall be true and correct as of such date, and the representations and warranties of KaloBios set forth in Article 9 that are not qualified by materiality or Material Adverse Effect shall be true and correct in all material respects as of the Effective Date and as of the Closing Date, except to the extent expressly made as of a specified date, in which case such representations and warranties shall be true and correct as of such date;

(iii)     as of the Closing Date, KaloBios shall have a minimum balance of Ten Million Dollars ($10,000,000) in cash, inclusive of the Initial Payment, which shall not be subject to any Encumbrance or Permitted Encumbrance;

(iv)     a court of competent jurisdiction shall have issued a judicial order approving the Contemplated Transactions, and the effective date of KaloBios' plan of reorganization (the "**Bankruptcy Exit**") shall have occurred or shall occur contemporaneously with the Closing of the Contemplated Transactions;

- 19 -

(v)     the Company shall have received the documents listed in <u>Section 2.8(b)</u>; and

(vi)     the Company shall have received an opinion from special counsel to KaloBios, in the form attached as <u>Exhibit E</u> concerning the validity and enforceability of the Transaction Documents and the Contemplated Transactions.

Section 2.8     <u>Deliveries at Closing</u>.   Upon the terms and subject to the conditions set forth in this Agreement, the Parties agree that at the Closing, among other things:

(a)     the Company shall deliver the following items, duly executed by the Company, all of which shall be in a form and substance reasonably acceptable to KaloBios and KaloBios' counsel:

(i)     the Transaction Documents that are required to be executed by the Company;

(ii)     a certificate executed by the Managing Member of the Company certifying that the conditions to KaloBios' obligations hereunder set forth in <u>Section 2.7(b)(i)</u> and <u>Section 2.7(b)(ii)</u> have been fulfilled;

(iii)     a certificate in the form prescribed by Treasury Regulation Section 1.4445-2, certifying either that the Company is not a foreign person for purposes of Section 1445 of the Code or that the Acquired Assets do not constitute a "United States Real Property Interest" within the meaning of Section 897 of the Code; and

(iv)     such other certificates, instruments or documents required pursuant to the provisions of this Agreement or otherwise necessary or appropriate in accordance with the terms hereof and consummate the Contemplated Transactions.

(b)     KaloBios shall deliver, or cause to be delivered, the following items, duly executed by the KaloBios, all of which shall be in a form and substance reasonably acceptable to the Company and the Company's counsel:

(i)     the Transaction Documents that are required to be executed by KaloBios;

(ii)     a certificate signed by the Chief Executive Officer of KaloBios certifying that the conditions to the Company's obligations hereunder set forth in <u>Section 2.7(c)(i)</u>, and <u>Section 2.7(c)(ii)</u>, <u>Section 2.7(c)(iii)</u> and <u>Section 2.7(c)(iv)</u> have been fulfilled;

(iii)     a certificate signed by the President of KaloBios certifying that (A) a judicial order of a court of competent jurisdiction approving

- 20 -

the Contemplated Transactions has been issued, and (B) the effective date of the Bankruptcy Exit shall have occurred or shall occur contemporaneously with the Closing of the Contemplated Transactions; and

(iv)   such other certificates, instruments or documents required pursuant to the provisions of this Agreement or otherwise necessary or appropriate in accordance with the terms hereof to consummate the Contemplated Transactions.

## ARTICLE 3
## CONSIDERATION

Section 3.1   Initial Payment.   As partial consideration for the sale, transfer, conveyance, assignment and delivery of the Acquired Assets to, and assumption of the Assumed Liabilities by, KaloBios, at the Closing, KaloBios shall pay to the Company Three Million Dollars ($3,000,000) less the amount of the Deposit (the "**Initial Payment**").   In addition, concurrently with the payment of the Initial Payment, KaloBios shall, pursuant to  Section 4.3(b), pay the first monthly payment and shall pay to the Company up to One Hundred Thousand Dollars ($100,000) in reimbursement of its documented legal and other expenses resulting from KaloBios' bankruptcy proceedings and incurred by the Company between December 17, 2015, and the date of KaloBios' exit from bankruptcy, subject to reasonable documentation of such expenses having been provided to KaloBios no less than three (3) Business Days prior to the Closing Date.

Section 3.2   Warrant.   As partial consideration for the sale, transfer, conveyance, assignment and delivery of the Acquired Assets to, and assumption of the Assumed Liabilities by, KaloBios, at the Closing, KaloBios shall issue to the Company a warrant to purchase two hundred thousand (200,000) shares of the Common Stock, as may be adjusted from time to time as set forth therein for reclassifications, stock-splits or otherwise, in substantially the form attached hereto as Exhibit F (the "**Warrant**").  The Parties hereby agree that the face value of the Warrant is One Hundred Dollars ($100).

Section 3.3   Milestones.

(a)   As partial consideration for the sale, transfer, conveyance, assignment and delivery of the Acquired Assets to, and assumption of the Assumed Liabilities by, KaloBios, KaloBios shall pay to the Company each of the following one-time milestone payments (the "**Milestone Payments**") promptly, but in no event later than within fifteen (15) days after the first achievement of the corresponding milestone event, if such milestone is achieved:

| Milestone Event | Milestone Payment |
|---|---|
| 1.   Acceptance of an IND by the FDA for the Product | $1,000,000 |
| 2.   FDA grants Orphan Drug Designation for the Product | $1,000,000 |

- 21 -

| | Milestone Event | Milestone Payment |
|---|---|---|
| 3. | Acceptance by the FDA of an NDA filing for the Product | $2,000,000 |
| 4. | FDA grants Regulatory Approval for the Product | $11,000,000 |
| 5. | Acceptance by the EMA of an MAA filing for the Product | $1,000,000 |
| 6. | EMA grants Regulatory Approval for the Product | $5,000,000 |

(b)     Each Milestone Payment shall be payable only once no matter how many times each corresponding milestone event is achieved and the aggregate amount of Milestone Payments paid by KaloBios under this Section 3.3 shall not exceed Twenty-One Million Dollars ($21,000,000).  Notwithstanding the foregoing, if a Change of Control of KaloBios occurs, KaloBios shall pay to the Company ten percent (10%) of all unpaid Milestone Payments, if any, concurrently with such Change of Control, irrespective of whether the corresponding milestone events have been achieved, and any remaining unpaid Milestone Payments shall be reduced by ten percent (10%).

(c)     Notwithstanding anything to the contrary or limiting any other rights of the Company under this Section 3.3, if, and only if, the FDA grants Regulatory Approval for the Product in the United States but does not issue a Voucher to KaloBios contemporaneously with such Regulatory Approval (a "***Non-Voucher Accompanying Approval***", and the date such Regulatory Approval is granted, the "***Voucher Issuance Expiration Date***"), then:

(i)     KaloBios shall have the option, exercisable at any time upon delivery of written notice to the Company within ten (10) days following the Voucher Issuance Expiration Date, to elect not to Exploit the Product (or otherwise commercialize the Product pursuant to the Commercialization Plan) in the United States (a "***KaloBios Non-Commercialization Notice***"), and upon timely delivery of such KaloBios Non-Commercialization Notice to the Company (A) the licenses granted to KaloBios in Section 7.2(a) shall be terminated with respect to the portion of the Territory comprised by the United States, (B) KaloBios' obligations under Section 5.3 to commercialize the Product in the United States shall be terminated and (C) KaloBios shall have no obligation to pay, and the Company shall have no right to receive, the Milestone Payment No. 4; *provided, however*, for the avoidance of doubt, in the event that KaloBios determines to Exploit the Product following the Non-Voucher Accompanying Approval or fails to deliver a KaloBios Non-Commercialization Notice, then KaloBios shall be deemed to have elected to commercialize the Product in the United States and it shall pay, and the Company shall be entitled to receive, the Milestone Payment No. 4 pursuant to the terms of this Section 3.3. Notwithstanding the foregoing if, due to changes in applicable Law with respect to the timing of the issuance of a Voucher, the issuance of the Voucher to KaloBios does not occur contemporaneously with the receipt of Regulatory Approval by the FDA for the Product in the United States, then the foregoing 10-

- 22 -

day option period shall instead run from the date of such Regulatory Approval until ten (10) days after determination by FDA that a Voucher shall not be issued in connection with the Regulatory Approval and notice to KaloBios thereof.

(ii)     If KaloBios timely delivers a KaloBios Non-Commercialization Notice to the Company pursuant to Section 3.3(c)(i), the Company shall have the option, exercisable at any time upon delivery of written notice to KaloBios within ten (10) days following the Company's receipt of the KaloBios Non-Commercialization Notice, to elect to either Exploit the Product (or otherwise commercialize the Product within the Licensed Field) in the United States (a "***Company Commercialization Notice***"), and upon timely delivery of such Company Commercialization Notice to KaloBios (A) KaloBios shall be deemed to have granted the Company a perpetual, exclusive, irrevocable, right and license, with the right to grant sublicenses (including through multiple-tiers), to the Development Program IP necessary to Exploit the Compound and the Product in the Licensed Field within the United States, (B) the Company shall pay, and KaloBios shall have a right to receive, the Milestone Payment No. 4, which shall be paid by the Company to KaloBios within thirty (30) days of delivery of the Company Commercialization Notice, and (C) the Company shall pay to KaloBios royalties on Annual Net Sales of the Product by the Company within the United States in accordance with the terms of Section 7.8; *provided, however*, for the avoidance of doubt, unless the Company delivers a timely Company Commercialization Notice, then the Company shall be deemed to have elected not to commercialize the Product in the United States and it shall not be obligated to pay, and KaloBios shall not be entitled to receive, the Milestone Payment No. 4 pursuant to the terms of this  Section 3.3.

(d)     If KaloBios delivers a KaloBios Non-Commercialization Notice and the Company does not deliver a Company Commercialization Notice, then neither Party shall be obligated to pay or receive Milestone Payment No. 4 or any royalties on Annual Net Sales of the Product within the United States; *provided, however*, that nothing in this Section 3.3(c) shall be construed to relieve KaloBios of any other obligations to pay any other Milestone Payments pursuant to this Section 3.3 or other royalty payments pursuant to Section 7.8, in each case as they become due, or to otherwise relieve KaloBios of any other obligations under Article 5 (other than Section 5.3).

Section 3.4     Voucher Payment.

(a)     *Voucher*.  Following the Closing, KaloBios shall, and it shall cause its Affiliates to, use Diligent Efforts to satisfy all preconditions and requirements for the issuance of a Voucher as soon as reasonably practical from the FDA with respect to the Product.  As partial consideration for the sale, transfer, conveyance, assignment and delivery of the Acquired Assets to, and assumption of the Assumed Liabilities by, KaloBios, after the receipt by KaloBios or its Affiliate of a Voucher as provided below, KaloBios shall pay to the Company (or cause to paid to the Company) a one-time cash payment with respect to such Voucher (the "**Voucher Payment**"), subject to the terms and conditions set forth in this Section 3.4.

- 23 -

(b)     *Voucher Sale Process.*

    (i)     Each Party agrees to use commercially reasonably efforts to sell, maintain or use the Voucher and to cooperate with the other Party to optimize the outreach efforts related to the foregoing, including providing informal updates to the other Party and evaluations of any Company contacts that may be helpful to effecting a Voucher Sale.  Following the filing of an NDA for the Product with the FDA, the Parties shall conduct quarterly reviews of such outreach efforts, such reviews to include a summary of KaloBios' outreach efforts, a review of on-going discussions with Third Parties with respect to a Voucher Sale (subject to any confidentiality obligations that a Party may owe to such Third Parties), a discussion of potential business development and financing contacts and the sharing and discussion of ideas, strategy and risks.  Notwithstanding the foregoing, KaloBios shall have final decision-making authority, and shall be solely responsible for corresponding and negotiating with Third Parties, with respect to a Voucher Sale, including the process and terms of any such Voucher Sale, and the Company shall provide consultation and assistance as may be reasonably necessary to monetize and/or sell the Voucher.

    (ii)    KaloBios shall notify the Company in writing upon KaloBios' initiation of any sales process to monetize the Voucher (whether through internal or external business development, corporate development, financing approaches or other processes).  KaloBios shall use commercially reasonable efforts to initiate such a sales process (x) at least once prior to the FDA's grant of Regulatory Approval for the Product, and (y) in the event that the Voucher has not been sold prior to the FDA's grant of Regulatory Approval, at least once within six (6) months following such grant of Regulatory Approval.  Within thirty (30) days of the Company's receipt of such notice, the Company shall have the right, but not the obligation, to deliver a bid for the purchase of the Voucher (a "**Company Offer**").  If the Company delivers a Company Offer to KaloBios, KaloBios shall have ten (10) days from KaloBios' receipt of such Company Offer to either accept or hold such Company Offer.  If KaloBios notifies the Company in writing of its decision to accept such Company Offer, the Company shall have thirty (30) days from the Company's receipt of such notice to consummate a Voucher Sale through a transfer to KaloBios of non-contingent funds in an amount equal to the purchase price reflected in the Company Offer by wire transfer to an account provided by KaloBios in such written notice.  Failure by the Company to transfer such funds within the thirty (30)-day period shall result in

- 24 -

the Company's forfeiture of all of its rights to purchase the Voucher under this Section 3.4.

(iii)     If KaloBios notifies the Company in its writing of its decision to hold such Company Offer, then within five (5) days of receipt of such notice the Company shall place funds in an amount equal to five percent (5%) of the purchase price reflected in the Company Offer (the "**Voucher Payment Floor**") in a mutually agreed, binding escrow account.  Failure by the Company to transfer such funds within the five (5)-day period shall result in the Company's forfeiture of all of its rights to purchase the Voucher under this Section 3.4.  For up to one (1) year following the Company's receipt of KaloBios' written notice, KaloBios shall have the right to solicit, negotiate and consummate a Voucher Sale with a Third Party, provided that the total economic value of the consideration being offered for the Voucher must exceed the Voucher Payment Floor.  Notwithstanding the foregoing, if the Company delivers a Company Offer to KaloBios prior to the FDA's grant of Regulatory Approval for the Product, KaloBios may, in its sole discretion, either accept such Company Offer, hold such Company Offer or decline to sell the Voucher to the Company or any Third Party.  If KaloBios does not sell the Voucher prior to such grant of Regulatory Approval, then, upon such grant of Regulatory Approval, KaloBios may renew the process of soliciting and consummating a Voucher Sale, and the Company must submit a new Company Offer in the event that it desires to purchase the Voucher.  If the Company delivers a Company Offer to KaloBios following the FDA's grant of Regulatory Approval, KaloBios must either accept the Company Offer or hold such Company Offer and consummate a Voucher Sale with a Third Party in accordance with this Section 3.4(b) within twelve (12) calendar months.  For the avoidance of doubt, the funds placed in escrow by the Company shall either (i) be credited against the Voucher Sale price and delivered to KaloBios in the event KaloBios accepts a Company Offer, or (ii) be returned to the Company in the event KaloBios holds a Company Offer and subsequently consummates a Voucher Sale with a Third Party or otherwise rejects such Company Offer.

(c)     *Voucher Sale*.  Subject to Section 3.4(d) below, if KaloBios or any of its Affiliates consummates a Voucher Sale at any time (other than a Voucher Sale to the Company pursuant to Section 3.4(b) above), then the Voucher Payment in connection with such Voucher Sale shall be an amount in the form of cash equal to the product obtained by *multiplying* (i) the Net Voucher Proceeds *by* (ii) 0.2 (the "**Sale Proceeds Voucher Payment**").  The Voucher Payment shall be made in the form of cash to the extent that the Net Voucher Proceeds are in the form of cash, and to the extent non-cash, shall be paid over in such non-cash consideration.

- 25 -

(d)     *Retained Voucher*.  If KaloBios has not consummated a process with respect to a Voucher Sale within twelve (12) months after a Voucher is issued to KaloBios or its Affiliate, or KaloBios notifies the Company in writing that it has determined not to engage in a Voucher Sale and to instead retain such Voucher for its or its Affiliates' own use, then the Voucher Payment shall be calculated based on Net Voucher Proceeds equal to the fair market value of the Voucher as determined using generally accepted methods by an independent Third Party valuator having significant experience in valuing Vouchers or similar assets.  The Third Party valuator shall be selected by KaloBios and reasonably acceptable to the Company, and KaloBios shall be responsible for paying the fees of any such Third Party valuator.   The determination of such Third Party valuator shall be binding on both KaloBios and the Company absent fraud.  The Voucher Payment shall be due within thirty (30) days after the determination of the value of the Net Voucher Proceeds by the Third Party valuator.

(e)     *Payment*.  The Voucher Payments shall be paid to the Company as follows:  with respect to a Sale Proceeds Voucher Payment, upon the closing of the Voucher Sale unless there is a disagreement over the value of any non-cash consideration, in which case it shall be made within five (5) days after the determination of such amounts by the Third Party valuator pursuant to Section 3.4(c) above (provided that the Company's share of any deferred consideration payable to KaloBios as Net Voucher Proceeds following such closing shall be paid to the Company promptly, and within five (5) days following payment thereof to KaloBios.) KaloBios shall pay, or cause any of its Affiliates to which it had transferred the Voucher to pay, such amounts to the Company within five (5) days after such determination.

Section 3.5   Security Agreement.  To secure the performance of KaloBios' payment obligations under this Agreement, the Company and KaloBios shall enter into a security agreement in substantially the form attached hereto as Exhibit G (the "**Security Agreement**").

Section 3.6   Purchase Price Allocation.  Within ninety (90) days after Closing the Parties will agree in good faith on a schedule setting forth the allocation of the Initial Payment to the Acquired Assets (the "**Allocation Schedule**"), to be attached hereto as Schedule 3.6.  The Company and KaloBios will sign and submit all necessary forms to report this transaction for U.S. federal, state and local income Tax purposes in accordance with the Allocation Schedule and will not take a position for such Tax purposes inconsistent therewith.  The Parties will treat the Contemplated Transactions in all filings with Governmental Authorities for all Tax purposes consistently with the Allocation Schedule and this Section 3.6.  Following the Closing, the Parties shall cooperate in good faith to amend the Allocation Schedule in order to take into account KaloBios' payment to the Company of additional consideration for the Acquired Assets in the form of any Contingent Payments actually received by the Company, and the Parties shall amend or file all necessary forms as may be required to report the amended Allocation Schedule.

Section 3.7   Payments.  Except as otherwise specified herein, all payments to be made by KaloBios or its Affiliates to the Company under this Agreement shall be made in Dollars by bank wire transfer in immediately available funds to a bank account designated in writing by the Company.  Interest will accrue on all late payments under this Agreement at an annual rate equal to the lesser of (i) LIBOR plus ten percent (10%) or (ii) the maximum rate permitted under applicable Law.  For the avoidance of doubt, all payments to be made by KaloBios under this

- 26 -

Agreement shall constitute Secured Obligations (as such term is defined in the Security Agreement).

Section 3.8    Audits.

(a)    KaloBios shall maintain for three (3) years complete and accurate records in sufficient detail to permit the Company to confirm the accuracy of (i) the calculation of the Voucher Payment hereunder, and (ii) the Royalties paid under Section 7.8 hereunder.

(b)    The Company shall, and shall ensure that its Affiliates and Third Party subcontractors shall, maintain complete and accurate records in sufficient detail to permit KaloBios to confirm the Joint Development Program Costs invoiced by the Company to KaloBios in accordance with Section 4.3(b).

(c)    Each Party shall have the right to have an independent and nationally recognized certified public accounting firm in the United States, reasonably acceptable to the other Party, have access during normal business hours, and upon reasonable prior written notice, to examine only those records of the other Party (and its Affiliates and Sublicensees) as may be reasonably necessary to determine, with respect to any calendar year ending not more than three (3) years prior to such request, the correctness or completeness of any report or payment made under Article 3, Article 4 or Section 7.8; *provided*, that upon request of the audited Party, such accounting firm shall enter into a confidentiality agreement in a form reasonably acceptable to the audited Party. The foregoing right of review may be exercised only (i) once by the Company with respect to the records described in Section 3.8(a)(i); (ii) once per year by the Company with respect to the records described in Section 3.8(a)(ii); *provided, however*, that the Company shall not be entitled to audit the same period of time more than once; and (iii) once per year by KaloBios with respect to the records described in Section 3.8(b); *provided, however*, that KaloBios shall not be entitled to audit the same period of time more than once.  Upon completion of the audit, the accounting firm shall disclose to both Parties, as applicable, (a) whether payments made under Section 3.4 or Section 7.8, as the case may be, are correct or incorrect, and if it believes in good faith that KaloBios is in breach of any of its payment obligations under the applicable section, and (b) whether it believes in good faith that any amounts invoiced by the Company were inaccurate or without a valid basis and the amount of such funds at issue.  Upon request, the accounting firm shall provide to both Parties its full, unredacted audit report. If the audit report concludes that additional amounts were owed but unpaid, such Party shall pay the additional amounts within fifteen (15) days after the date on which such audit report is delivered to both Parties, together with interest thereon at an annual rate equal to the lesser of (i) LIBOR plus five percent (5%) or (ii) the maximum rate permitted under applicable Law.  The auditing Party shall bear the full cost of the performance of any such audit, unless such audit discloses a variance of more than five percent (5%) of the amount actually owed for the period audited, in which case the other Party shall bear the full cost of the performance of such audit.  The results of such audit shall be final, absent manifest error or fraud. Each Party shall hold all information disclosed to it under this Section 3.8 as Confidential Information of the other Party.

- 27 -

Section 3.9    Taxes.

(a)    *Taxes on Income*.  Each Party shall be solely responsible for the payment of all Taxes imposed on its share of income arising directly or indirectly from the activities of, or the receipt of any payment by, the Parties under this Agreement.

(b)    *Proration*.  Liability for all personal property (tangible or intangible) Taxes (or other similar Taxes), if any, attributable to the Compound, the Product or the Acquired Assets, will be prorated between the Parties as of the Closing Date, with the Company liable to the extent such items relate to any taxable period (or portion thereof) ending on or before the Closing Date, and KaloBios liable to the extent such items relate to a period (or portion thereof) beginning after the Closing Date.  The Company will prepare a proration of such items, which it will present to KaloBios prior to the Closing Date, and the Parties will reasonably agree on such proration.  The Company will furnish KaloBios with such documents and other records as KaloBios reasonably requests in order to confirm the Company's proration calculations.  The Company will prepare and timely file all Tax Returns and pay all Taxes for all personal property (tangible or intangible) Taxes (or other similar Taxes), if any, attributable to the Compound, the Product or the Acquired Assets for all Tax periods ending on or prior to the Closing Date. KaloBios will prepare and timely file all other such Tax Returns that are required to be filed in respect of the Product or the Acquired Assets and KaloBios will be responsible for paying all Taxes with respect to periods beginning after the Closing Date.   With respect to Taxes apportioned pursuant to this Section 3.9, the Company will pay such apportioned Taxes that are due and payable on or prior to the Closing Date, and bill KaloBios for any part of that amount apportioned to KaloBios.  KaloBios will pay such apportioned Taxes that are due and payable after the Closing Date and bill the Company for any part of that amount apportioned to the Company.

(c)    *Taxes Resulting from Sale of Assets*.  The Company shall pay in a timely manner all Taxes resulting from or payable in connection with the sale of the Acquired Assets pursuant to this Agreement, regardless of the Person on whom such Taxes are imposed by Laws, and shall file, or cause to be filed, all Tax Returns required to be filed in connection therewith. The Parties shall cooperate with each other and use their reasonable efforts to reduce the Taxes attributable to the transfer of the Acquired Assets and shall use reasonable efforts to obtain any exemption or other similar certificate from any Governmental Authority as may be necessary to mitigate such Taxes.

(d)    *Tax Withholding*.  KaloBios shall be entitled to deduct and withhold from any amounts payable pursuant to this Agreement such amounts as may be required to be deducted or withheld therefrom under any provision of federal, state, local or foreign Tax law or under any applicable Law. To the extent such amounts are so deducted and withheld, such amounts shall be treated for all purposes under this Agreement as having been paid to the Company.

(e)    *Tax Cooperation*.  The Parties agree to cooperate with one another and use reasonable efforts to avoid or reduce Tax withholding or similar obligations in respect of payments made by KaloBios to the Company under this Agreement.  The Company shall provide KaloBios any Tax forms and other documents that may be reasonably necessary in order for

- 28 -

KaloBios to not withhold Tax or to withhold Tax at a reduced rate under an applicable bilateral income Tax treaty with respect to any payments made by KaloBios to the Company under this Agreement.  KaloBios shall be entitled to withhold the full amount of Tax applicable to any amount payable to the Company if the Company does not provide the applicable Tax forms and other necessary documents (establishing a Tax exemption or reduction) at least five (5) Business Days prior to the date the relevant payment is due.  Each Party shall provide the other Party with reasonable assistance to enable the recovery, as permitted by Law, of withholding Taxes or similar obligations resulting from payments made under this Agreement.

## ARTICLE 4
## DEVELOPMENT PROGRAM

Section 4.1    Overview; Joint Development Program Term.    The purpose of the Program is to conduct research and development activities, including regulatory activities and the Joint Development Program, with respect to the Compound and the Product with the aim of obtaining MAAs resulting in payments of all Milestone Payments.   The term of the Joint Development Program shall commence on the Closing Date and, unless terminated earlier pursuant to Section 13.5 or otherwise terminated earlier under Article 13, shall expire upon the FDA approval of the IND for the Product in the United States (the "**Joint Development Program Term**").  The Company agrees that during the Joint Development Program Term it shall not engage in any research or development activities with respect to the Compound or Product in the Licensed Field other than pursuant to the Joint Development Program.

Section 4.2    Joint Development Plan.

(a)    *Initial Joint Development Plan.*  The Parties have prepared and agreed to the terms of the development plan attached hereto as Exhibit I that sets forth in detail the activities to be conducted by or on behalf of each Party under the Joint Development Program and a budget for that work (as such plan may be updated or amended hereunder from time to time, the "**Joint Development Plan**").

(b)    *Joint Development Plan Updates and Amendments*.  At any time during the Joint Development Program Term, either Party may submit amendments to the Joint Development Plan to the JDC, which amendments may include new or additional development activities for the Compound or the Product.  The JDC shall determine whether or not to approve such proposed amendments, including whether or not any new or additional development activities shall be included in the Joint Development Plan, and if so, which Party should undertake such development activities based upon each Party's expertise, capabilities, infrastructure and the overall budget for the Joint Development Program.  The JDC shall submit each approved amendment to the Joint Development Plan to the JSC for review and approval in accordance with Section 6.1(e).   At least thirty (30) days prior to each anniversary of the Effective Date, the JDC shall prepare an updated version of the Joint Development Plan and submit such updated Joint Development Plan to the JSC for review and approval in accordance with Section 6.1(e).  Notwithstanding anything to the contrary set forth herein or in Article 6, the financial or other obligations of KaloBios under the Joint Development Plan may not be updated or amended to impose additional financial or other obligations upon KaloBios without KaloBios' prior written consent.

- 29 -

Section 4.3     Joint Development Program Costs.

(a)     *KaloBios Responsibility*.  KaloBios shall be responsible for funding the cost of the activities to be conducted by the Parties under the Program, including those costs of the Joint Development Program as set forth in the budget included within the Joint Development Plan (the "**Joint Development Program Costs**").  The Joint Development Program Costs shall include the cost of (i) FTEs at the FTE Rate, and (ii) any services or materials provided by Third Parties, in each case as set forth in the Joint Development Plan and calculated in accordance with GAAP.  For the avoidance of doubt, KaloBios shall have no responsibility to make any payment or reimbursement to the Company for costs or expenses that are not specified in, or exceed the amounts set forth in, the budget included within the Joint Development Plan unless such Joint Development Plan is duly amended.    Upon  the  expiration  or  termination  of  the  Joint Development Program Term, KaloBios' obligation to pay the Joint Development Program Costs or make any payments or reimbursements to the Company under this Section 4.3 shall terminate, and the Company will use good faith efforts to assign and facilitate the assignment of Company contracts, or at KaloBios' option, assist with execution of new agreements directly with KaloBios by, Third Party vendors providing services to the Company in connection with the Joint Development Program.

(b)     *Monthly Payments*.  No later than three (3) days prior to the start of each month during the Joint Development Program Term, KaloBios shall pay to the Company the Joint Development Program Costs corresponding to the budget included within the Joint Development Plan with respect to the activities to be performed by the Company thereunder for the upcoming month to the maximum extent known.  No later than fifteen (15) days after the last day of each quarter during the Joint Development Program Term, the Company shall deliver to KaloBios an invoice setting forth the Joint Development Program Costs incurred by the Company during that quarter and other related documentation including timesheets reflecting the activities conducted by the Company's employees, agents and contractors under the Joint Development Plan.  In the event such invoice reflects that Joint Development Program Costs incurred by the Company in the applicable quarter lower than those set forth in the budget included within the Joint Development Plan for such quarter, the subsequent payment to the Company will reflect a reduction in the amount payable by KaloBios equal to the amount by which such budget exceeded the actual Joint Development Program Costs incurred by the Company during such quarter.  For the avoidance of doubt, KaloBios will not be liable for amounts in excess of the budget included within the Joint Development Plan for any given quarter.

(c)     *Tax Withholding*.  KaloBios shall be entitled to deduct and withhold from any amounts payable pursuant to this Agreement such amounts as may be required to be deducted or withheld therefrom under any provision of federal, state, local or foreign tax law or under any applicable Law; *provided, however*, that such amounts are timely paid to the applicable taxing authority. To the extent such amounts are so deducted and withheld, such amounts shall be treated for all purposes under this Agreement as having been paid to the Company.

CONFIDENTIAL
\\BA - 045347/000003 - 594503 v33

Section 4.4     Diligent Efforts.  During the Joint Development Program Term, each Party shall use Diligent Efforts to, either by itself or in collaboration with its Affiliates and Third Parties, conduct the activities assigned to it under the Joint Development Plan.

Section 4.5     Subcontracting.  Subject to the terms of this Agreement, each Party shall have the right to engage Affiliates or Third Party subcontractors to perform certain of its obligations under the Joint Development Program; *provided, that* (a) the subcontracting Party shall ensure that each of its subcontractors accepts and complies with all applicable terms and conditions of this Agreement, such Party shall use commercially reasonable efforts to enforce any such subcontract, and such Party shall remain responsible for the performance of its subcontractors hereunder, (b) any such subcontract shall (i) be subject and subordinate to the terms and conditions of this Agreement, (ii) contain terms and conditions which are consistent with the terms and conditions of this Agreement, (iii) not in any way diminish, reduce or eliminate any of the subcontracting Party's obligations under this Agreement, and (iv) impose on the subcontractor all applicable obligations under the terms of this Agreement, including the reporting, audit, inspection and confidentiality provisions hereunder, and (c) the subcontracting Party shall provide to the other Party reasonably prompt notice of each subcontract, including the identity of the subcontractor and a description of the activities to be subcontracted.

Section 4.6     Compliance with Laws.

(a)     *Applicable Laws*.   The Parties shall conduct all of their respective activities under the Joint Development Plan in a good scientific manner and in compliance in all material respects with applicable Laws, and to the extent applicable, GLP, GCP and cGMP.

(b)     *Debarment.*   Neither Party shall knowingly employ (or use any Third Party subcontractor or agent that employs) any individual or entity debarred by the FDA (or subject to a similar sanction of the EMA), or any individual who or entity which is the subject of an FDA debarment investigation or proceeding (or similar proceeding of EMA), in the conduct of its activities under the Joint Development Plan.

Section 4.7     Regulatory Filings.

(a)     *General*.  KaloBios shall have the sole right and responsibility, and shall use Diligent Efforts, at its sole cost and expense, to prepare, file, own and maintain all Regulatory Materials filed with or submitted to Regulatory Authorities in the Territory in connection with the Compound and the Product, in accordance with any direction of the JDC and the JSC. The Company shall use Diligent Efforts in assisting KaloBios in complying with regulatory obligations relating to the Compound and the Product, including with respect to the transfer of ownership rules under 21 C.F.R. § 314.72 and 21 C.F.R. § 316.27, and the preparation and maintenance of Regulatory Materials, in each case at KaloBios' sole cost and expense. Such assistance shall include providing to KaloBios information and documentation that is in the Company's possession that may be reasonably necessary for KaloBios to prepare any filing with a Regulatory Authority or a response to an inquiry from a Regulatory Authority with respect to the Compound of the Product. KaloBios shall keep the Company informed, through the JDC, of any and all significant issues arising therefrom. At the Company's option, the Company shall be

- 31 -

given prompt and advance notice of and have observer rights at all FDA meetings (in person, *via* teleconference or otherwise).

(b)     *Filings*. KaloBios shall also be solely responsible for filing drug approval applications for the Product in seeking Regulatory Approval in those countries of the Territory for the Product in accordance with this Agreement and as KaloBios otherwise reasonably determines, following consultation with the JDC. At a minimum, KaloBios shall use Diligent Efforts in filing and seeking Regulatory Approval of the Product in the United States. Such regulatory documents for each filing shall be centralized and held at the offices of KaloBios. The Company shall provide such reasonable assistance as may be required by KaloBios, at KaloBios' sole cost and expense, where liaison between the Parties is, or may be, necessary to enable KaloBios to fulfill its responsibilities hereunder. KaloBios shall be responsible for maintaining the approvals obtained under this Section 4.7(b) and shall solely own all such approvals in the Territory.  KaloBios shall be fully responsible for bearing all costs and expenses associated with undertaking and completing said registration activities in the Territory, including but not limited to, the costs of preparing and prosecuting applications for such approvals and fees payable to regulatory agencies in obtaining and maintaining same.

(c)     *Company Right of Reference*.  KaloBios shall provide to the Company a right of reference to any Regulatory Materials for, or other information or data relating to, the Compound or the Product owned or controlled by KaloBios in order for the Company to (i) perform its obligations under the Joint Development Plan, and (ii) Exploit the Compound and the Product in the Territory in the Company Field. Notwithstanding anything to contrary set forth in this Agreement, the Company's right under this Section 4.7(c) shall be perpetual and shall survive any termination of this Agreement.

Section 4.8 Compensation for Development Delays.  Notwithstanding anything herein to the contrary, if, due to the insufficiency or inadequacy of the Acquired Assets delivered to KaloBios, (a) the acceptance of the NDA for the Product is delayed beyond six (6) months from the target date set forth in the Joint Development Plan, (b) the preparation and filing of such NDA would result in costs and expenses that exceed by more than Five Hundred Thousand Dollars ($500,000) in combined internal and external costs the Joint Development Program Costs set forth in the Joint Development Plan as of the Closing Date, and/or (c) the FDA determines that the Product is not eligible for submission of an NDA under Section 505(b)(2) of the FD&C Act, then the Company shall either (with such election between (i) and (ii) made in its sole discretion except as provided below), compensate KaloBios, as KaloBios' sole and exclusive monetary remedy for any and all liability arising out of, under or in connection with this Section 4.8, by either (i) allowing KaloBios to credit the payment of any such costs and expenses above Five Hundred Thousand Dollars ($500,000) incurred by KaloBios as a result of such insufficiency, inadequacy and/or delay against any future payments to be made by KaloBios to the Company under this Agreement on a Dollar-for-Dollar basis, provided that such credit shall not cause the payment of any Milestone Payments to be reduced to less than fifty percent (50%) of the total amount of all potential Milestone Payments, or (ii) pay KaloBios in cash any such costs and expenses above Five Hundred Thousand Dollars ($500,000) incurred by KaloBios as a result of such insufficiency, inadequacy and/or delay within thirty (30) days after receipt by the Company of an invoice and reasonable supporting detail for such costs and expenses (with the failure to make such payment within thirty (30) days being deemed as an election by the

- 32 -

Company to allow the credit described in subsection (i) above, and provided, however, that if no Milestone Payment comes due and payable within the calendar year in which such invoice is delivered that is sufficient to credit in full the amount of such invoice after giving effect to the fifty percent (50%) aggregate limitation described above, the Company shall pay the remainder of such invoice in full in cash within thirty (30) days after the end of such calendar year.) Notwithstanding anything to the contrary set forth in this Agreement including, without limitation, Section 12.1, this Section 4.8 sets forth the sole and exclusive remedy of KaloBios and liability of the Company to KaloBios for any and all Losses suffered by KaloBios with respect to the matters set forth in clauses (a) through (c) above, and all such Losses shall be deemed excluded from any Claim under Article 12.

Section 4.9    Monthly Activity Log.  During the Joint Development Program Term, the Company shall provide to KaloBios, within fifteen (15) days after the end of each calendar month, an activity log summarizing the activities performed by or on behalf of the Company under the Joint Development Plan during the prior calendar month.  Additionally, the Company shall promptly answer any questions or other inquiries from KaloBios relating to such activity log and the activities summarized thereunder.

## ARTICLE 5
## COMMERCIALIZATION

Section 5.1    Overview.  KaloBios, either by itself or by or through its Affiliates and Third Parties, shall be solely responsible at its cost and expense for all commercial manufacturing, marketing, advertising, promotional, launch and sales activities in connection with the Compound and the Product in the Territory (the "**Commercialization Program**").

Section 5.2    Commercialization Plan.

(a)    *Initial Commercialization Plan*.  Reasonably in advance of the expiration of the Joint Development Program Term, but in no event later than eighteen (18) months prior to the expected availability of the Product for first sale of the Product in the Territory, KaloBios shall submit to the JSC a commercialization plan summarizing at a high level the activities to be conducted by KaloBios under the Commercialization Program (as such plan may be updated or amended hereunder from time to time, the "**Commercialization Plan**").   The initial Commercialization Plan shall be subject to the review and approval of the JSC.

(b)    *Commercialization Plan Updates and Amendments*.  At any time during the Term, KaloBios may submit amendments to the Commercialization Plan to the JSC.  The JSC shall determine whether or not to approve such proposed amendments in accordance with Section 6.1(e).  At least thirty (30) days prior to each anniversary of the expiration of the Joint Development Program Term, KaloBios shall prepare an updated version of the Commercialization Plan and submit such updated Commercialization Plan to the JSC.  The JSC shall determine whether or not to modify and approve such updated Commercialization Plan in accordance with Section 6.1(e).  Notwithstanding anything to the contrary set forth herein, the financial or other obligations of KaloBios under the Commercialization Plan may not be updated or amended, and additional financial or other obligations may not be imposed upon KaloBios under the Commercialization Plan, without KaloBios' prior written consent.

- 33 -

Section 5.3     Diligent Efforts.  KaloBios shall use Diligent Efforts to, either by itself or by or through its Affiliates and Third Parties, (i) conduct the activities set forth in the Commercialization Plan, and (ii) support the launch of the Product in the United States as soon as reasonably practicable.

Section 5.4     Development, Commercialization outside the United States.  As soon as reasonably practicable but in any event within twelve (12) months of the date of submission of an NDA for the Product to the FDA, KaloBios shall conduct and complete, and deliver a complete copy of, a feasibility analysis of conducting development and commercialization of the Product in countries currently in the European Union and in Japan.  If KaloBios reasonably determines that the development and commercialization of the Product in the European Union or Japan by KaloBios directly is not commercially reasonable and does not intend to sublicense any of the rights granted to it by the Company, then the Company shall have the right, but not the obligation, to obtain a license from KaloBios to all rights under the Intellectual Property owned or Controlled by KaloBios and any other assets owned by KaloBios that are necessary to develop and commercialize the Product in the European Union and Japan, each as applicable.  Such license shall be subject to customary diligence obligations and the payment of Royalties by the Company to KaloBios on the same terms and conditions set forth in Section 7.8.  If the Company obtains such a license, no milestone payments will be due to KaloBios thereunder – only Royalties will be payable (and no Milestone Payments will be due under Milestone Events 5 and 6 hereunder).

Section 5.5     Reporting Requirements.  KaloBios shall report to the JSC on an annual basis, which report may be made orally during any meeting of the JSC, the progress and results of the activities undertaken by KaloBios during the prior year as part of the Commercialization Program.

Section 5.6     Drug Pricing Matters.  KaloBios shall use commercially reasonable efforts to maintain industry standard access programs (e.g., a patient assistance program) providing access to the Product to patients with an inability to pay for the Product.

## ARTICLE 6
## GOVERNANCE

Section 6.1     Joint Steering Committee.  The Parties have established a committee (the "**Joint Steering Committee**" or "**JSC**") as more fully described in this Section 6.1.  During the Term, the JSC shall have review and oversight responsibilities for all activities to be performed under the Joint Development Program and the Commercialization Program.

(a)     *Responsibilities*.  The JSC shall perform the following functions, some or all of which may be addressed directly at each meeting of the JSC:

(i)     monitor progress of activities under the Joint Development Program in coordination with the JDC and the Commercialization Program;

(ii)     review and approve amendments and updates to the Joint Development Plan and the Commercialization Plan;

- 34 -

(iii)     serve as an information transfer vehicle to facilitate collaboration and the discussion of activities under the Joint Development Plan and the Commercialization Plan;

(iv)     resolve disputes escalated to it by the JDC or any other subcommittee; and

(v)     such other responsibilities as may be assigned to the JSC pursuant to this Agreement or as may be mutually agreed by the Parties from time to time.

(b)     *Membership*.  The JSC shall be comprised of two representatives (or such other equal number of representatives from each Party as the Parties may agree) from each of KaloBios and the Company.  As of the Effective Date, (a) the representatives of KaloBios appointed to the JSC are Cameron Durrant and Morgan Lam, and (b) the representatives of the Company appointed to the JSC are Stephen Hurst and Linda Hakes.  Each Party may replace any or all of its representatives on the JSC at any time upon written notice to the other Party.  Any member of the JSC may designate a substitute to attend and perform the functions of that member at any meeting of the JSC.  Each representative of each Party shall have expertise (either individually or collectively) in pharmaceutical drug discovery and development.  Each Party may, in its reasonable discretion, invite non-member representatives of such Party to attend meetings of the JSC as a non-voting participant, subject to the confidentiality obligations of Article 11.  A representative of KaloBios shall be designated as the chairperson to oversee the operation of the JSC.  The chairperson shall appoint a secretary of the JSC, who shall be a representative of the other Party and who shall serve for the same annual term as such chairperson.

(c)     *Meetings*.  During the Joint Development Program Term, the JSC shall meet, either in person, by teleconference or by video conference, at least once each Calendar Quarter, and more or less frequently as the Parties mutually deem appropriate, on such dates, and at such places and times, as provided herein or as the Parties shall agree.  In each Calendar Year during the Joint Development Program Term, at least one (1) of the JSC meetings shall be held in person.  After the expiration of the Joint Development Program Term, the JSC shall no longer meet unless otherwise requested by KaloBios or the Company, but in no event more than once each Calendar Year.  The members of the JSC also may convene or be polled or consulted from time to time by means of telecommunications, video conferences, electronic mail or correspondence, as deemed necessary or appropriate by the JSC.  Meetings of the JSC that are held in person shall be in San Francisco, California, or such other place as the Parties may agree.  Each Party shall bear all expenses it incurs in regard to participating in all meetings of the JSC.

(d)     *Minutes*.  The Parties shall alternate responsibility for preparing and circulating minutes of each meeting of the JSC, with KaloBios having such responsibility with respect to the first meeting of the JSC occurring after the Effective Date, setting forth, *inter alia*, a summary description of the discussions at the meeting and a list of any actions, decisions or determinations approved by the JSC and a list of any issues to be resolved by the Executive Officers pursuant to Section 6.1(e).  Such minutes shall be effective only after approved by both Parties.  With the sole exception of specific items of the meeting minutes to which the members cannot agree and which are escalated to the Executive Officers as provided in Section 6.1(e)

- 35 -

below, definitive minutes of all JSC meetings shall be finalized no later than thirty (30) days after the meeting to which the minutes pertain.  If at any time during the preparation and finalization of the JSC minutes, the Parties do not agree on any issue with respect to the minutes, such issue shall be resolved by the escalation process as provided in <u>Section 6.1(e)</u>.  The decision resulting from the escalation process shall be recorded in amended finalized minutes for said meeting.

(e)     *Decisions*.  Except as otherwise provided herein, all decisions of the JSC shall be made unanimously.  If the JSC is unable to reach a unanimous decision within ten (10) days after it has met and attempted to reach such decision, then either Party may, by written notice to the other, have such issue referred to the Chief Executive Officer of KaloBios, or such other person as he or she designates from time to time, and the Chief Executive Officer of the Company, or such other person as he or she designates from time to time (collectively, the "**Executive Officers**"), for resolution.  The Executive Officers shall meet promptly, either in person or by telephone conference, to discuss the matter submitted and to determine a resolution. If the Executive Officers are unable to determine a resolution in a timely manner, which shall in no case be more than ten (10) days after the matter was referred to them, then KaloBios shall have final decision-making authority with respect to the Program, including the Joint Development Program, and all other matters; *provided, however*, that KaloBios may not exercise its final decision-making authority to: (i) impose on the Company any costs or expenses that would not be reimbursable under <u>Section 4.3</u> in connection with the Joint Development Program; (ii) amend this Agreement; or (iii) amend the Joint Development Plan in any way that would reasonably be expected to result in KaloBios using less than Diligent Efforts in developing and obtaining Regulatory Approval for the Product in the United States.  Notwithstanding the foregoing, unless otherwise agreed by the Parties, disputes relating to non-disclosure, non-use and maintenance of Confidential Information and determinations of material breach or interpretation of this Agreement shall not be subject to any Party's final decision-making authority and may be escalated pursuant to <u>Section 14.2</u>.

(f)     *Subcommittee(s)*.     From time to time, the JSC may establish subcommittees to oversee particular projects or activities, as it deems necessary or advisable. Each subcommittee shall consist of an equal number of members from each Party with such expertise as the JSC determines is appropriate from time to time.

Section 6.2     <u>Joint Development Committee</u>.  Prior to the Effective Date, the Parties established a committee (the "**Joint Development Committee**" or "**JDC**") as more fully described in this <u>Section 6.2</u>.  The JDC shall be comprised of an equal number of representatives from each of KaloBios and the Company with the appropriate scientific and drug development expertise with respect to the conduct of the Joint Development Plan.  As of the Effective Date, (a) the representatives of KaloBios appointed to the JDC are Morgan Lam, Ted Shih and Blair Evans, and (b) the representatives of the Company appointed to the JDC are Linda Hakes, Jeanne Bonelle and Terry Boardman.  Each Party may replace any or all of its representatives on the JDC at any time upon written notice to the other Party.  Any member of the JDC may designate a substitute to attend and perform the functions of that member at any meeting of the JDC.  Each Party may, in its reasonable discretion, invite non-member representatives of such Party to attend meetings of the JDC as a non-voting participant, subject to the confidentiality obligations of <u>Article 11</u>.  During the Joint Development Program Term, the JDC shall meet on a monthly basis

CONFIDENTIAL
\\BA - 045347/000003 - 594503 v33

(or more or less frequently as agreed by the Parties) at such places (either in person in San Francisco or by telephone conference) and times agreed by the Parties.  The JDC will report to the JSC and will be responsible for the day-to-day management of the conduct of the Joint Development Plan, reviewing data, discussing and developing a regulatory strategy for the Product, managing Product manufacturing and supply, reviewing and approving amendments to the Joint Development Plan proposed by a Party, proposing annual updates to the Joint Development Plan and allocating responsibility between the Parties with respect to the activities to be conducted under the Joint Development Plan.  All decisions of the JDC on matters for which it has responsibility shall be made unanimously.  In the event that the JDC is unable to reach a unanimous decision within ten (10) days after it has met and attempted to reach such decision, then either Party may, by written notice to the other, have such issue submitted to the JSC for resolution in accordance with Section 6.1(e).  Each Party shall bear all expenses it incurs in regard to participating in all meetings of the JDC.

Section 6.3   Commercialization Report.  Following the submission of an NDA filing for the Product to the FDA, at least once each quarter (or more or less frequently as agreed by the Parties) at such places and times agreed by the Parties, KaloBios will provide a written report to the Company detailing the activities conducted by KaloBios under the Commercialization Plan.  The information in such written report shall include, at a minimum and without limitation, the results of market research, market penetration projections and projected sales over a period greater than one (1) year, the results of competitive analysis, regulatory environment analysis, manufacturing analysis, licensing discussions, co-promotion discussions, co-marketing discussions, status of reimbursements, and a summary of the most recent regulatory filings, including those filing since the prior report.

Section 6.4   No Authority to Amend.  Notwithstanding anything contained herein to the contrary, none of the JSC, JDC or any subcommittee thereof, shall have any authority or power to amend or modify the terms or provisions of this Agreement.

**ARTICLE 7**
**INTELLECTUAL PROPERTY RIGHTS**

Section 7.1   Development Program IP.

(a)   *Ownership*.  Any rights in Intellectual Property covering inventions made solely by the Company, its Affiliates or Third Parties engaged by it and/or by the Company together with one or more Third Parties engaged by it, in each case as a result of its efforts under the Joint Development Program (the "**Company Development Program IP**"), shall be owned solely by the Company.  Any rights in Intellectual Property covering inventions made solely by KaloBios, its Affiliates or Third Parties engaged by it and/or by KaloBios together with one or more Third Parties engaged by it, in each case as a result of its efforts under the Joint Development Program (the "**KaloBios Development Program IP**"), shall be owned solely by KaloBios.  Any rights in Intellectual Property covering inventions made jointly by the Parties or their Affiliates or Third Parties engaged by them as a result of their efforts under the Joint Development Program (the "**Joint Development Program IP**," together with the Company Development Program IP and the KaloBios Development Program IP, the "**Development Program IP**"), shall be owned jointly by the Parties.

- 37 -

(b)     *Assignment of Inventions*.   Each Party shall cause all of its Affiliates, employees, agent, consultants and any other individuals who participated in any respect in the conception or reduction to practice of any inventions made pursuant to the Joint Development Program on its behalf, to assign all ownership rights in such inventions to such Party.

(c)     *Disclosure of Inventions and Know-How*.   On a periodic basis during the Joint Development Program Term, but no more frequently than four (4) times each year during the Joint Development Program Term, (i) each Party shall disclose to the other Party all Joint Development Program IP invented by or on behalf of that Party or invented jointly by or on behalf of the Parties, and (ii) each Party shall transfer and deliver to the other Party a copy of all tangible embodiments of Know-How in its possession included within the Company Development Program IP or the KaloBios Development Program IP, as applicable.

Section 7.2     Licenses by the Company.

(a)     *Company Development Program IP and Joint Development Program IP*. During the Term, subject to the terms and conditions of this Agreement, the Company hereby grants to KaloBios the exclusive (even as to the Company), royalty-free, irrevocable (subject to Section 13.4) fully paid up, right and license, with the right to grant sublicenses (including through multiple tiers), under the Company Development Program IP and the Company's interest in the Joint Development Program IP to Exploit the Compound and the Product in the Territory in the Licensed Field.   All grants of sublicenses shall be subject to the same limitations as specified in the Transaction Documents and shall not exceed the scope of rights granted hereunder.   KaloBios shall enforce all sublicenses at its cost and shall be responsible for the acts and omissions of its Sublicensees to the extent that such acts and omissions relate to the sublicensed rights.   All sublicense rights shall terminate concurrently as of the termination or expiration of the grant to KaloBios.   KaloBios shall deliver to the Company a true, complete and correct copy of each sublicense grant; provided, that in the event such sublicense is subject to confidentiality as between KaloBios and such sublicensee, then KaloBios shall use Diligent Efforts to cause the sublicensee to enter into a commercially reasonable confidentiality agreement with the Company which would enable the Company to review the full terms of such sublicense, or in the alternative and at the Company's election, the Company may agree for KaloBios to redact only those terms that are unrelated to the sublicensing of the Company's or KaloBios' rights.

(b)     *No Conflicting Rights or Licenses*. The Company shall not grant any right or license to any Third Party relating to the Company Development Program IP that would conflict or interfere with any of the rights or licenses granted to KaloBios hereunder.

(c)     *Reservation of Rights; No Implied Rights*.   Notwithstanding Section 7.2(a) above, the Company retains rights under the Company Development Program IP and its interest in the Joint Development Program IP to perform its obligations under this Agreement.   KaloBios shall have no other right to use, or interest in, the Company Development Program IP or any other Intellectual Property rights Controlled by the Company, other than as expressly provided in this Agreement or other valid written agreements.   The Company makes no grant of Intellectual Property rights by implication.

- 38 -

Section 7.3     Licenses by KaloBios.

(a)     *KaloBios Development Program IP*.  KaloBios hereby grants to the Company the non-exclusive royalty-free, irrevocable, fully paid up, right and license, with the right to grant sublicenses (including through multiple tiers), under the Development Program IP to (i) perform its obligations under the Transaction Documents, and (ii) Exploit the Compound and the Product in the Territory in the Company Field.

(b)     *No Conflicting Rights or Licenses*. KaloBios shall not grant any right or license to any Third Party relating to the KaloBios Development Program IP that would conflict or interfere with any of the rights or licenses granted to the Company hereunder.

(c)     *Reservation of Rights; No Implied Rights*.  The Company shall have no other right to use, or interest in, the KaloBios Development Program IP or any other Intellectual Property rights Controlled by KaloBios, other than as expressly provided in the Transaction Documents.  KaloBios makes no grant of Intellectual Property rights by implication.

Section 7.4     Prosecution and Maintenance of Development Program IP.

(a)     *KaloBios First Right; Company Step In Right*. KaloBios shall have the first right, and shall use Diligent Efforts, to prepare, file, prosecute, and maintain each of the Patents included within the Development Program IP throughout the Territory, at KaloBios' cost. If, during the Term, KaloBios intends to allow any such Patent to expire or intends to otherwise abandon any such Patent in any country, KaloBios shall notify the Company of such intention at least fifteen (15) days prior to any filing or payment due date or any other date that requires action in connection with such Patent, and the Company shall thereupon have the right, but not the obligation, to assume responsibility for the preparation, filing, prosecution or maintenance thereof in such country at its sole cost and expense.

(b)     *Cooperation*.  Each Party agrees to reasonably cooperate with the other Party to execute all lawful papers and instruments, including obtaining and executing necessary powers of attorney and assignments by the named inventors, to make all rightful oaths and declarations, and to provide consultation and assistance as may be reasonably necessary in the prosecution and maintenance of all Patents undertaken in a manner consistent with this Section 7.4, including complying with the requirements to obtain patent term extensions under the Patent Term Restoration program under 21 C.F.R. Part 60.

Section 7.5     Third Party Infringement.

(a)     *Notice*.  If either Party becomes aware of any suspected infringement or misappropriation by a Third Party of any Development Program IP, then that Party shall promptly notify the other Party and provide it with all details of such activities (each, an "**Infringement of Development Program IP**") of which it is aware. Further, the Parties shall notify each other immediately of any circumstances of which they are aware and which could impair the integrity and reputation of the Product or if a Party is threatened by or becomes aware of unlawful activity in relation to the Product, including but not limited to, deliberate tampering with or contamination of the Product. In any such circumstances, the Parties shall use commercially reasonable efforts to limit any damage to the Parties and/or to the Product. The

- 39 -

Parties shall promptly bring such circumstances to the Joint Steering Committee to discuss and resolve such circumstances.

(b) *KaloBios Right to Enforce*.  KaloBios shall have the sole right, but not the obligation, to enforce the Development Program IP in the Territory in the Licensed Field, which right may include the institution of an Action, and compromise or settle such Action.  The Company shall have the sole right, but not the obligation, to enforce the Development Program IP in the Territory in the Company Field, which right may include the institution of an Action, and compromise or settlement of such Action.

(c) *Right to Representation; Cooperation*.  Either Party shall have the right to participate and be represented by counsel that it selects, at its expense, in any Action instituted by the other Party under Section 7.5(b).  Both Parties shall cooperate with and each other in all reasonable respects with any Action instituted under this Section 7.5.  If a Party lacks standing to initiate an Action to eliminate an Infringement of Development Program IP and the other Party has standing to initiate such Action, or otherwise upon the reasonable request of the Party lacking standing, the Party without standing may require the other Party to initiate or join such Action at the expense of the requesting Party.

(d) *Share of Recoveries*.  Any damages or other monetary awards recovered under this Section 7.5 shall be shared as follows: (a) the amount of such recovery actually received by KaloBios shall first be applied to the out-of-pocket costs of each Party in connection with such Action on a *pro-rata* basis based on the total costs of each Party; and (b) any remaining proceeds shall be retained by the Party initiating the Action.

Section 7.6   Defense of Claims Brought by Third Parties.  In the event that any action, suit or proceeding is brought against either Party or an Affiliate or sublicensee of either Party alleging the infringement of the Know-How or Patents of a Third Party by the making, having made, use, sale, offering for sale or importation of the Compound or Product, such Party shall notify the other Party within five (5) days of the earlier of (a) receipt of service of process in such action, suit or proceeding, or (b) the date such Party becomes aware that such action, suit or proceeding has been instituted, and the Parties shall meet as soon as possible to discuss the overall strategy for defense of such matter.  KaloBios shall have the right, but not the obligation, to defend such action, suit or proceeding in the Territory at its sole cost and expense.  The Company shall have the right to separate counsel at its own expense in any such action, suit or proceeding, and the Parties shall cooperate with each other in all reasonable respects in any such action, suit or proceeding.  Each Party shall promptly furnish the other Party with a copy of each communication relating to the alleged infringement that is received by such Party, including all documents filed in any litigation.

Section 7.7   Grant of Rights to Company IP

(a) *Exclusive License to KaloBios*.  During the Term, subject to the terms and conditions of this Agreement and in consideration for the Royalty payments set forth herein, the Company hereby grants to KaloBios the exclusive (even as to the Company), irrevocable (subject to Section 13.4) right and license, with the right to grant sublicenses (including through multiple tiers), under the Company IP to Exploit the Compound and the Products in the Territory

- 40 -

in the Licensed Field. All grants of sublicenses shall be subject to the same limitations as specified in the Transaction Documents and shall not exceed the scope of rights granted hereunder. KaloBios shall enforce all sublicenses at its cost and shall be responsible for the acts and omissions of its sublicensees to the extent that such acts and omissions relate to the sublicensed rights. All sublicense rights shall terminate concurrently as of the termination or expiration of the grant to KaloBios.

(b)   *No Conflicting Rights or Licenses*. The Company shall not grant any right or license to any Third Party relating to any of the Company Patents or the Company Know-How that would conflict or interfere with any of the rights or licenses granted to KaloBios hereunder.

(c)   *Reservation of Rights; No Implied Rights*. Notwithstanding Section 7.7(a) above, the Company retains rights under the Company IP to perform its obligations under the Transaction Documents and to Exploit the Compound and the Product in the Territory in the Company Field. Except as expressly stated herein, KaloBios shall have no other right to use, or interest in, the Company IP or any other intellectual property rights Controlled by the Company, other than as expressly provided in this Agreement or other valid written agreements. The Company makes no grant of intellectual property rights by implication and shall retain rights under the Company IP or any other intellectual property rights Controlled by the Company for all purposes other than those granted to KaloBios hereunder.

Section 7.8   Royalty on Company IP.

(a)   *Royalty Rate*. Subject to the remainder of Section 7.8, on a Product-by-Product and country-by-country basis, KaloBios shall pay to the Company royalties at the rate of fifteen percent (15%) of Annual Net Sales of such Product; provided however, that if a Non-Voucher Accompanying Approval has been issued the royalty on Annual Net Sales of Products in the United States shall be seven and one-half percent (7.5%) (the "**Royalties**"); and provided further, that if a Voucher with respect to the Product is subsequently issued to a Party commercializing the Product in the United States pursuant to Section 3.3(c) after the Voucher Issuance Expiration Date, then the Royalty on Products in the United States shall be increased to fifteen percent (15%), effective from and after the date such Voucher is issued.

(b)   *Royalty Term*. KaloBios' obligation to pay royalties with respect to a Product in a particular country in the Territory, even if reduced as provided below in this Section 7.8, shall commence upon the First Commercial Sale of such Product in such country and shall expire on a country-by-country and Product-by-Product basis upon the expiration of Regulatory Exclusivity for such Product in such country (the "**Royalty Term**"). Upon the expiration of the Royalty Term, KaloBios shall have no additional payment obligations to the Company in respect of such Product in such country.

(c)   *Reduction for Third Party Licenses*. KaloBios shall pay all amounts due under Third Party Licenses; provided, that KaloBios shall be entitled to a credit against the Royalties due to the Company upon sales of a Product in a particular country of an amount equal to total royalties paid by KaloBios to a Third Party with respect to such Product in such country under any Third Party Licenses, and provided, further, without duplication of the foregoing, that KaloBios shall be entitled to a credit against all non-Royalty amounts due to the Company

- 41 -

hereunder in an amount equal to fifty percent (50%) of all non-royalty amounts paid by KaloBios to a Third Party under a Third Party License.  Notwithstanding the foregoing, such credit shall not cause the royalty rate payable to the Company to be reduced to less than (i) seven and one-half percent (7.5%), if the royalty rate pursuant to Section 7.8(a) above is then fifteen percent (15%), or (ii) three and three-quarters of a percent (3.75%), if the royalty rate pursuant to Section 7.8(a) above is then seven and one-half percent (7.5%), of Annual Net Sales of such Product in such country.

(d)      *Reports and Payments*.  Until the expiration of all applicable Royalty Terms, KaloBios shall make written reports to the Company within thirty (30) days after the end of each Calendar Quarter covering Net Sales of Products in the Territory by KaloBios, its Affiliates and Sublicensees during the preceding Calendar Quarter, commencing with the Calendar Quarter during which the First Commercial Sale of a Product is made anywhere in the Territory.  Each such written report shall contain the following information for the applicable Calendar Quarter, on a Product-by-Product and country-by-country basis:  (i) the amount of gross sales of the Products, (ii) the amount of Net Sales of the Products, and (iii) the calculation of the Royalties due to the Company on such Net Sales, showing the application of the reductions, if any.  Concurrent with the delivery of each such report, KaloBios shall make the Royalty payment due to the Company under this Section 7.8 for the Calendar Quarter covered by such report.

Section 7.9    Currency; Exchange Rate.  With respect to sales of the Product invoiced in Dollars, the Net Sales and the amounts due hereunder will be expressed in Dollars.  With respect to sales of the Product invoiced in a currency other than Dollars, the Net Sales and the amounts due hereunder will be reported in Dollars, calculated using the average of the exchange rates for the purchase and sale of Dollars reported by *The Wall Street Journal* on the last Business Day of the Calendar Quarter to which such Net Sales relate.

Section 7.10    Taxes.

(vii)      *Tax Withholding*.  KaloBios shall be entitled to deduct and withhold from any amounts payable pursuant to this Agreement such amounts as may be required to be deducted or withheld therefrom under any provision of federal, state, local or foreign tax law or under any applicable Law, provided, however, that such amounts are timely paid to the applicable taxing authority. To the extent such amounts are so deducted and withheld, such amounts shall be treated for all purposes under this Agreement as having been paid to the Company.

(viii)      *Tax Cooperation*.  The Parties agree to cooperate with one another and use reasonable efforts to avoid or reduce tax withholding or similar obligations in respect of Royalties paid by KaloBios to the Company under this Agreement.  The Company shall provide KaloBios any tax forms and other documents that may be reasonably necessary in order for KaloBios to not withhold tax or to withhold tax at a reduced rate under an applicable bilateral income tax treaty with respect to any payments made by KaloBios to the Company under this Agreement.  KaloBios shall be entitled to withhold the full amount of tax applicable to any amount payable to the Company if the Company does not provide the applicable tax forms and other necessary documents (establishing a tax exemption or reduction) at least five (5) Business

- 42 -

Days prior to the date the relevant payment is due. Each Party shall provide the other Party with reasonable assistance to enable the recovery, as permitted by Law, of withholding taxes or similar obligations resulting from payments made under this Agreement.

Section 7.11    Prosecution and Maintenance of Company IP.

(a)    *KaloBios First Right; Company Step In Right*. KaloBios shall have the first right, and shall use Diligent Efforts, to prepare, file, prosecute, and maintain each of the Company Patents throughout the Territory, at KaloBios' cost. If, during the Term, KaloBios intends to allow any Company Patent to expire or intends to otherwise abandon any such Company Patent in any country, KaloBios shall notify the Company of such intention at least fifteen (15) days prior to any filing or payment due date or any other date that requires action in connection with such Company Patent, and the Company shall thereupon have the right, but not the obligation, to assume responsibility for the preparation, filing, prosecution or maintenance thereof in such country at its sole cost and expense.

(b)    *Cooperation*. Each Party agrees to reasonably cooperate with the other Party to execute all lawful papers and instruments, including obtaining and executing necessary powers of attorney and assignments by the named inventors, to make all rightful oaths and declarations, and to provide consultation and assistance as may be reasonably necessary in the prosecution and maintenance of all Patents undertaken in a manner consistent with this Section 7.11, including complying with the requirements to obtain patent term extensions under the Patent Term Restoration program under 21 C.F.R. Part 60.

Section 7.12    Third Party Infringement of Company IP.

(a)    *Notice*. If either Party becomes aware of any suspected infringement or misappropriation by a Third Party of any Company Patent or Company Know-How, then that Party shall promptly notify the other Party and provide it with all details of such activities (each, an "**Infringement of Company IP**") of which it is aware.

(b)    *KaloBios Right to Enforce*. KaloBios shall have the sole right, but not the obligation, to (i) address such Infringement of Company IP in the Licensed Field, which right may include the institution of an Action, and (ii) compromise or settle such Action in its sole discretion. The Company shall have the sole right, but not the obligation, to (x) address such Infringement of Company IP in the Territory in the Company Field, which right may include the institution of an Action, and (y) compromise or settle such Action in its sole discretion.

(c)    *Right to Representation; Cooperation*. Either Party shall have the right to participate and be represented by counsel that it selects, at its expense, in any Action instituted by the other Party under Section 7.12(b). Both Parties shall cooperate with and each other in all reasonable respects with any Action instituted under this Section 7.12. If a Party lacks standing to initiate an Action to eliminate an Infringement of Company IP and the other Party has standing to initiate such Action, or otherwise upon the reasonable request of the Party lacking standing, the Party without standing may require the other Party to initiate or join such Action at the expense of the requesting Party.

CONFIDENTIAL
\\BA - 045347/000003 - 594503 v33

(d)      *Share of Recoveries*.  Any damages or other monetary awards recovered under this <u>Section 7.12</u> shall be shared as follows: (a) the amount of such recovery actually received by KaloBios shall first be applied to the out-of-pocket costs of each Party in connection with such Action on a *pro-rata* basis based on the total costs of each Party;  (b) any proceeds constituting lost sales of Products shall be treated as the equivalent of Annual Net Sales in the Calendar Year in which the recovery is paid (*i.e.*, shall be allocated to KaloBios with the Company receiving Royalties on the recovery proceeds in accordance with the provisions of <u>Section 7.8</u>); and (c) any remaining proceeds shall be distributed to the Party initiating the Action.

Section 7.13   <u>Defense of Claims Brought by Third Parties</u>.  In the event that any action, suit or proceeding is brought against either Party or an Affiliate or sublicensee of either Party alleging the infringement of the Know-How or Patents of a Third Party by the making, having made, use, sale, offering for sale or importation of the Compound or Product, such Party shall notify the other Party within five (5) days of the earlier of (a) receipt of service of process in such action, suit or proceeding, or (b) the date such Party becomes aware that such action, suit or proceeding has been instituted, and the Parties shall meet as soon as possible to discuss the overall strategy for defense of such matter.  KaloBios shall have the right, but not the obligation, to defend such action, suit or proceeding in the Territory at its sole cost and expense.  The Company shall have the right to separate counsel at its own expense in any such action, suit or proceeding, and the Parties shall cooperate with each other in all reasonable respects in any such action, suit or proceeding.  Each Party shall promptly furnish the other Party with a copy of each communication relating to the alleged infringement that is received by such Party, including all documents filed in any litigation.

## ARTICLE 8
## REPRESENTATIONS AND WARRANTIES OF THE COMPANY

Except as set forth in the Company's Disclosure Schedules delivered to KaloBios as of the date hereof, the Company represents and warrants to KaloBios as follows:

Section 8.1   <u>Corporate Existence</u>.  The Company is a limited liability company duly organized, validly existing, and in good standing under the Laws of the State of Delaware and has all necessary corporate power and authority to own, operate or lease the properties and assets now owned, operated or leased by it and to carry on its business as currently conducted.

Section 8.2   <u>Authorization and Enforceability</u>.  The Company (a) has the full limited liability company power and authority and the legal right to enter into this Agreement and the other Transaction Documents and to perform its obligations hereunder and thereunder; (b) has taken all necessary governance action on its part required to authorize the execution and delivery of this Agreement and the other Transaction Documents and the performance of its obligations hereunder and thereunder; and (c) this Agreement and the other Transaction Documents have been duly executed and delivered on behalf of the Company, and constitute legal, valid, and binding obligations of the Company that are enforceable against it in accordance with their terms, in each case, subject to enforcement of remedies under applicable bankruptcy, insolvency, reorganization, moratorium or similar Laws affecting generally the enforcement of creditors'

CONFIDENTIAL
\\BA - 045347/000003 - 594503 v33

rights and subject to a court's discretionary authority with respect to the granting of a decree ordering specific performance or other equitable remedies.

Section 8.3   No Conflict.  The execution and delivery of this Agreement and the other Transaction Documents, the performance of the Company's obligations hereunder and thereunder and the assignments, licenses and sublicenses to be granted pursuant to this Agreement and the other Transaction Documents do not and will not (a) conflict with or violate any requirement of applicable Law; (b) conflict with or violate the certificate of formation or other organizational documents of the Company; (c) conflict with, violate, breach or constitute a default under any Assumed Contract or other contractual obligations of the Company or any of its Affiliates; and (d) result in the creation of any Encumbrances on the Acquired Assets other than pursuant to the Transaction Documents; except in the case of (a) or (c) where the conflict, violation, breach, default, failure to give notice or Encumbrance would not, individually or in the aggregate, have a Material Adverse Effect.

Section 8.4   Legal Proceedings.   There are no pending, or to the Company's Knowledge, threatened in writing, adverse Actions against or by the Company or any of its Affiliates, at Law or in equity, or before or by any Governmental Authority that challenge or seek to prevent, enjoin or otherwise delay the Contemplated Transactions or that relate to or affect the Acquired Assets.

Section 8.5   Contracts and Commitments.

(a)   The Company has provided to KaloBios complete and accurate copies of each of the Assumed Contracts.  Other than the Assumed Contracts set forth on Schedule 2.1, there are no other Contracts of the Company or its Affiliates currently in effect that are directly related to the Acquired Assets or which are necessary for the Exploitation of the Compound or the Product.

(b)   Each Assumed Contract is a legal, valid and binding obligation of either the Company or one of its Affiliates and, to the Company's Knowledge, each other party thereto, enforceable against the Company and any applicable Affiliates and each other party thereto in accordance with its terms (except as limited by applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent transfer or other similar Law as now or hereafter in effect relating to or affecting creditors' rights generally, and subject to the limitations imposed by general principles of equity, regardless of whether such enforceability is considered in a proceeding at Law or in equity (including concepts of materiality, reasonableness, good faith or fair dealing)). Except with regards to the IECS Agreement,[1] neither the Company nor any of its Affiliates has received written notice from any party to any Assumed Contract claiming or alleging that the Company or any of its Affiliates has materially breached or is in default thereunder.  There is not under any Assumed Contract: (i) any existing material default by the Company or, to the Company's Knowledge, by any other party thereto, or (ii) any event which, after notice or lapse of time or both, would constitute a material default by the Company or, to the Company's Knowledge, by any other party, or result in a right to accelerate or terminate or

---

[1] NTD: Subject to further discussion with lenders.

CONFIDENTIAL
\\BA - 045347/000003 - 594503 v33

result in a loss of any material rights of the Company, except as would not reasonably be expected to have a Material Adverse Effect.

(c)     Neither the Company nor any of its Affiliates (i) is a party to or otherwise bound by any oral or written Contract or agreement that will result in any other Person obtaining any interest in, or that would give to any other Person any right to assert any claim in or with respect to, any of the Company's rights under the Transaction Documents; (ii) has granted any rights with respect to the Acquired Assets to any Person other than KaloBios that would impede the fulfillment of the Company's obligations hereunder or thereunder; or (iii) is under any obligation to any Person, contractual or otherwise, that is in material violation of the terms of this Agreement or the other Transaction Documents or that would impede the fulfillment of the Company's obligations hereunder or thereunder.

(d)     The Company is and at all times has been in compliance with all applicable terms and requirements of each Assumed Contract that is being assumed by KaloBios.

(e)     Neither the Company nor any of its Affiliates are bound by any non-competition agreements related to the Compound or the Product.

Section 8.6     No "Bad Actor"; No Debarment.   None of the Company or any of its predecessors, Affiliates, directors, executive officers, other officers of the Company or any Beneficial Owners of twenty percent (20%) or more of the Company's outstanding voting equity securities, calculated on the basis of voting power, in any capacity (each, a "**Company Covered Person**"):

(a)     is, to the Company's Knowledge, subject to any of the "bad actor" disqualification events described in Rule 506(d)(1)(i)-(viii) of the Securities Act (a "**Disqualification Event**"), except for a Disqualification Event covered by Rule 506(d)(2) or (d)(3) of the Securities Act,

(b)     is, or has been, to the Company's Knowledge, debarred under Section 306(a) or 306(b) of the FD&C Act or by the analogous Laws of any Regulatory Authority, or disqualified as a clinical investigator under 21 C.F.R. § 312.70 or any analogous Laws of any Regulatory Authority, or has engaged in any conduct that could reasonably be expected to result in any of the foregoing;

(c)     has, to the Company's Knowledge, been charged with, or convicted of, any felony or misdemeanor within the ambit of 42 U.S.C. §§ 1320a-7(a), 1320a-7(b)(1)-(3), or pursuant to the analogous Laws of any Regulatory Authority, or is proposed for exclusion, or the subject of exclusion or debarment proceedings by a Regulatory Authority, during the employee's or consultant's employment or contract term with the Company; or

(d)     is, to the Company's Knowledge, or has been, excluded, suspended or debarred from participation, or otherwise ineligible to participate, in any U.S. or non-U.S. health care programs (or has been convicted of a criminal offense that falls within the scope of 42 U.S.C. § 1320a-7 but not yet excluded, debarred, suspended, or otherwise declared

- 46 -

ineligible), or excluded, suspended or debarred by a Regulatory Authority from participation, or otherwise ineligible to participate, in any procurement or non-procurement programs.

(e)     The Company has exercised reasonable care to determine (i) the identity of each Person that is a Company Covered Person; and (ii) whether any Company Covered Person is subject to a Disqualification Event or has been excluded, debarred, suspended, or otherwise declared ineligible by any Regulatory Authority.

Section 8.7    Title; Encumbrances; Sufficiency.

(a)     The Company has (i) sufficient legal and beneficial title to or ownership of, and the Company will convey to KaloBios, all of the Acquired Assets, free and clear from any Encumbrances; and (ii) any assignments to the Company of the Acquired Assets have been validly made, duly executed and sufficiently perfected so as to grant KaloBios full legal title, free and clear and any Encumbrances.

(b)     Other than the Company IP, the Acquired Assets constitute all of the assets, tangible and intangible, owned or licensed by the Company relating to the Compound or the Product and necessary to the Exploitation of the Compound and the Product.  There are no assets, tangible or intangible, owned or licensed by Affiliates of the Company relating to the Compound or the Product and necessary to the Exploitation of the Compound and the Product.

(c)     Other than payments to Galenyx as set forth on Section 8.7(c) of the Disclosure Schedules, there are no outstanding obligations to pay any amounts or provide other material consideration to any other Person in connection with any Acquired Assets.

Section 8.8    No Consents.  To the Company's Knowledge, no material consent, waiver, approval, order or authorization of, or registration, declaration or filing with, or notice to any Governmental Authority is required by, or with respect to, the Company or the Acquired Assets in connection with the execution and delivery of this Agreement or the other Transaction Documents, or the consummation of the Contemplated Transactions, except for (a) any notice filings or registrations of transfer with any Governmental Authority that may be required in connection with the assignment and transfer of the Acquired Assets that are set forth on Section 8.8 of the Disclosure Schedules, except for those to be performed or made to evidence the transfer of Acquired Assets after the Closing in connection with the Transaction Documents, and (b) such other material consents, waivers, approvals, authorizations or notices, if any, set forth on Section 8.8 of the Disclosure Schedules.

Section 8.9    Compliance with Laws.

(a)     The Company is conducting, and since inception, has conducted,  its business as applied to or in connection with the Acquired Assets in compliance in all material respects with all Laws within all Territories applicable to the Acquired Assets, except where the failure to be in compliance would not have a Material Adverse Effect.

(b)     The Company has not received any written notices or other written communications related to the Compound, the Product or the Acquired Assets from any

- 47 -

Governmental Authority regarding any actual, alleged, threatened, possible or potential material violation of, or failure to comply in all material respects with, any Law.

(c)     The Company is not a party to or bound by any order, judgment, decree, injunction, rule or award of any Governmental Authority concerning the Compound, the Product or any Acquired Asset, and the Company has filed all reports required to be filed with any Governmental Authority in respect of the Compound, the Product or any Acquired Asset on or before the date hereof.

(d)     The Company and, to Company's Knowledge, its officers, employees, contractors, and agents, as well as all parties that conducted or were responsible for conducting pre-clinical and clinical studies on which the Company intends to rely, hold all applicable Governmental Approvals required to develop, test, manufacture, store, label, package, distribute, import, export, market and promote the Product and otherwise conduct business as presently conducted.  Each such Governmental Approval is valid and in full force and effect, and no suspension, revocation, or cancellation of such Governmental Approval is pending or threatened, and there is no reasonable basis for believing that such Governmental Approval will not be renewable upon expiration.

Section 8.10    Safety and Efficacy; Exclusive Rights to Certain Existing Foreign Data. To the Company's Knowledge there are no problems concerning the safety or efficacy of the Compound or the Product (including any of its ingredients) or any questions raised by any Regulatory Authority with respect thereto, and the Company has informed KaloBios of all adverse drug reactions of which it has Knowledge relating to the Compound, the Product or their use that occurred anywhere in the Territory, supplied or administered by any party, whether or not affiliated with the Company.  The Company entered into the IECS Agreement based upon the representation of IECS that IECS "[H]as collected and is the sole owner of certain, data, which includes demographic, clinical data, doses of Benznidazole, adverse events, follow-up data including serology, PCR and biomarkers as criteria of cure in patients (as referenced in the 1998 publication entitled '*Efficacy of chemotherapy with benznidazole in children in the indeterminate phase of Chagas' disease'),* and other groups of information about pharmacokinetics of Benznidazole in children, which it desires to license to Savant pursuant to the terms hereof." The IECS Agreement states that it is an exclusive license to use the Data Products (as such term is defined in the IECS Agreement) for purposes of completing any submissions to the Regulatory Agencies (as such term is defined in the IECS Agreement). The Company has not provided access to any third party to any of the Data Products received by the Company pursuant to the IECS Agreement or to any other clinical data owned by the Company or to which the Company has rights.

Section 8.11    Good Practices.     All pre-clinical and clinical studies and other development activities in the United States involving the Compound or the Product carried out by or on behalf of the Company that, at such time were required to be conducted in accordance with the FDA's Good Laboratory Practice ("**GLP**"), Good Clinical Practice ("**GCP**"), and current Good Manufacturing Practice ("**cGMP**") requirements and standards, as applicable, including regulations under title 21 of the C.F.R., Parts 50, 54, 56, 58, 210, 211, 312, the GCP requirements under the April 1996 ICH E6 Good Clinical Practice Guideline, and applicable guidance documents, as amended from time to time, the Animal Welfare Act, and all applicable

- 48 -

similar Laws in other jurisdictions, and all Laws relating to protection of human subjects were and/or are being conducted in accordance with such requirements.  The Company has not received any notice that FDA, any other Governmental Authority, or any institutional review board, ethics committee, or similar body has recommended, initiated, or threatened to initiate any action to suspend or terminate any clinical trial sponsored by the Company or on which the Company intends to rely for marketing approval purposes, or otherwise to restrict the preclinical research on or clinical study of the Compound or the Product.

FOR THE AVOIDANCE OF DOUBT, STUDIES MAY HAVE BEEN CONDUCTED BY OR ON BEHALF OF THE COMPANY THAT ARE NOT DESIGNATED AS GLP, CGMP OR GCP BUT MAY STILL BE OF VALUE AND INCLUDED IN THE ACQUIRED ASSETS OR THE DEVELOPMENT PROGRAM. FURTHER, THIRD PARTY STUDIES MAY BE REPORTED IN THE LITERATURE OR DATABASES AS GLP, CGMP OR GCP AND/OR OTHERWISE IN COMPLIANCE WITH RELEVANT REGULATORY AND LEGAL AUTHORITIES BY SUCH THIRD PARTY AND THE COMPANY MAKES NO REPRESENTATIONS OR WARRANTIES AS TO SUCH THIRD PARTY DESIGNATIONS OR COMPLIANCE CLAIMS.

Section 8.12    Regulatory Matters.

(a)    The Company has provided or made available any and all documents and communications in its possession from and to any Governmental Authority or Regulatory Authority, or prepared by any Governmental Authority or Regulatory Authority, related to the Compound, the Product and the Acquired Assets, including but not limited to any notice of inspection, inspection report, warning letter, deficiency letter, or similar communication.

(b)    To the Company's Knowledge, none of the Company, any of its Affiliates or any of their respective officers, employees or agents has made, with respect to the Compound or the Product, an untrue statement of a material fact or fraudulent statement to any Governmental Authority or Regulatory Authority or failed to disclose a material fact required to be disclosed to such Governmental Authority or Regulatory Authority.

(c)    The Company has maintained records relating to the research, development, testing, manufacture, handling, labeling, packaging, storage, and supply of the Compound and the Product in compliance with the FD&C Act, all implementing regulations and interpretative FDA guidance, and all other applicable Laws, and the Company has submitted to Governmental Authorities and Regulatory Authorities, in a timely manner, all required notices and annual or other reports, including but not limited to adverse experience reports and annual reports, related to the research, development, testing, manufacture, handling, labeling, packaging, storage, supply, promotion, distribution, marketing, commercialization, import, export, and sale of the Compound and the Product in the Territory.

(d)    To the Company's Knowledge, no other person or party currently holds any form of regulatory exclusivity in the United States that would materially and adversely affect  the  marketing of the Product, the Compound, or the Acquired Assets by KaloBios or a subsequent owner of the Acquired Assets, nor, to the Company's Knowledge, has any other person or party submitted a marketing application that, if approved, would create regulatory

- 49 -

exclusivity with such effect.  Regulatory exclusivity includes, but is not limited to, orphan drug exclusivity under Section 527 of the FD&C Act, new chemical entity exclusivity under Sections 505(c)(3)(E)(ii) and 505(j)(5)(F)(ii) of the FD&C Act, new use exclusivity under Sections 505(c)(3)(E)(iii) and 505(j)(5)(F)(iii) of the FD&C Act, and pediatric exclusivity under Section 505A of the FD&C Act.

Section 8.13    Taxes.  Except as set forth on Section 8.13 of the Disclosure Schedules:

(a)    The Company has duly and timely filed all Tax Returns (taking into account appropriate extensions) required to be filed with respect to the Acquired Assets, each such return is true, correct and complete in all respects, and the Company has timely paid all material Taxes required to be paid with respect to the Acquired Assets (whether or not such Taxes are shown as due on any Tax Return).

(b)    There are no currently proposed or pending or threatened adjustments, audits or examinations by any Governmental Authority in connection with any Taxes relating to the Acquired Assets, and there are no matters under discussion with any Governmental Authority with respect to Taxes that may result in an additional liability for Taxes with respect to which the Acquired Assets may be subject, levied, or assessed.

(c)    There is no waiver or extension of any statute of limitations with respect to any Tax matter relating to the Acquired Assets.

(d)    No claim has ever been made in writing by a Governmental Authority in a jurisdiction where the Company does not file Tax Returns that the Acquired Assets are or may be subject to taxation by that jurisdiction.

(e)    All Taxes required by legal requirements to be withheld or collected with respect to the Acquired Assets have been duly withheld or collected and, to the extent required, have been paid to the proper Governmental Authority or Person.

(f)    The Company is not a party to, nor is it bound by or required to make any payment under, any Tax sharing agreement, Tax allocation agreement, Tax indemnity obligation or similar agreement, arrangement, understanding or practice with respect to Taxes (including any advance pricing agreement, closing agreement or other agreement relating to Taxes with any Governmental Authority).

(g)    There are no Tax Encumbrances with respect to any Acquired Assets other than for Taxes not yet due and payable.

Section 8.14    No Undisclosed Liabilities.  The Company does not have any Liabilities of any nature (whether known or unknown and whether absolute, accrued, contingent, or otherwise) in respect of the Compound, the Product or the Acquired Assets other than Liabilities (a) incurred in the ordinary course of business, or (b) incurred in connection with the Contemplated Transactions; except where such Liabilities would not, individually or in the aggregate, have a Material Adverse Effect.

- 50 -

Section 8.15   <u>Inventory</u>.   All manufacturing operations relating to the Inventory are being conducted in compliance with all applicable provisions of cGMP requirements as set forth in 21 U.S.C. § 351(a)(2)(B), 21 C.F.R. Parts 210 and 211, and applicable guidance documents, as amended from time to time.   To the Company's Knowledge, the Inventory has not been voluntarily recalled, suspended, or discontinued by the Company or any other party that had authority to do so, either on its own initiative or at the request of the FDA or any other Governmental Authority. The Company has not received any written notice of observed cGMP violations (Form 483) or Warning Letters of cGMP violations from FDA or similar notices from other Governmental Authorities.

Section 8.16   <u>Brokers</u>.   No broker, investment banker, agent, finder or other intermediary acting on behalf of any member of the Company or its Affiliates or under the authority of the Company or any Affiliate is or will be entitled to any broker's or finder's fee or any other commission or similar fee directly or indirectly in connection with the Contemplated Transactions.

Section 8.17   <u>Compliance with the Foreign Corrupt Practices Act and Export Control and Anti-boycott Laws</u>.

(a)   Neither the Company nor, to the Company's Knowledge, any of the Company's directors, officers, employees or agents have, directly or indirectly, made, offered, promised or authorized any payment or gift of any money or anything of value to or for the benefit of any "foreign official" (as such term is defined in the U.S. Foreign Corrupt Practices Act of 1977, as amended (the "**FCPA**")), foreign political party or official thereof or candidate for foreign political office for the purpose of (i) influencing any official act or decision of such official, party or candidate, (ii) inducing such official, party or candidate to use his, her or its influence to affect any act or decision of a foreign governmental authority, or (iii) securing any improper advantage, in the case of (i), (ii) and (iii) above in order to assist the Company or any of its affiliates in obtaining or retaining business for or with, or directing business to, any person.  Neither the Company nor, to the Company's Knowledge, any of its directors, officers, employees or agents have made or authorized any bribe, rebate, payoff, influence payment, kickback or other unlawful payment of funds or received or retained any funds in violation of any law, rule or regulation.  The Company further represents that it has maintained, and has caused each of its Affiliates to maintain, systems of internal controls (including, but not limited to, accounting systems, purchasing systems and billing systems) to ensure compliance with the FCPA or any other applicable anti-bribery or anti-corruption law. Neither the Company, or, to the Company's Knowledge, any of its officers, directors or employees are the subject of any allegation, voluntary disclosure, investigation, prosecution or other enforcement action related to the FCPA or any other anti-corruption law.

(b)   Each transaction related to the Compound, the Product and the Acquired Assets is properly and accurately recorded on the books and records of the Company, and each document upon which entries in the Company's books and records are based is complete and accurate in all respects.  The Company maintains a system of internal accounting controls adequate to insure that the Company maintains no off-the-books accounts and that the Company's assets are used only in accordance with the Company's management directives.

- 51 -

CONFIDENTIAL
\\BA - 045347/000003 - 594503 v33

Section 8.18    Intellectual Property.   In all cases subject in its entirety to Section 9.8, below:

(a)    The Company Patents are subsisting.

(b)    The Company Controls the Company Patents and the Company Know-How and has the right to assign and grant all rights and licenses it purports to grant to KaloBios with respect to the Company Patents and the Company Know-How under this Agreement.

(c)    The Company has no present Knowledge of any settled, pending or threatened claim or lawsuit or legal proceeding of a Third Party against the Company alleging that the Company Patents or the Company Know-How infringes or misappropriates, in part or in whole, the intellectual property or intellectual property rights of such Third Party.

(d)    The Company has not granted any right or license to any Third Party relating to any of the Company Patents or the Company Know-How that would conflict or interfere with any of the rights or licenses granted to KaloBios hereunder.

(e)    Exhibit B-1 sets forth a complete and accurate list of the issued patents constituting Company Patents as of the Effective Date and Exhibit B-2 sets forth a complete and accurate list of the pending patent applications constituting Company Patents as of the Effective Date.

(f)    The Company has disclosed to KaloBios all material information received by the Company concerning the institution of any interference, opposition, reexamination, reissue, revocation, nullification or any official proceeding involving any Company Patent anywhere in the Territory.

## ARTICLE 9
## REPRESENTATIONS AND WARRANTIES OF KALOBIOS

Except as set forth in KaloBios' Disclosure Schedules delivered to the Company as of the date hereof, KaloBios represents and warrants to the Company as follows:

Section 9.1    Corporate Existence.   KaloBios is a corporation duly organized, validly existing, and in good standing under the Laws of the State of Delaware and has all necessary corporate power and authority to own, operate or lease the properties and assets now owned, operated or leased by it and to carry on its business as currently conducted.

Section 9.2    Authorization and Enforceability.   KaloBios (a) has the full corporate power and authority and the legal right to enter into this Agreement and the other Transaction Documents and perform its obligations hereunder and thereunder; (b) has taken all necessary governance action on its part required to authorize the execution and delivery of this Agreement and the other Transaction Documents and the performance of its obligations hereunder and thereunder; and (c) this Agreement and the other Transaction Documents have been duly executed and delivered on behalf of KaloBios, and constitute legal, valid, and binding obligations of KaloBios that are enforceable against it in accordance with their terms, in each case, subject to enforcement of remedies under applicable bankruptcy, insolvency,

- 52 -

reorganization, moratorium or similar Laws affecting generally the enforcement of creditors' rights and subject to a court's discretionary authority with respect to the granting of a decree ordering specific performance or other equitable remedies.

Section 9.3    Capitalization.

(a)    The authorized capital stock and the issued and outstanding stock of KaloBios and stock reserved for issuance are as described in KaloBios' Form 8-K filed with the SEC on June 22, 2016.

(b)    Except for the Warrant (including the shares of Common Stock issuable upon exercise of the Warrant) (the "**Warrant Shares**") to be issued under this Agreement and the issuance of New Common Stock under the Plan, there are no outstanding or authorized options, warrants, convertible securities or other rights, agreements, arrangements or commitments of any character relating to the capital stock of KaloBios or obligating KaloBios to issue or sell any shares of capital stock of, or any other interest in, KaloBios. KaloBios does not have outstanding or authorized any stock appreciation, phantom stock, profit participation or similar rights. KaloBios has reserved the Warrant Shares for issuance upon exercise of the Warrant.

(c)    The Warrant, when issued, delivered and paid for in compliance with the provisions of this Agreement, will be validly issued.  The Warrant Shares, when issued, delivered and paid for in compliance with the provisions of this Agreement and the Warrant, will be validly issued, fully paid and nonassessable.  The Warrant and the Warrant Shares, when issued, delivered and paid for, as the case may be, in accordance with the provisions of this Agreement and the Warrant, as applicable, will be free of any liens or Encumbrances (including free of any Permitted Encumbrances), other than any liens or encumbrances created by or imposed upon the Company; *provided, however*, that the Warrants and the Warrant Shares are subject to restrictions on transfer under U.S. state and/or federal securities Laws.  The Warrant and the Warrant Shares are not subject to any preemptive rights or rights of first refusal, except for such rights as have been, or will be, duly complied with or waived.

Section 9.4    No Conflict.  The execution and delivery of this Agreement and the other Transaction Documents, the performance of KaloBios' obligations hereunder and thereunder and the assignments and licenses to be granted pursuant to the Transaction Documents do not and will not (a) conflict with or violate any requirement of applicable Law; (b) conflict with or violate the certificate of incorporation, bylaws or other organizational documents of KaloBios; (c) conflict with, violate, breach or constitute a default under any material contractual obligations of KaloBios or any of its Affiliates; or (d) conflict with or violate any Government authorization, permit or consent.  No Person has any right to cause KaloBios to effect the registration under the Securities Act of any securities of KaloBios or any of its Affiliates, and neither KaloBios nor any of its Affiliates is a party to or otherwise bound by any oral or written contract or agreement that would prevent or restrict the ability of KaloBios to register for resale the Warrant Shares under the Securities Act or otherwise limit the amount of Warrant Shares that KaloBios could register for resale under the Securities Act.

CONFIDENTIAL
\\BA - 045347/000003 - 594503 v33

Section 9.5    Legal Proceedings.   There are no pending or, to KaloBios' Knowledge, overtly threatened in writing, adverse Actions against or by KaloBios or any of its Affiliates, at Law or in equity, or before or by any Governmental Authority that challenge or seek to prevent, enjoin or otherwise delay the Contemplated Transactions. No event has occurred or circumstances exist that may give rise to, or serve as a basis for, any such Action.

Section 9.6    No "Bad Actor"; No Debarment.   None of KaloBios or any of its predecessors, Affiliates, directors, executive officers, other officers of KaloBios or any Beneficial Owners of twenty percent (20%) or more of KaloBios' outstanding voting equity securities (with the sole exception of Martin Shkreli who is known by the Parties to be under federal indictment for securities fraud charges and is not an employee, director, consultant or agent of KaloBios and does not have any influence upon the management or direction of KaloBios in any form), calculated on the basis of voting power, in any capacity at the date hereof (each, a "**KaloBios Covered Person**"):

(a)    is, to the KaloBios' Knowledge, subject to any of the Disqualification Events, except for a Disqualification Event covered by Rule 506(d)(2) or (d)(3) of the Securities Act;

(b)    is, or has been, to the KaloBios' Knowledge, debarred under Section 306(a) or 306(b) of the FD&C Act or by the analogous Laws of any Regulatory Authority, or disqualified as a clinical investigator under 21 C.F.R. § 312.70 or under any analogous Laws of any Regulatory Authority;

(c)    has, to the KaloBios' Knowledge, been charged with, or convicted of, any felony or misdemeanor within the ambit of 42 U.S.C. §§ 1320a-7(a), 1320a-7(b)(1)-(3), or pursuant to the analogous Laws of any Regulatory Authority, or is proposed for exclusion, or the subject of exclusion or debarment proceedings by a Regulatory Authority, during the employee's or consultant's employment or contract term with KaloBios; and

(d)    is, or has been excluded, suspended or debarred from participation, or otherwise ineligible to participate, in any U.S. or non-U.S. health care programs (or has been convicted of a criminal offense that falls within the scope of 42 U.S.C. § 1320a-7 but not yet excluded, debarred, suspended, or otherwise declared ineligible), or excluded, suspended or debarred by a Regulatory Authority from participation, or otherwise ineligible to participate, in any procurement or non-procurement programs.

(e)    KaloBios has exercised reasonable care to determine (i) the identity of each person that is a KaloBios Covered Person; and (ii) whether any KaloBios Covered Person is subject to a Disqualification Event or has been excluded, debarred, suspended, or otherwise declared ineligible by any Regulatory Authority.

Section 9.7    Solvency.   Immediately after giving effect to the Contemplated Transactions, KaloBios shall be solvent and shall have the financial capacity to perform all of its obligations under this Agreement and the other Transaction Documents.

- 54 -

Section 9.8    Unencumbered Cash Balance.   Upon the Closing, KaloBios will have a minimum balance of at least Ten Million Dollars ($10,000,000) in cash, inclusive of the Initial Payment, which shall not be subject to any Encumbrance or Permitted Encumbrance.

Section 9.9    Data.    KaloBios acknowledges that access and use of data not commissioned by the Company are provided "as is, where is," that the Company makes no representations and warranties concerning the same and that the Company fully disclaims any and all implied warranties concerning the same.

Section 9.10    Private Offering.   Neither KaloBios nor anyone acting on its behalf has offered the Warrant (or the Warrant Shares) or any similar securities for sale to, or solicited any offer to buy the Warrant (or the Warrant Shares) or any similar securities from, or otherwise approached or negotiated in respect thereof with, any Person other than the Company, which has been offered the Warrant (and the Warrant Shares) pursuant to Section 1145 of the U.S. Bankruptcy Code and/or as a private sale for investment.   The offer, sale and issuance of the Warrant and the Warrant Shares to be issued in conformity with the terms of this Agreement and the Confirmation Order, constitute transactions exempt from the registration requirements of Section 5 of the Securities Act and from the registration or qualification requirements of applicable state securities laws, and neither KaloBios nor any authorized agent acting on its behalf will take any action hereafter that would cause the loss of such exemption.

Section 9.11    Brokers.   Except for Batuta Capital Advisors LLC, which was retained by KaloBios and the fees of which will be paid by KaloBios, no broker, investment banker, agent, finder or other intermediary acting on behalf of KaloBios or its Affiliates or under the authority of KaloBios or any Affiliate is or will be entitled to any broker's or finder's fee or any other commission or similar fee directly or indirectly in connection with the Contemplated Transactions.

## ARTICLE 10
## COVENANTS

Section 10.1    Availability of Records.

(a)    For so long as a Party is required to maintain books, records, files and other information that is subject to this Section 10.1, during normal business hours following reasonable prior notice, each Party will permit the other Party and its Affiliates, employees, agents and representatives, subject to execution of a confidentiality agreement in a form reasonably acceptable to both Parties, to review all Assigned Books and Records and all other information, records and documents in their possession, which are reasonably requested by the other Party and are necessary or useful in connection with any Tax inquiry, audit, investigation or dispute with a Third Party or any litigation, mediation or arbitration or similar legal Action by any Governmental Authority reasonably requiring access to any such books and records, in each case relating to or arising out of transactions or events occurring prior to the Closing and that relate to the Compound, the Product or the Acquired Assets.   Each Party will cause its employees, agents and representatives to abide by the terms of the confidentiality agreement entered into with respect to any access or information provided pursuant to this Section 10.1(a). Each Party will direct its employees (without substantial disruption of employment) to render

- 55 -

any assistance that the other Party may reasonably request in accessing or utilizing the Assigned Books and Records or other information, records or documents.  The Party requesting access to any such books and records or other information shall bear all of the out-of-pocket costs and expenses (including attorneys' fees) reasonably incurred by the other Party in order to comply with this <u>Section 10.1</u>.

(b)     Each Party will preserve all information, records and documents relating to or arising out of transactions or events occurring prior to the Closing and that relate to the Compound, the Product or the Acquired Assets until the later of: (i) seven (7) years after the Closing; or (ii) the expiration of the required retention period under any applicable Laws for all such information, records or documents.

Section 10.2   <u>Regulatory</u>.

(a)     The Parties shall cooperate and use commercially reasonable efforts to obtain promptly all consents from all Governmental Authorities or Regulatory Authorities that may be or become necessary for the performance of each of their respective obligations pursuant to the Transaction Documents.

(b)     Each Party shall promptly notify the other Party of any communication it or any of its Affiliates sends to or receives from any Governmental Authority or Regulatory Authority relating to the matters that are the subject of this Agreement.

Section 10.3   <u>Disqualification Events or Debarment</u>.   Until the full payment of all Contingent Payments, KaloBios agrees to immediately terminate the employment, consultancy, agency or other service relationship of any KaloBios Covered Person if such KaloBios Covered Person:

(a)     is subject to any Disqualification Event;

(b)     is charged with any felony or misdemeanor within the ambit of 42 U.S.C. §§ 1320a-7(a), 13a-7(b)(1)-(3), or pursuant to the analogous Laws of any Regulatory Authority, or is proposed for exclusion, or the subject of exclusion or debarment proceedings by any Regulatory Authority, during such individual's service relationship with KaloBios; or

(c)     becomes excluded, suspended or debarred from participation or otherwise is ineligible to participate, in any U.S. or non-U.S. health care programs (or has been convicted of a criminal offense that falls within the scope of 42 U.S.C. § 1320a-7 but not yet excluded, debarred, suspended, or otherwise declared ineligible), or excluded, suspended or debarred by a Regulatory Authority from participation, or otherwise ineligible to participate, in any procurement or non-procurement programs.

Section 10.4   <u>Further Assurances</u>. Each Party shall execute, acknowledge and deliver such further instruments, and do all such other acts, as is reasonably necessary or appropriate in order to consummate the Contemplated Transactions on the terms and subject to the conditions set forth herein, or to carry out the expressly stated purposes and the clear intent of this Agreement and the Contemplated Transactions.

- 56 -

Section 10.5   Consents.  In the event that (a) the sale, novation, conveyance, assignment or transfer of any Acquired Asset (including any Assumed Contract) or any claim, right or benefit arising thereunder or resulting therefrom, without the consent of any Third Party, would constitute a breach or other contravention thereof, be ineffective with respect to any party thereto, or in any way adversely affect the claims, rights or benefits of KaloBios thereunder, and (b) the Company shall not have received the consent or approval of such Person prior to the Effective Date, at the request of and for the benefit of KaloBios as to a particular Acquired Asset, the Company and KaloBios shall use reasonable commercial efforts to obtain the consent or approval of any such Person to the assignment, transfer or novation of any such Acquired Asset or any claims, rights or benefits arising thereunder (to the extent such claims, rights or benefits constitute Acquired Assets) for the assignment or transfer thereof to KaloBios.  Until such consent or approval is obtained, at the request of and for the benefit of KaloBios as to a particular Acquired Asset, the Company will cooperate with KaloBios to enter into a mutually agreeable arrangement under which (i) KaloBios would obtain, to the maximum extent possible, the claims, rights and benefits under each such Acquired Asset (to the extent such claims, rights or benefits constitute Acquired Assets), including subcontracting, sublicensing, or subleasing to KaloBios with KaloBios obtaining any and all rights of the Company against any party related thereto, (ii) KaloBios would assume, to the extent possible, all obligations of the Company under such Assumed Contracts (to the extent such obligations constitute Assumed Liabilities) and agree to perform and discharge all such obligations under such Assumed Contracts and indemnify the Company in connection therewith, and (iii) the Company would enforce at KaloBios' cost and at the reasonable request of and for the benefit of KaloBios, any and all claims, rights and benefits of the Company against any Third Party thereto arising from any such Assumed Contract (to the extent such claims, rights or benefits constitute Acquired Assets).  At the request of and for the benefit of KaloBios as to a particular Acquired Asset, the Company and KaloBios shall continue to use reasonable commercial efforts to obtain all such required consents and approvals, it being understood that upon receipt of all required consents and approvals for the assignment, novation or transfer of an Acquired Asset (or any claim, right or benefit arising thereunder or resulting therefrom to the extent such claims, rights or benefits constitute Acquired Assets) to KaloBios, the assignment, novation or transfer of such Acquired Asset shall be deemed to be effective as of the Closing Date.  The Company will promptly pay to KaloBios, when received, all monies received under any Acquired Asset, or any claim, right or benefit arising thereunder (to the extent such claims, rights or benefits constitute Acquired Assets), not assigned or transferred to KaloBios on the Closing Date.  KaloBios will promptly pay to the Company any amounts constituting Assumed Liabilities that are required to be paid by the Company, and actually paid to a Third Party, with respect to any Assumed Liability.

Section 10.6   Omitted Assets.  If KaloBios reasonably determines that an asset owned or licensed by the Company relating to the Compound or the Product or material to the Exploitation of the Compound or the Product in accordance with the terms and conditions of the Joint Development Plan (an "**Omitted Asset**") was not transferred to KaloBios as part of the Acquired Assets and notifies the Company in writing of the existence of such Omitted Asset and KaloBios' belief that such Omitted Asset constitutes an Acquired Asset, the Company shall cooperate in good faith with KaloBios to determine whether such Omitted Asset should have been transferred to KaloBios as an Acquired Asset, and if the Company agrees that such Omitted Asset should have been transferred to KaloBios, the Company shall either (a) transfer and assign the Omitted Asset to KaloBios, or (b) otherwise make the benefits of such Omitted Asset

- 57 -

available to KaloBios.  Any consideration payable by KaloBios for any such Omitted Assets shall be deemed to have already been included in the Initial Payment for the Acquired Assets. Notwithstanding the foregoing, KaloBios shall be responsible for payment of any fees or costs associated with the transfer of any Omitted Assets.

Section 10.7    Reserved.

Section 10.8    Listing of Common Stock on National Securities Exchange.  If determined by the Board of Directors of KaloBios to be in the best interests of KaloBios and its stockholders in accordance with applicable Law, KaloBios shall use commercially reasonable efforts to relist its Common Stock on a national securities exchange.

Section 10.9    Securities Registration Matters.

(a)    *SEC No-Action Submission*.  As contemplated by the Confirmation Order, KaloBios shall prepare (with the reasonable assistance, cooperation and support of the Company) and submit to the SEC a request that the staff of the SEC issue a "no-action letter" confirming to KaloBios that the staff of the SEC will recommend to the SEC that the SEC not take enforcement action against KaloBios for reliance on the exemption provided by Section 1145 of the Bankruptcy Code with respect to the Warrant and the Warrant Shares (such confirmatory letter from the SEC, the "**No-Action Letter**").

(b)    *Registration*.  If KaloBios shall determine to file a Registration Statement for the account of a security holder or holders, other than a Registration Statement relating solely to employee benefit plans, a Registration Statement relating to the offer and sale of debt securities, a Registration Statement relating to a corporate reorganization or other transaction pursuant to Rule 145 under the Securities Act, or a Registration Statement on any registration form that does not permit secondary sales, KaloBios will:

(i)    promptly give written notice of the proposed registration to the Company;

(ii)    use its commercially reasonable efforts to include in such Registration Statement (and any related qualification under other securities or "blue sky" laws, provided, that KaloBios shall not be required in connection therewith or as a condition thereto to qualify to do business or to file a general consent to service of process in any state or jurisdiction) all of the Registrable Securities; and

(iii)    use commercially reasonable efforts to keep such Registration Statement continuously effective under the Securities Act until all Registrable Securities covered by such Registration Statement (A) have been sold thereunder or pursuant to Rule 144, or (B) otherwise cease to be Registrable Securities.

(c)    *Obligations of the Company*.  The Company shall take all commercially reasonable efforts to cooperate with all reasonable requests from KaloBios as are necessary for KaloBios to perform its obligations under Section 10.9(a) and Section 10.9(b).  Furthermore, the Company agrees to furnish to KaloBios in a timely manner a completed questionnaire in

- 58 -

customary form reasonably acceptable to the Company containing all information regarding the Company as necessary for KaloBios to comply with the requirements of the Securities Act in connection with the filing of any Registration Statement covering any of the Registrable Securities.

Section 10.10  <u>Insurance</u>.  For so long as KaloBios is obligated to make any payments to the Company and for a period of four (4) years thereafter, KaloBios shall, at its sole cost and expense, obtain, pay for and maintain in full force and effect commercial general liability and professional liability (Errors and Omissions) insurance in commercially reasonable and appropriate amounts that (a) provides product liability coverage concerning the Products, and (b) with policy limits that reflect the customs of the industry, accounting for the then current and planned operations of KaloBios.  KaloBios shall have the Company named in each policy as an additional insured.  Upon request by the Company, KaloBios shall provide the Company with certificates of insurance or other reasonable written evidence of all coverages described herein.

**ARTICLE 11**
**CONFIDENTIALITY**

Section 11.1  <u>Confidential Information</u>.  Except to the extent expressly authorized by this Agreement or otherwise agreed in writing, the Parties agree that the receiving Party (the "**Receiving Party**") will, and will cause its employees, agents and representatives to, keep confidential and not publish or otherwise disclose or use for any purpose other than as provided for in this Agreement any confidential or proprietary information and materials, patentable or otherwise, in any form (written, oral, photographic, electronic, magnetic, or otherwise), which are disclosed to it by the other Party (the "**Disclosing Party**") or otherwise received or accessed by a Receiving Party in the course of performing its obligations or exercising its rights under this Agreement, the Letter of Intent, the Prior Letter of Intent or the Confidential Disclosure Agreement (collectively, "**Confidential Information**"), except to the extent that it can be established by the Receiving Party that such Confidential Information:

    (a)    was in the lawful knowledge and possession of the Receiving Party prior to the time it was disclosed to, or learned by, the Receiving Party, or was otherwise developed independently by the Receiving Party, as evidenced by written records kept in the ordinary course of business, or other documentary proof of actual knowledge by the Receiving Party;

    (b)    was generally available to the public or otherwise part of the public domain at the time of its disclosure to the Receiving Party;

    (c)    became generally available to the public or otherwise part of the public domain after its disclosure and other than through any act or omission of the Receiving Party in breach of this Agreement; or

    (d)    was disclosed to the Receiving Party, other than under an obligation of confidentiality, by a Third Party who had no obligation to the Disclosing Party not to disclose such information to others.

- 59 -

Section 11.2    Authorized Disclosure.  Except as otherwise provided in this Agreement, a Receiving Party may use and disclose Confidential Information of the Disclosing Party as follows:

(a)    under appropriate confidentiality provisions substantially equivalent to those in this Agreement, in connection with the performance of its obligations or exercise of rights granted or reserved in this Agreement;

(b)    to the extent such disclosure is reasonably necessary in filing or prosecuting patent, copyright and trademark applications, prosecuting or defending litigation, complying with applicable governmental regulations, obtaining Governmental Approval, conducting pre-clinical activities or clinical trials, marketing products or services, or otherwise required by applicable Laws; *provided, that* if a Receiving Party is required by Applicable Laws to make any such disclosure of a Disclosing Party's Confidential Information it will (i) give reasonable advance notice to the Disclosing Party of such disclosure requirement, (ii) upon the request of the Disclosing Party, use its reasonable efforts to secure confidential treatment of such Confidential Information required to be disclosed and cooperate with the Disclosing Party, and (iii) only disclose that portion of the Confidential Information required to be disclosed by Applicable Laws;

(c)    existing or prospective investors, advisors, collaborators, (sub)licensees, partners, lenders, acquirers or joint venturers, in each case solely to the extent related to the Contemplated Transactions and under appropriate confidentiality provisions substantially equivalent to those of this Agreement; and

(d)    as reasonably required under the circumstances, to a Third Party in connection with: (i) a Change of Control; or (ii) to the extent mutually agreed in writing by the Parties.

In each of the above authorized disclosures, the Receiving Party shall remain responsible for any failure by any Person who receives the Confidential Information from the Receiving Party pursuant to this Section 11.2 to treat such Confidential Information as required under this Article 11.

Section 11.3    Press Release; Disclosure of Agreement.  Except to the extent required by applicable Law, neither Party will issue any press release or other public disclosure concerning this Agreement, the subject matter hereof or the Parties' activities hereunder, or any results or data arising hereunder, except with the other Party's prior written consent.  A Party may publicly disclose, without regard to the preceding requirements of this Section 11.3, any information that was previously publicly disclosed pursuant to this Section 11.3; *provided, that* such disclosure does not materially alter the meaning of the information disclosed previously.

Section 11.4    Survival.  Each Party's obligations with respect to the other Party's Confidential Information shall survive the expiration or termination of this Agreement until the later of (a) five (5) years from disclosure of the Confidential Information, and (b) for so long as the Confidential Information is protected under applicable Laws.

CONFIDENTIAL
\\BA - 045347/000003 - 594503 v33

## ARTICLE 12
## INDEMNIFICATION

Section 12.1   <u>Indemnification by the Company</u>.  In each case subject to <u>Section 4.8</u>, the Company shall, at its sole expense, defend, indemnify, and hold KaloBios and its Affiliates and their respective officers, managers, directors, employees, and agents harmless from and against any and all liabilities, damages, losses, costs and expenses including the reasonable fees of attorneys and other professionals (collectively, "**Losses**"), arising out of or resulting from:

(a)   any breach of any representation or warranty made by the Company under the Transaction Documents;

(b)   any breach of any covenant made by the Company under the Transaction Documents;

(c)   the gross negligence of wrongful intentional acts or omissions of the Company, its Affiliates, and its or their respect directors, officers, employees and agents, in connection with the Company's performance of its obligations or exercise of its rights under this Agreement;

(d)   the extent to which the Company commercializes a Product, and any allegation that personal injury or death, or any damage to any property, was caused or allegedly caused by any Product manufactured, sold or used by or for the Company, including, without limitation, manufacturing or design defects in the Products or the failure to warn any person or entity of any such defects in the Products, except to the extent that the foregoing was directly caused by KaloBios in breach of its obligations pursuant to this Agreement; and

(e)   the Excluded Liabilities or Excluded Assets;

<u>except</u>, in each case of <u>Sections 12.1(a)</u> through <u>12.1(e)</u> (inclusive), to the extent that KaloBios is required to indemnify the Company with respect to such Losses under <u>Section 12.2</u>.

Section 12.2   <u>Indemnification by KaloBios</u>.  KaloBios shall, at its sole expense, defend, indemnify, and hold the Company and its Affiliates and their respective officers, managers, directors, employees, and agents harmless from and against any and all Losses arising out of or resulting from:

(a)   any breach of any representation or warranty made by KaloBios under the Transaction Documents;

(b)   any breach of any covenant made by KaloBios under the Transaction Documents;

(c)   the gross negligence of wrongful intentional acts or omissions of KaloBios, its Affiliates, and its or their respect directors, officers, employees and agents, in connection with KaloBios' performance of its obligations or exercise of its rights under this Agreement;

- 61 -

(d)     to the extent KaloBios or its Affiliates commercialize a Product, any allegation that personal injury or death, or any damage to any property, was caused or allegedly caused by any Product manufactured, sold or used by or for KaloBios, including, without limitation, manufacturing or design defects in the Products or the failure to warn any person or entity of any such defects in the Products, except to the extent that the foregoing was directly caused by the Company in breach of its obligations pursuant to this Agreement;

(e)     any actions taken with respect to the enforcement of any term or provision of the Security Agreement, exercise of any rights of the Company as a secured creditor thereunder or with respect to the taking of any actions by the Company pursuant to the terms of the Security Agreement with respect to the protection of the Collateral (as defined in the Security Agreement), in each case upon, after or during any Event of Default (as defined in the Security Agreement); and

(f)     the Acquired Assets or the Assumed Liabilities;

except, in each case of Sections 12.2(a) through 12.2(f) (inclusive), to the extent that the Company is required to indemnify KaloBios with respect to such Losses under Section 12.1.

Section 12.3     Indemnification Procedures.   In the event that any Person entitled to indemnification under Section 12.1 or Section 12.2 (an "**Indemnified Party**") is seeking indemnification, the Indemnified Party shall (a) inform, in writing, the indemnifying Party under Section 12.1 or Section 12.2 (the "**Indemnifying Party**") as soon as reasonably practicable after the Indemnified Party receives any written notice of any Action against or involving the Indemnified Party by a Governmental Authority or other Person, or otherwise discovers the liability, obligation or facts giving rise to such claim for indemnification (the "**Claim**"), (b) permit the Indemnifying Party to assume direction and control of the defense of the Claim (provided, that the Indemnifying Party may not settle the Claim without the prior consent of the Indemnified Party, not to be unreasonably withheld), (c) cooperate as reasonably requested (at the expense of the Indemnifying Party) in the defense of the Claim, and (d) undertake all reasonable steps to mitigate any loss, damage or expense with respect to the Claim(s).  Without limiting the foregoing, any Indemnified Party will be entitled to participate in the defense of a Claim for which it has sought indemnification hereunder and to employ counsel of its choice for such purpose; *provided, that* such employment will be at the Indemnified Party's own expense unless (i) the employment thereof has been specifically authorized by the Indemnifying Party in writing, (ii) the Indemnifying Party has failed to assume the defense (or has failed to continue to defend such Claim in good faith) and employ counsel in accordance with this Section 12.3, in which case the Indemnified Party will be allowed to control the defense, or (iii) there exists a conflict of interest between the Indemnifying Party and the Indemnified Party that cannot be waived.

Section 12.4     Right of Set Off.  Upon notice to the Company specifying in reasonable detail the basis therefor, KaloBios shall have the right to set off any amount to which it may be entitled with respect to any Losses pursuant to Section 12.1 (but in all cases, subject to the limits set forth in Section 12.6 and Section 12.7) against any future amounts payable by KaloBios to the Company pursuant to the Transaction Documents on or after the date such Losses are finally

- 62 -

determined by written agreement of the Parties or pursuant to a final judgement issued by a court in accordance with Section 14.2.

Section 12.5   Survival.   The representations and warranties of the Parties contained herein shall survive for a period of two (2) years following the Closing, except that each of the Company's and KaloBios' Fundamental Representations shall survive indefinitely (and for no less than the Royalty Term). Any claim for indemnification on account of breach of a representation, warranty or covenant will survive the applicable termination date if a Party, prior to such termination date, advises the other Party in writing of facts that constitute or may give rise to an alleged claim for indemnification, specifying in reasonable detail the basis under this Agreement for such claim.

Section 12.6   Limitation on Indemnity.

(a)   *Indemnification by the Company for Breach of Representation or Warranty*. Notwithstanding the provisions of Section 12.1, the Company shall not be liable for Losses under Section 12.1(a) unless the aggregate amount of Losses with respect to all misrepresentations or breaches of warranty exceed Three Hundred Thousand Dollars ($300,000) (the "**Indemnification Basket**"), in which event all Losses incurred shall be subject to indemnification. The Company's aggregate liability for all Losses under Section 12.1(a) shall not exceed the lesser of (i) the consideration actually received by the Company under this Agreement and (ii) Five Million Dollars ($5,000,000) (the "**Cap**").

(b)   *Indemnification by KaloBios for Breach of Representation or Warranty*. Notwithstanding the provisions of Section 12.2(a), (i) KaloBios shall not be liable for Losses under Section 12.2 unless the aggregate amount of Losses with respect to all misrepresentations or breaches of warranty exceed the Indemnification Basket, in which event all Losses incurred shall be subject to indemnification, and (ii) in no event shall KaloBios' aggregate liability for Losses under Section 12.2(a) exceed the Cap.

(c)   *Insurance Proceeds*. Payments by an Indemnifying Party pursuant to Section 12.1 or Section 12.2 in respect of any Losses shall be limited to the amount of any liability or damage that remains after deducting therefrom any insurance proceeds and any indemnity, contribution or other similar payment actually received by the Indemnified Party in respect of any such claim, less any related costs and expenses, including the aggregate cost of pursuing any related insurance claims and any related increases in insurance premiums or other chargebacks (it being agreed that neither Party shall have any obligation to seek to recover any insurance proceeds in connection with making a claim under this Article 12 and that, promptly after the realization of any insurance proceeds, indemnity, contribution or other similar payment, the Indemnified Party shall reimburse the Indemnifying Party for such reduction in Losses for which the Indemnified Party was indemnified prior to the realization of reduction of such Losses).

(d)   *Knowledge*. Neither Party shall be liable under this Article 12 for any Losses based upon or arising out of any inaccuracy in or breach of any of the representations or warranties of such Party contained in this Agreement that the other Party had knowledge of such inaccuracy or breach prior to the Closing.

- 63 -

Section 12.7  <u>Limitation of Liability</u>.  NEITHER PARTY, NOR ANY OF ITS AFFILIATES SHALL BE LIABLE TO THE OTHER PARTY OR ITS AFFILIATES FOR ANY INDIRECT, CONSEQUENTIAL, SPECIAL, RELIANCE OR PUNITIVE DAMAGES, WHETHER LIABILITY IS ASSERTED IN CONTRACT OR TORT (INCLUDING NEGLIGENCE AND STRICT PRODUCT LIABILITY), AND IRRESPECTIVE OF WHETHER THAT PARTY OR ANY REPRESENTATIVE OF THAT PARTY HAS BEEN ADVISED OF, OR OTHERWISE MIGHT HAVE ANTICIPATED THE POSSIBILITY OF, ANY SUCH LOSS OR DAMAGE. THE COMPANY AND ITS AFFILIATES SHALL NOT BE LIABLE UNDER ANY CIRCUMSTANCES FOR ANY LOSSES THAT EXCEED THE AMOUNTS THAT THE COMPANY HAS RECEIVED OR IS ENTITLED TO RECEIVE PURSUANT TO THE TRANSACTION DOCUMENTS.

Section 12.8  <u>Exclusive Remedy</u>.  Except in the case of fraud or as otherwise provided in <u>Section 4.8</u>, from and after the Closing, the indemnification provided in this <u>Section 12.8</u>, subject to the limitations herein, shall be the sole and exclusive monetary remedy of the Indemnified Parties for any and all liability arising out of, under or in connection with the Transaction Documents (including any breaches of any representations and warranties and covenants provided in the Transaction Documents) or in connection with the transactions contemplated thereby.

## ARTICLE 13
## TERM AND TERMINATION

Section 13.1  <u>Term</u>. This Agreement shall commence as of the Effective Date and, unless sooner terminated in whole or in part as specifically provided in this Agreement, shall continue in effect until the full satisfaction of all payment obligations under this Agreement (the "**Term**").

Section 13.2  <u>Termination for Convenience</u>. Either Party shall have the right, at its sole discretion and without any penalty or liability, exercisable at any time during the Term, to terminate this Agreement for any reason or no reason at all upon ninety (90) days' prior written notice to the other Party.

Section 13.3  <u>Termination for Cause</u>.

(a)  *Termination for Material Breach*.  Either Party (the "**Non-breaching Party**") may, without prejudice to any other remedies available to it at law or in equity, terminate this Agreement in the event the other Party (the "**Breaching Party**") shall have materially breached or defaulted in the performance of its obligations under the Transaction Documents and such breach or default shall have continued for sixty (60) days after written notice thereof was provided to the Breaching Party by the Non-breaching Party, such notice describing with particularity and in detail the alleged material breach or default.  Any such termination of this Agreement under this <u>Section 13.3(a)</u> shall become effective at the end of such sixty (60) day period, unless the Breaching Party has either (i) cured any such breach or default prior to the expiration of such sixty (60) day period, or (ii) if such breach is not susceptible to cure within such sixty (60) day period, the Breaching Party has, within such sixty (60) day period, provided to the Non-breaching Party a written plan that is reasonably

CONFIDENTIAL
\\BA - 045347/000003 - 594503 v33

calculated to effect a cure and such plan is reasonably acceptable to the Non-breaching Party. Where the Non-breaching Party has accepted any such plan in accordance with the preceding sentence, the Non-breaching Party may terminate this Agreement immediately upon written notice to the Breaching Party if the Breaching Party subsequently fails to carry out such plan.

(b)     *Company Termination Right*.   The Company may terminate this Agreement only with respect to the license granted to KaloBios under Section 7.7 immediately upon written notice to KaloBios if Martin Shkreli is appointed as an agent, employee, consultant, officer or director of KaloBios.

Section 13.4   Termination for Bankruptcy.  In the event that following the Closing either Party makes an assignment for the benefit of creditors, appoints or suffers appointment of a receiver or trustee over all or substantially all of its property, files a petition under any bankruptcy or insolvency act in any state or country or has any such petition filed against it which is not discharged within sixty (60) days of the filing thereof, then the other Party may thereafter terminate this Agreement effective immediately upon written notice to such Party.  In connection therewith, all rights and licenses granted under or pursuant to any section of this Agreement are and shall otherwise be deemed to be for purposes of Section 365(n) of Title 11, United States Code (the "**Bankruptcy Code**") licenses of rights to "intellectual property" as defined in Section 101(56) of the Bankruptcy Code.  The Parties shall retain and may fully exercise all of their respective rights and elections under the Bankruptcy Code, including without limitation, under Section 365(n)(4) thereto.  Upon the bankruptcy of any Party, the non-bankrupt Party shall further be entitled to a complete duplicate of, or complete access to, any such intellectual property, and such, if not already in its possession, shall be promptly delivered to the non-bankrupt Party, unless the bankrupt Party elects to continue, and continues, to perform all of its obligations under this Agreement.  For the avoidance of doubt, in the event that the ability to terminate this Agreement pursuant to this Section 13.4 is not enforceable for any reason, all other provisions in this Section 13.4 shall remain fully enforceable in accordance with Section 15.3.

Section 13.5   Termination of Joint Development Program upon Mutual Consent.  The obligations of the Parties under Article 5 may be terminated by written mutual consent, such consent not to be unreasonably withheld, conditioned or delayed, upon mutual agreement on a transition plan with respect to the Joint Development Program. If such transition plan is not mutually agreed within thirty (30) days after either Party has notified the other of its desire to terminate such obligations, either Party may immediately terminate such obligations upon written notice to the other Party.

Section 13.6   Effects of Termination after Closing.

(a)     *Upon Termination by KaloBios for Convenience*.  Except as otherwise provided in this Agreement, in the event of termination of this Agreement by KaloBios pursuant to Section 13.2, (i) all rights and licenses granted to KaloBios under this Agreement shall terminate, (ii) KaloBios shall, upon the written request of the Company and in exchange for the payment described in subsection (iv) below, which request shall be in the sole discretion of the Company, transfer to the Company all right, title and interest in and to the Acquired Assets any and all intellectual property rights, regulatory approvals and any other assets developed from the Acquired Assets pursuant to the Joint Development Program and used by the Parties in the Joint

- 65 -

Development Program or commercialization of the Product after the date hereof (the "**Future Assets**"), in all cases, free and clear of any Encumbrances other than those in favor of the Company, (iii) upon the earlier of (x) the return of all Collateral (as defined in the Security Agreement) pursuant to sub-clause (ii) above and (y) sixty (60) days after termination of this Agreement under this <u>Section 13.6(a)</u>, the Security Agreement shall terminate, and (iv) upon a request by the Company pursuant to sub-clause (ii) above and simultaneously with the transfer to the Company of all right, title and interest in and to the Collateral, the Company will pay to KaloBios an amount equal to ninety percent (90%) of the Joint Development Program Costs actually incurred by KaloBios under this Agreement.  Upon termination by KaloBios pursuant to this <u>Section 13.6(a)</u>, KaloBios shall deliver to the Company a certificate executed by the Chief Financial Officer of KaloBios certifying in good faith all Joint Development Program Costs actually incurred by KaloBios under this Agreement. KaloBios agrees that upon the termination of this Agreement pursuant to this <u>Section 13.6(a)</u> and thereafter until the Company's receipt of an MAA for the Product in the United States it shall not engage in any research or development activities with respect to the Compound or the Product in the Licensed Field.

(b)     *Upon Termination by KaloBios for Cause or Insolvency*.   Except as otherwise provided in this Agreement, in the event of termination of this Agreement by KaloBios pursuant to <u>Section 13.3(a)</u> or <u>Section 13.4</u>, in addition to, and not *in lieu* of, any rights and remedies of KaloBios under this Agreement (at law or in equity) all rights and licenses granted to KaloBios under this Agreement shall continue perpetually, and, subject to <u>Article 12</u>, the Company's rights to any payments to be made by KaloBios under this Agreement shall continue for the terms set forth herein.

(c)     *Upon Termination by the Company for Convenience*.  Except as otherwise provided in this Agreement, in the event of termination of this Agreement by the Company pursuant to <u>Section 13.2</u>, in addition to, and not *in lieu* of, any rights and remedies of the Company under this Agreement (at law or in equity) all rights and licenses granted to the Company under this Agreement, including the right to receive future payments, and the Security Agreement, shall terminate upon the effective date of termination, as will the Security Agreement, and all rights and licenses granted to KaloBios under this Agreement shall continue perpetually.

(d)     *Upon Termination by the Company for Cause or Insolvency*.  Except as otherwise provided in this Agreement, in the event of termination of this Agreement by the Company pursuant to <u>Section 13.3(a)</u> or <u>Section 13.4</u>, (i) all rights and licenses granted to KaloBios under this Agreement shall terminate upon the effective date of such termination, and (ii) KaloBios shall transfer to the Company all right, title and interest in and to the Acquired Assets and Future Assets, free and clear of any Encumbrances other than those in favor of the Company and upon completion of such transfer, the Security Agreement will terminate.

Section 13.7        <u>Termination Prior to Closing</u>.  This Agreement may be terminated and the Contemplated Transactions may be abandoned at any time prior to the Closing:

(a)      by mutual written agreement of the Parties;

- 66 -

(b)     by the Company or KaloBios if any court of competent jurisdiction or other Governmental Authority shall have issued an order, decree or ruling, or taken any other action permanently restraining, enjoining or otherwise prohibiting the Contemplated Transactions and such order, decree, ruling or other action shall have become final and non-appealable;

(c)     by the Company or KaloBios if the Contemplated Transactions shall not have been consummated on or before June 30, 2016; *provided*, that the right to terminate this Agreement under this Section 13.7(c) shall not be available to any Party whose failure to fulfill any obligation under this Agreement is the primary cause of, or results in, the failure to consummate the Contemplated Transactions on or before such date;

(d)     by KaloBios if (i) any of the conditions set forth in Section 2.7(b) shall have become incapable of fulfillment and shall not have been waived by KaloBios or (ii) the Company shall materially breach any of its representations, warranties, covenants or other obligations hereunder prior to the Closing and, within ten (10) days after written notice of such breach to the Company, such breach shall not have been cured or waived by KaloBios and the Company shall not have provided reasonable assurance to KaloBios that such breach will be cured in all material respects on or before the Closing; or

(e)     by the Company if (i) any of the conditions set forth in Section 2.7(c) shall have become incapable of fulfillment and shall not have been waived by the Company or (ii) KaloBios shall materially breach any of its representations, warranties, covenants or other obligations hereunder prior to the Closing and, within ten (10) days after written notice of such breach to KaloBios, such breach shall not have been cured or waived by the Company and KaloBios shall not have provided reasonable assurance to the Company that such breach will be cured in all material respects on or before the Closing.

Notwithstanding any else contained in this Agreement, the right to terminate this Agreement under this Section 13.7 shall not be available to any Party (i) that is in material breach of its obligations hereunder prior to the Closing or (ii) whose failure to fulfill its obligations or to comply with its covenants under this Agreement has been the cause of, or resulted in, the failure to satisfy any condition to the obligations of the Parties hereunder unless waived in writing by the other Party.

Section 13.8     Other Termination Consequences.

(a)     *Return of Proprietary Information*.  In the event of termination of this Agreement, each Party shall return all data, files, records and other materials in its possession or control containing or comprising the other Party's Confidential Information to which such first Party does not retain rights under the surviving provisions of this Agreement (except one copy of which may be retained solely for archival purposes).

(b)     *Accrued Rights*.  The expiration or termination of this Agreement shall not relieve the Parties from performing any obligations accrued under this Agreement prior to, or exercising any of its rights hereunder with respect to any breach by the other Party of the Agreement occurring prior to, the date this Agreement expires or terminates (including the

- 67 -

obligation to make payments accrued as of the effective date of such expiration or termination but not yet paid).

(c)   *Survival*.   Notwithstanding any other provision of this Agreement the following provisions, shall survive the termination or expiration of this Agreement for any reason, in accordance with their respective terms and conditions, and for the duration stated, and where no duration is stated, shall survive for so long as required to give effect to the subject matter of the provision: Articles 1, 11, 12, 13, 14 and 15 and Sections 3.6, 3.8, 3.9 and 7.10 as well as any applicable definitions in Article 1 and any other provisions which are expressed to survive termination or expiration or which are required to give effect to such termination or expiration.

## ARTICLE 14
## DISPUTE RESOLUTION

Section 14.1   Governing Law.  This Agreement and all disputes arising out of or related to this Agreement or any breach hereof shall be governed by and construed under the laws of the State of Delaware, without giving effect to any choice of law principles that would require the application of the laws of a different state.

Section 14.2   Dispute Resolution.   Unless otherwise set forth in this Agreement or required by Law, in the event of a dispute, claim or controversy between the Parties arising under or relating to this Agreement or the breach, termination, enforcement, interpretation or validity thereof, including the determination of the scope or applicability of this Agreement, (each, a "**Dispute**"), the Party shall refer such Dispute to their respective Executive Officers, and such Executive Officers shall attempt in good faith to resolve such Dispute.  If the Executive Officers are unable to resolve a given Dispute pursuant to this Section 14.2 within thirty (30) days of referring such Dispute to the Executive Officers (other than prior to the Closing, in which case within five (5) days of such dispute), either Party may bring suit exclusively in the state and federal courts of competent jurisdiction located in the State of Delaware and in no other jurisdiction; *provided, however*, that with respect to any suit brought prior to Closing, such suit shall be exclusively brought before the United States Bankruptcy Court for the District of Delaware.  Each Party hereby consents to personal jurisdiction and venue in, and agrees to service of process issued or authorized by, such courts and all such actions shall first be brought before such courts.

## ARTICLE 15
## GENERAL PROVISIONS

Section 15.1   Force Majeure.  Neither Party shall be liable for failure of or delay in performing obligations set forth in this Agreement, and neither shall be deemed in breach of its obligations, if such failure or delay is due to any occurrence beyond the reasonable control of such Party that (a) prevents or substantially interferes with the performance by such Party of any of its obligations hereunder, and (b) occurs by reason of any act of God, flood, fire, explosion, earthquake, strike, lockout, labor dispute, casualty or accident, war, revolution, civil commotion, act of terrorism, blockage or embargo, or injunction, law, order, proclamation, regulation, ordinance, demand or requirement of any government or of any subdivision, authority or

- 68 -

CONFIDENTIAL
\\BA - 045347/000003 - 594503 v33

representative of any such government. In event of such force majeure, the Party affected shall use reasonable efforts to cure or overcome the same and resume performance of its obligations hereunder.

Section 15.2    Assignment.  This Agreement (i) may be assigned by KaloBios in whole or in part to any Third Party without the consent of the Company, and (ii) may not be assigned by the Company in whole or in part without the consent of KaloBios; *provided, that* the Company may assign this Agreement in whole without the consent of KaloBios to an Affiliate or in the event of a Change of Control of the Company.  Any permitted assignee will expressly assume all obligations imposed on the assigning Party by this Agreement in writing.  Further (a) if the assignee of KaloBios is of equal or superior (i) creditworthiness and (ii) ability to perform obligations under this Agreement to KaloBios as of the date of assignment, as demonstrated by the assignee's (x) ability to fund the Joint Development Program for the first six (6) months after assignment and (y) track record of research and development and product commercialization in the biopharmaceutical industry, then KaloBios shall not remain liable for the assignee's performance of its obligations under this Agreement, and (b) if the assignee of KaloBios is not of equal or superior creditworthiness and ability to KaloBios as of the date of assignment, then KaloBios shall remain directly liable to the Company for all performance obligations (including payment obligations) of the assignee under this Agreement.  This Agreement shall bind and inure to the benefit of the Parties hereto and their respective successors and permitted assigns.  Any purported assignment in violation of this Section 15.2 shall be null and void.

Section 15.3    Severability.  If any provision hereof should be held invalid, illegal or unenforceable in any jurisdiction, the Parties shall negotiate in good faith a valid, legal and enforceable substitute provision that most nearly reflects the original intent of the Parties and all other provisions hereof shall remain in full force and effect in such jurisdiction and shall be liberally construed in order to carry out the intentions of the Parties hereto as nearly as may be possible.  Such invalidity, illegality or unenforceability shall not affect the validity, legality or enforceability of such provision in any other jurisdiction.

Section 15.4    Notices.  All notices which are required or permitted hereunder shall be in writing and sufficient if delivered personally, sent by electronic mail (and promptly confirmed by personal delivery, registered or certified mail or overnight courier), sent by nationally-recognized overnight courier or sent by registered or certified mail, postage prepaid, return receipt requested, addressed as follows:

If to the Company:

Savant Neglected Diseases, LLC
P.O. Box 620732
Woodside, CA 94062
Attn:   Stephen L. Hurst
Email: slhurst@savanthwp.com

- 69 -



with a copy (which shall not constitute notice) to:

    Dorsey & Whitney LLP
    305 Lytton Avenue
    Palo Alto, CA, 94301
    Attn:   Evan Ng
    Email: ng.evan@dorsey.com

If to KaloBios:

    KaloBios Pharmaceuticals, Inc.
    1000 Marina Blvd, Suite 250
    Brisbane, CA 94005
    Attn:   Cameron Durrant, CEO
    Email: cdurrant@kalobios.com

with a copy (which shall not constitute notice) to:

    Hogan Lovells US LLP
    100 International Drive, Suite 2000
    Baltimore, MD 21202
    Attn:   Asher M. Rubin
    Email: asher.rubin@hoganlovells.com

or to such other address(es) as the Party to whom notice is to be given may have furnished to the other Party in writing in accordance herewith.  Any such notice shall be deemed to have been given:  (a) when delivered if personally delivered or sent by electronic mail on a Business Day (or if delivered or sent on a non-Business Day, then on the next Business Day); (b) on the Business Day after dispatch if sent by nationally-recognized overnight courier; or (c) on the fifth (5th) Business Day following the date of mailing, if sent by mail.

Section 15.5   <u>Construction of Agreement</u>.  In the event an ambiguity or a question of intent or interpretation arises, this Agreement will be construed as if drafted jointly by the Parties and no presumption or burden of proof will arise favoring or disfavoring either Party by virtue of the authorship of any provisions of this Agreement.  The language in this Agreement is to be construed in all cases according to its fair meaning.

Section 15.6   <u>Headings; Interpretation</u>.  Headings used herein are for convenience only and shall not in any way affect the construction of or be taken into consideration in interpreting this Agreement.  Further, in this Agreement: (a) the word "including" shall be deemed to be followed by the phrase "without limitation" or like expression; (b) the singular shall include the plural and vice versa; and (c) masculine, feminine and neuter pronouns and expressions shall be interchangeable.  A Party includes its permitted assignees and/or the respective successors in title to substantially the whole of its undertaking.  A statute or statutory instrument or any of their provisions is to be construed as a reference to that statute or statutory instrument or such provision as the same may have been or may from time to time hereafter be amended, restated, modified, supplemented, or re-enacted.  The Exhibits and other attachments form part of the

- 70 -

operative provisions of this Agreement and references to this Agreement shall, unless the context otherwise requires, include references to the recitals and the Exhibits and attachments.

Section 15.7   Independent Contractors.  Nothing herein shall be construed to create any relationship of employer and employee, agent and principal, partnership or joint venture between the Parties.  Each Party is an independent contractor.  Neither Party shall assume, either directly or indirectly, any liability of or for the other Party.  The Parties shall not have the authority to bind or obligate the other Party and neither Party shall represent that it has such authority.

Section 15.8   Performance by Affiliates.  Each Party may discharge any obligations and exercise any right hereunder through any of its Affiliates.  Each Party hereby guarantees the performance by its Affiliates of such Party's obligations under this Agreement, and shall cause its Affiliates to comply with the provisions of this Agreement in connection with such performance.  Any breach by a Party's Affiliate of any of such Party's obligations under this Agreement shall be deemed a breach by such Party, and the other Party may proceed directly against such Party without any obligation to first proceed against such Party's Affiliate.

Section 15.9   Waiver.  Neither Party may waive or release any of its rights or interests in this Agreement except in writing.  The failure of either Party to assert a right hereunder or to insist upon compliance with any term or condition of this Agreement shall not constitute a waiver of that right or excuse a similar subsequent failure to perform any such term or condition.  No waiver by either Party of any condition or term in any one or more instances shall be construed as a continuing waiver of such condition or term or of another condition or term.

Section 15.10  Counterparts.  This Agreement may be signed in counterparts, each and every one of which shall be deemed an original, notwithstanding variations in format or file designation which may result from the electronic transmission, storage and printing of copies of this Agreement from separate computers or printers.  Signatures transmitted *via* .pdf shall be treated as original signatures.

Section 15.11  Expenses.  Each of the Parties will bear its own direct and indirect expenses incurred in connection with the negotiation and preparation of this Agreement and, except as set forth in this Agreement, the performance of the obligations contemplated hereby and thereby.

Section 15.12  Time of the Essence. Time is of the essence for the performance of each Party's obligations under this Agreement.

Section 15.13  Entire Agreement; Amendments.  This Agreement, including the Exhibits and Schedules hereto, together with the other Transaction Documents, sets forth the complete, final and exclusive agreement and all the covenants, promises, agreements, warranties, representations, conditions and understandings between the Parties with respect to the subject matter hereof and supersedes, as of the Effective Date, all prior and contemporaneous agreements and understandings between the Parties with respect to the subject matter hereof, including, without limitation, the Confidential Disclosure Agreement, the Letter of Intent and the Prior Letter of Intent; *provided, that* Sections 1.B, 4, 5, 6, 7, 8, 11 and 12 of the Letter of Intent shall survive until the Closing in accordance with the terms thereof, subject to Sections 13.6 and

CONFIDENTIAL
\\BA - 045347/000003 - 594503 v33

<u>13.8</u> of this Agreement.  There are no covenants, promises, agreements, warranties, representations, conditions or understandings, either oral or written, between the Parties with respect to the subject matter of this Agreement other than as are set forth in this Agreement, the other Transaction Documents, and the surviving provisions of the Letter of Intent set forth above. No subsequent alteration, amendment, change or addition to this Agreement shall be binding upon the Parties unless reduced to writing and signed by an authorized officer of each Party.  In the event of any conflict between the terms of this Agreement and the terms of any Transaction Document, the terms of this Agreement shall prevail.

[***Signature Page Follows***]

**CONFIDENTIAL**
\\BA - 045347/000003 - 594503 v33

**IN WITNESS WHEREOF**, the Parties have caused this Agreement to be executed by their respective duly authorized officers as of the date first above written.

**SAVANT NEGLECTED DISEASES, LLC**

By: _____

     Name: Stephen L. Hurst

     Title:  Managing Member


**KALOBIOS PHARMACEUTICALS, INC.**

By:_____

     Name: Cameron Durrant

     Title: Chairman and Chief Executive Officer


*[Signature Page to Agreement for the Manufacture, Development and Commercialization of Benznidazole for Human Use]*

**IN WITNESS WHEREOF**, the Parties have caused this Agreement to be executed by their respective duly authorized officers as of the date first above written.

SAVANT NEGLECTED DISEASES, LLC

By: _____

    Name: Stephen L. Hurst

    Title:  Managing Member

KALOBIOS PHARMACEUTICALS, INC.

By: _____

    Name: Cameron Durrant

    Title:  Chairman and Chief Executive Officer

*[Signature Page to Agreement for the Manufacture, Development and Commercialization of Benznidazole for Human Use]*

## **EXHIBIT A**

### **COMPOUND**

I

**<u>EXHIBIT B-1</u>**

**ISSUED COMPANY PATENTS**

None.

## EXHIBIT B-2

## PENDING COMPANY PATENTS

In re
USSN Provisional 62/341,290 – Filed 5-25-16
METHOD OF MAKING BENZNIDAZOLE
Inventor: Lynsey J. Watson


See Attached.

**<u>EXHIBIT C</u>**

**FORM OF BILL OF SALE**

[Attached hereto.]

**CONFIDENTIAL**

\\BA - 045347/000003 - 594503 v33

<u>EXHIBIT C</u>

## <u>FORM OF BILL OF SALE</u>

This **BILL OF SALE** (this "**Bill of Sale**") is entered into as of the [●] day of [●], 2016, by and between Savant Neglected Diseases, LLC, a Delaware limited liability company (the "**Company**"), in favor of KaloBios Pharmaceuticals, Inc., a Delaware corporation ("**KaloBios**"). KaloBios and the Company are each referred to herein by name or as a "**Party**" or, collectively, as the "**Parties**."

**WHEREAS**, KaloBios and the Company have entered into that certain Agreement for the Manufacture, Development and Commercialization of Benznidazole for Human Use, dated as of the date hereof (the "**Agreement**"), pursuant to which, among other things, the Company has agreed to sell, and KaloBios has agreed to purchase, the Acquired Assets (as defined in the Agreement), on the terms and subject to the conditions set forth in the Agreement; and

**WHEREAS**, the Company now seeks to consummate the sale, transfer, conveyance, assignment and delivery of the Acquired Assets to KaloBios.

**NOW, THEREFORE**, in consideration of the agreements and covenants contained in the Agreement, and the agreements and covenants contained herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties do hereby agree as follows:

1.     <u>Defined Terms</u>.  Capitalized terms used but not defined herein shall have the meanings set forth in the Agreement.

2.     <u>Sale and Transfer of Assets</u>.  Under the terms and subject to the conditions set forth in the Agreement, the Company hereby sells, transfers, conveys, assigns and delivers to KaloBios all of the Company's right, title and interest in and to all of the Acquired Assets, free and clear of all Encumbrances.  For the avoidance of doubt, the Company does not hereby transfer, convey or assign to KaloBios any Excluded Asset.

3.     <u>Further Assurances</u>.  The Company agrees, upon the reasonable request of KaloBios, to execute and deliver all such further transfers, assignments and conveyances and assurances as may be required to effect the sale, conveyance, transfer and assignment of the Acquired Assets to KaloBios as contemplated herein and in the Agreement and as are necessary to vest in KaloBios all rights, title and interest of the Company in and to the Acquired Assets.

4.     <u>Miscellaneous</u>.

4.1     <u>Assignment</u>.  This Bill of Sale may not be assigned by either Party in whole or in part without the consent of the other Party; provided, that each Party may assign this Bill of Sale without consent of the other Party as set forth in the Agreement.  Any permitted assignee will expressly assume all obligations imposed on the assigning Party by this Bill of Sale in writing.  This Bill of Sale shall bind and inure to the benefit of the Parties hereto and their respective successors and permitted assigns.  Any purported assignment in violation of this <u>Section 4.1</u> shall be null and void.

      4.2     <u>Terms of Agreement</u>.  Nothing contained herein shall itself change, amend, extend or alter the terms or conditions of the Agreement in any manner whatsoever.  In the event of any conflict or inconsistency between the terms of the Agreement and the terms hereof, the terms of the Agreement shall govern.

      4.3     <u>Governing Law; Disputes</u>.  The dispute resolution, governing law, jurisdiction, venue, process and notice provisions set forth in the Agreement are incorporated herein by reference.

      4.4     <u>Severability</u>.  If any provision hereof shall be held invalid, illegal or unenforceable in any jurisdiction, the Parties shall negotiate in good faith a valid, legal and enforceable substitute provision that most nearly reflects the original intent of the Parties and all other provisions hereof shall remain in full force and effect in such jurisdiction and shall be liberally construed in order to carry out the intentions of the Parties hereto as nearly as may be possible.  Such invalidity, illegality or unenforceability shall not affect the validity, legality or enforceability of such provision in any other jurisdiction.

      4.5     <u>Counterparts</u>.  This Bill of Sale may be signed in counterparts, each and every one of which shall be deemed an original, notwithstanding variations in format or file designation which may result from the electronic transmission, storage and printing of copies of this Bill of Sale from separate computers or printers.  Signatures transmitted via .pdf shall be treated as original signatures.

**[*Signature Page Follows*]**

\\BA - 045347/000003 - 593854 v4

**IN WITNESS WHEREOF**, the Parties have caused this Bill of Sale to be executed by their duly authorized representatives as of the date first written above.

**SAVANT NEGLECTED DISEASES, LLC**

By:_____

Name:  Stephen L. Hurst

Title:  Managing Member

*[Signature Page to Bill of Sale]*

**IN WITNESS WHEREOF**, the Parties have caused this Bill of Sale to be executed by their duly authorized representatives as of the date first written above.

**KALOBIOS PHARMACEUTICALS, INC.**

By:_____

Name:  Cameron Durrant

Title:  Chairman and Chief Executive Officer

*[Signature Page to Bill of Sale]*

## EXHIBIT D

**FORM OF ASSIGNMENT AND ASSUMPTION AGREEMENT**

[Attached hereto.]

**CONFIDENTIAL**

\\BA - 045347/000003 - 594503 v33

<u>**EXHIBIT D**</u>

**FORM OF ASSIGNMENT AND ASSUMPTION AGREEMENT**

   This **ASSIGNMENT AND ASSUMPTION AGREEMENT** (this "**Assignment and Assumption Agreement**") is entered into as of the [●] day of [●], 2016, by and between Savant Neglected Diseases, LLC, a Delaware limited liability company (the "**Company**"), and KaloBios Pharmaceuticals, Inc., a Delaware corporation ("**KaloBios**").  KaloBios and the Company are each referred to herein by name or as a "**Party**" or, collectively, as the "**Parties**."

   **WHEREAS**, KaloBios and the Company have entered into that certain Agreement for the Manufacture, Development and Commercialization of Benznidazole for Human Use, dated as of the date hereof (the "**Agreement**"), pursuant to which, among other things, the Company has agreed to sell, and KaloBios has agreed to purchase, the Acquired Assets (as defined in the Agreement), on the terms and subject to the conditions set forth in the Agreement; and

   **WHEREAS**, pursuant to the Agreement, the Company has agreed to assign to KaloBios, and KaloBios has agreed to assume from the Company, the Assumed Contracts (as defined in the Agreement), on the terms and subject to the conditions set forth in the Agreement.

   **NOW THEREFORE**, in consideration of the agreements and covenants contained in the Agreement, and the agreements and covenants contained herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties do hereby agree as follows:

   1. <u>Defined Terms</u>.  Capitalized terms used but not defined herein shall have the meanings set forth in the Agreement.

   2. <u>Assignment and Assumption</u>.  In accordance with and subject to the terms and conditions of the Agreement, the Company (or its applicable Affiliates) hereby sells, transfers, conveys, assigns and delivers to KaloBios, and KaloBios hereby assumes and agrees to pay, perform, satisfy and discharge (or cause to be paid, performed, satisfied and discharged on behalf of KaloBios) when due, and otherwise be responsible for, all of the Assumed Contracts set forth on <u>Exhibit A</u> to this Assignment and Assumption Agreement.

   3. <u>Miscellaneous</u>.

    3.1 <u>Assignment</u>.  This Assignment and Assumption Agreement may not be assigned by either Party in whole or in part without the consent of the other Party; provided, that each Party may assign this Assignment and Assumption Agreement without consent of the other Party as set forth in the Agreement.  Any permitted assignee will expressly assume all obligations imposed on the assigning Party by this Assignment and Assumption Agreement in writing.  This Assignment and Assumption Agreement shall bind and inure to the benefit of the Parties hereto and their respective successors and permitted assigns.  Any purported assignment in violation of this <u>Section 3.1</u> shall be null and void.

    3.2 <u>Terms of the Agreement</u>.  Nothing contained herein shall itself change, amend, extend or alter the terms or conditions of the Agreement in any manner whatsoever.  In the event of any conflict or inconsistency between the terms of the Agreement and the terms hereof, the terms of the Agreement shall govern.

3.3     <u>Governing Law; Disputes</u>.    The dispute resolution, governing law, jurisdiction, venue, process and notice provisions set forth in the Agreement are incorporated herein by reference.

3.4     <u>Severability</u>.    If any provision hereof shall be held invalid, illegal or unenforceable in any jurisdiction, the Parties shall negotiate in good faith a valid, legal and enforceable substitute provision that most nearly reflects the original intent of the Parties and all other provisions hereof shall remain in full force and effect in such jurisdiction and shall be liberally construed in order to carry out the intentions of the Parties hereto as nearly as may be possible.  Such invalidity, illegality or unenforceability shall not affect the validity, legality or enforceability of such provision in any other jurisdiction.

3.5     <u>Counterparts</u>.    This Assignment and Assumption Agreement may be signed in counterparts, each and every one of which shall be deemed an original, notwithstanding variations in format or file designation which may result from the electronic transmission, storage and printing of copies of this Assignment and Assumption Agreement from separate computers or printers.  Signatures transmitted via .pdf shall be treated as original signatures.

**[*Signature Page Follows*]**

2

**IN WITNESS WHEREOF**, the Parties have caused this Assignment and Assumption Agreement to be executed by their duly authorized representatives as of the date first written above.

**SAVANT NEGLECTED DISEASES, LLC**

By:_____
Name:  Stephen L. Hurst
Title:  Managing Member

*[Signature Page to Assignment and Assumption Agreement]*

**IN WITNESS WHEREOF**, the Parties have caused this Assignment and Assumption Agreement to be executed by their duly authorized representatives as of the date first written above.

**KALOBIOS PHARMACEUTICALS, INC.**

By:_____
Name:  Cameron Durrant
Title:  Chairman and Chief Executive Officer

*[Signature Page to Assignment and Assumption Agreement]*

**EXHIBIT A**

**ASSUMED CONTRACTS**

- Sponsored Research Agreement dated January 1, 2013 with IECS for Course of chronic *Trypanosoma cruzi* infection after treatment based on parasitological and serological tests: a systematic review of follow-up studies (PROSPERO Register Number CRD42012002162)

- Data License and Services Agreement with IECS dated August 23, 2013 for the data in the Estani et al 1998 study

- MSA Agreement with CDMO, Shasun Pharma Solutions Ltd. *[copy of Proposal in Dropbox folder]*

- Agreement with CDMO, Shasun Pharma Solutions Ltd to develop, scale-up and manufacture benznidazole active pharmaceutical ingredient (API) for non-clinical, clinical and commercial use. *[copy of Proposal in Dropbox folder]*

- MSA Agreement with CDMO for drug product – To Be Determined – to be supplied when available.

- Agreement with CDMO - To Be Determined -  for the develop, scale-up and manufacture of benznidazole drug product tablets for clinical and commercial use.  To be supplied when available.

## **EXHIBIT E**

**FORM OF OPINION**

[Attached hereto.]

**CONFIDENTIAL**

\\BA - 045347/000003 - 594503 v33

<u>**Exhibit E**</u>



Hogan Lovells US LLP
Columbia Square
555 Thirteenth Street, NW
Washington, DC 20004
T  +1 202 637 5600
F  +1 202 637 5910
www.hoganlovells.com

June [●], 2016

Savant Neglected Diseases, LLC
P.O. Box 620732
Woodside, CA 94062

**Re:     KaloBios Pharmaceuticals, Inc.**

Ladies and Gentlemen:

This firm has acted as counsel to KaloBios Pharmaceuticals, Inc., a Delaware corporation (the "Company"), in connection with the Agreement for the Manufacture, Development and Commercialization of Benznidazole for Human Use, dated as of June [●], 2016 (the "Agreement"), between the Company and Savant Neglected Diseases, LLC, a Delaware limited liability company ("Savant"), and the execution and delivery pursuant thereto of the Security Agreement and the Warrant.  This opinion letter is furnished to you pursuant to the requirements set forth in Section 2.7(c)(vi) of the Agreement in connection with the Closing thereunder on the date hereof.  Capitalized terms used herein which are defined in the Agreement shall have the meanings set forth in the Agreement, unless otherwise defined herein (including in <u>Schedule 1</u> attached hereto).  Certain other capitalized terms used herein are defined in <u>Schedule 1</u> attached hereto.

For purposes of this opinion letter, we have examined copies of the documents listed on <u>Schedule 1</u> attached hereto (the "Documents").  The Agreement, the Security Agreement and the Warrant are referred to hereinafter collectively as the "Transaction Agreements."

In our examination of the Documents, we have assumed the genuineness of all signatures, the legal capacity of all natural persons, the accuracy and completeness of all of the Documents, the authenticity of all originals of the Documents and the conformity to authentic originals of all of the Documents submitted to us as copies (including telecopies).  As to all matters of fact relevant to the opinions expressed and any other statements made herein, we have relied on the representations and statements of fact made in the Documents, we have not independently established the facts so relied on, and we have not made any investigation or inquiry other than our examination of the Documents.  This opinion letter is given, and all statements herein are made, in the context of the foregoing.

For purposes of this opinion letter, we have assumed that (i) each of the parties to the Transaction Agreements other than the Company has all requisite power and authority under all applicable laws, rules, regulations and governing documents to execute, deliver and perform its obligations under the Transaction Agreements, and Savant has complied with all legal requirements pertaining to its status as such status relates to its rights to enforce the Transaction Agreements against the Company, (ii) each of the parties to the Transaction Agreements other than the Company has duly authorized,

Hogan Lovells US LLP is a limited liability partnership registered in the District of Columbia.  "Hogan Lovells" is an international legal practice that includes Hogan Lovells US LLP and Hogan Lovells International LLP, with offices in:  Alicante  Amsterdam  Baltimore  Beijing  Berlin  Brussels  Caracas  Colorado Springs  Denver  Dubai  Dusseldorf  Frankfurt  Hamburg  Hanoi  Ho Chi Minh City  Hong Kong  Houston  London  Los Angeles  Madrid  Miami  Milan  Moscow  Munich  New York  Northern Virginia  Paris  Philadelphia  Prague  Rome  San Francisco  Shanghai  Silicon Valley  Singapore  Tokyo  Ulaanbaatar  Warsaw  Washington DC  Associated offices:  Budapest  Jakarta  Jeddah  Riyadh  Zagreb.  For more information see www.hoganlovells.com.

Savant Neglected Diseases, LLC                - 2 -                June [●], 2016

executed and delivered the Transaction Agreements, (iii) each of the parties to the Transaction Agreements is validly existing and in good standing in all necessary jurisdictions (except for the Company in the State of Delaware to the extent stated in paragraph (a) below), (iv) each of the Transaction Agreements constitutes a valid and binding obligation, enforceable against Savant in accordance with its terms, (v) there has been no mutual mistake of fact or misunderstanding, or fraud, duress or undue influence, in connection with the negotiation, execution or delivery of each of the Transaction Agreements, and the conduct of all parties to the Transaction Agreements has complied with any requirements of good faith, fair dealing and conscionability, and (vi) there are and have been no agreements or understandings among the parties, written or oral, and there is and has been no usage of trade or course of prior dealing among the parties (and no act or omission of any party), that would, in any such case, define, supplement or qualify the terms of any of the Transaction Agreements, and legally sufficient consideration has been given and received for the transactions covered by each of the Transaction Agreements and for the obligations of each of the parties thereunder.  We have also assumed the validity and constitutionality of each relevant statute, rule, regulation and agency action covered by this opinion letter, as well as the Confirmation Order (as defined below).

This opinion letter is based as to matters of law, subject to the exclusions and limitations set forth in this opinion letter, solely on applicable provisions of the following, as currently in effect: (i) as to the opinions expressed in paragraphs (a), (b), and (c), the Delaware General Corporation Law, (ii) as to the opinions expressed in paragraphs (c) and (d), (i) applicable provisions of internal Delaware state law, (ii) the United States Bankruptcy Code, (iii) the Company's Second Amended Plan of Reorganization, dated May 9, 2016 (the "Plan"), and (iv) the Confirmation Order entered in the pending Chapter 11 case entitled In re Kalobios Pharmaceuticals, Inc. (Case No. 15-12628 (LSS) in the United States Bankruptcy Court for the District of Delaware.

Based upon, subject to and limited by the assumptions, qualifications, exceptions, and limitations set forth in this opinion letter, we are of the opinion that:

    (a)    The Company is validly existing as a corporation and in good standing as of the date of the Good Standing Certificate under the laws of the State of Delaware.

    (b)    The Company has the corporate power to execute, deliver and perform each of the Transaction Agreements. The execution, delivery and performance by the Company of each of the Transaction Agreements have been duly authorized by all necessary corporate action of the Company.

    (c)    Each of the Transaction Agreements has been duly executed and delivered by the Company.

    (d)    Each of the Transaction Agreements constitutes a valid and binding obligation of the Company, enforceable by Savant against the Company in accordance with its terms.

The opinion expressed in paragraph (d) above shall be understood to mean only that if there is a default in performance of an obligation, (i) if a failure to pay or other damage can be shown and (ii) if the defaulting party can be brought into a court which will hear the case and apply the governing law, then, subject to the availability of defenses, and to the exceptions elsewhere set forth in this opinion

Savant Neglected Diseases, LLC                    - 3 -                    June [●], 2016

letter, the court will provide a money damage (or perhaps injunctive or specific performance) remedy.

In addition to the assumptions, qualifications, exceptions and limitations elsewhere set forth in this opinion letter, our opinions expressed above are also subject to the effect of: (1) bankruptcy, insolvency, reorganization, receivership, moratorium and other laws affecting creditors' rights (including, without limitation, the effect of statutory and other law regarding fraudulent conveyances, fraudulent transfers and preferential transfers) with respect to any future bankruptcy (or similar circumstance) of the Company; and (2) the exercise of judicial discretion and the application of principles of equity, good faith, fair dealing, reasonableness, conscionability and materiality (regardless of whether the applicable agreements are considered in a proceeding in equity or at law).

We express no opinion in this letter as to any other statutes, rules and regulations not specifically identified above as being covered hereby (and in particular, we express no opinion as to any effect that such other statutes, rules and regulations may have on the opinions expressed herein). We express no opinion in this letter as to securities statutes, rules or regulations (and in particular, we express no opinion with respect to the shares issuable upon exercise of the Warrant), antitrust, unfair competition, banking or tax statutes, rules or regulations, or statutes, rules or regulations of any political subdivision below the state level. We express no opinion in this letter as to creation, attachment, perfection or priority of any security interest on any collateral pursuant to the Security Agreement. The opinions set forth in paragraphs (a) above are based upon a review of only those statutes, rules and regulations (not otherwise excluded in this letter) that, in our experience, are generally recognized as applicable to transactions of the type covered by the Agreement and to the role of the Company in such transactions.

We assume no obligation to advise you of any changes in the foregoing subsequent to the delivery of this opinion letter. This opinion letter has been prepared solely for your use in connection with the closing under the Agreement on the date hereof, and should not be quoted in whole or in part or otherwise be referred to, and should not be filed with or furnished to any governmental agency or other person or entity, without the prior written consent of this firm.


Very truly yours,



HOGAN LOVELLS US LLP

**Schedule 1**

1.  Executed copy of the Agreement.

2.  Executed copy of the Security Agreement, dated as of the Agreement, by and between the Company and Savant (the "Security Agreement").

3.  Executed copy of the Common Stock Purchase Warrant, dated as of the date of the Agreement, issued to Savant by the Company (the "Warrant").

4.  The Certificate of Incorporation of the Company, as certified by the Secretary of State of the State of Delaware on June 27, 2016, and as certified by the Secretary of the Company on the date hereof as being complete, accurate and in effect.

5.  The by-laws of the Company, as certified by the Secretary of the Company on the date hereof as being complete, accurate and in effect.

6.  Certain resolutions of the Board of Directors of the Company adopted at a meeting on June 28, 2016, as certified by the Secretary of the Company on the date hereof as being complete, accurate and in effect, relating to, among other things, authorization of the Agreement, the Security Agreement, the Warrant and arrangements in connection therewith.

7.  A certificate of good standing of the Company issued by the Secretary of State of the State of Delaware dated June 27, 2016 (the "Good Standing Certificate").

8.  A certificate of certain officers of the Company, dated the date hereof, as to certain facts relating to the Company (the "Company Officers' Certificate").

9.  Findings of Fact, Conclusions of Law, and Order Confirming Second Amended Chapter 11 Plan of Reorganization of Kalobios Pharmaceuticals, Inc. dated June 16, 2016 (the "Confirmation Order").

10. The Plan.

## **EXHIBIT F**

## **FORM OF WARRANT**

[Attached hereto.]

CONFIDENTIAL

\\BA - 045347/000003 - 594503 v33

**EXHIBIT F**

THIS WARRANT AND THE SECURITIES ISSUABLE UPON EXERCISE OF THIS WARRANT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "**ACT**"), OR QUALIFIED UNDER ANY STATE OR FOREIGN SECURITIES LAWS AND MAY NOT BE OFFERED FOR SALE, SOLD, PLEDGED, HYPOTHECATED OR OTHERWISE TRANSFERRED OR ASSIGNED UNLESS A REGISTRATION STATEMENT COVERING SUCH SHARES IS EFFECTIVE UNDER THE ACT AND IS QUALIFIED UNDER APPLICABLE STATE AND FOREIGN LAW OR THE TRANSACTION IS EXEMPT FROM THE REGISTRATION AND PROSPECTUS DELIVERY REQUIREMENTS UNDER THE ACT AND THE QUALIFICATION REQUIREMENTS UNDER APPLICABLE STATE AND FOREIGN LAW.

## COMMON STOCK PURCHASE WARRANT

## KALOBIOS PHARMACEUTICALS, INC.

Warrant Shares: 200,000                                  Initial Exercise Date:  [●], 2016

THIS COMMON STOCK PURCHASE WARRANT (this "**Warrant**") certifies that, for value received, Savant Neglected Diseases, LLC, a Delaware limited liability company, or its assigns (the "**Holder**") is entitled, upon the terms and subject to the limitations on exercise and the conditions hereinafter set forth, at any time on or after the Initial Exercise Date and on or prior to the close of business on the five (5) year anniversary of the Initial Exercise Date (the "**Termination Date**") but not thereafter, to subscribe for and purchase from KaloBios Pharmaceuticals, Inc., a Delaware corporation ("**KaloBios**"), up to two hundred thousand (200,000) shares (as adjusted hereunder, the "**Warrant Shares**") of the common stock, par value $0.001 per share, of KaloBios ("**Common Stock**"). The exercise price per share of Common Stock under this Warrant shall be equal to $2.25, subject to adjustment hereunder (the "**Exercise Price**").

Section 1        **Definitions**.  Capitalized terms used and not otherwise defined herein shall have the meanings set forth in that certain Agreement for the Manufacture, Development and Commercialization of Benznidazole for Human Use (the "**MDC Agreement**"), dated as of [●], 2016, among KaloBios and Savant Neglected Diseases, LLC.

Section 2        **Exercise**.

(a)        Exercisability.  The purchase rights represented by this Warrant shall become exercisable hereunder as follows:  (i) as to 25% of the Warrant Shares, on or after the Initial Exercise Date; (ii) as to an additional 25% of the Warrant Shares, upon acceptance by the FDA of an IND filing for the Product; (iii) as to an additional 25% of the Warrant Shares, upon acceptance by the FDA of an MAA filing for the Product; and (iv) as to the final 25% of the Warrant Shares, upon FDA grant of Regulatory Approval of the Product (items (i) through (iv) each, an "**Exercise Date**").

(b)   <u>Exercise</u>.   The purchase rights represented by this Warrant may be exercised by the Holder, in whole or in part (to the extent exercisable), at any time or times on or after the applicable Exercise Date and on or before the Termination Date by delivery to KaloBios (or such other office or agency of KaloBios as it may designate by notice in writing to the registered Holder at the address of the Holder appearing on the books of KaloBios) of a duly executed facsimile copy (or e-mail attachment) of the Notice of Exercise in the form attached hereto as <u>Exhibit A</u> and, payment of the aggregate Exercise Price for the Warrant Shares specified in the Notice of Exercise within two (2) Business Days following delivery of the Notice of Exercise to KaloBios by wire transfer of immediately available funds equal to the aggregate Exercise Price for the shares specified in the applicable Notice of Exercise, or, if available and specified in the applicable Notice of Exercise, pursuant to the cashless exercise procedure specified in <u>Section 2(c)</u> below.   Notwithstanding anything herein to the contrary, the Holder shall not be required to physically surrender this Warrant to KaloBios until the Holder has purchased all of the Warrant Shares available hereunder and the Warrant has been exercised in full, in which case, the Holder shall promptly surrender this Warrant to KaloBios for cancellation after the date the final Notice of Exercise is delivered to KaloBios. Partial exercises of this Warrant resulting in purchases of a portion of the total number of Warrant Shares available hereunder shall have the effect of lowering the outstanding number of Warrant Shares purchasable hereunder in an amount equal to the applicable number of Warrant Shares purchased. The Holder and KaloBios shall maintain records showing the number of Warrant Shares purchased and the date of such purchases. KaloBios shall deliver any objection to any Notice of Exercise within two (2) Business Days of receipt of such notice. **The Holder and any assignee, by acceptance of this Warrant, acknowledge and agree that, by reason of the provisions of this paragraph, following the purchase of a portion of the Warrant Shares hereunder, the number of Warrant Shares available for purchase hereunder at any given time may be less than the amount stated on the face hereof**.

(c)   <u>Cashless Exercise</u>. If at the time of exercise hereof there is no effective registration statement registering the resale of the Warrant Shares by the Holder, *provided*, that the Holder has cooperated with KaloBios' reasonable requests in connection with KaloBios' efforts to register such resale, and *provided, further*, that the No-Action Letter has not been issued, then this Warrant may also be exercised, in whole or in part, at such time by means of a "cashless exercise" in which the Holder shall be entitled to receive a number of Warrant Shares equal to the quotient obtained by dividing [(A-B) (X)] by (A), where:

(A) =   the Fair Market Value of one (1) share of Common Stock on the date of the Notice of Exercise;

(B) =   the Exercise Price of this Warrant, as adjusted hereunder; and

(X) =   the number of Warrant Shares that would be issuable upon exercise of this Warrant in accordance with the terms of this Warrant if such exercise were by means of a cash exercise rather than a cashless exercise.

If Warrant Shares are issued in such a cashless exercise, the Parties acknowledge and agree that in accordance with Section 3(a)(9) of the Act, the Warrant Shares shall take on the

2

characteristics of the Warrants being exercised and the holding period of the Warrant Shares being issued may be tacked on to the holding period of the Warrant.  KaloBios agrees not to take any position contrary to this Section 2(c), subject to any change in applicable Law.

(d)     Fair Market Value.  "Fair Market Value" of one (1) share of KaloBios' Common Stock shall mean for any date, the price determined by the first of the following clauses that applies:

(i)     if the Common Stock is then listed or quoted on a national securities exchange, the daily volume weighted average price of the Common Stock for such date (or the nearest preceding date on which there were sales of the Common Stock) on the national securities exchange on which the Common Stock is then listed or quoted as reported for trading by Bloomberg L.P. (based on a trading day from 9:30 a.m. (New York City time) to 4:02 p.m. (New York City time));

(ii)     if the Common Stock is not then listed or quoted on a national securities exchange but is listed or quoted for trading on OTCQB or OCTQX, the volume weighted average price of the Common Stock for such date (or the nearest preceding date on which there were sales of the Common Stock) on OTCQB or OTCQX, as applicable;

(iii)     if the Common Stock is not then listed or quoted for trading on OTCQB or OTCQX and if prices for the Common Stock are then reported in the "Pink Sheets" published by OTC Markets Group Inc. (or a similar organization or agency succeeding to its functions of reporting prices), the most recent bid price per share of the Common Stock so reported;

(iv)     the fair market value of a share of Common Stock as determined by an independent appraiser selected in good faith by KaloBios and reasonably acceptable to the Holder, the fees and expenses of which shall be paid by KaloBios.

(e)     Mechanics of Exercise.

(i)     *Delivery of Warrant Shares upon Exercise*.  KaloBios shall cause the Warrant Shares purchased hereunder to be transmitted to the Holder by crediting the account of the Holder's or its designee's balance account with The Depository Trust Company through its Deposit or Withdrawal at Custodian system if KaloBios is then a participant in such system and either (A) there is an effective registration statement permitting the issuance of the Warrant Shares to or resale of the Warrant Shares by Holder, (B) this Warrant is being exercised via cashless exercise, (C) this Warrant is being exercised by the Holder and the underlying Warrant Shares are being sold pursuant to Rule 144 adopted under the Act ("**Rule 144**") or (D) the shares are eligible for resale by the Holder without volume or manner-of-sale limitations pursuant to Rule 144, and otherwise by physical delivery of a certificate, registered in KaloBios' share register in the name of the Holder or its designee, for the number of Warrant Shares to which the Holder is entitled pursuant to such exercise to the address specified by the Holder in the Notice of Exercise by the date that is three (3) Business Days after the delivery to KaloBios of the Notice of Exercise (the "**Warrant Share Delivery Date**"); *provided*,

3

under no circumstances is KaloBios required to cause the Warrant Shares to be delivered prior to payment of the aggregate Exercise Price (other than in the case of cashless exercise).   Upon delivery of the Notice of Exercise and payment of the aggregate Exercise Price within two Business Days after delivery of the Notice of Exercise (other than in the case of cashless exercise), the Holder shall be deemed for all corporate purposes to be the holder of record of the Warrant Shares with respect to which this Warrant has been exercised, irrespective of the date of delivery of the Warrant Shares.  If KaloBios fails for any reason to deliver to the Holder the Warrant Shares subject to a Notice of Exercise by the Warrant Share Delivery Date and the applicable aggregate Exercise Price has been delivered, KaloBios shall pay to the Holder, in cash, as liquidated damages and not as a penalty, for each $1,000 of Warrant Shares subject to such exercise (based on the Fair Market Value of the Common Stock on the date of the applicable Notice of Exercise), $10.00 per Business Day for each Business Day after the first Business Day following such Warrant Share Delivery Date until such Warrant Shares are delivered or the Holder rescinds such exercise.

(ii)      *Delivery of New Warrants upon Exercise*.  If this Warrant shall have been exercised in part, KaloBios shall, at the request of the Holder set forth in the Notice of Exercise and upon surrender of this Warrant certificate, at the time of delivery of the Warrant Shares, deliver to the Holder a new Warrant evidencing the rights of the Holder to purchase the unpurchased Warrant Shares called for by this Warrant, which new Warrant shall in all other respects be identical with this Warrant.

(iii)      *Rescission Rights*.  If KaloBios fails to deliver, or cause the delivery to the Holder of the Warrant Shares pursuant to Section 2(d)(ii) by the Warrant Share Delivery Date, then the Holder will have the right to rescind such exercise.

Section 3      **Certain Adjustments**.  The number and kind of securities purchasable upon the exercise of this Warrant and the Exercise Price shall be subject to adjustment from time to time upon the occurrence of certain events, as follows:

(a)      Change of Control or Reclassification.   In case of (i) any Change of Control of KaloBios or (ii) any reclassification of securities of the class issuable upon exercise of this Warrant (other than a change (A) in par value, (B) from par value to no par value, (C) from no par value to par value or (D) as a result of a subdivision or combination), KaloBios, or such successor or purchasing corporation, as the case may be, shall duly execute and deliver to the Holder a new Warrant (in form and substance reasonably satisfactory to the Holder), or KaloBios shall make appropriate provision without the issuance of a new Warrant, so that Holder shall have the right to receive, at a total purchase price not to exceed that payable upon the exercise of the unexercised portion of this Warrant, and in lieu of the Warrant Shares theretofore issuable upon exercise or conversion of this Warrant, the kind and amount of shares of stock, other securities, money and property receivable upon such reclassification, change, merger or sale by a holder of the number of shares of Common Stock then purchasable under this Warrant, or in the case of such a merger or sale in which the consideration paid consists all or in part of assets other than securities of the successor or purchasing corporation, at the option of Holder, the securities of the successor or purchasing corporation having a value at the time of the transaction equivalent to the value of the Warrant Shares purchasable upon exercise of this Warrant at the

4

time of the transaction.  Any new Warrant shall provide for adjustments that shall be as nearly equivalent as may be practicable to the adjustments provided for in this Section 3.  In the event of a Change of Control, the Exercise Dates shall be accelerated and all purchase rights with respect to all Warrant Shares represented by this Warrant (to the extent not previously exercised) shall become exercisable no later than immediately prior to the consummation of such Change of Control.  The provisions of this Section 3(a) shall similarly apply to successive Changes of Control or reclassifications. Prior to the closing of any Change of Control in which KaloBios will not be the surviving entity, KaloBios shall, unless the Holder requests otherwise, cause the surviving or successor entity to assume this Warrant and the obligations of KaloBios hereunder.

(b)     Stock Dividends and Splits. If KaloBios, at any time while this Warrant is outstanding: (i) pays a stock dividend or otherwise makes a distribution or distributions on shares of its Common Stock or any other equity or equity equivalent securities payable in shares of Common Stock (which, for avoidance of doubt, shall not include any shares of Common Stock issued by KaloBios upon exercise of this Warrant), (ii) subdivides outstanding shares of Common Stock into a larger number of shares, (iii) combines (including by way of reverse stock split) outstanding shares of Common Stock into a smaller number of shares, or (iv) issues by reclassification of shares of the Common Stock any shares of capital stock of KaloBios, then in each case the Exercise Price shall be multiplied by a fraction of which the numerator shall be the number of shares of Common Stock (excluding treasury shares, if any) outstanding immediately before such event and of which the denominator shall be the number of shares of Common Stock outstanding immediately after such event, and the number of shares issuable upon exercise of this Warrant shall be proportionately adjusted such that the aggregate Exercise Price of this Warrant shall remain unchanged, subject to the limitation on the issuance of fractional shares contained in Section 9(b).  Any adjustment made pursuant to this Section 3(b) shall become effective immediately after the record date for the determination of stockholders entitled to receive such dividend or distribution and shall become effective immediately after the effective date in the case of a subdivision, combination or re-classification.

(c)     Adjustment of Number of Shares.  Upon each adjustment in the Exercise Price, the number of Warrant Shares purchasable hereunder shall be adjusted, to the nearest whole share, to the product obtained by multiplying the number of Warrant Shares purchasable immediately prior to such adjustment in the Exercise Price by a fraction, the numerator of which shall be the Exercise Price immediately prior to such adjustment and the denominator of which shall be the Exercise Price immediately thereafter.

(d)     Calculations. All calculations under this Section 3 shall be made to the nearest cent or the nearest 1/100th of a share, as the case may be. For purposes of this Section 3, the number of shares of Common Stock deemed to be issued and outstanding as of a given date shall be the sum of the number of shares of Common Stock (excluding treasury shares, if any) issued and outstanding.

(e)     Notice to the Holder.  Whenever any Exercise Price or the kind or number of securities issuable under this Warrant shall be adjusted pursuant to Section 3 hereof, KaloBios shall promptly deliver to the Holder in accordance with Section 9(h) a certificate signed by an officer of KaloBios setting forth, in reasonable detail, the event requiring the adjustment, the amount of the adjustment, the method by which such adjustment was calculated, and the

5

Exercise Price and number or kind of shares issuable upon exercise of this Warrant after giving effect to such adjustment. KaloBios shall provide the Holder with written notice of any proposed Change of Control of KaloBios not later than twenty (20) Business Days prior to the closing of such Change of Control setting forth the material terms and conditions thereof, and shall also provide the Holder such other information respecting such proposed Change of Control as may reasonably be requested by the Holder.

Section 4  **Transfer of Warrant**.  In connection with any transfer by the Holder of this Warrant, KaloBios may require the transferee to provide KaloBios with written representations and warranties that the transferee is acquiring this Warrant and the shares of Common Stock to be issued upon exercise for investment purposes only and not with a view to any sale or distribution, if such transfer occurs prior to the issuance of the No-Action Letter, and may require a legal opinion, in form and substance satisfactory to KaloBios and its counsel, stating that such transfer is exempt from the registration and prospectus delivery requirements of the Act; *provided, however*, that no opinion shall be required from the Holder in the event that such transfer (i) occurs upon or after the issuance of the No-Action Letter, (ii) is to an Affiliate of the Holder, or (iii) results in a mere change in the form of beneficial ownership of this Warrant; *provided, further*, in the case of (ii) and (iii), that the Holder provides a representation letter representing that the transferee is an Affiliate of the Holder or that such transfer will result in a mere change in the form of beneficial ownership of this Warrant, as applicable.  Following any transfer of this Warrant, at the request of either KaloBios or the transferee, the transferee shall surrender this Warrant to KaloBios in exchange for a new warrant of like tenor and date, executed by KaloBios.  Upon any partial transfer, KaloBios will also execute and deliver to the Holder a new warrant of like tenor with respect to the portion of this Warrant not so transferred. Subject to the foregoing, this Warrant is transferable on the books of KaloBios at its principal office by the registered the Holder hereof upon surrender of this Warrant properly endorsed.

Section 5  **Representations and Warranties of KaloBios**.  KaloBios hereby represents and warrants to the Holder that the statements in the following paragraphs of this <u>Section 5</u> are true and correct as of the date hereof.

(a)  <u>Corporate Power; Authorization; Enforceability</u>.  KaloBios has all requisite legal and corporate power to execute and deliver this Warrant, to sell and issue the Warrant Shares hereunder, and to carry out and perform its obligations under the terms of this Warrant.  All corporate action on the part of KaloBios, its officers, directors and shareholders necessary for the authorization, execution, delivery and performance of its obligations under this Warrant and for the authorization, issuance and delivery of this Warrant and the Warrant Shares has been taken and this Warrant constitutes the legally binding and valid obligation of KaloBios enforceable in accordance with its terms.

(b)  <u>Valid Issuance of Warrant and Warrant Shares</u>.  This Warrant has been validly issued and is free of restrictions on transfer other than restrictions on transfer set forth herein and under applicable state and federal securities laws.  The Warrant Shares that may be issued upon the exercise of the rights represented by this Warrant will, upon issuance in accordance with the terms hereof including the payment by the Holder of the full Exercise Price, be duly and validly issued, fully paid and nonassessable, and be free of restrictions on transfer other than restrictions on transfer under this Warrant and under applicable state and federal

securities laws. KaloBios will at all times reserve and keep available out of its authorized but unissued shares of the Common Stock, solely for the issuance and delivery upon the exercise of this Warrant, such number of its shares of Common Stock as shall from time to time shall be issuable upon exercise of this Warrant. If at any time the number of authorized but unissued shares of the Warrant Shares shall not be sufficient for the full exercise of this Warrant, then in addition to such other remedies as shall be available to the Holder, KaloBios shall as soon as reasonably practicable take such corporate action as may, in the opinion of its counsel, be necessary to increase its authorized but unissued shares of Common Stock to such number of shares as shall be sufficient for such purposes.

(c)    No Registration.  The offer, sale and issuance of the Warrant Shares, as contemplated by this Warrant, are exempt from the prospectus and registration requirements of applicable United States federal and state security laws, and neither KaloBios nor any authorized agent acting on its behalf has taken or will take any action hereafter that would cause the loss of such exemption.

Section 6    **Representations and Warranties of the Holder**.  The Holder hereby represents and warrants to KaloBios that the statements in the following paragraphs of this Section 6 are true and correct as of the date hereof.

(a)    Acquisition for Personal Account.  This Warrant and the Warrant Shares are being acquired for the Holder's own account, for investment and not with a view to, or for resale in connection with, any distribution or public offering thereof within the meaning of the Act (pursuant to an exception from or exception to) in accordance with registration requirements of the Act. The Holder has no present intention of selling, granting any participation in, or otherwise distributing the same. The Holder does not presently have any contract, undertaking, agreement or arrangement with any person to sell, transfer or grant participations to such person or to any third person, with respect to this Warrant or any of the Warrant Shares. The Holder has not been formed for the specific purpose of acquiring this Warrant or the Warrant Shares.

(b)    Securities Not Registered.

(i)    The Holder understands that this Warrant and the Warrant Shares have not been registered under the Act, on the basis that no distribution or public offering of the stock of KaloBios is currently contemplated.  The Holder realizes that the basis for the exemption may not be present if, notwithstanding its representations, the Holder has a present intention of acquiring the securities for a fixed or determinable period in the future, selling (in connection with a distribution or otherwise), granting any participation in, or otherwise distributing the securities.  The Holder has no such present intention to sell or otherwise distribute this Warrant or the Warrant Shares.

(ii)    The Holder recognizes that this Warrant and the Warrant Shares must be held indefinitely unless they are subsequently registered under the Act, an exemption from such registration is available or the Securities and Exchange Commission (the "**SEC**") issues the No-Action Letter.

(iii)        The Holder is aware that neither this Warrant nor the Warrant Shares may be sold pursuant to Rule 144 unless certain conditions are met, including, among other things, the availability of certain current public information about KaloBios, the resale following the required holding period under Rule 144 and the number of shares being sold during any three month period not exceeding specified limitations.  The Holder is aware that the conditions for resale set forth in Rule 144 have not been satisfied and that KaloBios presently has no plans to satisfy these conditions in the foreseeable future.

(c)        <u>Accredited Investor</u>.  The Holder is an "accredited investor" as defined in Rule 501 pursuant to the Act. The Holder has such knowledge and experience in financial and business matters that the Holder is capable of evaluating the merits and risks of the purchase of this Warrant pursuant to the terms of this Warrant and of protecting the Holder's interests in connection therewith.

Section 7        **Legends**.

(a)        <u>Legend</u>.

(i)        Each certificate representing the Warrant Shares shall be endorsed with the following legend:

"THESE SECURITIES HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR QUALIFIED UNDER ANY STATE OR FOREIGN SECURITIES LAWS AND MAY NOT BE OFFERED FOR SALE, SOLD, PLEDGED, HYPOTHECATED OR OTHERWISE TRANSFERRED OR ASSIGNED UNLESS A REGISTRATION STATEMENT COVERING SUCH SHARES IS EFFECTIVE UNDER THE ACT AND IS QUALIFIED UNDER APPLICABLE STATE AND FOREIGN LAW OR THE TRANSACTION IS EXEMPT FROM THE REGISTRATION AND PROSPECTUS DELIVERY REQUIREMENTS UNDER THE ACT AND THE QUALIFICATION REQUIREMENTS UNDER APPLICABLE STATE AND FOREIGN LAW."

(ii)        In the event that the SEC issues the No-Action Letter, the Holder may surrender this Warrant to KaloBios in exchange for a new warrant of like tenor and date, executed by KaloBios, with the following legend:

"THIS WARRANT HAS BEEN, AND THE SECURITIES ISSUABLE UPON THE EXERCISE HEREOF WILL BE ISSUED PURSUANT TO AN EXEMPTION FROM REGISTRATION UNDER SECTION 1145 OF CHAPTER 11 OF TITLE 11 OF THE UNITED STATES CODE (THE "**BANKRUPTCY CODE**"). THIS WARRANT AND SUCH WARRANT SHARES MAY BE SOLD, OFFERED FOR SALE, PLEDGED OR HYPOTHECATED WITHOUT REGISTRATION UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "**ACT**"), <u>PROVIDED</u> THAT THE HOLDER IS NOT DEEMED TO BE AN UNDERWRITER AS SUCH TERM IS DEFINED IN SECTION 1145(b) OF THE BANKRUPTCY CODE. IF THE HOLDER IS DEEMED TO BE AN UNDERWRITER AS SUCH TERM IS DEFINED IN SECTION 1145(b) OF

THE BANKRUPTCY CODE, THEN THIS WARRANT, AND THE SECURITIES ISSUABLE UPON THE EXERCISE HEREOF, MAY ONLY BE SOLD, OFFERED FOR SALE, PLEDGED OR HYPOTHECATED UPON REGISTRATION UNDER THE SECURITIES ACT OR PURSUANT TO AN EXEMPTION FROM THE REGISTRATION AND THE PROSPECTUS DELIVERY REQUIREMENTS OF THE ACT, AND OF ANY APPLICABLE STATE SECURITIES LAWS."

(iii)    Further, in the event that the SEC issues the No-Action Letter, notwithstanding subparagraph (i) above, each certificate representing the Warrant Shares shall be endorsed with the following legend, and the Holder may surrender any previously issued certificates representing Warrant Shares to KaloBios in exchange for new certificates representing such Warrant Shares endorsed with the following legend:

"THE SECURITIES REPRESENTED BY THIS CERTIFICATE HAVE BEEN ISSUED PURSUANT TO AN EXEMPTION FROM REGISTRATION UNDER SECTION 1145 OF CHAPTER 11 OF TITLE 11 OF THE UNITED STATES CODE (THE "**BANKRUPTCY CODE**"). THE SECURITIES MAY BE SOLD, OFFERED FOR SALE, PLEDGED OR HYPOTHECATED WITHOUT REGISTRATION UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "**ACT**"), PROVIDED THAT THE HOLDER IS NOT DEEMED TO BE AN UNDERWRITER AS SUCH TERM IS DEFINED IN SECTION 1145(b) OF THE BANKRUPTCY CODE. IF THE HOLDER IS DEEMED TO BE AN UNDERWRITER AS SUCH TERM IS DEFINED IN SECTION 1145(b) OF THE BANKRUPTCY CODE, THEN THE SECURITIES MAY ONLY BE SOLD, OFFERED FOR SALE, PLEDGED OR HYPOTHECATED UPON REGISTRATION UNDER THE ACT OR PURSUANT TO A DISPOSITION THAT IS EXEMPT FROM THE REGISTRATION AND PROSPECTUS DELIVERY REQUIREMENTS OF THE ACT, AND OF ANY APPLICABLE STATE SECURITIES LAWS."

(b)    Transfer Restrictions. Under Section 1145 of the Bankruptcy Code, this Warrant and the Warrant Shares, in the event the SEC issues the No-Action Letter, shall be freely tradable in the United States by recipients thereof, subject to the provisions of Section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in Section 2(a)(11) of the Act, and compliance with applicable securities Laws and any rules and regulations of the SEC, if any, applicable at the time of any future transfer of the Warrant and the Warrant Shares.

(c)    Removal of Legend and Transfer Restrictions. The legend relating to the Act endorsed on a certificate pursuant to Section 7(a)(i) shall be removed and KaloBios shall issue a certificate without such legend to the Holder if (i) the Warrant Shares are registered under the Act and a prospectus meeting the requirements of Section 10 of the Act is available, (ii) the Warrant Shares are eligible for resale by the Holder without volume or manner-of-sale limitations pursuant to Rule 144 or (iii) the Holder provides to KaloBios an opinion of counsel for the Holder reasonably satisfactory to KaloBios, a no-action letter or interpretive opinion of the staff of the SEC reasonably satisfactory to KaloBios, or other evidence reasonably satisfactory to KaloBios, to the effect that the sale, transfer or assignment of the Warrant Shares may be made without registration under the Act, it being understood that no such opinion of

9

counsel will be required of the Holder if (x) the Holder is selling the Warrant Shares pursuant to Rule 144 and (y) KaloBios' transfer agent does not require an opinion to remove the legend and issue a certificate without such legend.

Section 8 **Registration Rights**.  The Warrant Shares issuable upon exercise hereof are Registrable Securities pursuant to Section 10.9(b) of the MDC Agreement.

Section 9 **Miscellaneous**.

(a) No Rights as Stockholder until Exercise.  This Warrant does not entitle the Holder to any voting rights, dividends or other rights as a stockholder of KaloBios prior to the exercise hereof as set forth in Section 2.

(b) Loss, Theft, Destruction or Mutilation of Warrant. KaloBios covenants that upon receipt by KaloBios of evidence reasonably satisfactory to it of the loss, theft, destruction or mutilation of this Warrant or any stock certificate relating to the Warrant Shares, and in case of loss, theft or destruction, of indemnity or security reasonably satisfactory to it (which, in the case of this Warrant, shall not include the posting of any bond), and upon surrender and cancellation of such Warrant or stock certificate, if mutilated, KaloBios will make and deliver a new Warrant or stock certificate of like tenor and dated as of such cancellation, in *lieu* of such Warrant or stock certificate. The applicant for a new Warrant or stock certificate under such circumstances shall also pay any reasonable third party costs (including customary indemnity, which shall not include the posting of any bond) associated with the issuance of such replacement certificate.

(c) Charges, Taxes and Expenses.  Issuance of certificates for Warrant Shares shall be made without charge to the Holder for any United States federal or state documentary stamp tax or other incidental expense with respect to the issuance of such certificate, all of which taxes and expenses shall be paid by KaloBios, and such certificates shall be issued in the name of the Holder.

(d) No Fractional Shares.  No fractional share of Common Stock will be issued in connection with any exercise or conversion hereunder, but in *lieu* of such fractional share KaloBios shall make a cash payment therefor upon the basis of the Exercise Price then in effect.

(e) Governing Law; Consent to Jurisdiction. This Warrant and all disputes arising out of or related to this Warrant or any breach hereof shall be governed by and construed under the laws of the State of Delaware, without giving effect to any choice of law principles that would require the application of the laws of a different state. In the event of a dispute, claim or controversy between the Parties arising under or relating to this Warrant or the breach, termination, enforcement, interpretation or validity thereof, either Party may bring suit exclusively in a court of competent jurisdiction located in the State of Delaware and in no other jurisdiction.  Each Party hereby consents to personal jurisdiction and venue in, and agrees to service of process issued or authorized by, such court.

(f) Successors and Assigns.  Subject to applicable securities laws, this Warrant and the rights and obligations evidenced hereby shall inure to the benefit of and be

binding upon the successors and permitted assigns of KaloBios and the successors and permitted assigns of the Holder.

(g)     <u>Severability</u>.  If any provision hereof should be held invalid, illegal or unenforceable in any jurisdiction, the Parties shall negotiate in good faith a valid, legal and enforceable substitute provision that most nearly reflects the original intent of the Parties and all other provisions hereof shall remain in full force and effect in such jurisdiction and shall be liberally construed in order to carry out the intentions of the Parties hereto as nearly as may be possible.  Such invalidity, illegality or unenforceability shall not affect the validity, legality or enforceability of such provision in any other jurisdiction.

(h)     <u>Notices</u>.  Any notice, request or other document required or permitted to be given or delivered to the Holder by KaloBios shall be delivered in accordance with the notice provisions of the MDC Agreement.

(i)     <u>Construction</u>. In the event an ambiguity or a question of intent or interpretation arises, this Warrant will be construed as if drafted jointly by the Parties and no presumption or burden of proof will arise favoring or disfavoring either Party by virtue of the authorship of any provisions of this Warrant.  The language in this Warrant is to be construed in all cases according to its fair meaning.

(j)     <u>Interpretation; Headings</u>.  Headings used herein are for convenience only and shall not in any way affect the construction of or be taken into consideration in interpreting this Warrant.  Further, in this Warrant: (i) the word "including" shall be deemed to be followed by the phrase "without limitation" or like expression; (ii) the singular shall include the plural and vice versa;  and (iii) masculine, feminine and neuter pronouns and expressions shall be interchangeable.  A Party includes its permitted assignees and/or the respective successors in title to substantially the whole of its undertaking.  A statute or statutory instrument or any of their provisions is to be construed as a reference to that statute or statutory instrument or such provision as the same may have been or may from time to time hereafter be amended, restated, modified, supplemented, or re-enacted.

(k)     <u>Waiver</u>.  Neither Party may waive or release any of its rights or interests in this Warrant except in writing.  The failure of either Party to assert a right hereunder or to insist upon compliance with any term or condition of this Warrant shall not constitute a waiver of that right or excuse a similar subsequent failure to perform any such term or condition.  No waiver by either Party of any condition or term in any one or more instances shall be construed as a continuing waiver of such condition or term or of another condition or term.

(l)     <u>Counterparts</u>.  This Warrant may be signed in counterparts, each and every one of which shall be deemed an original, notwithstanding variations in format or file designation which may result from the electronic transmission, storage and printing of copies of this Warrant from separate computers or printers.  Signatures transmitted via .pdf shall be treated as original signatures.

(m)   <u>Amendment</u>.  No subsequent alteration, amendment, change or addition to this Warrant shall be binding upon the Parties unless reduced to writing and signed by an authorized officer of each Party.

**[*Signature Page Follows*]**

12

IN WITNESS WHEREOF, KaloBios has caused this Warrant to be executed by its officer thereunto duly authorized as of the date first above indicated.

**KALOBIOS PHARMACEUTICALS, INC.**

By:_____

    Name:  Cameron Durrant
    Title:   Chairman and Chief Executive Officer

*[Signature Page to Common Stock Purchase Warrant]*

**EXHIBIT A**
**NOTICE OF EXERCISE**

TO:   KALOBIOS PHARMACEUTICALS, INC.

(1)       The undersigned hereby elects to purchase _____ Warrant Shares of KaloBios pursuant to the terms of the attached Warrant (only if exercised in full), and tenders herewith payment of the Exercise Price in full, together with all applicable transfer taxes, if any.

(2)       Payment shall take the form of (check applicable box):

☐ in lawful money of the United States in the sum of $_____; or

☐ if permitted, the cancellation of such number of Warrant Shares as is necessary, in accordance with the formula set forth in subsection 2(c) of the Warrant, to exercise this Warrant with respect to the maximum number of Warrant Shares purchasable pursuant to the cashless exercise procedure set forth in subsection 2(c).

(3)       Please issue said Warrant Shares in the name of the undersigned or in such other name as is specified below:

_____

The Warrant Shares shall be delivered to the following DWAC Account Number:

_____

_____

_____

[SIGNATURE OF HOLDER]

Name of Investing Entity:
_____
*Signature of Authorized Signatory of Investing Entity*: _____
Name of Authorized Signatory: _____
Title of Authorized Signatory: _____
Date: _____

## <u>EXHIBIT G</u>

**FORM OF SECURITY AGREEMENT**

[Attached hereto.]

**CONFIDENTIAL**

\\BA - 045347/000003 - 594503 v33

<u>**EXHIBIT G**</u>

**FORM OF SECURITY AGREEMENT**

This SECURITY AGREEMENT (this "**Agreement**") is entered into as of [●], 2016 by and between KaloBios Pharmaceuticals, Inc., a Delaware corporation, having offices at 1000 Marina Blvd, Suite 250, Brisbane, CA 94005 (the "**Obligor**") and Savant Neglected Diseases, LLC, a Delaware limited liability company, having a place of business at 740 Bair Island Road #106, Redwood City, CA 94063 (the "**Secured Party**").   KaloBios and the Company are sometimes referred to in this Agreement individually as a "**Party**" and collectively as the "**Parties**."

**RECITALS**

**WHEREAS**, pursuant to that certain Agreement for the Manufacture, Development and Commercialization of Benznidazole for Human Use, dated as the date hereof (as amended, modified or restated from time to time, the "**MDC Agreement**") between the Obligor and the Secured Party, the Secured Party has agreed to sell certain assets to the Obligor upon the terms and subject to the conditions set forth therein; and

**WHEREAS**, this Agreement is required by the terms of the MDC Agreement.

**NOW, THEREFORE**, in consideration of these premises and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties hereto agree as follows:

1.     <u>Definitions</u>.

Capitalized terms used and not otherwise defined herein shall have the meanings ascribed to such terms in the MDC Agreement.   In addition to the terms defined in this Agreement, the following capitalized terms have the meanings set forth in this Article 1 for purposes of this Agreement:

"**Agreement**" has the meaning set forth in the Preamble.

"**Collateral**" has the meaning set forth in <u>Section 2</u>.

"**Excluded Collateral**" has the meaning set forth in <u>Section 2</u>.

"**Financing Statement**" has the meaning set forth in <u>Section 3</u>.

"**General Intangible**" has the meaning provided therefor in the UCC.

"**Lien**" means any lien (statutory or other), mortgage, pledge, hypothecation, assignment, deposit arrangement, encumbrance, priority or other security agreement or similar arrangement of any kind or nature whatsoever.

"**MDC Agreement**" has the meaning set forth in the Recitals.

"**Obligor**" has the meaning set forth in the Preamble.

"**Party**" and "**Parties**" have the meaning set forth in the Preamble.

"**Permitted Dispositions**" shall mean: (i) sales, abandonment, or other dispositions of equipment that is substantially worn, damaged, or obsolete or no longer used or useful in the ordinary course of business and leases or subleases of real property not necessary in the conduct of the business of the Obligor, (ii) sales of inventory made, directly or indirectly, to unrelated third parties in the ordinary course of the Obligor's business, (iii) the use or transfer of money in a manner that is not prohibited by the terms of this Agreement or the MDC Agreement, (iv) the licensing of rights to any Collateral in accordance with the MDC Agreement, (v) the granting of Permitted Encumbrances, (vi) the sale or discount, in each case without recourse, of accounts receivable arising in the ordinary course of business, but only in connection with the compromise or collection thereof, (vii) any involuntary loss, damage or destruction of property covered, subject to any deductibles, by insurance, (viii) any involuntary condemnation, seizure or taking, by exercise of the power of eminent domain or otherwise, or confiscation or requisition of use of property, (ix) the leasing or subleasing of assets of the Obligor in the ordinary course of business and in accordance with the MDC Agreement, (x) the lapse of registered patents, trademarks, copyrights and other intellectual property of the Obligor to the extent not economically desirable in the conduct of the business of the Obligor as permitted by the MDC Agreement, (xi) the abandonment of patents, trademarks, copyrights, or other intellectual property rights in the ordinary course of business as permitted by the MDC Agreement, or (xii) dispositions of equipment to the extent that (a) such property is exchanged for credit against the purchase price of similar replacement property, or (b) the proceeds of such disposition are substantially contemporaneously applied to the purchase price of such replacement property.

"**Secured Obligations**" has the meaning set forth in Section 2.

"**Secured Party**" has the meaning provided in the introductory paragraph hereof.

"**Security Interest**" has the meaning set forth in Section 2.

"**UCC**" means the Uniform Commercial Code as in effect from time to time in the State of Delaware; provided, however, that, at any time, if by reason of mandatory provisions of law, any or all of the perfection or priority of the Secured Party's Security Interest in any item or portion of the Collateral is governed by the Uniform Commercial Code as in effect in a jurisdiction other than the State of Delaware, the term "UCC" shall mean the Uniform Commercial Code as in effect, at such time, in such other jurisdiction for purposes of the provisions hereof relating to such perfection or priority and for purposes of definitions relating to such provisions.

Any other capitalized terms used but not defined herein shall have the meaning ascribed to such terms in the MDC Agreement.

2.      Grant of Security Interest in the Collateral.  To secure the timely payment of the Obligor's obligations to pay (a) the Milestone Payments pursuant to Section 3.3 of the MDC Agreement, (b) the Voucher Payment pursuant to Section 3.4 of the MDC Agreement, (c) the Royalties under Section 7.8 of the MDC Agreement, and (d) all other amounts due and payable by the Obligor from time to time pursuant to any Transaction Document (collectively, the "**Secured Obligations**"), the Obligor hereby grants to the Secured Party a continuing senior security interest (the "**Security Interest**") in any and all right, title and interest of such Obligor in and to the Acquired Assets and the Future Assets (collectively, the "**Collateral**").  Notwithstanding anything

to the contrary contained herein, the Collateral shall not include (collectively, the "**Excluded Collateral**"): any property, General Intangible, permit, lease, license, contract or other instrument of the Obligor if the grant of a Security Interest in such property, General Intangible, permit, lease, license, contract or other instrument in the manner contemplated by this Agreement (i) is prohibited under the terms of any General Intangible, permit, lease, license, contract or other instrument and would result in the termination thereof or give the other parties thereto the right to terminate, accelerate or otherwise alter the Obligor's rights, titles and interests thereunder (including upon the giving of notice or the lapse of time or both) or (ii) is prohibited, or requires the consent of a Governmental Authority, under applicable law; provided, that any such limitation described above on the Security Interest shall only apply to the extent that any such prohibition would not be rendered ineffective pursuant to the UCC or any other applicable law or principles of equity, provided, however, that the Security Interest shall attach immediately to any severable term of such lease, license, contract, property rights or agreement to the extent that such attachment does not result in any of the consequences specified in (i) or (ii) above.

3.     <u>Authorization to File Financing Statements</u>.  The Obligor hereby authorizes the Secured Party to prepare and file such financing statements (including continuation statements) or other similar document used to perfect and preserve a security interest under the laws of any jurisdiction or amendments thereof or supplements thereto (a "**Financing Statement**") as the Secured Party may from time to time deem necessary or appropriate in order to perfect and maintain the Security Interests granted hereunder in accordance with the UCC; provided, that  (a) the description of any collateral contained in such Financing Statements shall be limited to the "Collateral" as defined herein, and (b) any such Financing Statement or amendment shall specifically identify any Excluded Collateral that is not subject thereto.

4.     <u>Title, Rights to Collateral</u>. The Obligor has (or will have at the time it acquires rights in Collateral hereafter acquired or arising), and shall maintain (other than in accordance with <u>Section 5</u>) so long as the Security Interest remains outstanding, title to each item of Collateral (including the proceeds and products thereof), or other rights sufficient to grant the Security Interest, free and clear of all Liens other than Permitted Encumbrances.  The Obligor shall not license any Collateral to any third party or otherwise, except in accordance with the provisions of the MDC Agreement.  The Obligor shall defend the Collateral against all claims or demands of all Persons (other than the Secured Party or any holder of Permitted Encumbrances) claiming the Collateral or any interest therein.  As of the Closing, no effective Financing Statement covering all or any part of the Collateral is on file in any recording office, except in favor of the Secured Party relating to this Agreement.

5.     <u>Disposition of Collateral</u>. The Obligor shall not sell, lease or otherwise dispose of, or discount or factor with or without recourse, any Collateral, except (a) with the prior written consent of the Secured Party, (b) in accordance with the terms of the MDC Agreement in connection with any sublicense or assignment thereunder or, to the extent applicable, Change of Control of the Obligor in accordance with the terms of the MDC Agreement, or (c) pursuant to any Permitted Disposition.

6.     <u>Notice of Loss</u>.  The Obligor shall promptly notify the Secured Party of any material loss of or material damage to any material item of Collateral, or of any material adverse change, actually known to the Obligor in any material item of Collateral.

7.     <u>Name, Office, Location, Jurisdiction of Organization.</u>  The Obligor shall not change its name, the location of its chief executive office or its jurisdiction of organization unless the Secured Party has received at least 20 days' prior written notice thereof.

8.     <u>Inspection</u>.   The Obligor shall permit the Secured Party and its respective representatives and agents to engage in such inspections and examinations of the Collateral and any books and records relating to the Collateral upon reasonable prior notice and at such reasonable times and intervals as the Secured Party may determine, at the sole expense of the Secured Party; provided that prior to the occurrence and continuance of an Event of Default, the Secured Party shall be limited to one (1) such inspection and examination per calendar year, at the sole expense of the Secured Party.

9.     <u>Further Assurances</u>.  From time to time, at its expense, the Obligor shall promptly execute and deliver all further instruments and documents, and take all further action, that is necessary or that the Secured Party reasonably requests to perfect and protect the Security Interest or to enable the Secured Party to exercise and enforce its rights and remedies hereunder with respect to any Collateral.  In furtherance, and not in limitation, of the other rights, powers and remedies granted to the Secured Party in this Agreement, the Obligor hereby appoints the Secured Party its attorney-in-fact, with full authority in the place and stead of such Grantor and in the Obligor's name or otherwise, from time to time during the continuance of an Event of Default and in the Secured Party's good faith discretion, to take any action (including the right to collect on any Collateral) and to execute any instrument that the Secured Party reasonably believes is necessary or advisable to accomplish the purposes of this Agreement, in a manner consistent with the terms hereof.

10.     <u>Defaults</u>.  Each of the following occurrence shall constitute an "Event of Default" under this Agreement: (a) the Obligor fails to pay any of the Secured Obligations when due (after taking into account any applicable grace periods) and such failure continues for ten (10) days; (b) the Obligor fails to observe or perform any covenant or agreement under this Agreement  (after taking into account any applicable grace periods) and such failure continues for thirty (30) days after written notice of such failure provided by the Secured Party to the Obligor; *provided, however,* that such failure shall be an Event of Default immediately and prior to any such thirty (30) day period in the event that such failure could not be cured within thirty (30) days or  such continuing failure would materially adversely affect the value of the Collateral; (c) the Obligor or any of its subsidiaries (x) commences any case, proceeding or other action under any existing or future debtor relief law, seeking (A) to have an order for relief entered with respect to it, (B) to adjudicate it as bankrupt or insolvent, (C) reorganization, arrangement, adjustment, winding-up, liquidation, dissolution, composition or other relief with respect to it or its debts, or (D) appointment of a receiver, trustee, custodian, conservator or other similar official for it or for all or any substantial part of its assets, or (y) makes a general assignment for the benefit of its creditors; (d) there is commenced against the Obligor or any of its subsidiaries in a court of competent jurisdiction any case, proceeding or other action of a nature referred to in clause (c) above which (x) results in the entry of an order for relief or any such adjudication or appointment or (y) remains undismissed, undischarged, unstayed or unbonded for sixty (60) days; (e) there is commenced against the Obligor or any of its subsidiaries any case, proceeding or other action seeking issuance of a warrant of attachment, execution or similar process against all or any substantial part of its assets which results in the entry of an order for any such relief which has not been vacated, discharged, stayed or bonded pending appeal within sixty (60) days from the entry thereof; (f) the Obligor or any of its

4

subsidiaries is generally not, or is unable to, or admits in writing its inability to, pay its debts as they become due; and (g) the Obligor contests in any manner the validity or enforceability of the security interest granted under this Agreement.

11.   <u>Remedies upon Default</u>.   Upon and during the continuance of an Event of Default, the Secured Party shall have, in addition to the rights and remedies provided herein, in any other Transaction Document(s) relating to the Secured Obligations, or by applicable law (including, but not limited to, levy of attachment, garnishment and the rights and remedies set forth in the UCC of the jurisdiction applicable to the affected Collateral), the rights and remedies of a secured party under the UCC (regardless of whether the UCC is the law of the jurisdiction where the rights and remedies are asserted and regardless of whether the UCC applies to the affected Collateral), the Secured Party may, with or without judicial process or the aid and assistance of others, (a) enter on any premises on which any of the Collateral may be located and, without resistance or interference by the Obligor, take possession of the Collateral, (b) dispose of any Collateral on any such premises, (c) require the Obligor to assemble and make available to the Secured Party at the expense of the Obligor any Collateral at any place and time designated by the Secured Party which is reasonably convenient to both Parties, (d) remove any Collateral from any such premises for the purpose of effecting sale or other disposition thereof, and/or (e) without demand and without advertisement, notice, hearing or process of law, all of which the Obligor hereby waives to the fullest extent permitted by applicable law, at any place and time or times, sell and deliver any or all Collateral held by or for it at public or private sale, at any exchange or broker's board or elsewhere, by one or more contracts, in one or more parcels, for money, upon credit or otherwise, at such prices and upon such terms as the Secured Party deems advisable, in its sole discretion (subject to any and all mandatory legal requirements).  The Obligor acknowledges that any such private sale may be at prices and on terms less favorable to the seller than the prices and other terms which might have been obtained at a public sale and, notwithstanding the foregoing, agrees that such private sale shall be deemed to have been made in a commercially reasonable manner.  Neither the Secured Party's compliance with applicable Law nor its disclaimer of warranties relating to the Collateral shall be considered to adversely affect the commercial reasonableness of any sale.  To the extent the rights of notice cannot be legally waived hereunder, the Obligor agrees that any requirement of reasonable notice shall be met if such notice, specifying the place of any public sale or the time after which any private sale is to be made, is personally served on or mailed, postage prepaid, to the Obligor in accordance with the notice provisions of <u>Section 16</u> at least ten (10) days before the time of sale or other event giving rise to the requirement of such notice.  The Secured Party may adjourn any public or private sale from time to time by announcement at the time and place fixed therefor, and such sale may, without further notice, be made at the time and place to which it was so adjourned.  The Secured Party shall not be obligated to make any sale or other disposition of the Collateral regardless of notice having been given.  To the extent permitted by applicable Law, any holder of Secured Obligations may be a purchaser at any such sale.  To the extent permitted by applicable Law, the Obligor hereby waives all of its rights of redemption with respect to any such sale.  Subject to the provisions of applicable Law, the Secured Party may postpone or cause the postponement of the sale of all or any portion of the Collateral by announcement at the time and place of such sale, and such sale may, without further notice, to the extent permitted by applicable Law, be made at the time and place to which the sale was postponed, or the Secured Party may further postpone such sale by announcement made at such time and place.

12.     <u>Application of Proceeds</u>.  Any proceeds of the Collateral received by the Secured Party in connection with the exercise of remedies pursuant to this Agreement will be applied in reduction of the Secured Obligations.

13.     <u>Continuing Agreement; Termination; Releases of Collateral</u>.  (a) This Agreement shall remain in full force and effect until the date upon which the Secured Obligations (other than contingent indemnification obligations not then due) have been paid in full or otherwise have been satisfied or are no longer outstanding, and shall be terminated as and when provided in the MDC Agreement, at which time this Agreement shall be automatically terminated and the Secured Party shall, upon the request and at the expense of the Obligor, forthwith release all of its liens and Security Interests hereunder and shall execute and deliver all UCC termination statements and/or other documents requested by the Obligor evidencing such termination and release of the Security Interest.

(b)     If any of the Collateral shall be sold, transferred or otherwise disposed of by the Obligor (i) in accordance with the terms and provisions of the MDC Agreement and upon execution of a security agreement substantially similar to this Agreement by such purchaser or transferee, or (ii) pursuant to a Permitted Disposition, the liens and security interests created pursuant to this Agreement in such Collateral shall be deemed automatically released. Upon such release the Secured Party, upon the written request and at the expense of the Obligor, shall execute and deliver to the Obligor all releases, UCC termination statements and other documents necessary or advisable for the release of the liens and security interests created hereby on such Collateral; provided that the Obligor shall have delivered to the Secured Party, at least three Business Days (or such shorter period reasonably acceptable to the Secured Party) prior to the date of the proposed release, a request for release identifying such Collateral to be released.

14.     <u>Amendments; Waivers; Modifications, etc</u>.  This Agreement and the provisions hereof may not be amended, waived, modified, changed, discharged or terminated except as set forth in <u>Section 13</u> or as set forth in writing and signed by an authorized officer of each Party.

15.     <u>Successors in Interest</u>.  This Agreement shall be binding upon the Obligor, its successors and permitted assigns and shall inure, together with the rights and remedies of the Secured Party, to the benefit of the Secured Party and its successors and permitted assigns.

16.     <u>Notices</u>.  All notices required or permitted to be given under this Agreement shall be in conformance with Section 15.4 of the MDC Agreement.

17.     <u>Counterparts</u>.  This Agreement may be signed in counterparts, each and every one of which shall be deemed an original, notwithstanding variations in format or file designation which may result from the electronic transmission, storage and printing of copies of this Agreement from separate computers or printers.  Signatures transmitted via .pdf shall be treated as original signatures.

18.     <u>Headings</u>.  Headings used herein are for convenience only and shall not in any way affect the construction of or be taken into consideration in interpreting this Agreement.

19.     <u>Governing Law; Dispute Resolution</u>.  This Agreement and all disputes arising out of or related to this Agreement or any breach hereof shall be governed by and construed under

6

the laws of the State of Delaware, without giving effect to any choice of law principles that would require the application of the laws of a different state.  In the event of a dispute, claim or controversy between the Parties arising under or relating to this Agreement or the breach, termination, enforcement, interpretation or validity thereof, either Party may bring suit exclusively in a court of competent jurisdiction located in the State of Delaware and in no other jurisdiction.  Each Party hereby consents to personal jurisdiction and venue in, and agrees to service of process issued or authorized by such court.

20.    Severability.  If any provision hereof should be held invalid, illegal or unenforceable in any jurisdiction, the Parties shall negotiate in good faith a valid, legal and enforceable substitute provision that most nearly reflects the original intent of the Parties and all other provisions hereof shall remain in full force and effect in such jurisdiction and shall be liberally construed in order to carry out the intentions of the Parties hereto as nearly as may be possible.  Such invalidity, illegality or unenforceability shall not affect the validity, legality or enforceability of such provision in any other jurisdiction.

21.    Reference to the Agreement.  This Agreement has been entered into by the Obligor and the Secured Party solely for purposes as contemplated by the MDC Agreement.  In the event of any inconsistency between any of the terms or provisions hereof and the terms and provisions of the MDC Agreement, the terms and provisions of this Agreement shall govern.

22.    Entirety.  This Agreement, the MDC Agreement and the other documents relating to the Secured Obligations represent the entire agreement of the Parties hereto and thereto, and supersede all prior agreements and understandings, oral or written, if any, including any commitment letters or correspondence relating to the MDC Agreement, any other documents relating to the Secured Obligations, or the transactions contemplated herein and therein.

[***Signature Page Follows***.]

**IN WITNESS WHEREOF**, Each of the Parties hereto has caused a counterpart of this Security Agreement to be duly executed and delivered as of the date first above written.

**OBLIGOR:**

**KALOBIOS PHARMACEUTICALS, INC.**

By: _____
       Name:  Cameron Durrant
       Title:   Chairman and Chief Executive Officer

*[Signature Page to Security Agreement]*

Accepted and agreed to as of the date first above written.

**SECURED PARTY:**

**SAVANT NEGLECTED DISEASES, LLC**

By: _____
      Name:  Stephen L. Hurst
      Title:   Managing Member

*[Signature Page to Security Agreement]*

## **EXHIBIT H**

**ESCROW AGREEMENT**

[Attached hereto.]

**CONFIDENTIAL**

\\BA - 045347/000003 - 594503 v33

<u>EXHIBIT H</u>

**FORM OF ESCROW AGREEMENT**

THIS ESCROW AGREEMENT (this "**Escrow Agreement**") is entered into as of June [●], 2016 by and among KaloBios Pharmaceuticals, Inc., a Delaware corporation ("**KaloBios**"), Savant Neglected Diseases, LLC, a Delaware limited liability company ("**Savant**"), Black Horse Capital LP ("**BHC**"), Black Horse Capital Master Fund Ltd. ("**BHCM**"), Cheval Holdings, Ltd. ("**Cheval**" and together with BHC and BHCM, the "**Black Horse Entities,**" and collectively with KaloBios and Savant, the "**Parties**") and Wilmington Savings Fund Society, FSB, as escrow agent ("**Escrow Agent**").

WHEREAS, KaloBios is a debtor and debtor-in-possession in the bankruptcy case captioned as Case No. 15-12628 (LSS) (the "**Bankruptcy Case**") pending before the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**");

WHEREAS, on April 1, 2016, KaloBios, BHC, BHCM, Cheval and Nomis Bay LTD ("**Nomis**," and collectively with BHC, BHCM and Cheval, the "**Purchasers**") entered into that certain Securities Purchase Agreement (as amended from time to time, the "**Securities Purchase Agreement**"), pursuant to which the Purchasers have agreed to purchase from KaloBios and KaloBios has agreed to issue and sell to the Purchasers shares of common stock of KaloBios, as reorganized pursuant to the Plan (as defined below), upon the terms and conditions of the Securities Purchase Agreement;

WHEREAS, on April 1, 2016, BHCM as Administrative Agent and Lender, BHC, Cheval and Nomis as Lenders (collectively, the "**DIP Credit Parties**"), and KaloBios as Borrower entered into that certain Debtor in Possession Credit and Security Agreement (as amended from time to time, the "**DIP Credit Agreement**"), which provides, among other things, for the Term Loan made to KaloBios thereunder, plus accrued and unpaid interest, plus the Commitment Fee, plus the Upfront Fee, plus all other non-contingent Obligations (each of the foregoing capitalized terms as defined in the DIP Credit Agreement) (collectively, the "**Term Loan Obligations**") to be paid and satisfied, upon the occurrence of the Maturity Date (as defined in the DIP Credit Agreement) thereunder, by the issuance to the DIP Credit Parties of shares of common stock of KaloBios, as reorganized pursuant to the Plan, upon the terms and conditions of the DIP Credit Agreement;

WHEREAS, simultaneous with the execution of this Escrow Agreement, KaloBios and Savant are entering into that certain Agreement for the Manufacture, Development and Commercialization of Benznidazole for Human Use (the "**MDC Agreement**"), pursuant to which, among other things, Savant will sell to KaloBios and KaloBios will purchase from Savant, all right, title and interest in and to certain assets relating to the compound known as benznidazole and pharmaceutical products containing benznidazole;

WHEREAS, by Order entered on June 16, 2016 [D.I. 581] (the "**Confirmation Order**"), the Bankruptcy Court, among other things, confirmed the Debtor's Second Amended Plan of Reorganization, dated May 9, 2016, as modified by the Confirmation Order (as amended and modified and including all exhibits, schedules and supplements thereto, the "**Plan**"), and authorized and approved the Contemplated Transaction and KaloBios' entry into and

performance under the MDC Agreement, subject to any applicable consent rights of the Purchasers;

WHEREAS, the Plan provides that the date of substantial consummation of the Plan shall occur on the first business day upon which all conditions precedent to the effectiveness of the Plan, specified in Section 9.2 of the Plan, are satisfied or waived in accordance with the Plan (the "**Effective Date**");

WHEREAS, the conditions precedent to the occurrence of the Effective Date include the requirement that all of the conditions precedent for the closing of the Securities Purchase Agreement have been satisfied or waived in accordance with the terms of the Securities Purchase Agreement;

WHEREAS, as a condition to the closing of the transactions contemplated by the MDC Agreement and the Securities Purchase Agreement, respectively (each, a "**Closing**" and collectively, the "**Closings**"), the Bankruptcy Court shall have issued a judicial order approving the contemplated transactions and the Effective Date shall have occurred or shall occur contemporaneously with the Closings;

WHEREAS, Nomis and Cortleigh Limited ("**Cortleigh**") (to which Nomis has assigned the right to receive twenty percent (20%) of the shares of new common stock of KaloBios, as reorganized under the Plan, that are to be issued to Nomis pursuant to the Securities Purchase Agreement) are not party to this Escrow Agreement solely because Nomis and Cortleigh have elected to remit at the Closing their respective portions of the Purchase Price (as defined in the Securities Purchase Agreement) directly to KaloBios;  and

WHEREAS, Escrow Agent desires to accept its appointment as an escrow agent and to hold and disburse the funds deposited with it in accordance with the terms of this Escrow Agreement.

NOW, THEREFORE, the Parties and the Escrow Agent, intending to be legally bound, hereby agree as follows:

## 1.    APPOINTMENT OF AND ACCEPTANCE BY ESCROW AGENT

The Parties hereby appoint Escrow Agent to serve as escrow agent hereunder.  Escrow Agent hereby accepts such appointment and, upon receipt by wire transfer of the Escrow Funds (as defined below) in accordance with Section 2 below, agrees to hold and disburse the Escrow Funds in accordance with this Escrow Agreement.

## 2.    ESTABLISHMENT OF ESCROW

The Black Horse Entities shall deposit with Escrow Agent the amounts set forth on Schedule A (each, a "**BH Deposit**") by wire transfer of immediately available funds to the account of Escrow Agent referenced in Schedule B, which shall be a non-interest bearing bank account of Escrow Agent (the "**Escrow Account**").  The amounts deposited in the Escrow Account, as reduced by any disbursements and amounts withdrawn therefrom, are herein referred to as the "**Escrow Funds**".

2

3.     DISBURSEMENT PROCEDURES; CLOSING

(a)     After Escrow Agent has received the BH Deposit, the disbursement from the Escrow Account shall be made in the amounts and to the accounts set forth on Schedule C attached hereto upon receipt by the Escrow Agent of: (i) a certificate of confirmation in substantially the form attached hereto as Exhibit A (a "**Party Certificate of Confirmation**") from each of the Parties; and (ii) a certificate of confirmation in substantially the form attached hereto as Exhibit B (together with the Party Certificates of Confirmation, the "**Certificates of Confirmation**") from each of Nomis and Cortleigh (collectively with the Parties, the "**Confirming Entities**"), in each case executed by an authorized person of such Confirming Entity (as described in Schedule D).   Such Certificates of Confirmation from all of the Confirming Entities are referred to collectively hereinafter as the "**Joint Escrow Instructions**." Upon the receipt of Joint Escrow Instructions from all Parties, title to the portion of the Escrow Funds payable to each payee as set forth on Schedule C shall be transferred to such payee, and the Purchasers shall have no further right or interest in or to the portion of the Escrow Funds to be paid to such payee pursuant to Section 3(b) below.

(b)     Escrow Agent shall make such disbursements prior to 5:00 p.m. (Eastern) on the business day on which the Escrow Agent receives the Joint Escrow Instructions; *provided, however,* if the Joint Escrow Instructions are not received by the Escrow Agent until after 1:00 p.m. (Easter), Escrow Agent shall have until 12:00 noon (Eastern) on the next business day to make such disbursements.

(c)     Upon completion of such disbursements referenced above and KaloBios' receipt of the portion of the Purchase Price due from Nomis and Cortleigh under the Securities Purchase Agreement, (i) KaloBios and Savant hereby agree that the MDC Agreement and the transactions contemplated thereby are closed; (ii) KaloBios and each of the Black Horse Entities hereby agree that the Securities Purchase Agreement and the transactions contemplated thereby are closed, and KaloBios will promptly thereafter deliver the common stock of KaloBios, as reorganized under its Plan, to the Purchasers in accordance with the Securities Purchase Agreement; (iii) KaloBios and each of the Black Horse Entities hereby agree that the Maturity Date for the DIP Credit Agreement has occurred, and KaloBios will promptly thereafter deliver the common stock of KaloBios, as reorganized under its Plan, to the DIP Credit Parties; (iv) KaloBios and each of the Black Horse Entities hereby agree that all conditions precedent to the occurrence of the Effective Date set forth in Section 9.2 of the Plan have been satisfied or waived as permitted by Section 9.3 of the Plan; and (v) subject to KaloBios' filing of the Notice of the Effective Date pursuant to Section 9.4 of the Plan, the Effective Date of the Plan shall have occurred.

(d)     If the Joint Escrow Instructions have not been executed by the Confirming Entities and delivered to the Escrow Agent by 5:00 p.m. (Eastern Time) on June 30, 2016, then upon the written demand of any of the Black Horse Entities, without prior notice to any other party, Escrow Agent shall return to each of the Black Horse Entities any BH Deposit deposited by or on behalf of such Black Horse Entity and Escrow Agent's obligations under this Agreement shall terminate; provided that, in the absence of such a written demand, Escrow Agent shall continue to comply with this Agreement without reference to the time limitations last previously mentioned until demand is made as aforesaid.

3

(e)     Notwithstanding the foregoing, all disbursements of Escrow Funds shall be subject to Escrow Agent's right to withhold amounts equal to the claims and unpaid fees of Escrow Agent pursuant to <u>Section 6</u> and <u>Section 13</u> below.

## 4.     DUTIES OF ESCROW AGENT

(a)     The Parties acknowledge and agree that (i) the duties, responsibilities and obligations of Escrow Agent shall be limited to those expressly set forth in this Escrow Agreement, each of which is administrative or ministerial (and shall not be construed to be fiduciary) in nature, and no duties, responsibilities or obligations shall be inferred or implied, (ii) Escrow Agent shall not be responsible for any of the agreements referred to or described herein (including without limitation the Plan, the MDC Agreement and the Securities Purchase Agreement), or for determining or compelling compliance therewith, and shall not otherwise be bound thereby, and (iii) Escrow Agent shall not be required to expend or risk any of its own funds to satisfy payments from the Escrow Funds hereunder.

(b)     Escrow Agent shall not be under any duty to give the Escrow Funds held by it hereunder any greater degree of care than it gives its own similar property and shall not be required to invest any funds held hereunder except as directed in this Escrow Agreement. Uninvested funds held hereunder shall not earn or accrue interest.

## 5.     ESCROW AGENT'S LIABILITY

(a)     Escrow Agent shall not be liable for actions or omissions hereunder, except to the extent that a court of competent jurisdiction determines in a final, non-appealable judgment that Escrow Agent's gross negligence or willful misconduct was the primary cause of any liability or loss to Escrow Agent.  Without limiting the foregoing, Escrow Agent shall in no event be liable in connection with its investment or reinvestment of any cash held by it hereunder in good faith, in accordance with the terms hereof, including, without limitation, any liability for any delays (not resulting from its gross negligence or willful misconduct) in the investment or reinvestment of the Escrow Funds or any loss of interest incident to any such delays.  In no event shall Escrow Agent be liable for incidental, indirect, special, consequential or punitive damages (including, but not limited to lost profits), even if Escrow Agent has been advised of the likelihood of such loss or damage and regardless of the form of action.  Escrow Agent shall not be obligated to take any legal action or commence any proceeding in connection with the Escrow Funds, any account in which Escrow Funds are deposited or this Escrow Agreement, or to appear in, prosecute or defend any such legal action or proceeding.  Escrow Agent may consult legal counsel selected by it in the event of any dispute or question as to the construction of any of the provisions hereof or of any other agreement or of its duties hereunder, or relating to any dispute involving the Parties, and shall incur no liability and shall be fully indemnified by the Parties from any liability whatsoever in acting in accordance with the reasonable opinion or instruction of such counsel.  The Parties shall promptly pay, upon demand, the reasonable fees and expenses of any such counsel.

(b)     If any portion of the Escrow Funds is at any time attached, garnished or levied upon under any court order, or in case the payment, assignment, transfer, conveyance or delivery of any such property shall be stayed or enjoined by any court order, or in case any order,

judgment or decree shall be made or entered by any court affecting such property or any part thereof, then and in any such event, Escrow Agent is authorized, in its sole discretion, to rely upon and comply with any such order, writ, judgment or decree which it is advised by legal counsel selected by it is binding upon it without the need for appeal or other action; and if Escrow Agent complies with any such order, writ, judgment or decree, it shall not be liable to any of the parties hereto or to any other person or entity by reason of such compliance even though such order, writ, judgment or decree may be subsequently reversed, modified, annulled, set aside or vacated.

### 6.    INDEMNIFICATION

From and at all times after the date of this Escrow Agreement, KaloBios shall, to the fullest extent permitted by law, defend, indemnify and hold harmless Escrow Agent and each director, officer, employee, attorney, agent and affiliate of Escrow Agent (collectively, the "Indemnified Parties") against any and all actions, claims (whether or not valid), losses, damages, liabilities, costs and expenses of any kind or nature whatsoever (including without limitation reasonable attorneys' fees, costs and expenses) incurred by or asserted against any of the Indemnified Parties from and after the date hereof, whether direct, indirect or consequential, as a result of or arising from or in any way relating to any claim, demand, suit, action or proceeding (including any inquiry or investigation) by any person, including without limitation any of the Parties, whether threatened or initiated, asserting a claim for any legal or equitable remedy against any person under any statute or regulation, including, but not limited to, any federal or state securities laws, or under any common law or equitable cause or otherwise, arising from or in connection with the negotiation, preparation, execution, performance or failure of performance of this Escrow Agreement or any transactions contemplated hereby, whether or not any such Indemnified Party is a party to any such action, proceeding, suit or the target of any such inquiry or investigation; provided, however, that no Indemnified Party shall have the right to be indemnified hereunder for any liability finally determined by a court of competent jurisdiction, subject to no further appeal, to have resulted solely from the gross negligence or willful misconduct of an Indemnified Party.  Indemnified Parties shall, in their sole discretion, have the right to select and employ separate counsel with respect to any action or claim brought or asserted against it, and the reasonable fees of such counsel shall be paid upon demand by the Parties; provided, however that the Parties shall not, in connection with any proceeding or related proceedings in the same jurisdiction, be liable for the reasonable fees of counsel of more than one separate firm (plus, if required, one separate firm admitted to practice in a local jurisdiction) at any one time retained by Indemnified Parties unless the employment of more than one counsel has been authorized in writing by the Parties.  The obligations of the Parties under this Section 6(a) shall survive any termination of this Escrow Agreement and the resignation or removal of Escrow Agent.

### 7.    RELIANCE

(a)    Escrow Agent shall be entitled to rely upon any order, judgment, certification, demand, notice, instrument or other writing delivered to it hereunder without being required to determine the authenticity or the correctness of any fact stated therein or the propriety or validity of the service thereof.  Escrow Agent may act in reliance upon any instrument or signature believed by it to be genuine and may assume that the person purporting to give receipt

5

or advice or make any statement or execute any document in connection with the provisions hereof has been duly authorized to do so.  Escrow Agent may conclusively presume that the undersigned representative of each Party has full power and authority to instruct Escrow Agent on behalf of such Party unless written notice to the contrary is delivered to Escrow Agent by such Party.  Escrow Agent is authorized to comply with final orders issued or process entered by any court with respect to the Escrow Amount, without determination by Escrow Agent of such court's jurisdiction in the matter.

(b)     Escrow Agent may act pursuant to the advice of counsel with respect to any matter relating to this Escrow Agreement and shall not be liable for any action taken or omitted by it in good faith in accordance with such advice.

### 8.     ESCROW FUNDS

(a)     Escrow Agent does not have any interest in the Escrow Funds deposited hereunder but is serving as escrow agent only and has only possession thereof.  Any payments of income from the Escrow Funds shall be subject to withholding regulations then in force with respect to United States taxes.  Upon execution of this Escrow Agreement, the Parties will provide Escrow Agent with appropriate Internal Revenue Service Forms W-8 or W-9 for tax identification number certification, or nonresident alien certifications.  Section 5(a) and this Section 8(a) shall survive notwithstanding any termination of this Escrow Agreement or the resignation of Escrow Agent.

(b)     Escrow Agent makes no representation as to the validity, value, genuineness or collectability of any security or other document or instrument held by or delivered to it.

(c)     Escrow Agent shall not be called upon to advise any party as to the wisdom in selling or retaining or taking or refraining from any action with respect to any amounts deposited hereunder.

### 9.     RESIGNATION

Escrow Agent (and any successor Escrow Agent) may at any time resign as such by delivering the Escrow Funds to any successor Escrow Agent designated by the Parties in writing, or to any court of competent jurisdiction, whereupon Escrow Agent shall be discharged of and from any and all further obligations arising in connection with this Escrow Agreement.  The resignation of Escrow Agent will take effect on the earlier of (i) the appointment of a successor (including a court of competent jurisdiction) or (ii) the day which is thirty (30) days after the date of delivery of its written notice of resignation to the Parties.  If, at that time, Escrow Agent has not received a designation of a successor Escrow Agent, Escrow Agent's sole responsibility after that time shall be to retain (without any obligation to reinvest the same) the Escrow Funds until receipt of a designation of successor Escrow Agent or a court order appointing a successor Escrow Agent as set forth below.  The Parties shall use commercially reasonable efforts to appoint a successor Escrow Agent prior to the effective date of such resignation and to cause such successor Escrow Agent to execute and deliver an instrument accepting such appointment.  The resigning Escrow Agent shall transmit all records pertaining to the Escrow Funds and shall pay all Escrow Funds to the successor Escrow Agent, after making copies of

6

such records as the resigning Escrow Agent deems advisable and after deduction and payment to the resigning Escrow Agent of all fees and expenses (including court costs and attorneys' fees) due and owing to the resigning Escrow Agent in connection with the performance of its duties and the exercise of its rights hereunder.  If the Parties have failed to appoint a successor Escrow Agent prior to the expiration of thirty (30) days following receipt of the notice of resignation, Escrow Agent may petition any court of competent jurisdiction for the appointment of a successor escrow agent or for other appropriate relief, and any such resulting appointment shall be binding upon the Parties.  After any resigning Escrow Agent's resignation, the provisions of this Escrow Agreement shall inure to its benefit as to any actions taken or omitted to be taken by it while it was Escrow Agent under this Escrow Agreement.  Any corporation or association into which Escrow Agent may be merged or converted or with which it may be consolidated, or any corporation or association to which all or substantially all of the escrow business of Escrow Agent's corporate trust line of business may be transferred, shall be Escrow Agent under this Escrow Agreement without further act.

**10.      REPRESENTATIONS AND WARRANTIES OF THE PARTIES**

Each Party makes the following representations and warranties to Escrow Agent:

(a)      It is duly organized, validly existing, and in good standing under the laws of the state of its incorporation or organization, as applicable, and has full power and authority to execute and deliver this Escrow Agreement and to perform its obligations hereunder.

(b)      This Escrow Agreement has been duly approved by all necessary action, including any necessary shareholder or membership approval, has been executed by its duly authorized officers and, assuming this Escrow Agreement constitutes the binding obligations of Escrow Agent, constitutes its valid and binding agreement, enforceable in accordance with its terms.

(c)      The execution, delivery, and performance of this Escrow Agreement will not violate, conflict with, or cause a default under its certificate of incorporation or bylaws, any applicable law or regulation, any court order or administrative ruling or decree to which it is a party or any of its property is subject, or any agreement, contract, indenture, or other binding arrangement, including without limitation the Plan, the MDC Agreement or the Securities Purchase Agreement, as applicable, to which it is a party or any of its property is subject.

(d)      No party other than such Party has, or shall have, any lien, claim or security interest in the Escrow Funds or any part thereof; provided, however, that the Parties acknowledge that such Party is establishing this escrow arrangement to hold in escrow BH Deposits made by or on behalf of the Black Horse Entities.  No financing statement under the Uniform Commercial Code is on file in any jurisdiction claiming a security interest in or describing (whether specifically or generally) the Escrow Funds or any part thereof.

(e)      All of its representations and warranties contained herein are true and complete as of the date hereof.

7

## 11.    IDENTIFYING INFORMATION

The following notification is provided to the Parties pursuant to Section 326 of the USA Patriot Act of 2001, 31 U.S.C. Section 5318 ("Patriot Act"): IMPORTANT INFORMATION ABOUT PROCEDURES FOR OPENING A NEW ACCOUNT.  To help the government fight the funding of terrorism and money laundering activities, Federal law requires all financial institutions to obtain, verify, and record information that identifies each person or entity that opens an account, including any deposit account, treasury management account, loan, other extension of credit, or other financial services product.  The Parties agree to provide any information requested by Escrow Agent in connection with the Patriot Act or any similar legislation or regulation to which Escrow Agent is subject, in a timely manner.  Each Party represents that all identifying information set forth in this Agreement and the Schedules hereto, including without limitation, its Taxpayer Identification Number assigned by the Internal Revenue Service or any other taxing authority, is true and complete on the date hereof and will be true and complete at the time of any disbursement of the Escrow Funds.

## 12.    DISPUTES

(a)    In the event of any adverse claims or demands being made against Escrow Agent in connection with the Escrow Funds or Escrow Agent is unable to determine, to Escrow Agent's sole satisfaction, the proper disposition of any portion of the Escrow Funds or Escrow Agent's proper actions with respect to its obligations hereunder, then Escrow Agent may, in its sole discretion, take either or any combination of the following actions:

(i)    Escrow Agent shall be entitled to retain such portion of the Escrow Funds until Escrow Agent shall have received (A) a court order directing delivery of the Escrow Funds or (B) a written direction executed jointly by the Parties and any person making such adverse claim or demand with respect to such portion of the Escrow Funds directing delivery of such portion of Escrow Funds, in which event Escrow Agent shall disburse the Escrow Funds in accordance with such order or direction;

(ii)    refrain from taking any action under this Escrow Agreement until such adverse claims or demands or uncertainty shall be resolved to the sole satisfaction of Escrow Agent or until a successor Escrow Agent shall have been appointed (as the case may be), provided, that Escrow Agent shall continue to hold the Escrow Funds until it is directed otherwise by the court order or written direction referenced in subsection (a)(i) above; or

(iii)    resign in accordance with Section 9.

(b)    Escrow Agent shall have no liability to any Party, its shareholders or any other person with respect to any failure or refusal to take any action hereunder pursuant to this Section 12 other than to hold the Escrow Funds in accordance with the provisions hereof.

## 13.    FEES, COSTS AND EXPENSES OF ESCROW AGENT

(a)    KaloBios shall pay Escrow Agent compensation for the services to be rendered by Escrow Agent hereunder in the amounts set out on Schedule E hereto.

8

(b)     KaloBios shall reimburse Escrow Agent for all of its reasonable out-of-pocket expenses, including attorneys' fees, travel expenses, telephone and facsimile transmission costs, postage (including express mail and overnight delivery charges), copying charges and the like.  The obligations of KaloBios under this <u>Section 13</u> shall survive any termination of this Escrow Agreement and the resignation or removal of Escrow Agent.  Escrow Agent is authorized to, and may, disburse to itself from the Escrow Funds, from time to time, the amount of any compensation and reimbursement of out-of-pocket expenses due and payable hereunder (including any amount to which Escrow Agent or any Indemnified Party is entitled to indemnification pursuant to <u>Section 6</u> hereof).  Escrow Agent shall notify KaloBios of any disbursement from the Escrow Funds to itself or any Indemnified Party in respect of any compensation or reimbursement hereunder and shall furnish to KaloBios copies of all related invoices and other statements within fifteen (15) business days thereafter.  The Parties hereby grants to Indemnified Parties a security interest in, lien upon and right to set-off against the Escrow Funds to secure payment of the amount of any compensation or reimbursement due any of them hereunder (including, as to KaloBios, any claim for indemnification pursuant to <u>Section 6</u> hereof) against the Escrow Funds.  If for any reason funds in the Escrow Funds are insufficient to cover such compensation and reimbursement, KaloBios shall promptly pay such amounts to Escrow Agent or any Indemnified Party upon receipt of an itemized invoice.

**14.     LIMITED RESPONSIBILITY; NO TAX ADVICE**

(a)     This Escrow Agreement expressly sets forth all the duties of Escrow Agent with respect to any and all matters pertinent hereto.  No implied duties or obligations shall be read into this Escrow Agreement against Escrow Agent and Escrow Agent shall not be charged with knowledge or notice of any fact or circumstance not specifically set forth herein.  Escrow Agent shall not be bound by the provisions of any agreement of the Parties hereto except this Escrow Agreement and Escrow Agent shall have no liability under, and no duty to inquire as to, the provisions of any agreement other than this Escrow Agreement.

(b)     Escrow Agent, its affiliates, and its employees are not in the business of providing tax or legal advice to any taxpayer outside of Escrow Agent and its affiliates.  This Escrow Agreement and any amendments or attachments are not intended or written to be used, and cannot be used or relied upon, by any such taxpayer or for the purpose of avoiding tax penalties.  Any such taxpayer should seek advice based on the taxpayer's particular circumstances from an independent tax advisor.

**15.     OWNERSHIP FOR TAX PURPOSES**

KaloBios agrees that, for purposes of federal and other taxes based on income, KaloBios will be treated as the owner of the Escrow Funds and that KaloBios will report all income, if any, that is earned on, or derived from, the Escrow Funds as its income in the taxable year or years in which such income is actually received by KaloBios and pay any taxes attributable thereto. KaloBios represents that its Taxpayer Identification Number ("<u>TIN</u>") assigned by the Internal Revenue Service ("<u>IRS</u>") or any other taxing authority listed on <u>Schedule D</u> is true and correct, and that it will notify Escrow Agent in writing immediately upon any change to such number. Taxes may be withheld by Escrow Agent as it determines may be required by any law or regulation in effect at the time of the distribution.  In the absence of written direction from

9

KaloBios, all proceeds of the Escrow Funds, if any, shall be retained as Escrow Funds. KaloBios grants to Escrow Agent a right of set-off which may be exercised to pay any and all taxes, whether federal, state or local, incurred by the investment of the Escrow Funds pursuant to this Escrow Agreement. KaloBios shall indemnify and hold harmless Escrow Agent against and in respect to liability for taxes and/or any penalties or interest attributable to the investment of Escrow Funds by Escrow Agent pursuant to this Escrow Agreement.

### 16.     SECURITY PROCEDURES

Upon the receipt of each Certificate of Confirmation and the Joint Escrow Instructions, whether in writing, by telecopier, electronic transmission, or otherwise, Escrow Agent is authorized to seek confirmation of such instructions by telephone call-back to the person or persons designated on Schedule D hereto, and Escrow Agent may rely upon the confirmation of anyone purporting to be the person or persons so designated.  The persons and telephone numbers for call-backs may be changed only in a writing actually received and acknowledged by Escrow Agent.

### 17.     ESCHEAT

The parties hereto are aware that under applicable state law, property which is presumed abandoned may under certain circumstances escheat to the applicable state.  Escrow Agent shall have no liability to any Party, its respective heirs, legal representatives, successors and assigns, or any other party, should any or all of the Escrow Funds and any proceeds thereof escheat by operation of law.

### 18.     NOTICES

All notices, consents, waivers and other communications required or permitted under this Escrow Agreement shall be in writing and shall be deemed given to a party when (a) delivered to the appropriate address by hand or by a nationally recognized overnight courier service (costs prepaid); (b) sent by facsimile or e-mail (with confirmation by the transmitting equipment); or (c) received by the addressee, if sent by certified mail, return receipt requested, in each case to the following addresses and facsimile numbers and marked to the attention of the person (by name or title) designated below (or to such other address, facsimile number or person as a party may designate by notice to the other parties):

(a)     If to KaloBios, to:

KaloBios Pharmaceuticals, Inc.
1000 Marina Blvd., #250
Brisbane, CA  94005-1878
Attention: Dean Witter III
Fax: (650) 243-3260

with a copy to:

Hogan Lovells US LLP
100 International Drive, Suite 2000
Baltimore, MD 21202
Attention:  Asher Rubin

and

Morris, Nichols, Arsht & Tunnell LLP
1201 N. Market Street, 16th Floor
Wilmington, DE  19801
Attention:  Eric D. Schwartz, Esq.
                    Gregory W. Werkheiser, Esq.

(b)    If to BHC, to:

Black Horse Capital LP
c/o Opus Equum, Inc.
P.O. Box 788
Dolores, CO 81323

(c)    If to BHCM, to:

Black Horse Capital Master Fund Ltd
c/o Opus Equum, Inc.
P.O. Box 788
Dolores, CO 81323

with a copy to:

Quarles & Brady LLP
300 N. LaSalle Street
Suite 4000
Chicago, IL 60654-3406
Attention:  Faye Feinstein

(d)    If to Cheval, to:

Cheval Holdings, Ltd
P.O. Box 309G, Ugland House
Georgetown, Grand Cayman
Cayman Islands, KY1-1104

with a copy to:

Quarles & Brady LLP
300 N. LaSalle Street
Suite 4000
Chicago, IL 60654-3406
Attention:  Faye Feinstein

(d)     If to Savant, to:

Savant Neglected Diseases, LLC
P.O. Box 620732
Woodside, CA 94062
Attention:  Stephen L. Hurst
E-mail:  slhurst@savanthwp.com

with a copy to:

Dorsey & Whitney LLP
305 Lytton Avenue
Palo Alto, CA 94301
Attention:  Evan Ng

or to such other person(s) or address(es) as such Party shall furnish to Escrow Agent in writing:

(e)     If to Escrow Agent, to:

Wilmington Savings Fund Society, FSB
Attention:  Raye Goldsborough
501 Carr Road, Suite100
Wilmington, DE 19809

or to such person or address as Escrow Agent shall furnish to the Parties in writing.

## 19.     JURISDICTION; SERVICE OF PROCESS

Any proceeding arising out of or relating to this Escrow Agreement may be brought in the Bankruptcy Court, and each of the parties irrevocably submits to the exclusive jurisdiction of the Bankruptcy Court (or, to the extent the Bankruptcy Court does not have or exercise subject matter jurisdiction, the courts of the State of Delaware and the United States District Court for the District of Delaware), in any such proceeding and waives any objection it may now or hereafter have to venue or to convenience of forum, agrees that all claims in respect of the proceeding shall be heard and determined only in the Bankruptcy Court (or, to the extent the Bankruptcy Court does not have or exercise subject matter jurisdiction, the courts of the State of

\\BA - 045347/000003 - 596672 v1

Delaware or the United States District Court for the District of Delaware) and agrees not to bring any proceeding arising out of or relating to this Escrow Agreement in any other court.  Process in any proceeding referred to in the preceding sentence may be served on any party anywhere in the world.

## 20.    EXECUTION OF AGREEMENT

This Escrow Agreement may be executed in one or more counterparts, each of which will be deemed to be an original copy of this Escrow Agreement and all of which, when taken together, will be deemed to constitute one and the same agreement.  The exchange of copies of this Escrow Agreement and of signature pages by facsimile or electronic transmission shall constitute effective execution and delivery of this Escrow Agreement as to the parties and may be used in lieu of the original Escrow Agreement for all purposes.  Signatures of the parties transmitted by facsimile or electronic transmission shall be deemed to be their original signatures for any purposes whatsoever.

## 21.    SECTION HEADINGS, CONSTRUCTION

The headings of sections in this Escrow Agreement are provided for convenience only and will not affect its construction or interpretation.

## 22.    WAIVER

The rights and remedies of the parties to this Escrow Agreement are cumulative and not alternative.  Neither the failure nor any delay by any party in exercising any right, power or privilege under this Escrow Agreement or the documents referred to in this Escrow Agreement will operate as a waiver of such right, power or privilege, and no single or partial exercise of any such right, power or privilege will preclude any other or further exercise of such right, power or privilege or the exercise of any other right, power or privilege.  To the maximum extent permitted by applicable law, (a) no claim or right arising out of this Escrow Agreement or the documents referred to in this Escrow Agreement can be discharged by one party, in whole or in part, by a waiver or renunciation of the claim or right unless in writing signed by the other party; (b) no waiver that may be given by a party will be applicable except in the specific instance for which it is given; and (c) no notice to or demand on one party will be deemed to be a waiver of any obligation of such party or of the right of the party giving such notice or demand to take further action without notice or demand as provided in this Escrow Agreement or the documents referred to in this Escrow Agreement.

## 23.    ENTIRE AGREEMENT AND MODIFICATION

This Escrow Agreement supersedes all prior agreements among the parties with respect to its subject matter and constitutes (along with the documents referred to in this Escrow Agreement) a complete and exclusive statement of the terms of the agreement between the parties with respect to its subject matter.  This Escrow Agreement may not be amended except by a written agreement executed by the Parties and Escrow Agent.

\\BA - 045347/000003 - 596672 v1

24.    **GOVERNING LAW**

This Escrow Agreement shall be governed by the laws of the State of Delaware without regard to conflicts of law principles thereof.

25.    **DEALINGS**

Except as provided by applicable state or federal law, Escrow Agent and any stockholder, director, officer or employee of Escrow Agent may buy, sell, and deal in any of the securities of a Party and become pecuniarily interested in any transaction in which a Party may be interested, and contract and lend money to a Party and otherwise act as fully and freely as though it were not Escrow Agent under this Escrow Agreement.  Nothing herein shall preclude Escrow Agent from acting in any other capacity for any Party or for any other entity.

26.    **FORCE MAJEURE**

No party to this Escrow Agreement shall be liable to any other party for losses arising out of, or the inability to perform its obligations under the terms of this Escrow Agreement, due to acts of God, which shall include, but shall not be limited to, fire, floods, strikes, mechanical failure, war, riot, nuclear accident, earthquake, terrorist attack, computer piracy, cyber-terrorism or other similar acts beyond the control of the parties hereto.

27.    **AUTHORIZED PERSONS**

Any notices or instructions given to Escrow Agent (other than in writing at the time of execution of this Escrow Agreement), whether in writing or by facsimile or other electronic transmission, shall be given by a person designated on Schedule D attached hereto, and Escrow Agent may rely upon any notices or instructions purported to be given by any person or persons so designated.  The persons and telephone numbers designated on Schedule D may be changed only in a writing actually received and acknowledged by Escrow Agent.  The applicable persons designated on Schedule D hereto have been duly appointed to act as its representatives hereunder and have full power and authority to execute and deliver the Joint Escrow Instructions or to take or refrain from taking an action pursuant to this Escrow Agreement, to amend, modify or waive any provision of this Escrow Agreement and to take any and all other actions as any Party under this Escrow Agreement, all without further consent or direction from, or notice to, it or any other party.

*[Signature Page Follows]*

14

**IN  WITNESS  WHEREOF**, the parties have executed and delivered this Escrow Agreement as of the date first written above.

**KALOBIOS:**

KALOBIOS PHARMACEUTICALS, INC.


By:   _____
          Name:  Cameron Durrant
          Title:  Chairman and Chief Executive Officer

*[Signature Page to Escrow Agreement]*

**SAVANT:**

Savant Neglected Diseases, LLC

By: _____
Name:  Stephen L. Hurst
Title:  Managing Member

*[Signature Page to Escrow Agreement]*

**BLACK HORSE ENTITIES**:

Black Horse Capital LP

By: _____
Name:  Dale Chappell
Title:  Manager of General Partnership

Black Horse Capital Master Fund Ltd.

By: _____
Name:  Dale Chappell
Title:  Director

Cheval Holdings, Ltd.

By: _____
Name:  Dale Chappell
Title:  Director

*[Signature Page to Escrow Agreement]*

**ESCROW AGENT:**

Wilmington Savings Fund Society, FSB


By: _____
Name: _____
Title: _____

*[Signature Page to Escrow Agreement]*

**SCHEDULE A**

**BLACK HORSE ENTITIES' DEPOSITS**

| Purchaser | Deposit |
|---|---|
| Black Horse Entities: | $5,072,617.10 |

**NOTE:** The total BH Deposits shown above equal the Black Horse Entities' portion of the Purchase Price ($5,500,000.00 USD), *less* $$427,382.90 reserved by the Black Horse Entities based upon their counsel's actual and estimated Exit Financing Attorneys' Fees.

**SCHEDULE B**

**ESCROW AGENT'S PAYMENT INSTRUCTIONS**

WILMINGTON SAVINGS FUND SOCIETY, FSB
WIRE INSTRUCTIONS FOR

WSFS Bank
409 Silverside Road, Suite 100
Wilmington, DE 19809
Routing Number: 031100102
Beneficiary Name: Christiana Trust
Beneficiary Acct #: 210576179
Ref:  CH145253-0 KaloBios Pharmaceuticals, Inc.

**SCHEDULE C**

**DISBURSEMENT INFORMATION**

**Savant Disbursement: $2,687,500.00**

      Initial Payment less Deposit:  $2,500,000.00

      Initial month Joint Development Program Cost payment: $87,500.00

      Reimbursement of Legal Fees: $100,000.00

      To:     Wells Fargo Bank, N.A.
              2925 Woodside Road
              Woodside, CA  94062
              Routing Number:  121000248
              Account Number:  1019733615
              Beneficiary Name:  Savant Neglected Diseases, LLC

**Escrow Agent Disbursement:  $4,040.00.**

      Fees as set forth on Schedule F (Annual Fee plus 2 wires)

**KaloBios Disbursement: $2,381,077.10.**

      To:     Receiving Bank:          Comerica Bank
              ABA Routing Number:    1211 37522
              SWIFT Code:             MNBDUS33 (International wires)
              Account Number:         1892865328
              Title on Account:        KaloBios Operating Account
                                     (KaloBios Pharmaceuticals, Inc.)

## SCHEDULE D

## AUTHORIZED PERSONS

**KALOBIOS:**

Telephone Number(s) for Person(s) Designated to Give
Notices and Instructions of Behalf of KaloBios:

| Name | Telephone Number |
|------|------------------|
| Cameron Durrant | (908) 672-9908 |
| Morgan Lam | (650) 270-0147 |
| Dean Witter III | (650) 400-5635 |

KALOBIOS TAX PAYER IDENTIFICATION NUMBER:  77-0557236

**SAVANT:**

Telephone Number(s) for Person(s) Designated to Give
Notices and Instructions of Behalf of Savant:

| Name | Telephone Number |
|------|------------------|
| Stephen L. Hurst | (650) 208-2454 |
| Evan Y. Ng | (650) 565-2252 |
|  |  |

SAVANT TAX PAYER IDENTIFICATION NUMBER:  46-1774705

**BLACK HORSE ENTITIES:**

Telephone Number(s) for Person(s) Designated to Give
Notices and Instructions of Behalf of the Black Horse Entities:

| Name | Telephone Number |
|------|------------------|
| Dale Chappell | (646) 472-7948 |
|  |  |
|  |  |

BHC TAX PAYER IDENTIFICATION NUMBER:  47-0870061

BHCM TAX PAYER IDENTIFICATION NUMBER:  98-0608394

CHEVAL TAX PAYER IDENTIFICATION NUMBER:  98-0682679

**NOMIS AND CORTLEIGH:**

<u>Telephone Number(s) for Person(s) Designated to Give</u>
<u>Notices and Instructions of Behalf of Nomis and Cortleigh</u>:

| Name | Telephone Number |
|---|---|
| Peter W. Poole | 1-284-49408086 |
|  |  |
|  |  |

<u>NOMIS TAX PAYER IDENTIFICATION NUMBER</u>:  98-1218017

<u>CORTLEIGH TAX PAYER IDENTIFICATION NUMBER</u>:  N/A

**SCHEDULE E**

**ESCROW AGENT FEE SCHEDULE**

Annual Administration Fee:          $4,000

Outgoing Wire Transfer Fee:         $20 (each occurrence)

International Wire Transfer Fee:     $40 (each occurrence)

**EXHIBIT A**

**FORM OF PARTY CERTIFICATE OF CONFIRMATION**

**CERTIFICATE OF CONFIRMATION**

**JUNE 30, 2016**

This Certificate of Confirmation (this "**Certificate**") is being delivered to Wilmington Savings Fund Society, FSB ("**Escrow Agent**") pursuant to Section 3 of that certain Escrow Agreement by and among KaloBios Pharmaceuticals, Inc., Savant Neglected Diseases, LLC, Black Horse Capital LP, Black Horse Capital Master Fund Ltd., and Cheval Holdings, Ltd. (the "**Parties**").  Unless otherwise defined herein, capitalized terms have the meanings set forth in the Escrow Agreement.

I, [*Name of Authorized Representative*], do hereby certify to Escrow Agent, solely on behalf of [*Name of Party*] in my capacity as [*Title*] thereof and not in my individual capacity, that, as of June 30, 2016:

1. [*Name of party*] has received all deliveries it requires [*as to KaloBios and Savant, to close the transactions contemplated by the MDC Agreement*] [*as to KaloBios and each of the Black Horse Entities, to (a) close the transactions contemplated by the Securities Purchase Agreement and (b) effect repayment of the Term Loan Obligations pursuant to the DIP Credit Agreement*] [*as to KaloBios only, to declare the Effective Date of the Plan*]; and

2. Prior to Closing, [*name of delivering party*] tendered all documents required to be delivered by [*Name of delivering party*] at Closing (the "**Closing Documents**") to counsel to the [*counterparty or counterparties, as applicable*] to the [*MDC Agreement and/or the Securities Purchase Agreement, as applicable*].  [*Name of delivering party*] hereby directs that such Closing Documents  are hereby released from escrow without further action on the part of [*Name of delivering party*] effective upon Escrow Agent's receipt of an executed Certificate of Confirmation from each other party to the [*MDC Agreement and/or the Securities Purchase Agreement, as applicable*], and upon such receipt Escrow Agent is hereby authorized and directed to make all disbursements described on <u>Schedule C</u> to the Escrow Agreement.

*[Signature Page Follows]*

**IN WITNESS WHEREOF**, the undersigned has duly executed this Certificate as of the date first written above

[*NAME OF PARTY*]


By: _____
Name:
Title:

**EXHIBIT B**

**FORM OF CERTIFICATE OF CONFIRMATION FOR NOMIS AND CORTLEIGH**

**CERTIFICATE OF CONFIRMATION**

**JUNE 30, 2016**

This Certificate of Confirmation (this "**Certificate**") is being delivered to Wilmington Savings Fund Society, FSB ("**Escrow Agent**") pursuant to Section 3 of that certain Escrow Agreement by and among KaloBios Pharmaceuticals, Inc., Savant Neglected Diseases, LLC, Black Horse Capital LP, Black Horse Capital Master Fund Ltd., and Cheval Holdings, Ltd. (the "**Parties**").  Unless otherwise defined herein, capitalized terms have the meanings set forth in the Escrow Agreement.

I, [*Name of Authorized Representative*], do hereby certify to Escrow Agent, solely on behalf of [*Nomis or Cortleigh, as applicable*] in my capacity as [*Title*] thereof and not in my individual capacity, that, as of June 30, 2016:

1. [*Nomis or Cortleigh, as applicable*] has received all documents it requires to close the transactions contemplated by the Securities Purchase Agreement [*and as to Nomis to effect repayment of the Term Loan Obligations pursuant to the DIP Credit Agreement*];

2. Prior to Closing, [*Nomis or Cortleigh, as applicable, as delivering party*] tendered all documents required to be delivered by [*Nomis or Cortleigh, as applicable*] at Closing (the "**Closing Documents**") to counsel to the counterparties to the Securities Purchase Agreement.  [*Nomis or Cortleigh, as applicable*] hereby directs that such Closing Documents are hereby released from escrow without further action on the part of [*Nomis or Cortleigh, as applicable*] effective upon Escrow Agent's receipt of an executed Certificate of Confirmation from each other party to the Securities Purchase Agreement, and upon such receipt Escrow Agent is hereby authorized and directed to make all disbursements described on <u>Schedule C</u> to the Escrow Agreement; and

3. Upon completion of the disbursements of the Escrow Funds and KaloBios' receipt of the portion of the Purchase Price due from Nomis and Cortleigh under the Securities Purchase Agreement, (i) [*Nomis or Cortleigh, as applicable*] acknowledges that the Securities Purchase Agreement and the transactions contemplated thereby are closed, it being understood that KaloBios will promptly thereafter deliver the common stock of KaloBios, as reorganized under its Plan, to the Purchasers in accordance with the Securities Purchase Agreement; (ii) [*Nomis*] acknowledges that the Maturity Date for the DIP Credit Agreement has occurred, it being understood that KaloBios will promptly thereafter deliver the common stock of KaloBios, as reorganized under its Plan, to the DIP Credit Parties; (iii) [*Nomis or Cortleigh, as applicable*] acknowledges that all conditions precedent to the occurrence of the Effective Date set forth in Section 9.2 of the Plan have been satisfied or waived as permitted by Section 9.3 of the Plan; and (iv) [*Nomis or Cortleigh, as applicable*] acknowledges that, subject to KaloBios' filing of the

Notice of the Effective Date pursuant to Section 9.4 of the Plan, the Effective Date of the Plan shall have occurred.

*[Signature Page Follows]*

**IN WITNESS WHEREOF**, the undersigned has duly executed this Certificate as of the date first written above

[*NOMIS OR CORTLEIGH, AS APPLICABLE*]


By: _____
Name:
Title:

## EXHIBIT I

## CURRENT DEVELOPMENT PLAN

[Attached hereto.]

# Summary of Current Development Program

Overall expense, timeline, and principal milestones agreed. Monthly allocation of overall Program spending (other than with respect to Savant FTEs) to be finalized by JDC within 30 days of agreement execution.

| Principal Milestones | 2016 | | | | | | | | | |
| --- | April | May | June | July | Aug | Sept | Oct | Nov | Dec | Year Total |
| | | | | | | | **Pre-IND Meeting** | | | |
| Services[1] | $0 | $0 | $0 | $0 | $166,297 | $166,297 | $141,297 | $92,103 | $92,103 | $658,096 |
| Consultants/FTEs: Other[2] | $0 | $0 | $0 | $95,325 | $40,635 | $40,635 | $40,635 | $40,635 | $49,920 | $307,785 |
| Consultants/FTEs: Savant[3] | $175,000 | $87,500 | $87,500 | $87,500 | $87,500 | $87,500 | $87,500 | $87,500 | $87,500 | $875,000 |
| CMC[4] | $353,501 | $0 | $0 | $0 | $0 | $0 | $989,549 | $0 | $0 | $1,343,050 |
| Commercial[4] | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Total[5] | $528,501 | $87,500 | $87,500 | $182,825 | $294,431 | $294,431 | $1,258,980 | $220,238 | $229,524 | **$3,183,930** |

1. Budget assumes total PDUFA fees of $3,073,850 based on current FY 2016 user rates[a]. If total PDUFA fees are waived, reduced or increased, then budget is adjusted accordingly.
2. Includes all external and internal/consultant (Kalobios) costs.
3. Reflects Savant staffing costs of three full-time employees amount to be funded to Savant monthly.
4. Includes all external costs and internal/consultant (Kalobios) costs.
5. Variances, Overages in Program Budget to be reconciled and invoiced annually on December 31 pursuant to Agreement including for any required Kalobios GAAP, internal accounting or other required disclosures.

a.) U.S. Food and Drug Administration. Prescription Drug User Fee Act (PDUFA) [Internet]. 2016 [cited 2016 Jun 1]. Available from:
http://www.fda.gov/forindustry/UserFees/PrescriptionDrugUserFee/

**2017**

| | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Year Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | $155,181 | $155,181 | $139,467 | $89,467 | $89,467 (File IND) | $89,467 | $189,467 | $189,467 | $189,467 | $126,389 | $126,389 | $26,389 | $1,565,795 |
| | $49,920 | $49,920 | $49,920 | $49,920 | $49,920 | $49,920 | $54,920 | $54,920 | $54,920 | $54,920 | $54,920 | $49,920 | $624,045 |
| | $87,500 | $87,500 | $87,500 | $87,500 | $87,500 | $87,500 | $0 | $0 | $0 | $0 | $0 | $0 | $525,000 |
| | $0 | $0 | $0 | $600,000 | $0 | $0 | $0 | $0 | $0 | $0 | $600,000 | $0 | $1,200,000 |
| | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| | $292,601 | $292,601 | $276,887 | $826,887 | $226,887 | $226,887 | $244,387 | $244,387 | $244,387 | $181,309 | $781,309 | $76,309 | **$3,914,840** |

| | 2018 | | | | | | | | | | | | | April 2016 - Dec 2018 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Year Total | Program Total |
| | **NDA Submission/ Acceptance** | | | | | | **NDA Approval** | | | | | | | |
| | $3,100,239 | $0 | $0 | $0 | $0 | $0 | $33,333 | $33,333 | $33,333 | $0 | $0 | $0 | $3,200,239 | $5,424,130 |
| | $49,920 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $49,920 | $981,750 |
| | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $1,400,000 |
| | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $2,543,050 |
| | $0 | $41,667 | $41,667 | $41,667 | $104,167 | $104,167 | $104,167 | $62,500 | $62,500 | $62,500 | $62,500 | $62,500 | $750,000 | $750,000 |
| | $3,150,159 | $41,667 | $41,667 | $41,667 | $104,167 | $104,167 | $137,500 | $95,833 | $95,833 | $62,500 | $62,500 | $62,500 | **$4,000,159** | **$11,098,930** |

## SCHEDULE 2.1

## SCHEDULE OF ACQUIRED ASSETS

(a)     Regulatory Materials:

- IND

  o   ***NONE; no IND has been filed by Galenyx or the Company.***

- FDA Meetings:

  o   Pre-meeting Briefing Document from June 29, 2012 FDA meeting;

  o   Meeting Agenda from June 29, 2012 FDA meeting;

  o   Minutes from June 29, 2012 FDA meeting; and

  o   Internal correspondence relating to FDA meetings.

- Other Regulatory Authority Meetings:

  o   All briefing documents, meeting agenda and minutes and internal correspondence relating to any meetings with Regulatory Authorities other than the FDA.

    ▪   No meetings have been held or were contemplated with Regulatory Authorities other than the FDA.

- Email from F. Izabi, Regulatory Health Project Manager, at the FDA, dated August 6, 2012, subject: "PIND 115224- (Benznidazole)-Additional comments".

(b)     Assumed Contracts:

- Sponsored Research Agreement;

- IECS Agreement;

- MSA Agreement with CDMO, Shasun Pharma Solutions Ltd.*;*

- Agreement with CDMO, Shasun Pharma Solutions Ltd to develop, scale-up and manufacture benznidazole active pharmaceutical ingredient (API) for non-clinical, clinical and commercial use*;*

- MSA Agreement with CDMO for drug product – To Be Determined – to be supplied when available; and

CONFIDENTIAL

- Agreement with CDMO - To Be Determined - for the development, scaling-up and manufacture of benznidazole drug product tablets for clinical and commercial use.  To be supplied when available.

(c)    Acquired Inventory:

- Product supply in final finished form, pre-cursers, analysts, test reagents and finished goods inventory to complete all testing required for submission under Section 505(b)(2) of the FD&C Act.

- Expired Radanil (benznidazole made by Roche):

    o   Lot number: RJ0361;

    o   Date of Manufacture: Feb 4, 2008;

    o   Expiration Date: April 2013;

    o   Quantity: 2 bottles, each are containing 100 tablets.

- Expired Abarax (benznidazole made by Elea):

    o   Lot number: 8884;

    o   Expiration Date: May 2015;

    o   Quantity:  1 bottle, containing 100 tablets.

- Benznidazole tablets, manufacturer unknown:

    o   Lot number: unknown;

    o   Expiration Date: unknown;

    o   Quantity: 41 tablets in a plastic, Ziploc bag.

- Raw Materials for Benznidazole API manufacture (transferred from Aesica to Shasun Plharma Solutions Ltd.)

    o   2-Nitroimidazole         Batch number: 33855      Quantity: 15kg
    o   Benzylamine              Batch number: 35155      Quantity: 50kg
    o   Potassium Carbonate      Batch number: 58087      Quantity: 25kg
    o   Ethanol                  Batch number: 57874      Quantity: 161kg
    o   Ethyl bromoacetate       Batch number: 58089      Quantity: 250kg

- Reference Standard of Benznidazole API.

    o   Lot number: RS1511;

     o   Approximately 20 grams;

     o   Reference standard produced by Aesica, currently stored at Shasun Pharma Solutions Ltd.

(d)    Governmental Approvals:

- ***Savant does not hold any government approvals for benznidazole.***

(e)    Assigned Books and Records:

- Whole Radanil tablets:

     o   Whole tablet protocol and report [WIL-954007];

     o   Bio-analytical reports [MC13B-0090];

     o   Research Bio-analytical reports for benznidazole metabolites [MC13R-0013];

     o   Savant pk analysis [excel file created June, 11, 2013].

- Dissolved Radanil Tablets:

     o   Dissolved tablet protocol and report [WIL-954012];

     o   Bio-analytical reports [MC13B-0136];

     o   Research Bio-analytical reports for benznidazole metabolites [MC13R-0020].

- GLP Dog Studies – MicroConstants:

     o   Validation protocol and report for benznidazole in dog plasma [MC13B-0061, MC13B-0062];

     o   Dog plasma analytical method MN-13013 [included in MC13B-0090].

- Tissue levels of benznidazole following oral administration in mice research study pharmacokinetics report:

     o   Report [dated June 12, 2016];

     o   Bioanalytical report [MC13B-0151];

     o   Tissue preparation and analysis method [MN13067].

- Hepatocyte Metabolism data [PF13M-037].

- CMC Information:

  o CDG-PO348 Benznidazole Development Report;

  o Reference standard lot RS1511 initial and retest CoA;

  o Aesica Raw Material test methods:

    ▪ Q-P0016 – Acetone;

    ▪ Q-P0305 – Methanol;

    ▪ Q-P0714 – Ethanol;

    ▪ Q-P0897 Benzylamine;

    ▪ Q-P0898 – Potassium Carbonate;

    ▪ Q-P0904 – 2-Nitroimidazole;

    ▪ Q-P0905 – Ethylbromoacetate.

- Quality Agreement with Shasun Pharma Solutions Ltd. (draft).

- Bioavailability / Bioequivalence proposed study and draft study protocol.

**CONFIDENTIAL**

\\BA - 045347/000003 - 594503 v33

## SCHEDULE 2.6(a)

**ADDITIONAL ACQUIRED ASSETS**

None.

## <u>SCHEDULE 3.6</u>

**ALLOCATION SCHEDULE**

[To be attached within 90 days of Closing]

**SCHEDULE 8**

**COMPANY DISCLOSURE SCHEDULES**

The following are the disclosure schedules and exceptions (the "***Company Disclosure Schedule***") of Savant Neglected Diseases, LLC, a Delaware limited liability company (the "***Company***"), to the representations and warranties as set forth in <u>Article 8</u> of that certain Agreement for the Manufacture, Development and Commercialization of Benznidazole for Human Use dated as of June 30, 2016 (the "***Agreement***") by and between the Company and KaloBios Pharmaceuticals, Inc., a Delaware corporation ("***KaloBios***").  The section numbers in this Company Disclosure Schedule correspond to section numbers in the Agreement. Capitalized terms used and not otherwise defined herein shall have the meanings ascribed to them as set forth in the Agreement.  The heading and descriptions of representations and warranties are for convenience of reference only and are not intended to, and do not, alter the meaning of any provision of the Agreement.  Any information described herein under any section number, however, shall be deemed to have been disclosed and incorporated into all other relevant section numbers of this Company Disclosure Schedule if it is readily apparent on its face that such information is applicable to such other sections.  This Company Disclosure Schedule is confidential and shall not be disclosed to any persons or entities other than KaloBios.

The information in this Company Disclosure Schedule is being provided as required under the Agreement.  In disclosing this information, the Company expressly does not waive any attorney-client privilege associated with any such information or any protection afforded by the "work product doctrine" with respect to any of the matters disclosed or discussed herein.  All descriptions of agreements or other matters appearing herein are summary in nature and are qualified by reference to the complete documents, which have been made available to KaloBios. Nothing herein, including attachments, is intended to broaden the scope of the representations and warranties of the Company contained in the Agreement or to create any covenant on the part of the Company.  In no event shall any disclosure hereunder be deemed to (a) constitute an acknowledgement that the subject matter of such disclosure is material to the Company unless the representation, warranty or covenant to which such disclosure relates expressly requires the Company to disclose information that is material to the Company; or (b) to be an admission by the Company that such item is material to the business, assets or results of operations of the Company nor shall it be deemed an admission of any obligation or liability to any third-party.

Section 8.1     <u>Corporate Existence</u>.  No exceptions.

Section 8.2     <u>Authorization and Enforceability</u>.  No exceptions.

Section 8.3     <u>No Conflict</u>.  No exceptions.

Section 8.4     <u>Legal Proceedings</u>.  No exceptions.

Section 8.5     <u>Contracts and Commitments</u>.

    (f)     No exceptions.

CONFIDENTIAL

\\BA - 045347/000003 - 594503 v33

(g)     The Company has been notified in writing by IECS that it denies that the IECS Agreement was ever in effect based on its alleged failure to receive a countersigned copy of such agreement from the Company.  The Company has prior correspondence from IECS acknowledging the existence of such agreement.  IECS has referred the Company to the investigator, Dr. Sergio Sosa Estani for fulfillment of the obligations related to the agreement. The Company is reviewing its legal options under the agreement but has taken no further action at this time, choosing instead to work with Dr. Estani to obtain the subject matter of the agreement. Dr. Estani and KaloBios are in direct communications related to obtaining the underlying data as of June 17, 2016.  The Company believes the IECS Agreement to be valid and enforceable and by its terms, governed by the laws of the State of California. Any dispute must be submitted to arbitration according to the rules of the American Arbitration Association to be conducted in San Carlos, California. The IECS Agreement expressly authorizes injunctive relief in the event of breach.

(h)     No exceptions.

(i)     No exceptions other than Section 8.5(b) of the Disclosure Schedules.

(j)     No exceptions.

Section 8.6     No "Bad Actor"; No Debarment.  No exceptions.

Section 8.7     Title; Encumbrances; Sufficiency.  No exceptions.

(k)     No exceptions.

(l)     Other than the Company IP, there are no exceptions.

(m)     Other than payments to Galenyx in the total amount of Ten Thousand Dollars ($10,000), there are no outstanding obligations to pay any amounts or provide other material consideration to any other Person in connection with any Acquired Assets.  The Company acknowledges and agrees that it shall remain obligated to make any payments due to Galenyx, and such obligations shall constitute Excluded Liabilities.

Section 8.8     No Consents.  No exceptions unless KaloBios requires assignment of that certain agreement with Galenyx, which requires the consent of Galenyx.[2]

Section 8.9     Compliance with Laws.

(n)     No exceptions.

(o)     No exceptions.

(p)     No exceptions.

---

[2] Note to KB: Please see agreement listed on "Box" under Material Agreements.

(q)     No exceptions.

Section 8.10    <u>Safety and Efficacy; Exclusive Rights to Certain Existing Foreign Data</u>. The disclosures in <u>Section 8.5(g)</u> of the Disclosure Schedules are incorporated by reference into this <u>Section 8.10</u>.

Section 8.11    <u>Good Practices</u>.  No exceptions.

Section 8.12    <u>Regulatory Matters</u>.

(r)     No exceptions.

(s)     No exceptions.

(t)     No exceptions.

(u)     No exceptions.

Section 8.13    <u>Taxes</u>.

(v)     The Company has not filed either federal or state income tax returns for the fiscal years ended December 31, 2014 or 2015. Returns are pending financial audits and the Company has reserved funds for any late filing penalties and, based on its unaudited financials, does not expect any tax to be due for either fiscal year.  The Company acknowledges and agrees that the Company shall remain solely responsible for any taxes, late filing penalties and other costs and expenses incurred in connection with the foregoing.

(w)     No exceptions.

(x)     No exceptions.

(y)     No exceptions.

(z)     No exceptions.

(aa)    No exceptions.

(bb)    No exceptions.

Section 8.14    <u>No Undisclosed Liabilities</u>.  At the earliest opportunity following the production of benznidazole active pharmaceutical ingredient (that need not be of GLP or cGMP quality), 90 grams of material is to be provided to Rick Tarleton in fulfillment of an oral agreement wherein the Company received 100 100 milligram Radinal tablets in a sealed bottle, which material is included in the Acquired Assets.

Section 8.15    <u>Inventory</u>.  No exceptions.

Section 8.16    <u>Brokers</u>.  No broker, investment banker, agent, finder or other intermediary acting on behalf of any member of the Company or its Affiliates or under the

authority of the Company or any Affiliate is or will be entitled to any broker's or finder's fee or any other commission or similar fee directly or indirectly in connection with the Contemplated Transactions, the Company was introduced to KaloBios through its investor relations consultant, MaidStone Life Sciences which has received consulting fees and may receive additional consulting fees related to the Contemplated Transactions.  The Company acknowledges and agrees that the Company shall remain solely responsible for any amounts due and payable to MaidStone Life Sciences.

Section 8.17   <u>Compliance with the Foreign Corrupt Practices Act and Export Control and Anti-boycott Laws</u>.  Approximately Forty–Four Thousand Dollars ($44,000) has been paid to IECS under the Sponsored Research Agreement. All four payments of approximately Eleven Thousand Dollars ($11,000) each were made to the account listed in the invoice provided to the Company and the Company notes that one of those four payments was made to an account with the name of Dr. Ezequiel Garcia Ellorio, Director of Administration at IECS. To the Company's Knowledge, these payments comply with all applicable Laws, including the FCPA. To the extent any payments under the Sponsored Research Agreement are determined by a court of competent jurisdiction by final and nonappealable judgment to be in violation of the FCPA, the Company shall, as between the Company and KaloBios, retain sole and exclusive liability for such violation.

Section 8.18   <u>Intellectual Property</u>.   No exceptions.

(cc)   No exceptions.

(dd)   No exceptions.

(ee)   No exceptions.

(ff)   No exceptions.

(gg)   No exceptions.

(hh)   No exceptions.

## SCHEDULE 9

## KALOBIOS DISCLOSURE SCHEDULES

The following are the disclosure schedules and exceptions (the "**KaloBios Disclosure Schedules**") of KaloBios Pharmaceuticals, Inc., a Delaware corporation ("**KaloBios**"), to the representations and warranties as set forth in Article 9 of that certain Agreement for the Manufacture, Development and Commercialization of Benznidazole for Human Use dated as of June 30, 2016 (the "**Agreement**") by and between KaloBios and Savant Neglected Diseases, LLC, a Delaware limited liability company (the "**Company**").  The section numbers in these KaloBios Disclosure Schedules correspond to section numbers in the Agreement.  Capitalized terms used and not otherwise defined herein shall have the meanings ascribed to them as set forth in the Agreement.  The heading and descriptions of representations and warranties are for convenience of reference only and are not intended to, and do not, alter the meaning of any provision of the Agreement.  Any information described herein under any section number, however, shall be deemed to have been disclosed and incorporated into all other relevant section numbers of these KaloBios Disclosure Schedules if it is readily apparent on its face that such information is applicable to such other sections.  These KaloBios Disclosure Schedules are confidential and shall not be disclosed to any persons or entities other than the Company.

The information in these KaloBios Disclosure Schedules is being provided as required under the Agreement.  In disclosing this information, KaloBios expressly does not waive any attorney-client privilege associated with any such information or any protection afforded by the "work product doctrine" with respect to any of the matters disclosed or discussed herein.  All descriptions of agreements or other matters appearing herein are summary in nature and are qualified by reference to the complete documents, which have been made available to the Company.  Nothing herein, including attachments, is intended to broaden the scope of the representations and warranties of KaloBios contained in the Agreement or to create any covenant on the part of KaloBios.  In no event shall any disclosure hereunder be deemed to (a) constitute an acknowledgement that the subject matter of such disclosure is material to KaloBios unless the representation, warranty or covenant to which such disclosure relates expressly requires KaloBios to disclose information that is material to KaloBios; or (b) to be an admission by KaloBios that such item is material to the business, assets or results of operations of KaloBios nor shall it be deemed an admission of any obligation or liability to any third-party.

Section 9.1    Corporate Existence.  Pending the Effective Date (as defined therein) of the Plan, KaloBios, as a debtor-in-possession, is authorized under Section 363(c) of the Bankruptcy Code to enter into transactions in the ordinary course of its business and as otherwise as authorized by orders of the United States Bankruptcy Court.  Upon the occurrence of the Effective Date, KaloBios will have all necessary corporate power and authority to own, operate or lease the properties and assets now owned, operated or leased by it and to carry on its business as currently conducted.

Schedule 9.2    Authorization and Enforceability.    The disclosures in Section 9.1 of the Disclosure Schedules are incorporated by reference into this Section 9.2.  KaloBios is authorized to enter into and perform the Transaction Documents pursuant to the Plan, the Findings of Fact,

Conclusions of Law, and Order Confirming Second Amended Chapter 11 Plan of Reorganization of KaloBios Pharmaceuticals, Inc. dated June 16, 2016, entered in the pending Chapter 11 case entitled *In re KaloBios Pharmaceuticals, Inc.* (Case No. 15-12628 (LSS) in the Bankruptcy Court for the District of Delaware, and resolutions of its board of directors dated June 28, 2016.

Section 9.3    Capitalization.

(a)    No exceptions.

(b)    See KaloBios' Current Report on Form 8-K filed with the SEC on June 22, 2016, regarding KaloBios' capitalization and shares reserved for issuance, as well as KaloBios' prior filings with the SEC.  Armistice Capital Fund and MidCap Financial hold warrants exercisable for 125,000 and 6,193 shares, respectively, of the Common Stock, and KaloBios has granted employee stock options under its equity incentive plans.  The purchasers under that certain Securities Purchase Agreement by and between KaloBios and Black Horse Capital, LP, Black Horse Capital Master Fund Ltd., Cheval Holdings, Ltd., and Nomis Bay Ltd. are entitled to certain anti-dilution protection pursuant to such agreement.

(c)    No exceptions.

Section 9.4    No Conflict.   The disclosures in Section 9.1 of the Disclosure Schedules are incorporated by reference into this Section 9.4.

Section 9.5    Legal Proceedings.    The disclosures in Section 9.1 of the Disclosure Schedules are incorporated by reference into this Section 9.5.

Section 9.6    No "Bad Actor"; No Debarment.      No exceptions.

Section 9.7    Solvency.    Immediately after giving effect to the Contemplated Transactions KaloBios shall be solvent and shall have the financial capacity to perform all of its obligations under this Agreement and the other Transaction Documents to be performed on the Effective Date but, for the avoidance of doubt, future activities pursuant to the Contemplated Transactions (including those that may trigger the obligations for KaloBios to make certain Milestone Payments) will require additional capital.

Section 9.8    Unencumbered Cash Balance.         No exceptions.

Section 9.9    Data.   No exceptions.

Section 9.10    Private Offering.       The disclosures in Section 9.3(b) of the Disclosure Schedules are incorporated by reference into this Section 9.10.

Section 9.11.    Brokers.        No exceptions.

# **EXHIBIT B**

EX-10.35 3 ex10_35.htm EXHIBIT 10.35

**Exhibit 10.35**

**SECURITIES PURCHASE AND LOAN SATISFACTION AGREEMENT**

**BY AND AMONG**

**HUMANIGEN, INC.,**

**BLACK HORSE CAPITAL MASTER FUND LTD,**

**BLACK HORSE CAPITAL LP,**

**CHEVAL HOLDINGS, LTD,**

**and**

**NOMIS BAY LTD**

**DATED AS OF DECEMBER 21, 2017**

**SECURITIES PURCHASE AND LOAN SATISFACTION AGREEMENT**

This Securities Purchase and Loan Satisfaction Agreement (this "Agreement") is dated as of December 21, 2017 by and among Humanigen, Inc., a Delaware corporation (the "Company"), Black Horse Capital Master Fund Ltd ("BH Master Fund"), Black Horse Capital LP ("BH Capital"), Cheval Holdings, Ltd ("Cheval" and collectively with BH Master Fund and BH Capital, the "Black Horse Entities"), and Nomis Bay Ltd ("Nomis") Each of the Black Horse Entities and Nomis shall each individually be referred to herein as a "Purchaser" and collectively be referred to herein as the "Purchasers").

WHEREAS, the Company desires to raise additional capital for the continued operation and development of the Company;

WHEREAS, the Company, the Black Horse Entities, and Nomis are parties to that certain Credit and Security Agreement dated December 21, 2016 (the "Credit and Security Agreement"; each of the Black Horse Entities and Nomis in their capacities as lenders under the Credit and Security Agreement shall individually be referred to herein as a "Lender" and collectively be referred to herein as the "Lenders");

WHEREAS, the Company is in default under the Credit and Security Agreement due to, without limitation, the Company's failure to repay the obligations thereunder (the "Obligations") under in full at their maturity date of December 1, 2017 (the "Existing Default");

WHEREAS, the Existing Default has not been cured, waived or excused by the Lenders at any time or in any manner; and that there are no claims, demands, offsets or defenses at law or in equity that would defeat or diminish each Lender's present and unconditional right to collect any of the Obligations, and to proceed to enforce the rights and remedies available to Lenders under the Credit and Security Agreement or otherwise at law;

WHEREAS, concurrently with the execution of this Agreement, the Lenders and the Company have executed the Forbearance and Loan Modification Agreement (as defined herein);

WHEREAS, subject to the terms and conditions set forth in this Agreement, Forbearance and Loan Modification Agreement, the Benz Entity Operating Agreement and the other Transaction Documents, in lieu of the Lenders exercising their rights and remedies under the Credit and Security Agreement or otherwise at law, the Company desires at the Closing Date to issue to the Lenders, and the Lenders have agreed to accept, the New Lender Securities (as defined herein) in satisfaction of the Obligations, upon all of the terms and conditions set forth herein; and

WHEREAS, as of the Closing Date, Cheval desires to make a significant investment in the Company, and to implement such investment, Cheval desires to purchase from the Company, and the Company desires to issue and sell to Cheval, upon the terms and conditions set forth herein, the Securities (as defined herein), in each case upon all of the terms and conditions of this Agreement.

NOW, THEREFORE, IN CONSIDERATIO N of the mutual covenants contained in this Agreement, and for other good and valuable consideration the receipt and adequacy of which are hereby acknowledged, the Company and each Purchaser, intending to be legally bound, agree as follows:

**ARTICLE I.**
DEFINITIONS

1.1    Definitions. In addition to the terms defined elsewhere in this Agreement, for all purposes of this Agreement, the following terms have the meanings set forth in this Section 1.1:

2

"<u>Action</u>" means collectively, any action, suit, inquiry, notice of violation, proceeding or investigation pending against the Company or any of its properties or assets before or by any court, arbitrator, governmental or administrative agency or regulatory authority (federal, state, county, local or foreign).

"<u>Affiliate</u>" means any Person that, directly or indirectly through one or more intermediaries, controls or is controlled by or is under common control with a Person as such terms are used in and construed under Rule 405 under the Securities Act.

"<u>Adverse Claim</u>" means, with respect to any Claim or any interest therein or any Proceeds thereof, (i) any mortgage, deed of trust, lien, pledge, hypothecation, encumbrance, charge or security interest in, on or affecting such Claim or any interest therein or any Proceeds thereof, (ii) the interest of a vendor or a lessor under any conditional sale agreement, capital lease or title retention agreement (or any financing lease having substantially the same economic effect as any of the foregoing) relating to such Claim or any interest therein or any Proceeds thereof, (iii) any purchase option, call or similar right of a third party with respect to such Claim or any interest therein or any Proceeds thereof and (iv) any other claim that a claimant has a property interest in such Claim or any interest therein or any Proceeds thereof and that it is a violation of the rights of the claimant for another person to hold, transfer, or deal with such Claim or any interest therein or any Proceeds thereof.

"<u>Bankruptcy Case</u>" means the bankruptcy case of the Company, as debtor and debtor in possession, which was commenced by the Company's filing in the United States Bankruptcy Court for the District of Delaware of a voluntary petition for bankruptcy relief under chapter 11 of the Bankruptcy Code. The Bankruptcy Case is captioned as Case No. 15-12628 (LSS).

"<u>Bankruptcy Court</u>" means the United States Bankruptcy Court for the District of Delaware presiding over the Bankruptcy Case.

"<u>Benz Assets</u>" means all of the assets of the Company related to Benznidazole that will become Contributed Assets, as defined in the Benz Entity Operating Agreement, including without limitation, all of the Company's rights (but not the Company's liabilities or obligations) pursuant to the MDC Agreement, and all Claims related to or arising in connection with Benznidazole, including the Chemo Claims and Savant Litigation.

"<u>Benz Entity</u>" shall have the meaning set forth in Section 2.4(a).

"<u>Benz Entity Operating Agreement</u>" means the Limited Liability Company Operating Agreement of the Benz Entity, substantially in the form attached hereto as <u>Exhibit A</u>.

"<u>Bill of Sale, Assignment and Assumption Agreement</u>" means that certain Bill of Sale, Assignment and Assumption Agreement between the Company and the Benz Entity substantially in the form attached to the Benz Entity Operating Agreement.

"<u>Board of Directors</u>" means the board of directors of the Company.

"<u>Bridge Loan</u>" shall have the meaning set forth in Section 2.1.

"<u>Business Day</u>" means any day except any Saturday, any Sunday, any day which is a federal legal holiday in the United States or any day on which banking institutions in the State of New York are authorized or required by law or other governmental action to close.

"Cash Purchase Price" shall have the meaning set forth in Section 2.2(c)(ii).

"Charter Amendment" means the effective Proposed Charter Amendment.

"Chemo Claims" means all claims, causes of action, judgments and demands, arbitrations, regulatory proceedings, settlement negotiations or other dispute resolution mechanisms of whatever kind or description, in each case whether choate or inchoate, known or unknown, contingent or non-contingent, against any, each and/or all of Savant, Chemo Group, Chemo Research S.L., Exeltis USA, Inc., Mundo Sano, Drugs for Neglected Diseases Initiative, Instituto de Efectividad Clinica y Sanitaria, Dr. Sergio Sosa-Estani and their respective affiliates or collaborators (including, without limitation, Claims arising out of or related to potential misappropriation or misuse of the Company's trade secrets in connection with submissions to the FDA, the FDA issuance of market approval of the Compound or the FDA issuance of a Voucher).

"Claim Advances" means all amounts advanced to the Company or the Benz Entity for further payment, or paid directly, to counsel to the Company or the Benz Entity at Nomis' request, during the period prior to the Closing, in connection with investigating the Claims or in furtherance of settlement discussions with Savant (including any payments of the Company's outstanding and unpaid legal fees owed to Kaplan Rice LLP and Richards Layton & Finger, PA).

"Claim Defect" means, with respect to any Claim, (i) any right or interest of any Person in respect of such Claim or any part thereof, the effect of which is or would be to materially reduce, impair or otherwise materially or prejudicially affect such Claim or any part thereof; (ii) any claim or action of any Person whatsoever in respect of such Claim or any part thereof, the effect of which, if determined adversely, is or would be to materially reduce, impair or otherwise materially and prejudicially affect such Claim or any part thereof; or (iii) any right of set-off, counterclaim, cross-claim or impairment of any Person in respect of such Claim or any part thereof.

"Claims" means all claims, causes of action, judgments and demands, arbitrations, regulatory proceedings, settlement negotiations or other dispute resolution mechanisms of whatever kind or description of the Company against third parties that arise out of or relate to the Benz Assets (regardless of whether or not such claims, demands and causes of action have been asserted by the Company), in each case whether choate or inchoate, known or unknown, contingent or non-contingent, including without limitation, the Chemo Claims and Savant Litigation.

"Claims Reversion" shall have the meaning set forth in Section 2.4(g).

"Closing" means the closing of the purchase and sale of the Securities and related transactions pursuant to Section 2.2.

"Closing Date" shall have the meaning set forth in Section 2.2.

"Commission" means the United States Securities and Exchange Commission.

"Common Stock" means the common stock of the Company, par value $0.001 per share.

"Company" shall have the meaning set forth in the preamble of this Agreement.

"Contract" means any agreement, instrument, license, document, real or personal property lease, employee benefit or welfare plan or other business or commercial arrangement (in each case, including any extension, renewal, amendment or other modification thereof) to which the Company is a party or by which the Company is bound or to which the Company is subject or which pertains to the business or properties of the Company.

"Credit and Security Agreement" shall have the meeting set forth in the recitals of this Agreement.

"Drug Application" means any new drug application ("NDA"), abbreviated new drug application ("ANDA"), investigational new drug application ("IND"), and/or biologics license application ("BLA"), as well as any product license application for any Product, as appropriate, as those terms are defined by the FDA.

"Environmental Legal Requirements" means all Legal Requirements relating to pollution or protection of human health or the environment (including ambient air, surface water, groundwater, land surface or subsurface strata), including laws relating to Hazardous Materials into the environment, or otherwise relating to the manufacture, processing, distribution, use, treatment, storage, disposal, transport or handling of Hazardous Materials, as well as all authorizations, codes, decrees, demands, or demand letters, injunctions, judgments, licenses, notices or notice letters, orders, permits, plans or regulations, issued, entered, promulgated or approved thereunder.

"Exchange Act" means the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder.

"FCPA" means the Foreign Corrupt Practices Act of 1977, as amended.

"FDA" means the United States Food and Drug Administration.

"FDCA" means the United States Federal Food, Drug and Cosmetic Act, as amended, and the regulations thereunder.

"Final Order" means any order entered by the Bankruptcy Court, or any other court exercising jurisdiction over the subject matter and the parties, that has not been stayed, reversed, modified, or vacated, and as to which: (i) there has not been filed and is not pending any appeal or petition for writ of certiorari; (ii) there has not been filed and is not pending any motion for stay, rehearing, reargument, reconsideration, or other motion (collectively, a "Tolling Motion") that tolls the running of the time period within which a notice of appeal, petition for writ of certiorari, or a Tolling Motion must be filed; and (iii) the time within which a Tolling Motion, notice of appeal, or petition for writ of certiorari must be filed has expired without any Tolling Motion, notice of appeal, or petition for writ of certiorari having been filed.

"Forbearance and Loan Modification Agreement" means the Forbearance and Loan Modification Agreement attached hereto as Exhibit B, which has been executed by the Lenders and the Company concurrently with the execution of this Agreement.

"FTC" means the United States Federal Trade Commission.

"GAAP" means United States generally accepted accounting principles applied on a consistent basis during the periods involved.

"Governmental Approval" means any consent, authorization, approval, order, license, franchise, permit, certificate, accreditation, registration, filing or notice, of, issued by, from or to, or other act by or in respect of, any Governmental Entity.

5

"<u>Governmental Entity</u>" means any government, agency, governmental department, commission, board, bureau, court, arbitration panel or instrumentality of the United States of America or any state or other political subdivision thereof (whether now or hereafter constituted and/or existing), including, without limitation, the Bankruptcy Court, and any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government.

"<u>Hazardous Materials</u>" means any chemicals, pollutants, contaminants, or toxic or hazardous substances or wastes.

"<u>Healthcare Regulatory Legal Requirements</u>" means the Federal Food, Drug and Cosmetic Act (21 U.S.C. § 301 et seq.), the Federal Anti-kickback Statute (42 U.S.C. § 1320a-7b(b)), Physician Payment Sunshine Act (42 U.S.C. § 1320a-7h), the civil False Claims Act (31 U.S.C. §§ 3729 et seq.), the administrative False Claims Legal Requirement (42 U.S.C. § 1320a-7b(a)), the Anti-Inducement Legal Requirement (42 U.S.C. § 1320a-7a(a)(5)), the Health Insurance Portability and Accountability Act of 1996 (42 U.S.C. § 1320d et seq.), as amended by the Health Information Technology for Economic and Clinical Health Act of 2009, the exclusion laws, Social Security Act § 1128 (42 U.S.C. § 1320a-7), Medicare (Title XVIII of the Social Security Act), Medicaid (Title XIX of the Social Security Act), and the regulations promulgated pursuant to such laws, and comparable state laws, and all other local, state, federal, national, supranational and foreign laws, manual provisions, policies and administrative guidance relating to the regulation of the Company.

"<u>Indebtedness</u>" shall have the meaning ascribed to such term in Section 4.1(w).

"<u>Intellectual Property</u>" means, with respect to any Person, all United States and foreign patents, Patent Applications and like protections, including improvements, divisions, continuation, renewals, reissues, extensions and continuations in part of the same, trademarks, trade names, trade styles, trade dress, service marks, logos and other business identifiers and, to the extent permitted under applicable law, any applications therefore, whether registered or not, and the goodwill of the business of such Person connected with and symbolized thereby, copyright rights, copyright applications, copyright registrations and like protections in each work of authorship and derivative works, whether published or unpublished, technology, know-how and processes, operating manuals, trade secrets, clinical and non-clinical data, computer hardware and software, rights to unpatented inventions and all applications and licenses therefor, used in or necessary for the conduct of business by such Person and all claims for damages by way of any past, present or future infringement of any of the foregoing.

"<u>Intellectual Property Rights</u>" shall have the meaning ascribed to such term in Section 4.1(o).

"<u>Knowledge</u>" or "<u>Knowledge of the Company</u>" means the actual knowledge without investigation of (i) Dr. Cameron Durrant, in his capacity as a Director of the Company or as the Company's Chief Executive Officer, (ii) Morgan Lam, in his capacity as the Company's Chief Scientific Officer and otherwise as an employee of the Company, and (iii) Greg Jester in his capacity as the Company's Chief Financial Officer and otherwise as an employee of the Company.

"<u>Legal Requirements</u>" means all federal, state, foreign and local laws, statutes, codes, rules, regulations, ordinances, orders, Proceedings and the like of any Governmental Entity, including common law, including, without limitation, Environmental Legal Requirements, Drug Regulatory Legal Requirements and Healthcare Regulatory Legal Requirements.

"Liens" means a lien, charge, pledge, security interest, encumbrance, right of first refusal, preemptive right or other restriction.

"Loan Satisfaction" means the Termination and Release Agreement, substantially in the form attached hereto as Exhibit C.

"Market", "Marketed" or "Marketing" means to study, investigate, develop, manufacture, test, sell, or market any Product pursuant to a preclinical or clinical trial, Drug Application or other Governmental Approval issued by the FDA or any state Board of Pharmacy or Department of Health.

"Material Adverse Claim Effect" means, with respect to any event or circumstance and the Company, one or more of (i) the impairment of its ability to perform any of its obligations under this Agreement or the Benz Entity Operating Agreement, (ii) the impairment of the rights or remedies available under this Agreement or the Benz Entity Operating Agreement to the Benz Entity or Nomis and (iii) a material adverse effect on any Claim or the value or collectability thereof.

"Material Contract" means any contract required to be filed by the Company with the Commission under Item 601(b)(10) of Regulation S-K.

"MDC Agreement" means the Agreement for the Manufacture, Development and Commercialization of Benznidazole for Human Use entered into as of June 30, 2016, by and between Savant and the Company.

"New Black Horse Securities" shall have the meaning set forth in Section 2.2(b).

"New Lender Securities" shall have the meaning set forth in Section 2.2(a).

"Order" means any decision, injunction, judgment, order, decree, ruling, or verdict entered or issued by any Government Entity.

"Party" means each of the Black Horse Entities, Nomis, and the Company.

"Parties" mean collectively, the Black Horse Entities, Nomis, and the Company.

"Person" means an individual or corporation, partnership, trust, incorporated or unincorporated association, joint venture, limited liability company, joint stock company, government (or an agency or subdivision thereof) or other entity of any kind.

"Product(s)" mean any product Marketed by the Company or any of its Subsidiaries or its contractors on behalf of Company as of the date hereof or at any date thereafter, and includes the products listed on Schedule 4.1(aa).

"Proceeds" means, collectively: (i) any and all gross, pre-tax monetary awards, damages, recoveries, judgments or other property or value awarded to or recovered by or on behalf of (or reduced to a debt owed to) any Person, on account or as a result or by virtue (directly or indirectly) of a Claim, whether by negotiation, arbitration, mediation, diplomatic efforts, lawsuit, settlement, or otherwise, and includes all of such Person's legal and/or equitable rights, title and interest in and/or to any of the foregoing, whether in the nature of ownership, lien, security interest or otherwise; (ii) any consequential, rescissionary, punitive, exemplary or treble damages, pre-judgment interest (including damages comparable to pre-judgment interest), post-judgment interest, penalties, and attorneys' fees and other fees and costs awarded or recovered on account thereof; and (iii) any recoveries against attorneys, accountants, experts, directors, officers or other related parties in connection with any of the foregoing or the pursuit of the Claim. For the avoidance of doubt, "Proceeds" includes (without limitation) any and all of the foregoing in the form of cash, real estate, negotiable instruments, intellectual or intangible property, choses in action, contract rights, membership rights, subrogation rights, annuities, claims, refunds, and any other rights to payment of cash and/or transfer(s) of things of value or other property (including property substituted therefor), whether delivered or to be delivered in a lump sum or in installments, in relation to any claim or negotiation with any Person in relation to the Claim.

"<u>Proceeding</u>" means an action, claim, suit, investigation or proceeding (including, without limitation, an informal investigation or partial proceeding, such as a deposition), whether commenced or threatened.

"<u>Proposed Charter Amendment</u>" means the proposed amendments to the Company's certificate of incorporation to increase the number of authorized shares of common stock to two hundred and twenty five million (225,000,000) and to authorize the issuance of blank check preferred stock.

"<u>Purchase Price</u>" means an aggregate amount equal to the sum of the amount satisfied pursuant to the Loan Satisfaction plus the Cash Purchase Price.

"<u>Registration Rights Agreement</u>" means the Registration Rights Agreement, substantially in the form attached hereto as <u>Exhibit D</u>.

"<u>Registration Statement</u>" means a registration statement covering the resale of the Securities by the Purchasers.

"<u>Required Approvals</u>" shall have the meaning set forth in Section 4.1(e).

"<u>Required Permit(s)</u>" means a permit (a) issued or required under Legal Requirements applicable to the business of Company or any of its subsidiaries or contractors or necessary in the investigation, testing, manufacture, sale, or marketing of goods or services under Legal Requirements applicable to the business of Company or any of its subsidiaries or contractors or any Drug Application (including without limitation, at any point in time, all licenses, approvals and permits issued by FDA or any applicable Governmental Entity necessary for the investigation, testing, manufacture, sale, or marketing of any Product by Company as such activities are being undertaken by Company with respect to any Product at any time); or (b) issued by any Person from which Company or any of its contractors have received an accreditation.

"<u>Rule 144</u>" means Rule 144 promulgated by the Commission pursuant to the Securities Act, as such Rule may be amended or interpreted from time to time, or any similar rule or regulation hereafter adopted by the Commission having substantially the same purpose and effect as such Rule.

"<u>Rule 2004 Discovery Motion</u>" means a motion presented to the Bankruptcy Court pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure, requesting permission to take discovery related to the Claims.

"Rule 2004 Discovery Order" means a Final Order of the Bankruptcy Court granting or denying the Rule 2004 Discovery Motion.

"Savant" means Savant Neglected Diseases, LLC.

"Savant Litigation" means the pending litigation that has been brought in connection with the MDC Agreement and any additional Claims that the Company may assert against Savant.

"Schedules" means the Disclosure Schedules of the Company delivered concurrently herewith.

"SEC Reports" shall have the meaning ascribed to such term in Section 4.1(h).

"Securities" means, collectively, the New Lender Securities and the New Black Horse Securities.

"Securities Act" means the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

"Subsidiary" means any subsidiary of the Company as set forth on Schedule 4.1(a) and shall, where applicable, also include any direct or indirect subsidiary of the Company formed or acquired after the date hereof.

"Transaction Documents" means this Agreement, the Loan Satisfaction, the Forbearance and Loan Modification Agreement, the Registration Rights Agreement, the Benz Entity Operating Agreement, the Bill of Sale, Assignment and Assumption Agreement, and any other documents or agreements executed in connection with the issuance of Securities and assignment of property contemplated hereunder.

"Transfer Agent" means Computershare, Inc., the current transfer agent of the Company, with a mailing address of 250 Royall Street, Canton, MA 02021, and any successor transfer agent of the Company.

"Voucher" means a priority review voucher issued by the FDA or otherwise under the authority of the United States Department of Health and Human Services.

## ARTICLE II.
### TRANSACTIONS; CLOSING

2.1     Bridge Loan.  Upon the execution of this Agreement and before the Closing, the Company may, at its election, request a bridge loan from Cheval in the amount of one million, five hundred thousand dollars ($1,500,000) (the "Bridge Loan").  If the Company makes such a request, then the Bridge Loan shall be made pursuant to the terms and conditions of the Forbearance and Loan Modification Agreement.

2.2     Closing.  The Closing shall occur, upon the terms and subject to the conditions set forth herein, on the first business day after the satisfaction or waiver of the conditions set forth in Section 2.3 (such date, the "Closing Date").  On the Closing Date:

(a)     In satisfaction of the Original Term Loan, the Additional Term Loan and the Grid Loan (each as defined in the Forbearance and Loan Modification Agreement), (A) the Company agrees to issue, and the Lenders, severally and not jointly, agree to accept, an aggregate of 59,786,848 shares of Common Stock (collectively, the "New Lender Securities") and (B) the Company agrees to assign, subject to Section 4.4 of the Benz Entity Operating Agreement, the Contributed Assets (as defined in the Benz Entity Operating Agreement) directly to the Benz Entity, at the direction, and on behalf, of Nomis.  At the Closing, the Company shall deliver the New Lender Securities to each Lender in such amounts as set forth on Schedule 2.2(a).

9

(b)        The Company agrees to sell, and Cheval agrees to purchase, an additional 32,028,669 shares of Common Stock (collectively, the "New Black Horse Securities"). At the Closing, the Company shall deliver the New Black Horse Securities to Cheval in such amounts as set forth on Schedule 2.2(b).

(c)        The Purchasers agree to pay the Purchase Price to the Company as follows:

(i)        As consideration for the New Lender Securities issued to Nomis, Nomis shall provide the Company with the Loan Satisfaction.

(ii)        As consideration for the New Lender Securities issued to each of the Black Horse Entities, the Black Horse Entities shall provide the Company with the Loan Satisfaction.

(iii)        As consideration for the New Black Horse Securities, Cheval shall transfer to the Company an amount equal to three million US dollars ($3,000,000.00) *minus* the amount of principal balance of the Bridge Loan (such amount, the "Cash Purchase Price") via wire transfer of immediately available funds.

2.3    Closing Conditions.

(a)        The obligations of the Company hereunder in connection with the Closing are subject to the following conditions being met (or waived by the Company in writing):

(i)        the accuracy in all material respects on the Closing Date of the representations and warranties (or, in the case of any representation or warranty that is already qualified by materiality, the accuracy in all respects of such representation or warranty) of the Purchasers contained herein (unless herein required as of a specific date, in which case they shall be accurate in all material respects as of such date);

(ii)        all obligations, covenants and agreements of each Purchaser required to be performed at or prior to the Closing Date shall have been performed in all material respects;

(iii)        Cheval shall have paid the Cash Purchase Price, and the Lenders shall have delivered the Loan Satisfaction;

(iv)        the Proposed Charter Amendment shall have become effective; and

(v)        each of Nomis and the Black Horse Entities shall have delivered each of the Transaction Documents to which each is a party, and such other documents or instruments as the Company reasonably requests and as are reasonably necessary to effect the transactions contemplated by this Agreement.

10

(b)     The obligations of Nomis hereunder in connection with the Closing are subject to the following conditions being met (or waived by Nomis in writing):

(i)     the accuracy in all material respects on the Closing Date of the representations and warranties (or, in the case of any representation or warranty that is already qualified by materiality, the accuracy in all respects of such representation or warranty) of the Company contained in Sections 4.1(c), (d), (e), (f), (g), (h), (i), (j), and (k) and in Section 4.3 herein (unless herein required as of a specific date, in which case they shall be accurate in all material respects as of such date);

(ii)     there be no motion pending for, nor shall there have occurred (a) the appointment of a Chapter 11 Trustee for the Company; (b) the conversion of the Company's pending bankruptcy case to a Chapter 7 case; (c) filing of any additional or subsequent bankruptcy proceeding; or (d) the pursuit of an action under state law for the appointment of a receiver, assignee for the benefit of creditors, dissolution, or reorganization;

(iii)     a Forbearance Default (as defined in the Forbearance Agreement) shall not have occurred;

(iv)     The Rule 2004 Discovery Motion shall have been scheduled and heard by the Bankruptcy Court on or before March 15, 2018;

(v)     all obligations, covenants and agreements of the Company required to be performed at or prior to the Closing Date, including without limitation those set forth in Section 2.4, shall have been performed in all material respects;

(vi)     the Company shall have delivered the executed (a) the Bill of Sale and Assignment and Assumption Agreement, (b) the Benz Entity Operating Agreement, and (c) the Loan Satisfaction;

(vii)     the Proposed Charter Amendment shall have become effective, and the Company shall have delivered a certificate of an officer of the Company, given on behalf of the Company, certifying that attached to such certificate are true, correct and complete copies of the Company's (A) certificate of incorporation, including the Charter Amendment, certified by the Delaware Secretary of State, (B) bylaws or similar organizational documents, and (C) resolutions of the Board of Directors of the Company authorizing this Agreement and the other Transaction Documents and the consummation of the transactions contemplated herein and therein;

(viii)     the Company shall have delivered the New Lender Securities to Nomis in the amount set forth on Schedule 2.2(a);

(ix)     Dr. Cameron Durrant and Mr. Morgan Lam shall enter into consulting agreements with the Benz Entity in the forms previously agreed; and

(x)     the Company and each of the Black Horse Entities shall have delivered all other Transaction Documents to which each is a party and such other documents or instruments as Nomis reasonably requests and as are reasonably necessary to effect the transactions contemplated by this Agreement.

11

(c)      The obligations of the Black Horse Entities hereunder in connection with the Closing are subject to the following conditions being met (or waived by each of the Black Horse Entities in writing):

(i)      the accuracy in all material respects on the Closing Date of the representations and warranties (or, in the case of any representation or warranty that is already qualified by materiality, the accuracy in all respects of such representation or warranty) of the Company contained in Sections 4.1(c), (d), (e), (f), (g), (h), (i), (j), and (k) herein (unless herein required as of a specific date, in which case they shall be accurate in all material respects as of such date);

(ii)      there be no motion pending for, nor shall there have occurred (a) the appointment of a Chapter 11 Trustee for the Company; (b) the conversion of the Company's pending bankruptcy case to a Chapter 7 case; (c) filing of any additional or subsequent bankruptcy proceeding; or (d) the pursuit of an action under state law for the appointment of a receiver, assignee for the benefit of creditors, dissolution, or reorganization;

(iii)      a Forbearance Default (as defined in the Forbearance Agreement) shall not have occurred;

(iv)      The Rule 2004 Discovery Motion shall have been scheduled and heard by the Bankruptcy Court on or before March 15, 2018;

(v)      all obligations, covenants and agreements of the Company required to be performed at or prior to the Closing Date shall have been performed in all material respects;

(vi)      the Proposed Charter Amendment shall have become effective, and  the Company shall have delivered a certificate of an officer of the Company, given on behalf of the Company, certifying that attached to such certificate are true, correct and complete copies of the Company's (A) certificate of incorporation, including the Charter Amendment, certified by the Delaware Secretary of State, (B) bylaws or similar organizational documents, and (C) resolutions of the Board of Directors of the Company authorizing this Agreement and the other Transaction Documents and the consummation of the transactions contemplated herein and therein;

(vii)      the Company shall have delivered the New Lender Securities to the Black Horse Entities in the amounts set forth on Schedule 2.2(a) and the New Black Horse Securities to Cheval; and

(viii)      the Company and Nomis each shall have delivered all Transaction Documents to which each is a party, and such other documents or instruments as the Black Horse Entities reasonably request and as are reasonably necessary to effect the transactions contemplated by this Agreement.

2.4  <u>Assignment of Benznidazole Assets; Certain Covenants Related Thereto</u>.

(a)      At the Closing, the Company, at the direction and on behalf of Nomis, will transfer and assign the Benz Assets, subject to Section 4.4 of the Operating Agreement, to an entity to be formed and capitalized by Nomis (the "<u>Benz Entity</u>").

(b)      As soon as practicable following the execution of this Agreement, counsel to the Company shall file the Rule 2004 Discovery Motion. If the Rule 2004 Discovery Motion is granted, such counsel shall commence such discovery promptly thereafter. All such discovery and settlement negotiations shall be performed in accordance with a litigation budget to be agreed upon by Nomis, which shall have the rights to (a) monitor and provide input into such discovery; (b) approve, in its sole discretion, the scope and cost of all discovery that it agrees to fund; and (c) approve any settlement with Savant.

12

(c)     Nomis shall have (i) 90 days (subject to extension as provided below) from the date of entry of the Rule 2004 Discovery Order granting the Rule 2004 Discovery Motion or (ii) 180 days from the Closing Date if either  a Rule 2004 Discovery Order is entered denying the Rule 2004 Discovery Motion  or a Rule 2004 Discovery Order has not been entered on or before the Closing Date (in either case under clauses (i) or (ii) of this Section 2.4(c) , the "Nomis Review Period"),  to decide, in its sole discretion, to elect (or to cause the Benz Entity) to keep the Benz Assets, including the Claims (a "Positive Election").

(d)     If Nomis makes a Positive Election, Nomis will assume (or cause the Benz Entity to assume) and Nomis shall pay certain legal fees and expenses of the Company (in the amount set forth in the letter from Kaplan Rice LLP to the Company dated December 8, 2017) presently owed to Kaplan Rice LLP and Richards Layton & Finger, PA (" RLF") (such amounts, the "Outstanding Legal Fees"). The Nomis Review Period may be extended for up to an additional 90 days in the event (i) an objection is filed to the Rule 2004 discovery requests or, in the judgment of Nomis, in its sole discretion, any respondent otherwise fails to substantially respond to the Rule 2004 discovery requests, so that the Company or the Benz Entity may make motion to the Bankruptcy Court and obtain ruling and response to such discovery requests or (ii) either the Company or the Benz Entity needs to effectuate process in any foreign country to enforce the Rule 2004 discovery requests. For the avoidance of doubt, the second 90-day shall not be in addition to the 180-day period in the event that either  a Rule 2004 Discovery Order is entered denying the Rule 2004 Discovery Motion  or a Rule 2004 Discovery Order has not been entered on or before the Closing Date.

(e)     Regardless of whether Nomis makes a Positive Election, Nomis or the Benz Entity shall pay all Claim Advances from the time this Agreement is executed until the earlier of (a) the expiration of the Nomis Review Period or (b) the delivery by Nomis to the Company of a Positive Election or a declination to proceed with a Positive Election (including, if a Positive Election is made, any payments of the Outstanding Legal Fees required to induce Kaplan Rice and RLF to continue to represent the Company, Nomis or the Benz Entity in the discovery processes described above or to represent the Company in any settlement discussions with Savant). Until the Closing, such Claim Advances will be provided as secured loans, as provided in the Forbearance and Loan Modification Agreement. In addition, Nomis shall have the right, in its sole discretion and at its sole expense, to identify other counsel, reasonably satisfactory to the Company, to represent the Company, Nomis or the Benz Entity in the discovery processes or to represent the Company in any settlement discussions with Savant in the event that an arrangement, satisfactory to Nomis in its sole discretion, can't be reached with Kaplan Rice LLP or RLF to continue to act as counsel in such matters.

(f)     Promptly after the date hereof, Kaplan Rice LLP shall send a letter to the FDA, substantially in the form previously agreed to among the Parties. The Company shall cooperate fully in permitting counsel to the Company or the Benz Entity as described above, and Nomis and its attorneys and representatives, to make full investigation of the Claims, and upon request will afford Nomis full access, following advance notice of any such request, to counsel, consultants, employees and officers of the Company, as needed. Nomis understands that the Company may attempt to resolve certain claims against it before and/or during the Nomis Review Period, and/or any extension thereof.

13

(g)        If, at or prior to the end of the Nomis Review Period (as it may be extended), Nomis makes a Positive Election: (i) Nomis will assume and pay all the Outstanding Legal Fees; (ii) any amounts realized from the Claims or the other Benz Assets will be paid as set forth in the Benz Entity Operating Agreement; (iv) Nomis shall have full control, in its sole discretion, over the management of the Benz Entity, any development of or realization on the Benz Assets and the prosecution of the Claims, including without limitation any determination to (x) discontinue and/or settle at any time the prosecution of the Claims and (y) so long as there is no direct liability to the Company, to settle the Savant Litigation; and (v) the Company will cooperate with the Benz Entity in order for it to realize on the Benz Assets, including the successful prosecution of the Claims in a manner and on a schedule that does not interfere with the Company's primary business operations.  In furtherance and not in limitation of the foregoing clause (f):

- The Company shall join the Benz Entity as a co-plaintiff in bringing any claims if requested by the Benz Entity except the Company shall not be or become a party to any litigation in which any of the following is a defendant: the United States Food and Drug Administration, the World Health Organization and the Drugs for Neglected Diseases Initiative;

- The Company will consent to, and waive any conflict of interest in connection with, the representation by RLF and Kaplan Rice LLP of the Benz Entity as well as the Company;

- The Company will request of and authorize each of Cameron Durrant and Morgan Lam to enter into a Consulting Agreement in the form of Exhibit E; and

- If requested, the Company will use commercially reasonable efforts to take such steps as may be reasonably requested by the Benz Entity to make available the consulting services of Ted Shih, Steven Pal, Marcia Gaido, Facundo Garcia Bournissen and/or Matthew and Mary Lo (which steps may take the form of including the existing consulting and/or confidentiality agreements with such persons in the Benz Assets).

(h)        Upon completion of the Nomis Review Period, if Nomis in its sole discretion elects not to make a Positive Election, the Benz Entity will transfer and assign the Benz Assets, including the Claims, to the Company or its designee (a "Claims Reversion"). Following any Claims Reversion, the transferee will have the right to seek and find a third party to fund the Claims on whatever terms negotiated and accepted by the transferee; provided, however, that the Parties agree and acknowledge that, following any Claims Reversion, (A) the transferee shall have no obligation to seek any such litigation funding, and (B) the transferee shall be entitled, in its sole discretion to discontinue and/or settle at any time the prosecution of the Claims and to settle the Savant Litigation.  If, following a Claims Reversion, the transferee proposes to accept terms from a third party to fund the Claims, the transferee shall provide written notice to Nomis of the terms proposed to be accepted, and Nomis shall have a right for ten days to elect to fund the Claims on the same terms as the third party and, if Nomis so elects, Nomis will proceed with such funding of the Claims.  If Nomis does not elect to fund the claims on the same terms as the third party, Nomis will thereafter have no separate interest in the Claims, and any proceeds of the Claims that are not paid to the third party pursuant to any such agreement with a third party will be retained by the transferee to be paid, applied or used as the transferee shall determine, except that the transferee will reimburse Nomis solely from such proceeds from the Claims, and not from any other funds or assets of the transferee, for any documented expenses incurred by Nomis or the Benz Entity in connection with the Rule 2004 discovery or in furtherance of settlement discussions with Savant from which the transferee determines it has received benefit in the successful pursuit of the Claims and/or the settlement discussions with Savant.

14

(i)      In the event that, after the Closing Date, any provision of this Section 2.4 conflicts with a provision of the Benz Entity Operating Agreement that addresses the same subject matter, the provision of the Benz Entity Operating Agreement shall prevail.

2.5  Other Agreements.

(a)      Concurrently with the Closing, the Parties shall enter into the Registration Rights Agreement.

(b)      Concurrently with the execution of this Agreement, the Company shall deliver to the Purchasers documentation of the Company's Board of Directors' approval and recommendation of the Proposed Charter Amendment.

(c)      Concurrently with the execution of this Agreement, each of the Black Horse Entities and Nomis shall deliver to the Company a written consent approving the Proposed Charter Amendment (the "Stockholder Approval").

2.6  Failure to Close.  If, on March 31, 2018, or such later date as the parties hereto may agree in writing, any of the Closing Conditions set forth in Section 2.3 have not been satisfied or waived in writing, then this Agreement shall automatically terminate and be of no further force or effect.

## ARTICLE III.

## COVENANTS

3.1  Operation and Maintenance of the Business.  Prior to the Closing, unless the Company has received the prior consent or waiver of the Purchasers, and subject to the terms and conditions of the other Transaction Documents, the Company will:

(a)      conduct its business and operations only in the ordinary course of business;

(b)      use commercially reasonable efforts, consistent with sound business practice, to keep in full force and effect its corporate existence and all material rights, permits, franchises, Intellectual Property Rights, Material Contracts and contractual rights relating or pertaining to its business, the termination of which other than pursuant to its terms in the ordinary course of business would be materially adverse to the Company;

(c)      maintain its material assets as is reasonably necessary for the conduct of its businesses consistent with then-present needs;

(d)      maintain its books, accounts and records consistent with sound business practice, and not make or institute any material change in its methods of purchase, sale, management, accounting or operation;

(e)      maintain all of its material insurance policies in effect as of the date hereof or reasonable replacement policies therefor;

15

(f)      pay and discharge all material taxes due and owing by the Company before the same becomes delinquent and before penalties accrue thereon, unless and to the extent such taxes are being contested in good faith by appropriate procedures and adequate accruals or reserves (as determined in accordance with GAAP) have been established on the books and financial statements of the Company for such taxes;

(g)      as promptly as practicable, prepare, file with the Commission and, after clearing any comments of the Commission staff thereon, issue an information statement or information statement to all holders of stock of the Company to inform them of the approval of the Board and stockholder action to approve the Proposed Charter Amendment and related matters, and within one business day after the required period after the issuance of the information statement, cause the Proposed Charter Amendment to become effective.

3.2 <u>Information</u>

(a)      <u>Access</u>.  Subject to Section 3.2(b), upon reasonable prior notice and at reasonable times, in connection with this Agreement, the Company will provide to representatives of the Purchasers and each of their agents, employees and accounting, tax, legal and other advisors, except where such provision would cause the Company to violate existing Contracts or waive legal privilege:

(i)      access to the offices, assets, suppliers, employees and other Persons having business dealings with the Company; provided, however, that the Parties shall mutually agree upon the timing and manner of any communications between Purchasers and any such suppliers, employees and other Persons having business dealings with the Company;

(ii)      access to all books, records (except employee medical records or other records including personally identifiable information or information otherwise restricted from disclosure under applicable privacy laws or regulations), financial statements and agreements (including any agreements with related parties) of the Company and such other relevant information and materials relating to the financial condition, assets, liabilities and business of the Company as may be reasonably requested (including the ability to make copies and abstracts thereof);

(iii)      access to each report, schedule, registration statement and other document filed by the Company pursuant to the requirements of federal or state securities laws (including the ability to make copies and abstracts thereof);

(iv)      access to operating reports, financial reporting packages and other operational and/or financial information sent to management or the Board of Directors or to the banks with whom the Company maintains credit facilities or lines of credit (including the ability to make copies and abstracts thereof); and

(v)      the opportunity to discuss the affairs of the Company with the officers and employees of the Company; provided that no investigation pursuant to this Section 3.2(a) shall affect any representation, warranty, covenant or agreement made by the Company herein or the conditions to the obligations of the Purchasers to consummate the transactions contemplated in this Agreement.

(b)    <u>Confidentiality</u>. The Purchasers agree that, after the Closing, the Company shall have no obligation to provide any information, records or other access by the Company to a Purchaser pursuant to Section 3.2(a) except pursuant to the terms and conditions of a customary non-disclosure agreement to be entered into between the Company and such Purchaser (each, a "<u>Non-Disclosure Agreement</u>").

3.3 <u>Governmental Approvals and Filings</u>.

(a)    In furtherance of the Parties' obligations pursuant to this Agreement, each Party shall use commercially reasonable efforts to prepare and agrees to file, promptly following the execution of this Agreement, any materials and information required to be filed with or provided to any Governmental Entity with respect to the transactions contemplated by the Transaction Documents. Each of Nomis, the Black Horse Entities, and the Company shall use commercially reasonable efforts to promptly supply any additional information as may be required or requested by any Governmental Entity in connection with the transactions contemplated by the Transaction Documents. Each of Nomis, the Black Horse Entities, and the Company shall use commercially reasonable efforts to take such actions and shall file and use commercially reasonable efforts to have declared effective or approved all documents and notifications with any Governmental Entity as may be necessary and advisable or may be reasonably requested under applicable Legal Requirements for the consummation of the transactions contemplated by the Transaction Documents. Each Party shall, (a) promptly notify the other Party of any material communication between that Party and any Governmental Entity in respect of any filings or investigation relating to the transactions contemplated hereby, (b) subject to applicable Legal Requirements, discuss with and permit the other Party (and its counsel) to review in advance, and consider in good faith the other Party's reasonable comments in connection with any proposed communication to any Governmental Entity relating to any filing or investigation in connection with the transactions contemplated hereby, and (c) not participate or agree to participate in any substantive meeting, telephone call or discussion with any Governmental Entity in respect of any filings or investigation in connection with the transactions contemplated hereby unless it consults with the other Party in advance and, to the extent permitted by such Governmental Entity, gives the other Party the opportunity to attend and participate in such meeting, telephone call or discussion.

(b)    <u>Acknowledgment</u>. The Purchasers acknowledge and agree that the purchase of the Securities by the Purchasers as contemplated by the terms and conditions set forth in this Agreement, is not subject to the terms of the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, and the rules and regulations promulgated thereunder.

**ARTICLE IV.**
REPRESENTATIONS AND WARRANTIES

4.1    <u>Representations and Warranties of the Company to the Purchasers</u>. Except as set forth in the Schedules, which Schedules shall be deemed a part hereof and shall qualify any representation or warranty or otherwise made herein to the extent of the disclosure contained in the corresponding section of the Schedules or that it is readily apparent from the face of such Schedules that a disclosure on such Schedule is applicable to such representation or warranty, or as set forth in the SEC Reports, and subject, in each applicable case, to the Savant Impairments (as defined in the Benz Entity Operating Agreement), the Company hereby makes the following representations and warranties to each Purchaser:

(a)    <u>Subsidiaries</u>. All of the direct and indirect subsidiaries of the Company are set forth on <u>Schedule 4.1(a)</u>. The Company owns, directly or indirectly, all of the capital stock or other equity interests of each Subsidiary. None of the Subsidiaries of the Company own any Intellectual Property Rights related to the Products, hold any material Intellectual Property Rights of the Company or hold any other assets with a value in excess of $5,000, and the Subsidiaries are treated as inactive by the Company and not used in the ordinary course of business.

(b)     Organization and Qualification.  The Company is an entity duly incorporated or otherwise organized, validly existing and as of the Closing Date will be in good standing under the laws of the jurisdiction of its incorporation or organization, with the requisite power and authority to own and use its properties and assets and to carry on its business as currently conducted. The Company is not in violation or in default of any of the provisions of its certificate or articles of incorporation, bylaws or other organizational or charter documents. As of the Closing Date, the Company will be duly qualified to conduct business and in good standing as a foreign corporation or other entity in each jurisdiction in which the nature of the business conducted or property owned by it makes such qualification necessary.

(c)     Authorization; Enforcement. The Company has the requisite corporate power and authority to enter into and, subject to obtaining the Stockholder Approval and the effectiveness of the Proposed Charter Amendment, to consummate the transactions contemplated by this Agreement and each of the other Transaction Documents and otherwise to carry out its obligations hereunder and thereunder.  The execution and delivery of this Agreement and each of the other Transaction Documents by the Company and the consummation by it of the transactions contemplated hereby and thereby, have been duly authorized by all necessary action on the part of the Company and, except for obtaining the Stockholder Approval and effecting the Proposed Charter Amendment, no further action is required by the Company, the Board of Directors or the Company's stockholders in connection herewith or therewith other than in connection with the Required Approvals.  This Agreement and each other Transaction Document to which it is a party has been (or upon delivery will have been) duly executed by the Company and, when delivered in accordance with the terms hereof and thereof, will constitute the valid and binding obligation of the Company enforceable against the Company in accordance with its terms, except (i) as limited by any applicable bankruptcy, insolvency and other similar Legal Requirements affecting the enforcement of creditors' rights generally, (ii) as limited by laws relating to the availability of specific performance, injunctive relief or other equitable remedies, and (iii) insofar as indemnification and contribution provisions may be limited by applicable law.

(d)     No Conflicts.  Subject to obtaining the Stockholder Approval and the effectiveness of the Proposed Charter Amendment, the execution, delivery and performance by the Company of this Agreement and the other Transaction Documents to which it is a party, the issuance and sale of the Securities, the assignment of the Contributed Assets (subject to Section 4.4 of the Benz Entity Operating Agreement), and the consummation by it of the transactions contemplated hereby and thereby do not and will not (i) conflict with or violate any provision of the Company's or any Subsidiary's certificate or articles of incorporation, bylaws or other organizational or charter documents, or (ii) conflict with, or constitute a default (or an event that with notice or lapse of time or both would become a default) under, result in the creation of any Lien upon any of the properties or assets of the Company or any Subsidiary, or, except as set forth on Schedule 4.1(d), give to others any rights of termination, amendment, acceleration or cancellation (with or without notice, lapse of time or both) of, any agreement, credit facility, debt or other instrument (evidencing a Company or Subsidiary debt or otherwise) or other understanding to which the Company or any Subsidiary is a party or by which any property or asset of the Company or any Subsidiary is bound or affected, or (iii) subject to the Required Approvals, conflict with or result in a violation of any Legal Requirements of any Governmental Entity to which the Company or any Subsidiary is subject (including federal and state securities laws and regulations), or by which any property or asset of the Company is bound or affected.

18

(e)      Filings, Consents and Approvals.  The Company is not required to obtain any consent, waiver, authorization or order of, give any notice to, or make any filing or registration with, any Governmental Entity or other Person in connection with the execution, delivery and performance by the Company of the Transaction Documents, other than: (i) the filing of the Proposed Charter Amendment with the secretary of state of the State of Delaware as contemplated herein, (ii) the filing of the information statement with the Commission, including such notice as is required to be provided to non-consenting stockholders of the Company under Delaware law to inform them of the Stockholder Approval and the Proposed Charter Amendment; (iii) the filings required with the Commission related to the issuance of the Securities, execution of this Agreement and the other Transaction Documents and the Closing of the transactions contemplated herein and therein; (iv) such filings as are required to be made under applicable state securities laws; (v) such filings as are required to be made in accordance with the rules of the OTCQB Venture Market; and (vi) such consents, waivers, authorizations or notices as may be required to transfer and assign the Contributed Assets, subject to Section 4.4 of the Benz Entity Operating Agreement, to the Benz Entity (collectively, the "Required Approvals").

(f)      Issuance of the Securities.  Subject to the effectiveness of the Proposed Charter Amendment, the Securities issued pursuant to this Agreement will be duly authorized and, when issued and paid for in accordance with the applicable Transaction Documents, will be duly and validly issued, fully paid and nonassessable, free and clear of all Liens.

(g)      Capitalization.  The capitalization of the Company set forth in the SEC Reports is true, accurate and complete as of the date hereof. The Company has not issued any capital stock since its most recently filed periodic report under the Exchange Act, other than pursuant to the exercise of employee stock options under the Company's stock option plans outstanding as of the date of the most recently filed periodic report under the Exchange Act. No Person has any right of first refusal, preemptive right, right of participation, or any similar right to participate in the transactions contemplated by the Transaction Documents. The issuance and sale of the Securities will not obligate the Company to issue, or give rise to any Person's right to purchase, shares, or other securities to any Person (other than the Purchasers) and, except as set forth on Schedule 4.1(g), will not result in a right of any holder of Company securities to adjust the exercise, conversion, exchange or reset price under any of such securities. Except as set forth on Schedule 4.1(g), all of the outstanding shares of capital stock of the Company are duly authorized, validly issued, fully paid and nonassessable, have been issued in compliance with all Legal Requirements, and none of such outstanding shares was issued in violation of any preemptive rights or similar rights to subscribe for or purchase securities. Subject to the effectiveness of the Proposed Charter Amendment, no further approval or authorization of any stockholder, the Board of Directors, or any third party is required for the issuance and sale of the Securities. Except as set forth in the SEC Reports, there are no stockholders agreements, voting agreements or other similar agreements with respect to the Company's capital stock to which the Company is a party or between or among any of the Company's stockholders.

(h)      SEC Reports; Financial Statements.  Since January 1, 2017, the Company has timely filed all reports, schedules, forms, statements and other documents required to be filed by the Company under Section 13(a) or 15(d) of the Exchange Act (the foregoing materials, including the exhibits thereto and documents incorporated by reference therein, being collectively referred to herein as the "SEC Reports").

19

(i)      <u>Material Changes; Undisclosed Events, Liabilities or Developments</u>.  Since the date of the latest financial statements included within the SEC Reports, except as specifically disclosed in a subsequent SEC Report filed prior to the date hereof or in the Schedules, (a) the Company has not incurred any liabilities (contingent or otherwise) other than (1) trade payables and accrued expenses incurred in the ordinary course of business, or costs related to this Agreement, and (2) liabilities not required to be reflected in the Company's financial statements pursuant to GAAP or disclosed in filings made with the Commission or in the Schedules, (b) the Company has not altered its method of accounting, (c) the Company has not declared or made any dividend or distribution of cash or other property to its stockholders or purchased, redeemed or made any agreements to purchase or redeem any shares of its capital stock and (d) the Company has not issued any equity securities to any officer, director or Affiliate, except pursuant to existing Company stock option plans.  The Company does not have pending before the Commission any request for confidential treatment of information.  Except for the issuance of the Securities contemplated by this Agreement and the consummation of the other transactions contemplated hereby and by the other Transaction Documents and events disclosed in the Schedules and SEC Reports, other than immaterial matters, no event, liability, fact, circumstance, occurrence or development has occurred or exists or is reasonably expected to occur or exist with respect to the Company or its business, prospects, properties, operations, assets or financial condition that would be required to be disclosed by the Company under applicable securities laws as of the date of this Agreement.

(j)      <u>Litigation</u>.  Except for Actions disclosed in the Schedules or the SEC Reports, and except for the Bankruptcy Case, there is no Action or Proceeding, which adversely affects or challenges the legality, validity or enforceability of any of the Transaction Documents or the Securities.  Except as set forth on <u>Schedule 4.1(j)</u>, neither the Company, nor any Subsidiary, nor, any current director or officer thereof, is or has been the subject of any Action, or, any Proceeding, involving a claim of violation of or liability under federal or state securities laws or a claim of breach of fiduciary duty.  There has not been, and there is not pending or contemplated, any investigation by the Commission involving the Company or any current director or officer of the Company.  Except as set forth on <u>Schedule 4.1(j)</u>, the Commission has not issued any stop order or other order suspending the effectiveness of any registration statement filed by the Company or any Subsidiary under the Exchange Act or the Securities Act.

(k)      <u>Creditors' Claims</u>.  Except as set forth on <u>Schedule 4.1(k)(i)</u>, there are no unsecured creditors, other than claims of vendors in the ordinary course of business, whose claims against the Company have not been satisfied.  <u>Schedule 4.1(k)(ii)</u> lists creditors of the Company who have executed releases in exchange for a payment in satisfaction of their claim against the Company.

(l)      <u>Labor Relations</u>.  No material labor dispute exists or, to the Knowledge of the Company, is imminent with respect to any of the employees of the Company.  None of the Company's employees is a member of a union that relates to such employee's relationship with the Company, and the Company is not a party to a collective bargaining agreement, and the Company believes that its relationships with its employees are in good standing.  To the Knowledge of the Company, no executive officer of the Company or any Subsidiary is, or is now expected to be, in violation of any material term of any Material Contract, employment contract, confidentiality, disclosure or proprietary information agreement or non-competition agreement, or any other Contract or any restrictive covenant in favor of any third party, and the continued employment of each such executive officer does not subject the Company or any of its Subsidiaries to any liability with respect to any of the foregoing matters.  The Company is in compliance with all applicable Legal Requirements relating to employment and employment practices, terms and conditions of employment and wages and hours.

20

(m)        Compliance.  Except as set forth on Schedule 4.1(m) or in the Schedules, and except for any breaches, defaults, violations, or rights of termination, neither the Company nor any Subsidiary: (a) is in default under or in violation of (and no event has occurred that has not been waived that, with notice or lapse of time or both, would result in a default by the Company or any Subsidiary under), nor has the Company or any Subsidiary received notice of a claim that, as of the date hereof, it is in default under or that it is in violation of, any Contract to which it is a party or by which it or any of its properties is bound (whether or not such default or violation has been waived), (b) is in violation of any judgment, decree or Order of any Governmental Entity, or (c) is in violation of any Legal Requirements,  including without limitation all foreign, federal, state and local laws relating to taxes, environmental protection, occupational health and safety, product quality and safety and employment and labor matters.

(n)        Title to Assets.  Except as set forth on Schedule 4.1(n), the Company and its Subsidiaries have good and valid title in all material personal property owned by them, free and clear of all Liens, except for (a) Liens as do not materially affect the value of such property and do not materially interfere with the use made and proposed to be made of such property by the Company and the Subsidiaries, and (b) Liens for the payment of federal, state or other taxes, for which appropriate reserves have been made in accordance with GAAP and, the payment of which is neither delinquent nor subject to penalties.  Any real property and facilities held under lease by the Company and the Subsidiaries are held by them under valid, subsisting and enforceable leases with which the Company and the Subsidiaries are in compliance in all material respects. The Company does not currently own any real property.

(o)        Intellectual Property.

(i)        Except as set forth on Schedule 4.1(o), Company is sole owner of all Intellectual Property Rights (defined herein) and has had executed all of the appropriate paperwork to establish ownership in Company, or Company has rights to use, all Intellectual Property, and other intellectual property rights and similar rights necessary or required for use in connection with its business as described in the SEC Reports (collectively, the "Intellectual Property Rights").  All Intellectual Property existing as of the Closing Date, as applicable, which is issued, registered or pending with any United States or foreign Governmental Entity (including, without limitation, any and all applications for the registration of any Intellectual Property with any such United States or foreign Governmental Entity) and all licenses under which Company is the licensee of any such registered Intellectual Property (or any such application for the registration of Intellectual Property) owned by another Person are set forth in Schedule 4.1(o).  Such Schedule 4.1(o) indicates in each case whether such registered Intellectual Property (or application therefore) is owned or licensed by Company, and in the case of any such licensed registered Intellectual Property (or application therefore), lists the name and address of the licensor and the name and date of the agreement pursuant to which such item of Intellectual Property is licensed pursuant to which such item of Intellectual Property is licensed and whether or not such license is an exclusive license and indicates whether there are any purported restrictions in such license on the ability of Company to grant a security interest in and/or to transfer any of its rights as a licensee under such license.  Except as indicated on Schedule 4.1(o), Company is the sole and exclusive owner of the entire and unencumbered right, title and interest in and to each such registered Intellectual Property (or application therefore) purported to be owned by Company, free and clear of any Liens and/or licenses in favor of third parties or agreements or covenants not such sue third parties for infringement.  Company is not party to, nor bound by, any material license or other agreement with respect to which Company is the licensee that prohibits or otherwise restricts Company from granting a security interest in Company's interest in such license or agreement or other property.

21

(ii)       Except as set on <u>Schedule 4.1(o)</u>, Company has not received a notice (written or otherwise) that any of, the Intellectual Property Rights has expired, terminated or been abandoned, or is expected to expire or terminate or be abandoned, within five (5) years from the date of this Agreement.  Except as set forth on <u>Schedule 4.1(o)</u>, Company has not received, since the date of the latest financial statements included within the SEC Reports, a written notice of a claim or otherwise has any Knowledge that the Intellectual Property Rights violate or infringe upon the rights of any Person.  Except as set forth on <u>Schedule 4.1(o)</u>, all such Intellectual Property Rights are enforceable and there is no existing infringement by another Person of any of the Intellectual Property Rights.  Except as set forth on <u>Schedule 4.1(o)</u>, Company's patents are being maintained, and the required United States and foreign maintenance fees or annuities (if any) are being paid. Company has taken reasonable security measures to protect the secrecy, confidentiality and value of all of its Intellectual Property Rights.  Except as set forth o n <u>Schedule 4.1(o)</u>, Company has entered into binding, written agreements with every current and former employee of Company, and with every current and former independent contractor, whereby such employees and independent contractors (i) assign to Company any ownership interest and right they may have in the Intellectual Property Rights; and (ii) acknowledge Company's exclusive ownership of the Intellectual Property Rights.  Except as set forth on <u>Schedule 4.1(o)</u>, no third party possesses rights to Intellectual Property Rights that, if exercised, could enable such party to develop products competitive to the Products.

(iii)      Except as set forth on <u>Schedule 4.1(o)</u>, Company has duly and properly filed or caused to be filed with the U.S. Patent and Trademark Office (the "PTO") and applicable foreign and international patent authorities all material patent applications as listed on <u>Schedule 4.1(o)</u> and owned by Company (the "Patent Applications").  Except as set forth on <u>Schedule 4.1(o)</u>, Company has not been notified of any inventorship or ownership challenges nor has any interference been declared or provoked which has not been finally resolved.  Except as set forth on <u>Schedule 4.1(o)</u>, no opposition filings or invalidation filings have been submitted which have not been finally resolved in connection with any of Company's patents and Patent Applications in any jurisdiction where Company has applied for, or received, a patent.

(p)      <u>Insurance</u>.  The Company is insured by insurers of recognized financial responsibility against such losses and risks and in such amounts as are prudent and customary in the business in which the Company is engaged, including, but not limited to, directors and officers insurance coverage.

(q)      <u>Transactions with Affiliates and Employees</u>.  Except as set forth in the SEC Reports, or as set forth in <u>Schedule 4.1(q)</u>, none of the current officers or directors of the Company and, none of the employees of the Company is presently a party to any transaction with the Company (other than for services as employees, officers and directors), including any Contract or other arrangement providing for the furnishing of services to or by, providing for rental of real or personal property to or from, providing for the borrowing of money from or lending of money entity in which any officer, director, or any such employee has a substantial interest or is an officer, director, trustee, stockholder, member or partner.

(r)      <u>Certain Fees</u>.  Except as set forth in <u>Schedule 4.1(r)</u>, no brokerage or finder's fees or commissions are or will be payable by the Company or any Subsidiary to any broker, financial advisor or consultant, finder, placement agent, investment banker, bank or other Person with respect to the transactions contemplated by the Transaction Documents.  The Purchasers shall have no obligation with respect to any fees or with respect to any claims made by or on behalf of other Persons for fees of a type contemplated in this Section that may be due in connection with the transactions contemplated by the Transaction Documents.

(s)  <u>Investment Company</u>. The Company is not, and immediately after receipt of payment for the Securities, will not be, an "investment company" within the meaning of the Investment Company Act of 1940, as amended.

(t)  <u>Registration Rights</u>. Other than each of the Purchasers, except as set forth on <u>Schedule 4.1(t)</u>, no Person has any right to cause the Company to effect the registration under the Securities Act of any Securities of the Company.

(u)  <u>Listing and Maintenance Requirements</u>. The Company's capital stock is registered pursuant to Section 12(b) or 12(g) of the Exchange Act, and the Company has taken no action designed to terminate, or is likely to have the effect of, terminating the registration of the capital stock under the Exchange Act nor has the Company received any notification that the Commission is contemplating terminating such registration. Except as set forth on <u>Schedule 4.1(u)</u>, the Company has not, in the 12 months preceding the date hereof, received notice from any trading market on which the capital stock is or has been listed or quoted to the effect that the Company is not in compliance with the listing or maintenance requirements of such trading market, if any.

(v)  <u>No Anti-Takeover Plan</u>.  There are no registration or anti-dilution rights, and there is no control share acquisition, voting trust, proxy, rights plan, plan, scheme, device, or arrangement, commonly known as a "poison pill" or "anti-takeover plan", or other agreement, arrangement or understanding to which the Company or any Subsidiary is a party or by which they are bound with respect to any capital stock of the Company or any Subsidiary. No state takeover statute or similar statute or regulation applies or purports to apply to this Agreement or any of the transactions contemplated by this Agreement. Stockholders of the Company or any Subsidiary will not be entitled to dissenters' rights under applicable state law in connection with the transactions contemplated hereunder.

(w)  <u>Indebtedness</u>.  Except for (a) Indebtedness (as defined herein) incurred by the Company (1) under the Credit and Security Agreement or (2) in the ordinary course of business and not considered past due or delinquent under the trade terms applicable to such Indebtedness and (b) amounts owed to vendors of the Company as set forth on <u>Schedule 4.1(w)</u>, all outstanding secured and unsecured Indebtedness of the Company or any Subsidiary, or for which the Company or any Subsidiary has commitments is current and in good standing.  For the purposes of this Agreement, "<u>Indebtedness</u>" means (i) any liabilities for borrowed money or amounts owed, (ii) all guaranties, endorsements and other contingent obligations in respect of indebtedness of others, whether or not the same are or should be reflected in the Company's balance sheets (or the notes thereto), and (iii) the present value of any lease payments under leases required to be capitalized in accordance with GAAP.

(x)  <u>Tax Status</u>.  The Company and its Subsidiaries each (i) has made or filed all United States federal and state income and all foreign income and franchise tax returns, reports and declarations required by any jurisdiction to which it is subject, (ii) has paid all taxes and other governmental assessments and charges that are material in amount, shown or determined to be due on such returns, reports and declarations and (iii) has set aside on its books provision reasonably adequate for the payment of all material taxes for periods subsequent to the periods to which such returns, reports or declarations apply.  There are no unpaid taxes in any material amount claimed to be due by the taxing authority of any jurisdiction, and the officers of the Company know of no basis for any such claim.

(y)      Foreign Corrupt Practices.  Neither the Company nor any Subsidiary, nor to the Knowledge of the Company, any agent or other person acting on behalf of the Company or any Subsidiary, has (i) directly or indirectly, used any funds for unlawful contributions, gifts, bribe, rebate, payoff, commissions, promotional allowances, entertainment, influence payments, kickback or other unlawful expenses or other payment or economic benefit to any Person, private or public, in the United States, its territories, or any foreign jurisdiction, regardless of what form, whether in money, property, or service, (ii) made any unlawful payment to foreign or domestic government officials or employees or to any foreign or domestic political parties or campaigns from corporate funds, (iii) failed to disclose fully any contribution made by the Company or any Subsidiary (or made by any person acting on its behalf of which the Company is aware) which is in violation of law, (iv) violated in any material respect any provision of FCPA; (v) established or maintained any fund or asset that has not been recorded in the books and records of Company; or (vi) aided, abetted, caused (directly or indirectly), participated in, or otherwise conspired with, any Person to violate the terms of any judgment, sentence, order or decree of any court or Governmental Entity.

(z)      Regulation M Compliance.  The Company has not, and no one acting on its behalf has, (i) taken, directly or indirectly, any action designed to cause or to result in the stabilization or manipulation of the price of any security of the Company to facilitate the sale or resale of any of the Securities, (ii) sold, bid for, purchased, or paid any compensation for soliciting purchases of, any of the Securities, or (iii) paid or agreed to pay to any Person any compensation for soliciting another to purchase any other securities of the Company, other than, in the case of clauses (ii) and (iii), compensation paid to the Company's placement agent, if any, in connection with the placement of the Securities.

(aa)      Regulatory Compliance. Schedule 4.1(aa) lists all Products other than any Products associated with the Benz Assets. With respect to all Products, the Company has only engaged in Marketing activities pursuant to and within the scope of all required Governmental Approvals, and in compliance with the FDCA and applicable state laws. The clinical trials conducted by and on behalf of Company as part of its Marketing activities with respect to the Products have been and continue to be conducted in accordance with any and all approved protocols, and no Governmental Entity or institutional review board has issued notice to Company demanding the termination, suspension, material modification, or clinical hold of any such Marketing activities.  There are no pending or threatened criminal, civil, or administrative investigations or actions pertaining to the Company's Marketing activities, and Company is not a party to any consent decree with any Governmental Entity.  The Company has not received nor is it aware of any warning letters, pending or unremediated FDA inspection violations, quarantine, or other notice of wrongdoing or prohibition on future Marketing activities supplied by the FDA or any state board of pharmacy or department of health. The handling of all biological and pharmaceutical materials, have been and are being conducted in all material respects in accordance with the FDCA and applicable state laws.  The Company is not directly, nor indirectly by any through its officers, directors, employees, agents or contractors, debarred, suspended, or excluded from participation in the Medicare or Medicaid programs, or any other state or federal health care program.

(bb)      Regulatory Developments. All material Required Permits related to the Marketing of the Products are listed on Schedule 4.1(bb).

(cc)      Office of Foreign Assets Control.  Neither the Company nor any Subsidiary, nor any current director, officer, agent, employee nor any affiliate of the Company or any Subsidiary is currently subject to any U.S. sanctions administered by the Office of Foreign Assets Control of the U.S. Treasury Department ("OFAC").

(dd)     <u>U.S. Real Property Holding Corporation</u>.  The Company is not and has never been a U.S. real property holding corporation within the meaning of Section 897 of the Internal Revenue Code of 1986, as amended, and the Company shall so certify upon Purchaser's request.

(ee)     <u>Bank Holding Company Act</u>. Neither the Company nor any of its Subsidiaries, nor any of its Affiliates, is subject to the Bank Holding Company Act of 1956, as amended (the "<u>BHCA</u>") and to regulation by the Board of Governors of the Federal Reserve System (the "<u>Federal Reserve</u>").  Neither the Company nor any of its Subsidiaries, nor any of its Affiliates owns or controls, directly or indirectly, five percent (5%) or more of the outstanding shares of any class of voting securities or twenty-five percent or more of the total equity of a bank or any entity that is subject to the BHCA and to regulation by the Federal Reserve.  Neither the Company nor any of its Subsidiaries, nor any of its Affiliates exercises a controlling influence over the management or policies of a bank or any entity that is subject to the BHCA and to regulation by the Federal Reserve.

(ff)     <u>Money Laundering</u>.  The operations of the Company and its Subsidiaries are and have been conducted at all times in compliance with applicable financial record-keeping and reporting requirements of the Currency and Foreign Transactions Reporting Act of 1970, as amended, applicable money laundering statutes and applicable rules and regulations thereunder (collectively, the "<u>Money Laundering Laws</u>"), and no Action or Proceeding by or before any court or governmental agency, authority or body or any arbitrator involving the Company with respect to the Money Laundering Laws is pending or, threatened.

(gg)     <u>Environmental Legal Requirements</u>.  The Company (i) is in compliance with all Environmental Legal Requirements; (ii) has received all permits licenses or other approvals required of it under applicable Environmental Legal Requirements to conduct its business; and (iii) is in compliance with all terms and conditions of any such permit, license or approval.

4.2  <u>Representations and Warranties of the Purchasers</u>.  Each Purchaser, for itself and for no other Purchaser, hereby represents and warrants as of the date hereof and as of the Closing Date to the Company as follows (unless as of a specific date therein):

(a)     Each Purchaser is either an individual or an entity duly incorporated or formed, validly existing and in good standing under the laws of the jurisdiction of its incorporation or formation with full right, corporate, partnership, limited liability company or similar power and authority to enter into and to consummate the transactions contemplated by this Agreement and otherwise to carry out its obligations hereunder. The execution and delivery of this Agreement and performance by such Purchaser of the transactions contemplated by this Agreement have been duly authorized by all necessary corporate, partnership, limited liability company or similar action, as applicable, on the part of such Purchaser. Each Transaction Document to which it is a party has been duly executed by such Purchaser, and when delivered by such Purchaser in accordance with the terms hereof, will constitute the valid and legally binding obligation of such Purchaser, enforceable against it in accordance with its terms, except: (i) as limited by general equitable principles and applicable bankruptcy, insolvency, reorganization, moratorium and other laws of general application affecting enforcement of creditors' rights generally, (ii) as limited by laws relating to the availability of specific performance, injunctive relief or other equitable remedies and (iii) insofar as indemnification and contribution provisions may be limited by applicable law.

25

(b)  Own Account. Each Purchaser understands that the Securities are "restricted securities" and have not been registered under the Securities Act or any applicable state securities law and is acquiring the Securities as principal for its own account and not with a view to or for distributing or reselling such Securities or any part thereof in violation of the Securities Act or any applicable state securities law, has no present intention of distributing any of such Securities in violation of the Securities Act or any applicable state securities law and has no direct or indirect arrangement or understandings with any other persons to distribute or regarding the distribution of such Securities in violation of the Securities Act or any applicable state securities law (this representation and warranty not limiting such Purchaser's right to sell the Securities pursuant to the Registration Statement or otherwise in compliance with applicable federal and state securities laws).

(c)  Purchaser Status. At the time each Purchaser was offered the Securities, it was, and as of the date hereof it is, an "accredited investor" as defined in Rule 501(a)(1), (a)(2), (a)(3), (a)(7) or (a)(8) under the Securities Act.

(d)  Experience of Each Purchaser. Each Purchaser, either alone or together with its representatives, has such knowledge, sophistication and experience in business and financial matters so as to be capable of evaluating the merits and risks of the prospective investment in the Securities, and has so evaluated the merits and risks of such investment. Each Purchaser is able to bear the economic risk of an investment in the Securities and, at the present time, is able to afford a complete loss of such investment.

(e)  Compliance. No part of the funds being used by Cheval to acquire the Securities has been, or shall be, directly or indirectly derived from, or related to, any activity that may contravene United States federal or state or non-United States laws or regulations, including, without limitation, the Currency and Foreign Transactions Reporting Act of 1970, as amended, applicable money laundering statutes and applicable rules and regulations thereunder.

The Company acknowledges and agrees that the representations contained in this Section 4.2 shall not modify, amend or affect such Purchaser's right to rely on the Company's representations and warranties contained in this Agreement or any representations and warranties contained in any other Transaction Document or any other document or instrument executed and/or delivered in connection with this Agreement or the consummation of the transaction contemplated hereby, provided, however, that the Company is relying on the representations contained in this Section 4.2 for purposes of making its representations that the issuance of the Securities will comply with all applicable Legal Requirements.

4.3  Representations and Warranties of the Company to Nomis. Except as set forth in the Schedules, which Schedules shall be deemed a part hereof and shall qualify any representation or warranty or otherwise made herein to the extent of the disclosure contained in the corresponding section of the Schedules or that it is readily apparent from the face of such Schedules that a disclosure on such Schedule is applicable to such representation or warranty, or as set forth in the SEC Reports, and subject, in each applicable case, to the Savant Impairments (as defined in the Benz Entity Operating Agreement), the Company hereby makes the following representations and warranties to Nomis:

(a)  The Company is the sole legal and beneficial owner of, and has good title to, each Claim free and clear of any Adverse Claim.

(b)  The Company has not disposed of, transferred, encumbered or assigned all or any portion of any Claim (or any interest therein) or any Proceeds thereof, whether by way of security or otherwise.

(c)  The Company has not taken any steps or executed any documents which could reasonably be expected, either individually or in the aggregate, to have a Material Adverse Claim Effect. To the Knowledge of the Company there is no asserted or unasserted claim, lien or judgment against it, which could reasonably be expected, either individually or in the aggregate, to have a Material Adverse Claim Effect.

26

(d)      The Company has not set off or agreed to set off any amounts against any Claim, and there exist no rights of set-off or similar rights against the Company that could permit any set-off of or counterclaim against any Claim.

(e)      To the Knowledge of the Company, no Claim or any portion thereof is subject to any Claim Defect or is otherwise invalid or void.

(f)      The Company has disclosed or made available to Nomis, Kaplan Rice LLP or RLF, as applicable, all documentation and other information in its possession or control relevant to each Claim, and all such documentation and information so provided or made available has been provided or made available in its true, complete and correct form.

(g)      The Company has full power and authority to transfer and assign, subject to Section 4.4 of the Benz Entity Operating Agreement, the Contributed Assets to the Benz Entity at the direction, and on behalf of, Nomis, and has obtained all necessary corporate and other authorizations to do so, it being agreed and acknowledged by Nomis that, to the extent applicable or relevant to any such transfer or assignment, the Benz Entity will be an Affiliate of the Company for purposes of making any such assignment.

**ARTICLE V.**
OTHER AGREEMENTS OF THE PARTIES

5.1 <u>Furnishing of Information</u>.  Until the time that no Purchaser owns Securities originally acquired by such Purchaser pursuant to this Agreement, the Company covenants to use reasonable efforts to timely file (or obtain extensions in respect thereof and file within the applicable grace period) all reports required to be filed by the Company after the date hereof pursuant to the Exchange Act even if the Company is not then subject to the reporting requirements of the Exchange Act.

5.2 <u>Securities Laws Disclosure; Publicity</u>.  The Company shall (a) issue a press release disclosing the material terms of the transactions contemplated hereby and (b) file a Current Report on Form 8-K with the Commission within the time and with the disclosures required by the Exchange Act.  The Company and each Purchaser shall consult with each other in issuing any other press releases with respect to the transactions contemplated hereby, and neither the Company nor any Purchaser shall issue any such press release nor otherwise make any such public statement without the prior written consent of the Company, with respect to any press release of any Purchaser, or without the prior consent of each Purchaser, with respect to any press release of the Company, which consent shall not unreasonably be withheld or delayed, except if such disclosure is required by applicable Legal Requirements (including as required in order to comply with filing requirements under any competition, antitrust, or merger control law or to respond to a request for information or documents by a Governmental Entity investigating the transactions described herein), in which case the disclosing party shall promptly provide the other party with prior notice of such public statement or communication. The obligations under this section shall survive the Closing.

5 .3 <u>Equal Treatment of Purchasers</u>.  No consideration shall be offered or paid to any Person to amend or consent to a waiver or modification of any provision of any of this Agreement unless the same consideration is also offered to all of the Parties to this Agreement.  For clarification purposes, this provision constitutes a separate right granted to each Purchaser by the Company and negotiated separately by each Purchaser, and is intended for the Company to treat the Purchasers as a class and shall not in any way be construed as the Purchasers acting in concert or as a group with respect to the purchase, disposition or voting of Securities or otherwise.

27

5.4 <u>Securities Laws</u>. The Securities will be issued at Closing pursuant to the exemption from registration provided by Section 4(a)(2) under the Securities Act, and thereafter may only be sold or otherwise transferred by the Purchasers in compliance with state and federal securities laws. In connection with any transfer of Securities other than pursuant to an effective registration statement, to the Company or to an Affiliate of a Purchaser, the Company may require the transferor thereof to provide to the Company an opinion of counsel selected by the transferor and reasonably acceptable to the Company, the form and substance of which opinion shall be reasonably satisfactory to the Company, to the effect that such transfer does not require registration of such transferred Securities under the Securities Act. Each Purchaser agrees the Securities may be imprinted, or a book entry notation may be made, with a restricted legend to the effect of the foregoing.

**ARTICLE VI.**

**INDEMNIFICATION**

6.1 <u>Survival</u>. The representation and warranties, covenants and agreements contained herein shall survive the Closing and shall remain in full force and effect for a period of twenty four months following the Closing Date.

6.2 <u>Indemnification by Company</u>. Subject to the terms and conditions of this Article VI, the Company shall indemnify and defend each Purchaser and their respective managers, directors, officers, employees, stockholders, members, representatives, agents, and Affiliates (collectively, the "<u>Purchaser Indemnitees</u>") against, and shall hold each of them harmless from and against, and shall pay and reimburse each of them for, any and all losses, claims, demands, suits and actions in law or in equity (including reasonable costs, expenses and reasonable attorneys' fees incurred in connection with the same), in each case incurred or sustained by, or imposed upon, the Purchaser Indemnitees based upon, arising out of, with respect to or by reason of:

(a) any material inaccuracy in or breach of any of the representations or warranties (or, in the case of any representation or warranty that is already qualified by materiality, any inaccuracy in or breach of such representation or warranty) of the Company contained in this Agreement or in any certificate or instrument delivered by or on behalf of the Company pursuant to this Agreement; or

(b) any material breach or non-fulfillment of any covenant, agreement or obligation to be performed by the Company pursuant to this Agreement.

6.3 <u>Payments</u>. The Company shall be required to pay or be liable to the Purchaser Indemnitees for all such losses arising from Section 6.2 from the first dollar. For the purpose of this Article VI, any inaccuracy in or breach of any representation or warranty shall be determined without regard to any materiality or other similar qualification contained in or otherwise applicable to such representation or warranty. Once a loss is agreed to by the Company or finally adjudicated to be payable, the Company shall satisfy its obligations within thirty (30) days of such agreement or final, non-appealable adjudication by wire transfer of immediately available funds. The parties hereto agree that should the Company not make full payment of any such obligations within such thirty (30) day period, any amount payable shall accrue interest from and including the date of agreement of the Company or final, non-appealable adjudication and including the date such payment has been made at a rate per annum equal to five (5) percent. Such interest shall be calculated daily on the basis of a 365-day year and the actual number of days elapsed, without compounding.

28

6.4 <u>Limitation on Certain Damages</u>. Notwithstanding any provision or agreement herein to the contrary, amounts payable to Nomis based upon losses incurred or sustained by, or imposed upon, Nomis arising out of, with respect to or by reason of a material inaccuracy or breach of any of the representations or warranties made by the Company in Section 4.3 hereof shall be limited to actual payments or disbursements made by Nomis in respect of or related to (i) the Claims (including, without limitation, all Outstanding Claims Advances and Future Nomis Claim Advances, as defined in the Benz Entity Operating Agreement) and (ii) the negotiation, preparation and execution of the Transaction Documents and the term sheet and due diligence related thereto; provided, that to the extent such disbursements are made for the reimbursement or payment of professional services to Hahn & Hessen LLP in connection with the negotiation, preparation or execution of the transactions contemplated by the Transaction Documents and the term sheet and due diligence related thereto, such amount of damages shall be further limited to an amount not to exceed $150,000.00).

**ARTICLE VII.**
**MISCELLANEOUS**

7.1 <u>Fees and Expenses</u>. The Company shall pay all Transfer Agent fees, stamp taxes and other taxes and duties levied in connection with (i) the delivery of any Securities to the Purchasers and (ii) the assignment of the Benz Assets to the Benz Entity at the direction, and on behalf, of Nomis.

7.2 <u>Entire Agreement</u>. The Transaction Documents, as well as any Non-Disclosure Agreement, together with the exhibits and schedules thereto, contain the entire understanding of the Parties with respect to the subject matter hereof and thereof and supersede all prior agreements and understandings, oral or written, with respect to such matters, which the Parties acknowledge have been merged into such documents, exhibits and schedules.

7.3 <u>Notices</u>. Any and all notices or other communications or deliveries required or permitted to be provided hereunder shall be in writing and shall be deemed given and effective on the earliest of: (a) the date of transmission, if such notice or communication is delivered via email at the email address set forth on the signature pages attached hereto at or prior to 5:30 p.m. (Eastern time) on a Business Day, (b) the next Business Day after the date of transmission, if such notice or communication is delivered via email at the email address set forth on the signature pages attached hereto on a day that is not a Business Day or later than 5:30 p.m. (Eastern time) on any Business Day, (c) the second (2nd) Business Day following the date of mailing, if sent by U.S. nationally recognized overnight courier service or (d) upon actual receipt by the party to whom such notice is required to be given. The address for such notices and communications shall be as set forth on the signature pages attached hereto.

7.4 <u>Amendments; Waivers</u>. No provision of this Agreement may be waived, modified, supplemented or amended except in a written instrument signed, in the case of an amendment, by the Company and the Purchasers or, in the case of a waiver, by the Party against whom enforcement of any such waived provision is sought. No waiver of any default with respect to any provision, condition or requirement of this Agreement shall be deemed to be a continuing waiver in the future or a waiver of any subsequent default or a waiver of any other provision, condition or requirement hereof, nor shall any delay or omission of any Party to exercise any right hereunder in any manner impair the exercise of any such right.

7.5 <u>Headings</u>. The headings herein are for convenience only, do not constitute a part of this Agreement and shall not be deemed to limit or affect any of the provisions hereof.

29

7.6  <u>Successors and Assigns</u>.  This Agreement shall be binding upon and inure to the benefit of the Parties and their successors and permitted assigns.  The Company may not assign this Agreement or any rights or obligations hereunder without the prior written consent of each Purchaser (other than by merger).  Any Purchaser may assign any or all of its rights under this Agreement to any Person, provided however, that any such assignment or transfer shall not relieve such Purchaser of its respective obligations hereunder.

7 .7  <u>No Third-Party Beneficiaries</u>.  This Agreement is intended for the benefit of the Parties and their respective successors and permitted assigns and is not for the benefit of, nor may any provision hereof be enforced by, any other Person other than the Benz Entity.

7.8  <u>Governing Law</u>.  All questions concerning the construction, validity, enforcement and interpretation of the Transaction Documents shall be governed by and construed and enforced in accordance with the internal laws of the State of Delaware, without regard to the principles of conflicts of law thereof.  Each Party agrees that all legal proceedings concerning the interpretations, enforcement and defense of the transactions contemplated by the Transaction Documents (whether brought against a Party hereto or its respective affiliates, directors, officers, shareholders, partners, members, employees or agents) shall be commenced exclusively in the United States Federal Court for the District of Delaware. Each Party hereby irrevocably submits to the exclusive jurisdiction of the United States Federal Court for the District of Delaware for the adjudication of any dispute hereunder or in connection herewith or with any transaction contemplated hereby or discussed herein (including with respect to the enforcement of any of the Transaction Documents), and hereby irrevocably waives, and agrees not to assert in any Action or Proceeding, any claim that it is not personally subject to the jurisdiction of any such court, that such Action or Proceeding is improper or is an inconvenient venue for such proceeding.  Each Party hereby irrevocably waives personal service of process and consents to process being served in any such Action or proceeding by mailing a copy thereof via registered or certified mail or overnight delivery (with evidence of delivery) to such Party at the address in effect for notices to it under this Agreement and agrees that such service shall constitute good and sufficient service of process and notice thereof.  Nothing contained herein shall be deemed to limit in any way any right to serve process in any other manner permitted by law.  If any Party shall commence an Action or Proceeding to enforce any provisions of the Transaction Documents, then, the prevailing Party in such Action or Proceeding shall be reimbursed by the other Party for its reasonable attorneys' fees and other costs and expenses incurred with the investigation, preparation and prosecution of such Action or Proceeding.

7.9  <u>Execution</u>.  This Agreement may be executed in two or more counterparts, all of which when taken together shall be considered one and the same agreement and shall become effective when counterparts have been signed by each Party and delivered to each other Party, it being understood that the Parties need not sign the same counterpart.  In the event that any signature is delivered by facsimile transmission or by e-mail delivery of a ".pdf" format data file, such signature shall create a valid and binding obligation of the Party executing (or on whose behalf such signature is executed) with the same force and effect as if such facsimile or ".pdf" signature page were an original thereof.

7.10  <u>Severability</u>.  If any term, provision, covenant or restriction of this Agreement is held by a court of competent jurisdiction to be invalid, illegal, void or unenforceable, the remainder of the terms, provisions, covenants and restrictions set forth herein shall remain in full force and effect and shall in no way be affected, impaired or invalidated, and the Parties shall use their commercially reasonable efforts to find and employ an alternative means to achieve the same or substantially the same result as that contemplated by such term, provision, covenant or restriction. It is hereby stipulated and declared to be the intention of the Parties that they would have executed the remaining terms, provisions, covenants and restrictions without including any of such that may be hereafter declared invalid, illegal, void or unenforceable.

30

7.11     Replacement of Securities.  If any certificate or instrument evidencing any Securities is mutilated, lost, stolen or destroyed, the Company shall issue or cause to be issued in exchange and substitution for and upon cancellation thereof (in the case of mutilation), or in lieu of and substitution therefor, a new certificate or instrument, but only upon receipt of evidence reasonably satisfactory to the Company of such loss, theft or destruction.  The applicant for a new certificate or instrument under such circumstances shall also pay any reasonable third-party costs (including customary indemnity) associated with the issuance of such replacement Securities.

7.12     Remedies.  In addition to being entitled to exercise all rights provided herein or granted by law, including recovery of damages, each of the Purchasers and the Company will be entitled to specific performance under the Transaction Documents.  The Parties agree that monetary damages may not be adequate compensation for any loss incurred by reason of any breach of obligations contained in the Transaction Documents and hereby agree to waive and not to assert in any Action for specific performance of any such obligation the defense that a remedy at law would be adequate.

7.13     Independent Nature of Purchasers' Obligations and Rights.  The obligations of each Purchaser under any Transaction Document are several and not joint with the obligations of any other Purchaser, and no Purchaser shall be responsible in any way for the performance or non-performance of the obligations of any other Purchaser under any Transaction Document.  Nothing contained herein or in any other Transaction Document, and no action taken by any Purchaser pursuant hereto or thereto, shall be deemed to constitute the Purchasers as a partnership, an association, a joint venture or any other kind of entity, or create a presumption that the Purchasers are in any way acting in concert or as a group with respect to such obligations or the transactions contemplated by the Transaction Documents.  Each Purchaser shall be entitled to independently protect and enforce its rights including, without limitation, the rights arising out of this Agreement or out of the other Transaction Documents, and it shall not be necessary for any other Purchaser to be joined as an additional party in any proceeding for such purpose.  Each Purchaser has been represented by its own separate legal counsel in its review and negotiation of the Transaction Documents.  It is expressly understood and agreed that each provision contained in this Agreement and in each other Transaction Document is between the Company and a Purchaser, solely, and not between the Company and the Purchasers collectively and not between and among the Purchasers.

7.14     Saturdays, Sundays, Holidays, etc.  If the last or appointed day for the taking of any action or the expiration of any right required or granted herein shall not be a Business Day, then such action may be taken or such right may be exercised on the next succeeding Business Day.

7.15     Construction. The Parties agree that each of them and/or their respective counsel have reviewed and had an opportunity to revise the Transaction Documents and, therefore, the normal rule of construction to the effect that any ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of the Transaction Documents or any amendments thereto. In addition, each and every reference to share prices and shares of New Common Stock in any Transaction Document shall be subject to adjustment for reverse and forward stock splits, stock dividends, stock combinations and other similar transactions of the New Common Stock that occur after the date of this Agreement.

7.16     **WAIVER OF JURY TRIAL .  IN ANY ACTION, SUIT, OR PROCEEDING IN ANY JURISDICTION BROUGHT BY ANY PARTY AGAINST ANY OTHER PARTY, EACH OF THE PARTIES  KNOWINGLY AND    INTENTIONALLY, TO THE GREATEST EXTENT PERMITTED  BY APPLICABLE  LAW, HEREBY ABSOLUTELY, UNCONDITIONALLY, IRREVOCABLY AND  EXPRESSLY  WAIVES   FOREVER TRIAL BY JURY.**

*(Signature Pages Follow)*

31

IN WITNESS WHEREOF, the Parties have caused this Securities Purchase and Loan Satisfaction Agreement to be duly executed by their respective authorized signatories as of the date first indicated above.

**COMPANY:**

**HUMANIGEN, INC.**

By: /s/ Dr. Cameron Durrant
Name: Dr. Cameron Durrant
Title: Chief Executive Officer

Address for Notice:

1000 Marina Blvd #250
Brisbane, CA 940005-1878
Attn: Dr. Cameron Durrant
E-mail: cdurrant@humanigen.com

with a copy (which copy shall not constitute notice to the Company) to:

Polsinelli PC
1401 Eye Street, NW
Suite 800
Washington, DC 20005
Attention: Kevin L. Vold
Telephone: 202-626-8357
Email: kvold@polsinelli.com

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK
SIGNATURE PAGE FOR PURCHASERS FOLLOWS]

PURCHASER SIGNATURE PAGES TO SECURITIES PURCHASE AND LOAN SATISFACTION AGREEMENT

IN WITNESS WHEREOF, the undersigned have caused this Securities Purchase and Loan Satisfaction Agreement to be duly executed by their respective authorized signatories as of the date first indicated above.

Name of Purchaser: NOMIS BAY LTD

*Signature of Authorized Signatory of Purchaser:* /s/ Peter Poole
Name of Authorized Signatory:  Peter Poole
Title of Authorized Signatory: Director
Email Address of Authorized Signatory:

Address for Notice to Purchaser:

Wessex House, 3rd Floor
45 Reid Street
Hamilton  HM12
Bermuda

with a copy (which copy shall not constitute notice to the Purchaser) to:

Hahn & Hessen LLP
488 Madison Avenue
New York, New York 10022
Attention: Gilbert Backenroth, Esq. and Don D. Grubman, Esq.
Don D.  Grubman Esq.
Telephone: 212-478-7200
Email:      gbackenroth@hahnhessen.com
Email:      dgrubman@hahnhessen.com

[SIGNATURE PAGES CONTINUE]

PURCHASER SIGNATURE PAGES TO SECURITIES PURCHASE AND LOAN SATISFACTION AGREEMENT

IN WITNESS WHEREOF, the undersigned have caused this Securities Purchase and Loan Satisfaction Agreement to be duly executed by their respective authorized signatories as of the date first indicated above.

Name of Purchaser: CHEVAL HOLDINGS, LTD

*Signature of Authorized Signatory of Purchaser:* /s/ Dale Chappell
Name of Authorized Signatory: Dale Chappell
Title of Authorized Signatory: Director
Email Address of Authorized Signatory: dchappell@chevalholdingsltd.com
Facsimile Number of Authorized Signatory: (646) 786-4044

Address for Notice to Purchaser:

Cheval Holdings, Ltd
P.O. Box 309G, Ugland House
Georgetown, Grand Cayman
Cayman Islands, KY1-1104
Attn: Dale Chappell

with a copy (which copy shall not constitute notice to the Purchasers) to:

Quarles & Brady LLP
300 North LaSalle Street
Suite 4000
Chicago, IL 60654
Attn: Faye Feinstein, Esq.
Facsimile: (312) 623-1723
E-mail: faye.feinstein@quarles.com

[SIGNATURE PAGES CONTINUE]

PURCHASER SIGNATURE PAGES TO SECURITIES PURCHASE AND LOAN SATISFACTION AGREEMENT

IN WITNESS WHEREOF, the undersigned have caused this Securities Purchase and Loan Satisfaction Agreement to be duly executed by their respective authorized signatories as of the date first indicated above.

Name of Purchaser: BLACK HORSE CAPITAL MASTER FUND LTD.

*Signature of Authorized Signatory of Purchaser:* /s/ Dale Chappell
Name of Authorized Signatory: Dale Chappell
Title of Authorized Signatory: Director
Email Address of Authorized Signatory: dchappell@blackhorsecap.com
Facsimile Number of Authorized Signatory: (646) 786-4044

Address for Notice to Purchaser:

Black Horse Capital Master Fund Ltd.
c/o Opus Equuum, Inc.
P.O. Box 788
Dolores, CO 81323
Attn: Dale Chappell

with a copy (which copy shall not constitute notice to the Purchasers) to:

Quarles & Brady LLP
300 North LaSalle Street
Suite 4000
Chicago, IL 60654
Attn: Faye Feinstein, Esq.
Facsimile: (312) 623-1723
E-mail: faye.feinstein@quarles.com

PURCHASER SIGNATURE PAGES TO SECURITIES PURCHASE AND LOAN SATISFACTION AGREEMENT

IN WITNESS WHEREOF, the undersigned have caused this Securities Purchase and Loan Satisfaction Agreement to be duly executed by their respective authorized signatories as of the date first indicated above.

Name of Purchaser: BLACK HORSE CAPITAL LP

*Signature of Authorized Signatory of Purchaser:* /s/ Dale Chappell
Name of Authorized Signatory: Dale Chappell
Title of Authorized Signatory: Manager of the General Partnership
Email Address of Authorized Signatory: dchappell@blackhorsecap.com
Facsimile Number of Authorized Signatory: (646) 786-4044
Address for Notice to Purchaser:

Black Horse Capital LP
c/o Opus Equum, Inc.
P.O. Box 788
Dolores, CO 81323
Attn: Dale Chappell

with a copy (which copy shall not constitute notice to the Purchasers) to:

Quarles & Brady LLP
300 North LaSalle Street
Suite 4000
Chicago, IL 60654
Attn: Faye Feinstein, Esq.
Facsimile: (312) 623-1723
E-mail: faye.feinstein@quarles.com

Address for Delivery of Securities to Purchaser (if not same as address for notice):